No. 22-12796-A

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

RICHARD VALLE,

*Plaintiff-Appellee,*

v.

3M COMPANY,

*Defendant-Appellant,*

AEARO TECHNOLOGIES LLC, et al.,

*Defendants.*

_____

On Appeal from the United States District Court
for the Northern District of Florida,
MDL No. 19-02885

_____

## TIME-SENSITIVE MOTION FOR STAY PENDING APPEAL

_____

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Defendant-Appellant*
*3M Company*

August 29, 2022

No. 22-12796-A, *Richard Valle v. 3M Company*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Defendant-Appellant 3M Company hereby certifies that the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case on appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

- 3M Company (**MMM**) – Defendant-Appellant

- 3M Occupational Safety LLC – Defendant/Non-appellant wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo Holdings LLC – Defendant/Non-appellant wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo Intermediate LLC – Defendant/Non-appellant wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo Technologies LLC – Defendant/Non-appellant wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo, LLC – Defendant/Non-appellant wholly owned subsidiary of Defendant-Appellant 3M Company

- Aylstock Witkin Kreis & Overholtz – counsel for MDL Plaintiffs

No. 22-12796-A, *Richard Valle v. 3M Company*

- Aylstock, Bryan Frederick – counsel for MDL Plaintiffs

- Barr, Brian H. – counsel for MDL Plaintiffs

- Beall, Charles Franklin, Jr. – counsel for Defendant-Appellant 3M Company

- Benton, Diana Clough – counsel for Defendants/Non-appellants

- Bhimani, Jay L. – counsel for Defendants/Non-appellants

- Bouk, Winston Troy – counsel for MDL Plaintiffs

- Bradley Arant Boult Cummings – counsel for Defendant-Appellant 3M Company

- Branscome, Kimberly O. – counsel for Defendants/Non-appellants

- Brock, Robert C. – counsel for Defendants/Non-appellants

- Brown & James – counsel for MDL Plaintiffs

- Brown, Micah David – counsel for Defendants/Non-appellants

- Buchanan, David R. – counsel for MDL Plaintiffs

- Burns, Michael A. – counsel for MDL Plaintiffs

- Buxner, Evan D. – counsel for MDL Plaintiffs

- Cantero, Raoul G. – counsel for Defendant-Appellant 3M Company

- Carter, Cole T. – counsel for Defendants/Non-appellants

- Cartmell, Thomas P. – counsel for MDL Plaintiffs

- Castiglia, Craig – counsel for Defendants/Non-appellants

No. 22-12796-A, *Richard Valle v. 3M Company*

- Ciresi Conlin LLP – counsel for MDL Plaintiffs

- Clark Love & Hutson – counsel for MDL Plaintiffs

- Clement, Paul D. – counsel for Defendant-Appellant 3M Company

- Clement & Murphy, PLLC – counsel for Defendant-Appellant 3M Company

- Cooper, David M. – counsel for MDL Plaintiffs

- Cornell, Katherine Lindsey – counsel for MDL Plaintiffs

- Czak, Steven C. – counsel for Defendants/Non-appellants

- DeCamp, Kyle Richard – counsel for Defendants/Non-appellants

- Dechert LLP – counsel for Defendants/Non-appellants

- De Paulo, Tabitha J. – counsel for Defendants/Non-appellants

- Elizabeth, Sierra – counsel for Defendants/Non-appellants

- Ellis, Robert P. – counsel for Defendants/Non-appellants

- Esfandiarifard, Saghar – counsel for Defendants/Non-appellants

- Fields, Barry E. – counsel for Defendants/Non-appellants

- Fox, Shawn – counsel for MDL Plaintiffs

- Glass, David M. – counsel for the United States of America

- Gori Julian & Associates – counsel for MDL Plaintiffs

- Gottlieb, Simon – counsel for Defendants/Non-appellants

- Gunderson, Karl B. – counsel for Defendants/Non-appellants

No. 22-12796-A, *Richard Valle v. 3M Company*

- Hill, Thomas Larry – counsel for Defendant-Appellant 3M Company

- Hodge, Leigh Anne – counsel for Defendant-Appellant 3M Company

- Hoekstra, Jennifer M. – counsel for MDL Plaintiffs

- Hutson, Shelley Van Natter – counsel for MDL Plaintiffs

- Jones, Hon. Gary R. – U.S. Magistrate Judge for the Northern District of Florida

- Karis, Hariklia – counsel for Defendants/Non-appellants

- Keller, Ashley – counsel for Plaintiff Richard Valle and MDL Plaintiffs

- Keller Postman LLC – counsel for Plaintiff Richard Valle and MDL Plaintiffs

- Kelly, Maxwell H. – counsel for MDL Plaintiffs

- Kim, Mary H. – counsel for Defendants/Non-appellants

- Kirkland & Ellis LLP – counsel for Defendants/Non-appellants

- Kolsky, Joshua M. – counsel for the United States of America

- Kreis, Douglass A. – counsel for MDL Plaintiffs

- Laminack Pirtle & Martines – counsel for MDL Plaintiffs

- Lauria, Jessica C. – counsel for Defendant-Appellant 3M Company

- Leach, Garret A. – counsel for Defendants/Non-appellants

- Leuthauser, Nolan M. – counsel for Defendants/Non-appellants

- Levin Papantonio Rafferty – counsel for MDL Plaintiffs

No. 22-12796-A, *Richard Valle v. 3M Company*

- Marlowe, Emily B. – counsel for MDL Plaintiffs

- Mitchell, Kasdin – counsel for Defendants/Non-appellants

- Morriss, F. Chadwick – counsel for Defendants/Non-appellants

- Mostyn Law – counsel for MDL Plaintiffs

- Moore Hill & Westmoreland – counsel for Defendant-Appellant 3M Company

- Murphy, Erin E. – counsel for Defendant-Appellant 3M Company

- Neglia, Ashley E. – counsel for Defendants/Non-appellants

- Nomellini, Mark J. – counsel for Defendants/Non-appellants

- Odom, Megan L. – counsel for MDL Plaintiffs

- Onder Law LLC – counsel for MDL Plaintiffs

- Ozurovich, Allison K. – counsel for Defendants/Non-appellants

- Pirtle, Thomas W. – counsel for MDL Plaintiffs

- Pulaski Law Firm – counsel for MDL Plaintiffs

- Quinn Emanuel Urquhart & Sullivan LLP – counsel for MDL Plaintiffs

- Rafferty, Troy Alan – counsel for MDL Plaintiffs

- Rivera, Maria P. – counsel for Defendants/Non-appellants

- Rodgers, Hon. M. Casey – U.S. District Judge for the Northern District of Florida

- Sacchet, Michael A. – counsel for MDL Plaintiffs

No. 22-12796-A, *Richard Valle v. 3M Company*

- Seeger, Christopher A. – counsel for MDL Plaintiffs

- Seeger Weiss LLP – counsel for MDL Plaintiffs

- Seeley, Caleb A. – counsel for MDL Plaintiffs

- Tam, Jonathan S.  – counsel for Defendants/Non-appellants

- Tracey Fox King & Walters – counsel for MDL Plaintiffs

- Tracey, Sean Patrick – counsel for MDL Plaintiffs

- Van Fleteren, Haley J. – counsel for Defendant-Appellant 3M Company

- Wagstaff & Cartmell – counsel for MDL Plaintiffs

- Wasdin, Nicholas F. – counsel for Defendants/Non-appellants

- White & Case LLP –counsel for Defendant-Appellant 3M Company

- Wilson, Quinn Robert – counsel for MDL Plaintiffs

Defendant-Appellant 3M Company states that it is a corporation whose shares are publicly traded (NYSE: **MMM**).   3M Company does not have a parent corporation and no publicly held corporation owns 10% or more of 3M's stock.

Respectfully submitted,

s/Paul D. Clement

PAUL D. CLEMENT

*Counsel for Defendant-Appellant*

*3M Company*

August 29, 2022

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT.............................................................. 1

TABLE OF AUTHORITIES.................................................................... ii

INTRODUCTION ................................................................................. 1

BACKGROUND ................................................................................... 2

    A.    The MDL Proceedings and the Debtors' Chapter 11 Proceedings ........................................................................... 2

    B.    The Valle Motion.................................................................... 4

    C.    The MDL Court's Unprecedented Injunction ....................... 5

ARGUMENT ......................................................................................... 8

I.    The Injunction Is Highly Likely To Be Vacated On Appeal........................... 9

    A.    The Injunction Invades the Bankruptcy Court's Exclusive Jurisdiction ............................................................ 9

    B.    The Injunction Violates 3M's Constitutional Rights........................... 14

    C.    The Injunction Violates the Automatic Stay ....................... 15

    D.    The Injunction Violates Federal Rules of Civil Procedure 52 and 65 .............................................................. 17

II.    The Injunction Will Inflict Irreparable Harm On 3M.................................. 19

III.    A Stay Pending Appeal Will Not Substantially Injure Other Parties ........... 21

IV.    The Public Interest Overwhelmingly Favors A Stay Pending Appeal ....................................................................... 22

CONCLUSION ..................................................................................... 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES[*]

**Cases**

*Am. Red Cross v. Palm Beach Blood Bank, Inc.*,
    143 F.3d 1407 (11th Cir. 1998) .......................................................................18

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
    897 F.3d 314 (D.C. Cir. 2018) .........................................................................20

*Brow v. Farrelly*,
    994 F.2d 1027 (3d Cir. 1993) ...........................................................................18

*Brown v. Ala. DOT*,
    597 F.3d 1160 (11th Cir. 2010) .......................................................................19

*City of S. Miami v. DeSantis*,
    561 F.Supp.3d 1211 (S.D. Fla. 2021) ..............................................................22

*Constitution Bank v. Tubbs*,
    68 F.3d 685 (3d Cir. 1995) ...............................................................................16

*Dunn v. McNabb*,
    138 S.Ct. 369 (2017) ........................................................................................17

*Gilchrist v. Gen. Elec. Capital Corp.*,
    262 F.3d 295 (4th Cir. 2001) ............................................................ 10, 12, 16*

*In re Baldwin-United Corp. Litig.*,
    765 F.2d 343 (2d Cir. 1985) ......................................................................10, 11

*In re James Wilson Assocs.*,
    965 F.2d 160 (7th Cir. 1992) ........................................................................... 12

*In re McLean*,
    794 F.3d 1313 (11th Cir. 2015) .......................................................................12

*League of Women Voters of Fla. v. Fla. Sec'y of State*,
    32 F.4th 1363 (11th Cir. 2022) ..........................................................................8

---

[*] Citations upon which Appellant primarily relies are marked with asterisks.

*LeCroy v. United States*,
975 F.3d 1192 (11th Cir. 2020) ............................................................. 1, 9, 17*

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) .............................................................................14

*Matter of Mahurkar Double Lumen Hemodialysis Catheter Pat. Litig.*,
140 B.R. 969 (N.D. Ill. 1992) ...............................................................10

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
523 F.3d 1091 (9th Cir. 2008) ..............................................................11

*NetChoice, LLC v. Att'y Gen., Fla.*,
34 F.4th 1196 (11th Cir. 2022) .............................................................20

*NLRB v. Bildisco & Bildisco*,
465 U.S. 513 (1984) .............................................................................22

*Roberts v. Comm'r*,
175 F.3d 889 (11th Cir. 1999) ..............................................................16

*Rohe v. Wells Fargo Bank, N.A.*,
988 F.3d 1256 (11th Cir. 2021) ............................................................. 9, 10*

*Ruiz v. Estelle*,
650 F.2d 555 (5th Cir. 1981) ...................................................................8

*Schiavo ex rel. Schindler v. Schiavo*,
403 F.3d 1223 (11th Cir. 2005) ............................................................17

*Schmidt v. Lessard*,
414 U.S. 473 (1974) ............................................................................. 18, 19

*SEC v. Brennan*,
230 F.3d 65 (2d Cir. 2000) ...................................................................16

*Smith v. Bayer Corp.*,
564 U.S. 299 (2011) .............................................................................11

*Wisc. Right to Life, Inc. v. Fed. Election Comm'n*,
542 U.S. 1305 (2004) .............................................................................9

**Statutes**

11 U.S.C. §362 ................................................................... 3, 15

11 U.S.C. §1109(b) .................................................................12

11 U.S.C. §1112(b) .................................................................10

28 U.S.C. §1651(a) ........................................................... 4, 9, 17

**Other Authorities**

*Collier on Bankruptcy* (16th ed. 2022) ....................................12

## INTRODUCTION

This Court has "carefully confined" use of the All Writs Act to "extraordinary circumstances." *LeCroy v. United States*, 975 F.3d 1192, 1197 (11th Cir. 2020). The All Writs Act injunction issued here is indeed extraordinary, but for all the wrong reasons. It involves an unprecedented interference with ongoing bankruptcy proceedings and 3M's statutory and First Amendment rights to petition the bankruptcy court for relief, all in an impermissible effort to shield the MDL court from any criticism it alone deems an "attempt[] to relitigate" the "same issues or related issues" it previously addressed, under threat of contempt. That crossing of jurisdictional lines and invasion of the bankruptcy court's exclusive jurisdiction is not just unprecedented and impermissible, but also unjustified and unnecessary. The injunction is not based on anything *3M* has said or done—only on statements by debtors in the bankruptcy, whom the MDL court improperly conflated with 3M. And the bankruptcy court is fully empowered to consider the propriety of filings directed to it, apply *res judicata* principles, and police everything from contemptuous conduct to misuse of the Code. Indeed, the MDL court belatedly recognized that half of its injunction was so infirm and so likely to inflict irreparable harm and interfere with the bankruptcy that it stayed that portion pending appeal. But that partial relief only highlights the injunction's fundamental flaws and 3M's imminent harm, as 3M remains subject to contempt for any statements to the bankruptcy court that, in the

MDL court's sole view, constitute an improper "attempt[] to relitigate … related issues," even if the bankruptcy court views those same statements as mere differences of opinion, fair criticism, or affirmatively helpful. This Court should finish the job and stay the entire injunction pending an expedited appeal.

## BACKGROUND

### A.    The MDL Proceedings and the Debtors' Chapter 11 Proceedings

3M Company and Aearo Technologies LLC, which 3M purchased in 2008, are co-defendants in a consolidated multi-district litigation proceeding in the Northern District of Florida. Since its April 2019 inception, the MDL has ballooned to more than 230,000 cases alleging that the co-defendants manufactured and distributed faulty hearing protection devices (the "CAEv2" devices). By July 2022, bellwether trials had produced mixed results, ranging from complete defense verdicts to a verdict against co-defendants awarding $77 million to a single plaintiff. Furthermore, thousands of cases were set to be soon remanded for trials in federal courts around the country, with thousands more to follow. *See* Ex.B.17-19.

Given the significant burden, uncertainty, and anticipated duration of the hundreds of thousands of remaining cases, Aearo—which designed the devices, made the key early decisions challenged by plaintiffs, and sold about 80% of the devices before 3M purchased it—concluded that continued litigation could not bring an efficient, equitable, or expeditious resolution to what had become, by far, the

2

largest MDL in history.  Consequently, on July 26, 2022, Aearo and certain of its affiliates (together, "Debtors"), but not 3M, filed for Chapter 11 protection.  *See* Bankr.Dkt.1; Ex.B.9-11.[1]  Shortly beforehand, to obtain the financing necessary to fund a successful Chapter 11 process, including professional fees and a claims trust, Debtors entered into an agreement with non-debtor 3M (the "Funding Agreement").  Under the Funding Agreement, 3M agreed, upon Debtors' exhaustion of cash, to fund Debtors' operating and legal administrative costs during the Chapter 11 process and, upon confirmation of a reorganization plan, to contribute to a trust to ensure payments to claimants.  In exchange, Debtors agreed to indemnify 3M for liabilities related to the devices.  *See* Ex.B.20-23.

Debtors immediately filed a complaint and motion in bankruptcy court seeking confirmation that the Bankruptcy Code's automatic stay prohibits the commencement or continuation of claims against 3M, in addition to Debtors, in the MDL, *see* 11 U.S.C. §362, or alternatively for a preliminary injunction under 11 U.S.C. §105(a) enjoining the prosecution of claims against 3M in the MDL.  *See* Adv.Pro.Dkt.1-2.[2]  The bankruptcy court held an initial hearing on that motion on

---

[1] "Bankr.Dkt." refers to the docket in *In re Aearo Technologies LLC, et al.*, No. 22-02890-11 (Bankr. S.D. Ind.).

[2] "Adv.Pro.Dkt." refers to the adversary proceeding docket, No. 22-50059 (Bankr. S.D. Ind.).

July 27 and, at Debtors' request, a three-day evidentiary hearing beginning on August 15. Adv.Pro.Dkt.32.

**B.    The Valle Motion**

On July 27—just one day after Debtors sought Chapter 11 protection and asked the bankruptcy court to confirm that the automatic stay applied to claims against 3M in the MDL (or order comparable injunctive relief)—one of the MDL plaintiffs, Richard Valle, asked the MDL court, pursuant to the All Writs Act, 28 U.S.C. §1651(a), for a temporary restraining order "enjoin[ing] 3M from taking any action outside of this MDL to enjoin other parties from pursuing their CAEV2 claims against 3M." Ex.C.1. On July 28, the MDL court denied Valle's motion, explaining that "there is presently no automatic stay in place as to 3M Company and the bankruptcy court's decision on whether the automatic stay will apply to 3M Company will not be made until August 18 or later." Ex.D.2.

Undeterred, on August 3, Valle filed an "Emergency Motion for Preliminary Injunction Against Defendant 3M Company," a self-described "more complete" version of his first "hurried" motion. Ex.E.4. Again invoking the All Writs Act, Valle asked the MDL court "for a preliminary injunction preventing 3M from (i) relitigating matters in Bankruptcy Court that this Court has already adjudicated and (ii) supporting an injunction against any Plaintiffs from litigating CAEv2 matters against 3M." Ex.E.6. Valle repeatedly accused "3M" of "attempting to halt this

4

MDL in its tracks," and "want[ing] to wipe out the scientific and evidentiary rulings that the Court and the parties have tirelessly litigated." Ex.E.2, 15, 17-20. To support those assertions, however, Valle only cited pleadings that Debtors (not 3M) had filed in the bankruptcy court—principally, an informational brief that Debtors (not 3M) submitted on the first day of those proceedings. *See* Ex.E.7, 9, 10, 12, 21 n.8; Bankr.Dkt.12. The MDL court ordered 3M to respond within six days and held a hearing on August 11. Ex.F.

At the hearing, Valle's counsel repeatedly argued that 3M planned "to collaterally attack Your Honor's orders," Ex.G.6:5-16, but again relied on statements made by Debtors in the bankruptcy court, *see* Ex.G.8:1-3 (quoting "the bankruptcy court first day hearing" and "the informational brief"). For its part, the MDL court indicated that it "still ha[d]n't figured out" factual questions like "if you all have a separate indemnity agreement or if just a clause in the funding agreement." Ex.G.22:17-19. Despite these open questions, the MDL court did not hold an evidentiary hearing or even ask for the submission of any evidence.

### C.    The MDL Court's Unprecedented Injunction

Five days later, on August 16—while the evidentiary hearing in the bankruptcy court was ongoing—the MDL court granted Valle's motion in part. Ex.A. It denied Valle's principal request "that 3M be enjoined from supporting a bankruptcy injunction that would preclude individual plaintiffs from continuing to

5

litigate CAEv2 matters against 3M." Ex.A.3. While the court viewed itself as capable of determining "whether Aearo's automatic stay applies to the claims against 3M in this MDL," it recognized that the bankruptcy court "has even broader equitable powers to further extend the stay" and was "presiding over an evidentiary hearing on that matter at this very moment." Ex.A.5-6. The court thus "yield[ed]" to the bankruptcy court's "specialized expertise" and "full evidentiary record," concluding that the bankruptcy court "is well-qualified and aptly suited to determine whether 3M is lawfully using the Bankruptcy Code for a proper restructuring purpose or, instead, using its subsidiaries' bankruptcy petition as bad faith subterfuge to defeat this Court's jurisdiction and relitigate this Court's rulings." Ex.A.6.

Nevertheless, the court granted Valle's alternative request for "an All Writs Act injunction prohibiting 3M from attacking this Court's prior orders." Ex.A.7. Citing only *Debtors'* informational brief in the bankruptcy case, and nothing said or filed by 3M itself, the court stated that "Aearo and 3M ... prefer to resolve CAEv2 claims on the basis of the 'fair and complete evidentiary record' they plan to create in bankruptcy court." *Id*. (quotation marks omitted). "From this," the court asserted, "the threat to this Court's previously exercised jurisdiction is undeniable." *Id.* The court thus enjoined "3M from attempting to relitigate the same issues or related issues precluded by the principles of res judicata and collateral estoppel in bankruptcy court." *Id.* (quotation marks omitted). The court then imposed

6

additional injunctive relief that Valle's moving papers never requested: "3M also is enjoined from supporting, directly or indirectly, financially or otherwise, any collateral attack on this Court's orders by any other parties in any other forum, including Aearo." Ex.A.8. The court warned: "If 3M defies this injunction by attempting to relitigate (or supporting relitigation of) these matters in the bankruptcy court, this Court retains jurisdiction to convene contempt proceedings to enforce compliance." *Id.*

3M appealed and filed an emergency motion seeking a stay of the MDL court's injunction. On August 25, the MDL court granted that motion in part. Ex.H. It stayed the portion of the injunction enjoining 3M from "supporting, directly or indirectly, financially or otherwise, any collateral attack on this Court's orders by any other parties in any other forum, including Aearo," in recognition that the prohibition "may … interfere with Aearo's ability to act in the bankruptcy court in light of the funding agreement between 3M and Aearo." Ex.H.2-3. But it denied a stay of the portion of the injunction enjoining 3M from "attempting to relitigate the same issues or related issues precluded by the principles of res judicata and collateral estoppel in bankruptcy court." Ex.H.3-5. And it maintained its threat to "convene contempt proceedings" if 3M "defies this injunction by attempting to relitigate" issues or orders in the bankruptcy court. Ex.H.8. This Court has jurisdiction under 28 U.S.C. §§1292(a)(1).

## ARGUMENT

The MDL court's unprecedented effort to interfere with ongoing bankruptcy proceedings and to suppress criticism of its orders cries out for a stay pending appeal. The "traditional" standard governing a stay pending appeal balances four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *League of Women Voters of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022). When a case involves "a serious legal question" and "the balance of equities weighs heavily in favor of granting the stay," the movant need only present a "substantial case on the merits." *Id.*; *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981). 3M's appellate case is more than "substantial"; the MDL court's attempt to constrain 3M's efforts before the bankruptcy court via its order and the threat of contempt is as erroneous as it is unprecedented. Although the MDL court stayed half of the injunction—a tacit recognition of its deficiencies—the entire underlying order remains at issue in this appeal, and the half that remains in force is just as problematic and just as immediately harmful to 3M. Indeed, by disclaiming any intent to limit Debtors' actions in bankruptcy court, the MDL court's exclusive reliance on statements by Debtors, and not 3M, to enjoin 3M becomes inexplicable. The entire injunction is

8

infirm and should be stayed pending an expedited appeal which will result in the injunction being overturned *in toto*.

## I.    The Injunction Is Highly Likely To Be Vacated On Appeal.

While the All Writs Act authorizes courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law," 28 U.S.C. §1651(a), this Court has "carefully confined the Act's office to 'extraordinary circumstances,'" *LeCroy*, 975 F.3d at 1197; *see also Wisc. Right to Life, Inc. v. Fed. Election Comm'n,* 542 U.S. 1305, 1306 (2004) (Rehnquist, C.J., in chambers) (All Writs Act "is to be used sparingly and only in the most critical and exigent circumstances").   The MDL court's novel effort to interfere with proceedings before a specialized federal court and shield its orders from a perceived collateral attack fails that demanding standard and is highly likely to be vacated on appeal.

### A.    The Injunction Invades the Bankruptcy Court's Exclusive Jurisdiction.

A federal court's ability to grant relief under the All Writs Act is "limited by the Act's supplemental character."  *Rohe v. Wells Fargo Bank, N.A.*, 988 F.3d 1256, 1264 (11th Cir. 2021).  Because relief under the Act is "essentially equitable," it is "not generally available to provide alternatives to other, adequate remedies at law." *Id*.  The Act is merely a "residual source of authority to issue writs that are not

otherwise covered by statute. Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." *Id.* For this basic reason, district court efforts to enjoin ongoing proceedings before the specialized bankruptcy courts are virtually unheard of. In the rare times when courts have invoked the All Writs Act's general and residual provisions to constrain actions before the specialized bankruptcy courts, they have not survived appeal. *See, e.g., Gilchrist v. Gen. Elec. Capital Corp.*, 262 F.3d 295, 305 (4th Cir. 2001) (rejecting effort to enjoin bankruptcy filing as prohibited by automatic stay); *In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985) (rejecting effort to prohibit asking bankruptcy court whether automatic stay applies).[3]

Under 28 U.S.C. §157(a) and §1334(e), a bankruptcy court in which a Chapter 11 case is pending has "exclusive jurisdiction" over "all the property, wherever located, of the debtor," and is statutorily authorized to police bad-faith filings or other efforts to misuse the Bankruptcy Code, *see* 11 U.S.C. §1112(b). If the scope or effect of the MDL court's prior rulings become relevant to the bankruptcy proceedings, the bankruptcy court is fully capable of applying rules of claim and

---

[3] Below, Valle identified only one (unappealed) All Writs Act injunction directed toward Chapter 11 proceedings. *See Matter of Mahurkar Double Lumen Hemodialysis Catheter Pat. Litig.*, 140 B.R. 969 (N.D. Ill. 1992). But there, the bankruptcy court first tried to enjoin a plaintiff from arguing in district court about the reach of the automatic stay, and the district court used the Act to block that order to preserve its ability to decide the scope of its own jurisdiction.

issue preclusion to determine their legal effect.  Not only is deciding the preclusive effect of prior litigation "usually the bailiwick of the *second* court," *Smith v. Bayer Corp.*, 564 U.S. 299, 307 (2011), but that principle is especially apposite in Chapter 11 proceedings, given the bankruptcy courts' exclusive jurisdiction to preserve the property of a debtor's estate and facilitate reorganizations. *See In re Baldwin-United Corp.*, 765 F.2d at 348 ("[T]o whatever extent a conflict may arise between the authority of the Bankruptcy Court to administer this complex reorganization and the authority of the District Court to administer consolidated pretrial proceedings, the equities favor maintenance of the unfettered authority of the Bankruptcy Court."). Moreover, to the extent there is a concern that the bankruptcy process is being manipulated to improperly attack collateral proceedings or otherwise, the bankruptcy courts—with their intimate familiarity with the Code and extensive experience with the full range of bankruptcies—are fully equipped to resolve such complaints.  For good reason, then, while an All Writs Act injunction directed at another federal court is itself a "rara[] aves," *Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1099 (9th Cir. 2008), valid All Writs Act relief directed toward Chapter 11 proceedings is essentially unprecedented.

By issuing its injunction, the MDL court injected itself into the bankruptcy proceedings and arrogated to itself the power to determine whether *any* statement made by 3M in the bankruptcy court constitutes an improper "attempt[] to relitigate"

the MDL court's prior rulings.  But that power lies exclusively with the bankruptcy court in connection with its exclusive jurisdiction over the Debtors' estate and their efforts to reorganize.  The bankruptcy court is armed with its own contempt power, *see In re McLean*, 794 F.3d 1313, 1319 (11th Cir. 2015), and is perfectly capable of differentiating an improper collateral attack from a valid effort to dispute or properly value a claim.  3M should not have to participate in the bankruptcy court under the looming threat of contempt from the MDL court if it takes issue with any characterization of one of its rulings in the bankruptcy court.  Allowing the injunction to stand would "set[] courts in different districts against one another" and "completely frustrate the scheme of courts created by Congress."  *Gilchrist*, 262 F.3d at 305.

The injunction cannot be justified on the ground it extends only to 3M, a non-debtor.  3M has its own statutory right to participate in the bankruptcy proceedings.  The Bankruptcy Code unqualifiedly promises that *any* party "may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C. §1109(b); *accord In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992); 7 *Collier on Bankruptcy* §1109.04 (16th ed. 2022).  By enjoining 3M, under threat of contempt, from taking any action that the MDL court may perceive as "attempting to relitigate" decided issues, Ex.A.7-8, the injunction improperly muzzles 3M from asserting a position in the bankruptcy court on any issue on which it may disagree with the MDL

12

court's rulings, thus effectively prohibiting 3M from participating in large swaths of the restructuring proceedings.

The MDL court correctly recognized that it could not grant Valle the principal relief he requested—enjoining 3M from supporting an injunction against litigation of CAEv2 matters against 3M—because that would improperly interfere with the bankruptcy court's jurisdiction. And in staying half of its injunction, the MDL court essentially conceded that it could not bar 3M from "supporting" Debtors' arguments in the bankruptcy court. But the unstayed component of the MDL court's order is in many respects the worst of all. It poses the same intrusion into the bankruptcy court's specialized expertise, while promising greater entanglement as the MDL court asserts the ongoing power, backed by contempt, to scrutinize 3M's statements in the bankruptcy court to decide whether they comport with the MDL court's own conception of permissible arguments, regardless of whether the bankruptcy court deems those same statements appropriate and helpful. Worse still, 3M cannot be assured that statements made by Debtors in the bankruptcy court will not be held against 3M. After all, the only predicate for the injunction is statements made by Debtors, and not 3M, in bankruptcy court. *See* p.6, *supra*. That entire dynamic is completely untenable and far more problematic than a typical All Writs Act injunction that categorically forbids litigation in another forum. The order

13

simultaneously interferes with the bankruptcy court's jurisdiction and attempts to improperly insulate the MDL court from what it views as unfair criticism.

**B.    The Injunction Violates 3M's Constitutional Rights.**

By broadly prohibiting 3M from taking any action in the bankruptcy court that could be construed as "attempting to relitigate" any of the thousands of issues (or "related issues") decided in the MDL or even supporting such efforts, the injunction not only intrudes on the bankruptcy court's exclusive jurisdiction but plainly violates 3M's First Amendment rights.  The looming presence of the MDL court threatening contempt if 3M dares to contest or criticize any of the court's decisions over the past three-and-a-half years of litigation is simply antithetical to First Amendment principles.

An injunction against a collateral attack on a district court's ruling in a different federal forum is doubly suspect because it implicates not only the right to free speech but also the right to petition.  And injunctions involving speech are subject to "rigorous" constitutional scrutiny, as they operate much like a prior restraint.  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).  They must satisfy both First Amendment principles and "the general rule, quite apart from First Amendment considerations," that an injunction should be "no broader than necessary to achieve its desired goals."  *Id.*

14

The injunction here cannot survive that "rigorous" scrutiny. It is as content-based, and indeed viewpoint-based, as it gets. If 3M wants to meekly accept the MDL court's rulings, it has nothing to fear. But if 3M wants to contend, for example, that those rulings are flawed or that they overstate the co-defendants' liability, it faces the specter of being hauled into the MDL court for contempt proceedings. Simply put, it is hard to imagine an injunction more antithetical to free speech and the right to petition than one in which the issuing judge prospectively prohibits a citizen from speaking negatively about that judge's orders in a different forum. The bankruptcy court has its own power to police the pleadings before it, to scrutinize the financial arrangements between debtors and non-debtors, to enforce principles of collateral estoppel, and to punish contemptuous conduct. By placing not just a thumb, but the heavy hand of contempt, on the scales to deter 3M's criticism of the MDL court's orders, the injunction is incompatible with the First Amendment.

### C.    The Injunction Violates the Automatic Stay.

The injunction also violates the automatic stay already in place vis-à-vis the Debtors. The filing of a Chapter 11 petition automatically stays, *inter alia*, any subsequent judicial "action or proceeding against the debtor," and "any act to obtain possession of property of the estate … or to exercise control over property of the estate." 11 U.S.C. §§362(a)(1), (3). The automatic stay "is intended to allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate

15

so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *SEC v. Brennan*, 230 F.3d 65, 75 (2d Cir. 2000) (quotation marks omitted).  It thus applies, *a fortiori*, to the injunction's direct interference with the ongoing bankruptcy proceedings.  While the MDL court thought it could avoid the automatic stay by directing its order to 3M, a non-debtor, that effort is belied by the MDL court's and Valle's repeated use of Debtors' statements in the bankruptcy court against 3M in the MDL court, *see* pp.4-6, *supra*, and the impact upon the Chapter 11 proceedings that would result if 3M is chilled from fully participating under threat of contempt.

Because the injunction violates the automatic stay, it is "void and without effect." *Roberts v. Comm'r*, 175 F.3d 889, 892 n.3 (11th Cir. 1999).  Court decisions that violate an automatic stay are void *ab initio*.  *Id.*; *see Constitution Bank v. Tubbs*, 68 F.3d 685, 692-93 (3d Cir. 1995).  Although bankruptcy courts often decide whether an automatic stay is violated, a court of appeals also has the authority (and obligation) to set aside a lower court's decision that violates an automatic stay.  *See, e.g., Gilchrist*, 262 F.3d at 304; *Brennan*, 230 F.3d at 75-76 (vacating order entered "in violation of the automatic stay").  Here, too, the MDL court's injunction interfering with the Chapter 11 reorganization efforts violates the automatic stay, is void *ab initio*, and must be set aside.

### D.    The Injunction Violates Federal Rules of Civil Procedure 52 and 65.

The injunction is also procedurally invalid in ways that magnify its deeper substantive defects.    The Federal Rules impose two distinct requirements on injunctive relief.    First, Rule 52(a)(2) requires a court to "state the findings and conclusions that support its action."    Second, Rule 65(d)(1) requires "[e]very order granting an injunction" to, *inter alia*, "describe in reasonable detail … the act or acts restrained or required."    These requirements apply fully to All Writs Act injunctions. "[T]he All Writs Act cannot be used to evade the requirements for preliminary injunctions," *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1229 (11th Cir. 2005), and it "'does not excuse a court from making' injunction- or stay-related … findings." *LeCroy*, 975 F.3d at 1197 (quoting *Dunn v. McNabb*, 138 S.Ct. 369, 369 (2017)).

The injunction fails to comply with either rule.    As for Rule 52, the order does not contain *any* factual findings or conclusions of law supporting the relief granted— which is no surprise given that the MDL court did not hold an evidentiary hearing or even request the submission of any evidence before issuing its injunction.    The court certainly did not find that 3M itself has tried to "relitigate" (or even "attempt[] to relitigate") previously-decided issues.    And it made no findings about how any such efforts would threaten its jurisdiction over the MDL or establish that an All Writs Act injunction is "necessary or appropriate," 28 U.S.C. §1651(a); *see Brow v.*

*Farrelly*, 994 F.2d 1027, 1038-39 (3d Cir. 1993) (vacating All Writs Act injunction where there was "no evidence supporting any determination that [enjoined party] continually has attempted to relitigate adjudicated claims"). This lack of specific findings allowed the MDL court to gloss over distinctions between 3M and Debtors, for example, by pointing to a brief filed by *Debtors* (not 3M) in the bankruptcy court as evidence of the "undeniable" threat to "this Court's previously exercised jurisdiction." Ex.A.7. The MDL court's grant of a partial stay puts this fatal error into sharper relief. The MDL stayed the portion of its injunction prohibiting 3M from "supporting" efforts to "collaterally attack" the MDL court's orders out of an apparent belated recognition that this aspect of the injunction could improperly interfere with Debtors' filings in bankruptcy court. But the only findings that even arguably support the injunction in its entirety are statements made by Debtors, and not 3M. The remaining operative provision of the injunction is wholly unsupported and entirely inconsistent with Rule 52.

The injunction likewise violates Rule 65, as its vagueness makes it impossible for either 3M or this Court to ascertain "precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974); *see also Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1411 (11th Cir. 1998). For example, the injunction broadly prohibits 3M from "attempting to relitigate the same or related issues" previously decided by the MDL court. Ex.A.7. But the MDL court did not elaborate

18

on what it would consider "attempting to relitigate" or what constitutes the "same or related issues."  The portion of the injunction already stayed by the MDL is vaguer still; indeed, even the MDL court appears to have failed to appreciate the degree to which it could interfere with Debtors and the bankruptcy proceedings.  Ex.H.2-3. The lack of specificity and failure to define key terms in both the stayed and unstayed provisions of the injunction create the very "uncertainty and confusion" that Rule 65 was designed to prevent, *Schmidt*, 414 U.S. at 476; *accord Brown v. Ala. DOT*, 597 F.3d 1160, 1185 (11th Cir. 2010).  Moreover, given that everything the injunction addresses is presumptively protected First Amendment activity, this vagueness not only is a Rule 65 violation but magnifies the order's constitutional problems.

## II.    The Injunction Will Inflict Irreparable Harm On 3M.

Absent a stay, the injunction will inflict irreparable harm on 3M.  As noted above, the injunction deprives 3M of its statutory and constitutional rights to full and unfettered participation in Debtors' ongoing—and fast-moving—bankruptcy proceedings.  3M must instead constantly operate under the threat of contempt from a different court—one that has made no secret of its sensitivity to criticism of its own proceedings.  The elimination of the ability to fully and freely participate in a bankruptcy case that could unalterably affect a party's rights unquestionably constitutes irreparable harm.  Moreover, the deprivation of constitutional rights, especially First Amendment rights, "constitutes an irreparable injury."  *NetChoice,*

*LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1231 (11th Cir. 2022); *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) ("[T]he loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

The irreparable harm to 3M is underscored by the injunction's expansive (if vague) view of what constitutes an impermissible "attempt[] to relitigate" the "same issues or related issues."  To be clear, 3M has no intent to violate any principle of *res judicata* or collateral estoppel or launch any impermissible collateral attack on the MDL court's rulings.  But those principles are neither free from doubt nor self-executing.  Given the imprecision and breadth of the injunction, there is a significant likelihood that 3M will make some argument or take some other action in the bankruptcy court that both 3M and the bankruptcy court view as permissible, but the MDL court views as falling within the injunction's scope.  That is particularly true given that the MDL court has already made clear that it views the entire bankruptcy as an attempt to "upend th[e] statutorily authorized MDL," Ex.A.1.  Nor can 3M be assured, even after the partial stay pending appeal, that it will only be held to account for its own statements before the bankruptcy court.  After all, the sole factual predicate for the injunction *against 3M* consists of statements made *by Debtors*.  Thus, not only every argument *3M* might make in bankruptcy court, but every document *Debtors* file in bankruptcy court—including the proposed findings of fact

20

and conclusions of law submitted after the evidentiary hearing—risks a contempt finding against 3M.  Indeed, Valle's counsel pointedly refused to agree to a standstill agreement that would make clear that those filings could not be used to seek contempt sanctions against 3M.  Ex.I.  Accordingly, the injunction inflicts ongoing and irreparable injury on 3M and directly interferes with the ongoing bankruptcy proceedings.

## III.    A Stay Pending Appeal Will Not Substantially Injure Other Parties.

A stay of the injunction will not injure—much less substantially injure—Valle or any other plaintiff.  The only potential injury Valle has ever articulated is a risk that, absent the injunction, issues from the MDL could be improperly relitigated in the bankruptcy.  But neither Valle nor the MDL court ever actually identified any instance where 3M itself has sought to improperly "relitigate" a MDL ruling.  And if 3M sought to launch an improper collateral attack on the MDL court's prior rulings—as opposed to merely criticizing them or arguing that they provide an inaccurate basis for valuing claims—the bankruptcy court is well-positioned to police matters.  Moreover, 3M stands ready to expedite the underlying appeal to any degree the Court deems appropriate, which further mitigates any harm to plaintiffs.  In short, a stay will impose no burden on the plaintiffs, but will allow 3M to fully

exercise its rights as an interested party and avoid the irreparable harm that the MDL court's injunction is inflicting.

## IV.    The Public Interest Overwhelmingly Favors A Stay Pending Appeal.

Finally, the public interest favors a stay of the injunction pending appeal. The injunction interferes with 3M's constitutional rights, and "the public interest is always served when constitutional rights are vindicated." *City of S. Miami v. DeSantis*, 561 F.Supp.3d 1211, 1285 (S.D. Fla. 2021) (collecting cases). Public policy also favors the reorganization of companies through Chapter 11, *see NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984), and the injunction is an unwarranted interference with the ongoing bankruptcy proceedings and Debtors' attempted restructuring.

## CONCLUSION

For the foregoing reasons, this Court should stay the entire injunction pending appeal.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Defendant-Appellant*
*3M Company*

August 29, 2022

## CERTIFICATE OF COMPLIANCE

1.   This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5,200 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2.   This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

August 29, 2022

<u>s/Paul D. Clement</u>
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I further certify that one copy was sent via first-class mail and email service to the following:

ASHLEY CONRAD KELLER
NICOLE BERG
ASHLEY BARRIERE
FRANK DYLEWSKI
KELLER POSTMAN, LLC
150 N Riverside Plz
Suite 4100
Chicago, IL 60606
ack@kellerpostman.com
ncb@kellerpostman.com
ashley.barriere@kellerpostman.com
frank.dylewski@kellerpostman.com

*Counsel for Plaintiff-Appellee*

s/Paul D. Clement
Paul D. Clement

Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to All Cases | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

**<u>ORDER</u>**

This matter is before the Court on an Emergency Motion for Preliminary Injunction Against 3M Company filed by Plaintiff Richard Valle, *see* ECF No. 3358, which 3M opposes, *see* ECF No. 3370. The motion follows on the heels of a petition for Chapter 11 bankruptcy filed in the Southern District of Indiana by five of the six defendants in this MDL—Aearo Technologies LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and 3M Occupational Safety LLC (collectively, "Aearo"). In the bankruptcy court, Aearo has, among other things, requested that the automatic stay of actions or proceedings against it be extended to 3M Company, Aearo's non-debtor parent, and has made clear that its motive for doing so is to upend this statutorily authorized MDL. *See In re Aearo Techs. LLC*, Case No. 1:22bk2890, Informational Brief, ECF No. 12 at 56-61. Valle now asks this Court to enjoin 3M Company from (1) supporting an extension of the automatic stay that would preclude individual plaintiffs from litigating CAEv2 matters against 3M in

the MDL or following remand for trial; and (2) relitigating matters in bankruptcy court that this Court has already adjudicated.  Oral argument was heard on August 11, 2022.  After careful consideration, Valle's motion is granted in part and denied in part.

Valle's motion is grounded in the All Writs Act, which empowers federal courts to "issue all writs necessary or appropriate" to safeguard the integrity of "ongoing proceedings" and "potential future proceedings" before them, and to "protect or effectuate" their prior orders and judgments.  *See Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099-1100 (11th Cir. 2004); *Wesch v. Folsom*, 6 F.3d 1465, 1470 (11th Cir. 1993); *see also* 28 U.S.C. § 1651.  A court's authority to enjoin certain activities in other forums is broad and "extends, under appropriate circumstances, to [any] persons who . . . are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice."  *United States v. New York Tel*. Co., 434 U.S. 159, 174 (1977). Nevertheless, an All Writs Act injunction is an extraordinary remedy which, although derived from statute, is "essentially equitable" and, as such, generally is not available where there are adequate remedies at law.  *See Klay*, 376 F.3d at 1100.

All Writs Act injunctions must be "predicated on the existence of some underlying proceeding over which the issuing court [already] has jurisdiction[.]"  *See*

Case 3:19-md-02885-MCR-GRJ   Document 3389   Filed 08/16/22   Page 3 of 8
USCA11 Case: 22-12796   Document: 3   Date Filed: 08/29/2022   Page: 40 of 149

Page 3 of 8

*Rohe v. Wells Fargo Bank, N.A.*, 988 F.3d 1256, 1264 (11th Cir. 2021).[1] Accordingly, to obtain an injunction under the Act, the requesting party must "point to some ongoing proceedings, or some past order or judgment, the integrity of which is being threatened by someone else's action or behavior." *See id.*  For threats to ongoing proceedings, "a court may enjoin almost any conduct which, left unchecked, would have the practical effect of diminishing the court's power to bring the litigation to a natural conclusion." *See Klay*, 376 F.3d at 1102.  For threats to prior orders, a court "has the power to enjoin a party before it from attempting to relitigate the same issues or related issues precluded by the principles of res judicata and collateral estoppel in another federal court." *See New York Life Ins. Co. v. Deshotel*, 142 F.3d 873, 879 (5th Cir. 1998) (citing *Kinnear-Weed Corp. v. Humble Oil & Refining Co.*, 441 F.2d 631, 637 (5th Cir. 1971)).

The Court begins with Valle's request that 3M be enjoined from supporting a bankruptcy injunction that would preclude individual plaintiffs from continuing to litigate CAEv2 matters against 3M in the MDL and other forums.  There can be no doubt that if Aearo's automatic bankruptcy stay is extended to 3M, this Court will be prevented from guiding this litigation to "its natural conclusion." *See Klay*, 376

---

[1] *See also Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099 (11th Cir. 2004) ("The Act does not create any substantive federal jurisdiction" and is instead a "codification of the federal courts' traditional, inherent power to protect the jurisdiction they already have, derived from some other source.").

F.3d at 1102.  Except for matters related to the recent bankruptcy filing, the MDL is now at a complete standstill.  Nearly 1,200 cases at various stages of Wave discovery are sitting idle.  Countless scheduled and pending depositions and defense medical exams have been, or will be, indefinitely cancelled.  Roughly 1,500 ripe *Daubert* and summary judgment motions are languishing.  Multiple appeals pending in the Eleventh Circuit Court of Appeals are halted.  Concurrent litigation in Minnesota state court likewise is halted.  And this is only the beginning.  *See*, the "ultimate objective" of this entire scheme is a permanent channeling injunction (and a third-party release of 3M) in the bankruptcy court requiring that all CAEv2 hearing-related claims be resolved through a bankruptcy claims trust rather than adjudicated in an Article III court.  *See In re Aearo*, 1:22bk2890, Informational Brief, ECF No. 12 at 61.  If successful, hundreds of thousands of individual plaintiffs will be deprived of their constitutional right to a jury trial while 3M—a fully solvent and highly profitable Fortune 500 Company that will never actually file a bankruptcy petition itself—will reap all of the benefits of the bankruptcy system without the attendant burdens.[2]  The unabashed justification for dismantling this MDL is 3M/Aearo's

---

[2] The Aearo debtors apparently were solvent wholly owned subsidiaries of 3M until the bankruptcy-eve execution of a funding and indemnity agreement, which left the companies in severe financial distress due to their newly created *exclusive* liability for the CAEv2 claims in this litigation.  As the Court reads it, albeit without the benefit of an evidentiary hearing, the funding and indemnity agreement creates no value other than to mount 3M's escape from this MDL.  In the agreement, Aearo agrees to take on potentially billions in liability for the CAEv2 claims in exchange for 3M funding a claims trust that automatically depletes if and only if 3M faces judgments in the MDL (or state court), artificially tying Aearo's ability to reorganize with

dissatisfaction with the MDL system, this Court's legal rulings, and the multiple jury verdicts against it in this litigation.  *See id*.

Under these circumstances, the Court readily concludes that it has jurisdiction to determine whether Aearo's automatic stay applies to the claims against 3M in this MDL, *see, e.g., Hunt v. Bankers Trust Co.*, 799 F.2d 1060, 1069 (5th Cir. 1986), and the authority under the All Writs Act to enjoin actions by 3M in other forums which threaten the Court's jurisdiction, *see* 28 U.S.C. § 1651.  Nevertheless—and despite the Court's serious concerns over the prospect of a solvent defendant being able to evade the jurisdiction of an Article III court, leaving over 230,000 plaintiffs in its wake, based solely on its policy disagreement with a system created by Congress and its dissatisfaction with the lawfully entered rulings of an Article III court—the Court declines to exercise that jurisdiction to prohibit 3M from supporting a bankruptcy court injunction precluding plaintiffs from litigating CAEv2 matters against 3M.

"[T]he All Writs Act is a residual source of authority to issue writs which are not otherwise covered by statute."  *Klay*, 376 F.3d at 1100.  Here, the Court's jurisdiction to interpret the automatic stay statute, 11 U.S.C. § 362, is concurrent

---

continued litigation against 3M in the MDL (or state court).  While the argument can be made (and has been) that this is a fairly transparent attempt at manipulation and abuse of the bankruptcy code, it may be a perfectly legitimate use.  This Court trusts that the bankruptcy court judge is well-equipped to decide the matter based on his knowledge of bankruptcy law and the fact that he will have a complete evidentiary record.

Case 3:19-md-02885-MCR-GRJ   Document 3389   Filed 08/16/22   Page 6 of 8
USCA11 Case: 22-12796   Document: 3   Date Filed: 08/29/2022   Page: 43 of 149

Page 6 of 8

with that of the bankruptcy court.[3]   However, the bankruptcy court also has even

broader equitable powers to further extend the stay under 11 U.S.C. § 105(a), and

the bankruptcy court judge is presiding over an evidentiary hearing on that matter at

this very moment.   Thus, while this Court respects and appreciates the solemn

responsibility of Article III courts to enforce, protect and preserve their jurisdiction,

there are times when those ends are best served by yielding to a court with concurrent

jurisdiction, specialized expertise, and a full evidentiary record.   This is one of those

times.   The bankruptcy court is well-qualified and aptly suited to determine whether

3M is lawfully using the Bankruptcy Code for a proper restructuring purpose or,

instead, using its subsidiaries' bankruptcy petition as bad faith subterfuge to defeat

this Court's jurisdiction and relitigate this Court's rulings.   *See, e.g., In re Moog*,

159 B.R. 357, 361 (Bankr. S.D. Fla. 1993) (explaining that "if the timing of the filing

[of the bankruptcy petition] is such that the court concludes that the primary, if not

sole purpose, of the filing was *litigation tactic*, the petition may be dismissed" and

that "frustrating the legitimate processes of a non-bankruptcy forum" is inconsistent

with the congressional intent of the bankruptcy code) (emphasis added).[4]

---

[3] *See In re Baldwin-United Corp. Litig.*, 765 F.2d 343 (2d Cir. 1985) (MDL courts have concurrent jurisdiction to interpret whether a bankruptcy stay applies and to issue injunction in aid of the MDL court's jurisdiction but may appropriately decline to exercise that jurisdiction when it unduly interferes with the bankruptcy court's ability to carry out its duties).

[4] *See also In re Karum Grp., Inc.,* 66 B.R. 436 (Bankr. W.D. Wash.1986) (case dismissed where debtor filed bankruptcy as a litigation tactic to avoid posting supersedeas bond); *In re Golden Ocala P'ship,* 50 B.R. 552 (Bankr. M.D. Fla. 1985) (Chapter 11 not designed to resolve internal fights between feuding shareholders); *In re Ofty Corp.,* 44 B.R. 479 (Bankr. D. Del.

Case 3:19-md-02885-MCR-GRJ   Document 3389   Filed 08/16/22   Page 7 of 8
USCA11 Case: 22-12796   Document: 3   Date Filed: 08/29/2022   Page: 44 of 149

Page 7 of 8

Valle's second request implicates a more specific threat to this Court's jurisdiction. Aearo's written submissions and oral representations to the bankruptcy court are replete with substantive challenges to this Court's many legal and evidentiary rulings in the MDL, and culminate in an outright rejection of traditional appellate review of those decisions by the Eleventh Circuit Court of Appeals. According to Aearo, *both* companies—specifically, "Aearo and 3M"—prefer to resolve CAEv2 claims on the basis of the "fair and complete evidentiary record" they plan to create in bankruptcy court. *See In re Aearo*, 1:22bk2890, Informational Brief, ECF No. 12 at 61. From this, the threat to this Court's previously exercised jurisdiction is undeniable. It cannot and will not be countenanced, and compels immediate action from this Court by means of an All Writs Act injunction prohibiting 3M from attacking this Court's prior orders.

For the avoidance of doubt, the scope of today's injunction prevents 3M from "attempting to relitigate the same issues or related issues precluded by the principles of res judicata and collateral estoppel in" bankruptcy court. *See New York Life*, 142 F.3d at 879. This includes the relitigation of identical issues that the defendants

---

1984) (bankruptcy case filed to circumvent liquidation orders in state court dismissed as a bad faith filing); *In re Wally Findlay Galleries (N.Y.) Inc.,* 36 B.R. 849 (Bankr. S.D.N.Y. 1984) (bankruptcy case dismissed where intent was to relitigate not reorganize); *but see In re LTL Mgmt., LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022)("Texas Two-Step" corporate restructuring and transfer of liability to a reorganized debtor considered a valid bankruptcy purpose, not merely aimed at gaining a tactical litigation advantage), *appeal docketed*, No. 22-2003 (3d Cir. Mar. 10, 2022).

litigated and lost against a particular plaintiff in this Court. *See, e.g., Jack Faucett Assocs., Inc. v. AT&T*, 744 F.2d 118, 124 (D.C. Cir. 1984) (citing *S. Pac. Commc'ns Co. v. AT&T*, 740 F.2d 1011, 1014 n.2 (1984)). 3M also is enjoined from supporting, directly or indirectly, financially or otherwise, any collateral attack on this Court's orders by any other parties in any other forum, including Aearo. After nearly three and a half years of litigation, 3M has had a "full and fair opportunity to litigate" a myriad of issues that were "critical and necessary" to the Court's orders and judgments. *See Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir. 2000) (articulating standard for collateral estoppel. Today's injunction enforces the preclusive effect of all of those orders and judgments. If 3M defies this injunction by attempting to relitigate (or supporting relitigation of) these matters in the bankruptcy court, this Court retains jurisdiction to convene contempt proceedings to enforce compliance. *See United States v. Coulton*, 594 Fed. App'x 563, 565-66 (11th Cir. 2014).

Based on the foregoing, Valle's Motion for Preliminary Injunction, ECF No. 3358, is **GRANTED IN PART and DENIED IN PART**, consistent with this Order.

**DONE AND ORDERED** this 16th day of August 2022.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

Exhibit B

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AEARO TECHNOLOGIES LLC, *et al.*,[1] | ) | Case No. 22-02890-JJG-11 |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DECLARATION OF
JOHN R. CASTELLANO IN SUPPORT OF THE
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, John R. Castellano, hereby declare under penalty of perjury:

1.     I am the Chief Restructuring Officer of Aearo Technologies LLC (together with the above-captioned debtors and debtors-in-possession, the "Debtors"),[2] a limited liability company incorporated under the laws of Delaware.

2.     I am a Managing Director of AlixPartners, LLP, an affiliate of AP Services, LLC (collectively, "AlixPartners").  Pursuant to an agreement with the Debtors, AlixPartners agreed to provide personnel to the Debtors to assist it with certain functions.  I was appointed Chief Restructuring Officer of Aearo Technologies LLC and each of the Debtors on July 25, 2022.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' First Day Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief*, filed contemporaneously herewith.  The location of the Debtors' service address for the purposes of these chapter 11 cases is:  7911 Zionsville Road, Indianapolis, Indiana 46268.

[2]     In addition, the Debtors are direct parents and/or subsidiaries, as applicable, of certain non-U.S. entities that are not debtors in these chapter 11 cases (such entities, the "Aearo Non-Debtors").  The Aearo Non-Debtors are: (1) Aearo Trading (Shenzhen) Co. Ltd. (a wholly-owned subsidiary of Aearo Technologies LLC); (2) Aearo Technologies de Baja, S.A. de C.V. (99% ownership by Aearo Technologies LLC and 1% ownership by Aearo LLC); (3) Aearo Canada Limited / Aearo Canada Limitee (a wholly-owned subsidiary of Cabot Safety Intermediate LLC); and (4) Aearo Technologies de Mexico, S.A. de C.V., (99.998% ownership by Aearo Mexico Holding Corp. and .002% ownership by Cabot Safety Intermediate LLC).

3.    I hold a bachelor's degree in Accounting from DePaul University and a master's degree in Management, Finance, and Strategy from the Kellogg School of Management at Northwestern University.  I have over twenty-six years of financial restructuring and bankruptcy-related experience and over twenty-four years of experience with AlixPartners.  I have served as a Managing Director in AlixPartners' Turnaround & Restructuring Group since 2007.  Prior to joining AlixPartners, I worked at Ernst & Young LLP in its Assurance practice as an auditor, and in its Consulting practice focusing on restructuring advisory services.  I have served as Chief Restructuring Officer (or in an equivalent role) in numerous large-scale corporate restructurings, including: *In re Footprint Power Salem Harbor Development LP*, No. 22-10239 (MFW) (Bankr. D. Del. 2022); *In re Alpha Latam Management, LLC*, No. 21-11109 (JKS) (Bankr. D. Del. 2021); *In re Lonestar Resources US Inc.*, No. 20-34805 (DRJ) (Bankr. S.D. Tex. 2020); *In re McDermott International, Inc*., No. 20-30336 (DRJ) (Bankr. S.D. Tex. 2020); and *In re Aegerion Pharmaceuticals, Inc.*, No. 19-11632 (MG) (Bankr. S.D.N.Y. 2019).

4.    Since May 2022, I and the AlixPartners team have worked closely with the Debtors and their management team on contingency planning with respect to a potential chapter 11 filing. As a result of my role and experience with the Debtors, my review of relevant documents, and my discussions with other individuals who manage the Debtors' day-to-day business operations and affairs, I am generally familiar with the Debtors' business, financial affairs, and books and records. I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and to provide support for the Debtors' petitions for relief under title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and related first day motions.

5.      Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge of the Debtors' operations, finances, and employees, as well as information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management team and their advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations, financial affairs, and restructuring initiatives.  I am over the age of eighteen and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

### **Introduction**

6.      The Debtors filed these chapter 11 cases to reorganize a business with healthy operations that has become saddled with unsustainable tort liabilities.  To achieve this reorganization, the Debtors intend to utilize the tools available under the Bankruptcy Code to provide a full recovery to tort claimants who are entitled to compensation, while endeavoring to ensure that all general unsecured creditors will receive a 100% recovery in the chapter 11 cases.

7.      Under the brand name Aearo Technologies, the Debtors manufacture and sell custom noise, vibration, thermal, and shock protection solutions, primarily serving the aerospace, commercial vehicle, heavy equipment, and electronics industries.  The Debtors have 330 employees and generated approximately $108 million in direct sales in 2021.  The Debtors are headquartered in Indianapolis, Indiana, where they have been based for over 40 years and where they have their main operating plant.  In 2008, the Debtors were acquired by 3M Company (together with its affiliates other than the Debtors and the Aearo Non-Debtors, "3M") in a stock purchase and remain a wholly-owned subsidiary of 3M.  3M and its other affiliates are not debtors in these chapter 11 cases.

###### A. Tort Liabilities

8.     In recent years, the Debtors have been the subject of a flood of tort litigation. Specifically, five of the Debtors, plus 3M, are the named defendants in what has become by far the largest multidistrict litigation in United States history, in which over 230,000 claims are pending against the Debtors in the Northern District of Florida (the "MDL").  The claims generally allege hearing injuries arising from the sale of noise-reduction earplugs, known as "Dual-Ended Combat Arms — Version 2" earplugs ("Combat Arms," and claims related thereto, including any Earplug Liabilities,[3] the "Combat Arms Claims"), which were historically manufactured by the Debtors.  For over a decade, the Combat Arms product received accolades from soldiers for its ability to offer hearing protection while preserving lifesaving situational awareness.  The Debtors began selling the earplugs in significant quantities in the early 2000s, and the Debtors and 3M continued to manufacture the earplugs after the 2008 acquisition until they discontinued the product in 2015.  The earplugs were designed in close collaboration with, and were historically sold to, the United States military, and the Debtors understand that the vast majority of plaintiffs in the MDL are military veterans.[4]  The litigations commenced in December 2018, when a military veteran filed an individual lawsuit, and were consolidated into the MDL in April 2019.

9.     The Combat Arms litigation remains in the early stages.  Only 19 of the over 230,000 claims included in the MDL have been tried to a jury verdict.  Appeals are pending on several issues, including whether the Debtors can assert the "government contractor" defense,

---

[3]     As defined in the Funding Agreement, "Earplug Liabilities" means any Liability of any Company Party, whether existing now or arising in the future, based in whole or in part on any conduct or circumstance arising out of, relating to or in connection with dual-ended earplugs, including Dual-Ended Combat Arms – Version 2 earplugs, ARC Plug earplugs, and AO Safety Indoor Outdoor Range Earplugs, sold or manufactured by any Company Party, under any trade name, including any Liability pursuant to any Proceedings relating to any of the foregoing.

[4]     The Combat Arms and consumer versions of the earplugs were also sold commercially to non-military customers beginning around 2000.

4

which I understand may be a total defense to liability.  Discovery has not commenced as to the vast majority of claims, and the Debtors lack basic substantiating information regarding the vast majority of the claims pending in the MDL.  The Debtors and 3M have vigorously defended the litigation and believe the Combat Arms earplugs are effective and safe when used properly. Initial trials have resulted in disparate outcomes, ranging from complete defense verdicts to individual plaintiff's verdicts of as much as $77.5 million.  Other bellwether plaintiffs dismissed their cases before trial.  According to one plaintiff's attorney, the MDL poses an exposure risk of over $1 trillion.  3M has already spent approximately $347 million in fees and costs defending the Combat Arms claims to date.  As set forth in greater detail in the Informational Brief,[5] the Debtors submit that the MDL cannot provide fair and efficient resolution of the Combat Arms Claims. The Debtors believe that these chapter 11 cases present the optimal path to resolve the Combat Arms Claims and compensate claimants who are entitled to compensation in an expeditious fashion.

10.     The Debtors are also subject to a smaller number of claims related to alleged personal injury from workplace exposures to asbestos, silica, coal mine dust, or other occupational dusts in connection with the use of the Debtors' mask and respirator products (the "Respirators"). As of the filing of these chapter 11 cases, there are a number of mask and respirator claims pending against the Debtors, and the Debtors have a $41 million accounting accrual for both product liabilities and defense costs related to their mask and respirator claims (such claims, the "Respirator Claims").

---

[5]     *See Informational Brief of Aearo Technologies LLC* (the "Informational Brief").

**B.      Chapter 11 Cases**

11.      Through these chapter 11 cases, the Debtors seek to establish and fund one or more trusts that will provide a full recovery to tort claimants who are entitled to compensation.  Absent the filing of the chapter 11 cases, the Debtors believe that litigation related to Combat Arms and Respirators could go on for decades, continue to consume millions of dollars in defense costs annually, and continue to result in highly disparate outcomes for plaintiffs. The Debtors believe that the tools available under the Bankruptcy Code will allow for a faster and more efficient resolution of claims in a centralized forum, the establishment of a fully-funded trust for the benefit of claimants, and the establishment of procedures that ensure equitable recoveries to claimants entitled to compensation.   To that end, the Debtors are prepared to negotiate a consensual plan of reorganization with affected stakeholders.

12.      To ensure that they can achieve these goals, on July 25, 2022, the Debtors entered into a funding and indemnification agreement attached hereto as **Exhibit B** (the "Funding Agreement") with 3M under which 3M has agreed to contribute $240 million to fund administration of these chapter 11 cases and $1 billion to a trust to ensure claimants entitled to compensation receive payment.  If necessary to achieve a resolution, 3M has committed to provide additional funding.  Under the Funding Agreement, 3M has also committed to continue certain shared services traditionally provided by 3M and to fund, among other things, certain disbursements traditionally made by 3M on the Debtors' behalf, the Debtors' costs and expenses related to these chapter 11 cases, and other liabilities under a plan of reorganization.  In exchange, the Debtors have agreed to indemnify 3M and its affiliates for all applicable tort claims, as well as defense costs related thereto.  In 2021, 3M's net sales exceeded $35 billion, up from approximately $32 billion in 2020.   In 2021, pre-tax income was $7.2 billion, up from $6.8 billion in 2020. The Funding Agreement therefore ensures that these chapter 11 cases will be fully funded,

including administrative expenses, general unsecured claims, and any ultimate plan trust. The Debtors have no repayment obligation to 3M pursuant to the Funding Agreement.

13.     The Debtors' business is managed by their boards of directors, including two disinterested directors, Roger Meltzer and Jeffrey Stein, to whom the boards have delegated authority to decide any conflicts matters.  In April 2022, the Debtors retained Kirkland & Ellis LLP ("K&E") to assist in contingency planning for potential chapter 11 proceedings to address their tort liabilities.  K&E also represents the Debtors and 3M in the MDL.  In May 2022, the Debtors retained AlixPartners to assist with contingency planning.  On July 23, 2022, the disinterested directors approved entry into the Funding Agreement, which was negotiated between the Debtors, at the direction of the disinterested directors in consultation with their conflicts counsel, McDonald Hopkins LLC, and 3M, in consultation with their counsel, White & Case LLP. On July 25, 2022, the Debtors' boards approved the commencement of these chapter 11 cases and appointed me as CRO of the Debtors.

14.     Contemporaneously herewith, the Debtors filed an adversary complaint and a motion seeking (i) confirmation that the commencement or continued prosecution of Combat Arms Claims against 3M while these chapter 11 cases remain pending violates the automatic stay imposed by section 362(a) of the Bankruptcy Code, (ii) a preliminary injunction pursuant to sections 105 and 362 of the Bankruptcy Code prohibiting the Stay Defendants from continuing to prosecute the Combat Arms Claims against 3M while the chapter 11 cases remain pending, and (iii) temporary restraining order prohibiting the prosecution of certain Combat Arms Claims against 3M pending an order on the Debtors' request for a preliminary injunction (as more fully set forth in those papers).

15.     The Debtors have also filed various motions and pleadings seeking "first day" relief (collectively, the "First Day Motions") to ensure a smooth transition into chapter 11.  I am familiar with the contents of each First Day Motion, and I believe that the relief sought therein (a) is necessary to enable the Debtors to continue their business operations in the ordinary course, (b) constitutes a critical element in achieving successful confirmation of a chapter 11 plan, (c) is necessary to enable the Debtors to fairly and efficiently manage the Combat Arms Claims in these chapter 11 cases, and (d) best serves the interests of the Debtors, their estates, and their stakeholders.  The facts set forth in each First Day Motion are incorporated herein by reference.

16.     To familiarize the Court with the Debtors, their business, and the circumstances leading to these chapter 11 cases, I have organized this Declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history, business, corporate structure, and objectives in commencing these chapter 11 cases.

- **Part II** summarizes the relief requested in and the evidentiary support for the First Day Motions.

## PART I:
## CORPORATE BACKGROUND AND HISTORY

### A.     The Debtors' Corporate History

#### 1.     Origins of the Debtors

17.     In the 1940s, American Optical Company began manufacturing and selling respirators as part of its industrial safety business.  In 1967, the American Optical Corporation, an entity ultimately owned by the Warner-Lambert Company, acquired the assets of American Optical Company.  Thereafter, in 1982, a company called A.O. Holding Corporation acquired Warner-Lambert Company's interests in American Optical Corporation.  In 1990, Cabot Safety Corporation purchased the assets of American Optical Company's safety division from American Optical Corporation.  The Cabot Safety Corporation entities holding the

American Optical Corporation's assets then underwent a series of name changes, resulting in the name "Aearo," which reflected the combination of the American Optical Company's safety products with Cabot Safety Corporation's existing energy absorbing resin (or "E-A-R") technologies. The Debtors were then acquired by Vestar Capital Partners through a management buyout in 1995, and were subsequently sold to Bear Stearns Merchant Bank in 2004. Two years later, in 2006, Bear Stearns Merchant Bank sold the Debtors to Permira, a private equity firm, for approximately $765 million. Finally, as discussed in further detail in the subsequent section, 3M acquired the Debtors in 2008.

18.     In the late 1990s, the U.S. military was searching for hearing protection to offer protection from high-level impulse noises—like gunfire—while still allowing the user to hear lower-level sounds—like speech—with limited interruption. To meet this need, the Debtors, in close collaboration with the military and expert scientists at the French-German Institute de St. Louis, designed and developed the Combat Arms earplugs, which the military then approved for purchase. Extensive testing by the Debtors, the military, and independent labs and other organizations confirmed that the Combat Arms worked as intended.

19.     At the time of the Debtors' acquisition by 3M, over half of the Debtors' sales were in the hearing-protection space, including significant sales of both passive hearing protective gear (*i.e.*, ear plugs and earmuffs for industrial use) and active hearing protective gear (*i.e.*, stronger protective gear used in the industrial, military, and aerospace markets). As discussed further herein, certain members of the military who utilized the Combat Arms have asserted claims against the Debtors and 3M that gave rise to these chapter 11 cases.

### 2.     3M's Acquisition of the Debtors

20.     Founded in 1902 as the Minnesota Mining and Manufacturing Company in Two Harbors, Minnesota, 3M is an iconic American multinational technology and manufacturing

company.  3M grew exponentially through the twentieth century to become one of America's largest manufacturing firms, becoming one of just thirty companies included in the Dow Jones Industrial Average in 1976.  3M achieved this massive growth through innovation—developing products across a wide range of markets including pharmaceuticals and chemicals, digital imaging and sound technology, and office supply and consumer goods.  3M currently operates through four business groups: (1) the Safety and Industrial Business Group, (2) the Transportation and Electronics Business Group, (3) the Health Care Business Group, and (4) the Consumer Business Group.

21.     3M's business remains strong, with over $8.8 billion in sales reported through the first quarter of 2022, roughly matching their sales from the same period in 2021.  In 2021, 3M's net sales exceeded $35 billion, up from approximately $32 billion in 2020.  In July 2022, 3M announced its intention to spin off its Health Care Business Group into an independent, publicly-traded company (such transaction, the "Spin-Off").  I understand that 3M anticipates that the Spin-Off will close by the end of 2023.  The Health Care Business Group accounted for approximately $9.1 billion of 3M's total sales (over $35 billion) in fiscal year 2021.  Based on my review of the relevant financial information, following the Spin-Off, 3M will remain well-positioned to meet its funding obligations set forth in the Funding Agreement.

22.     3M acquired the Debtors in April 2008 through a stock purchase for approximately $1.2 billion.  The acquisition was initiated through the Safety and Industrial Business Group, with the goal of creating synergies with 3M's existing occupational health and safety business by adding the Debtors' hearing, eyewear, and fall protection product lines.  At the time of the acquisition, the Debtors were already manufacturing and distributing the Combat Arms earplugs that would ultimately lead to the Combat Arms Claims necessitating these chapter 11 cases.  As expressed on

the chart below, of the approximately $31 million in lifetime sales of the Combat Arms, the vast majority (approximately 80%) occurred prior to 3M's acquisition of the Debtors.



23.      In the first two years following the acquisition, the Debtors' business remained independent from 3M.  In 2010, the component of the Debtors' business responsible for the significant majority of its earplug sales was transferred upstream to 3M.

### 3.      Corporate Structure and Governance

24.      The Debtors consist of seven entities that are each ultimately owned by 3M Company.  Each Debtor entity has its own board of directors.

25.      Before commencing these chapter 11 cases, the Debtors appointed Roger Meltzer and Jeffrey Stein (the "Disinterested Directors") to the boards of directors of each filing entity (the "Boards").  Messrs. Meltzer and Stein have experience serving as disinterested directors, and neither has any prior affiliations with the Debtors or 3M.  Messrs. Meltzer and Stein have been delegated broad decision-making authority with respect to matters that may constitute a conflict between the Debtors and 3M.

26.     The Disinterested Directors have also retained McDonald Hopkins LLC as conflicts counsel.  A simplified version of the Debtors' corporate organizational chart is set forth below.



27.     Further, on July 25, 2022, Aearo Technologies LLC appointed me as the Chief Restructuring Officer.  The Debtors also engaged K&E and Ice Miller LLP as legal counsel to advise the Boards as to the potential tools to address the Debtors' tort liabilities, including through a chapter 11 process.

### B.        The Debtors' Operations

### 1.        Business Operations

28.        The Debtors discontinued the Combat Arms in 2015 and have since shifted their business away from production of earplugs and towards other energy absorption products. The Debtors are market leaders in the energy control space, having pioneered new treatment techniques and developed proprietary, high-performance materials that control unwanted noise, vibration, shock, and thermal energy.  The Debtors manufacture and sell these materials directly to original equipment manufacturers and other customers in the aerospace, commercial vehicles, electronics, and power generation industries, as well as supplying components to the construction, agriculture, medical devices, and specialty vehicles spaces.  The energy absorption components manufactured by the Debtors generally fall into one of five categories: (1) damping materials, (2) isolation materials, (3) acoustic absorbers, (4) barriers, and (5) thermal control materials.

29.        These energy absorption components are implemented throughout the interiors of heavy machinery, including commercial trucks and aircraft, to ensure that such vehicles function both safely and in a user-friendly manner.





30.    The Debtors are headquartered in Indianapolis, Indiana, with additional U.S. offices and manufacturing facilities located in Newark, Delaware.  Aearo Technologies LLC directly employs 330 individuals, all on a full-time basis.  Of the 330 employees, 172 are located in Indianapolis (the Debtors' global headquarters and home to their largest equipment testing facility) with additional employees employed at the Debtors' facilities in Newark.  The Debtors' principal tangible assets, including over 247,800 square feet of real property, are located in Indianapolis.

31.    The Debtors' sales, which amounted to approximately $126 million in 2021, generally occur through Aearo Technologies LLC.  These sales primarily come in the form of "direct" sales from Aearo Technologies LLC to third-party consumers and manufacturers.  Aearo Technologies LLC completed approximately $108 million in direct sales in fiscal year 2021.  The Debtors maintain long-term supply contracts with certain of their largest direct sales customers, which include original equipment manufacturers in the commercial vehicle and aerospace industries.  By contrast, the Debtors' other customers ordinarily purchase products through purchase orders without entering into long-term contractual arrangements with the Debtors.  The remainder of the Debtors' sales (approximately $18 million in fiscal year 2021) are

"indirect" sales through which the Debtors sell products and raw materials to 3M.  3M then combines those products and raw materials supplied by the Debtors into finished goods and sells them to 3M's customers.  For example, the Debtors provide a significant quantity of raw foam material to 3M, which 3M then uses to manufacture certain of its products.

32.     While the Debtors utilize 3M's broader corporate structure for functions such as finance, treasury, information technology and other related services, the Debtors are operated by their own management team, cultivate sales relationships, develop and design products, and control their own affairs in many respects.  The Debtors are staffed with their own application and design engineering teams, commercial development, logistics, manufacturing, marketing, and quality organizations.  The Debtors are solely responsible for delivering their business plan. The Debtors have no funded debt obligations.

33.     The Debtors and 3M are parties to a shared services agreement and accompanying IP agreement entered into shortly after 3M's acquisition of the Debtors (the "Shared Services Agreement").   The Shared Services Agreement governs, among other things: (a) laboratory, technical assistance, and manufacturing services (related to R&D, manufacturing, and other operations); (b) selling, marketing, and general and administrative services (including HR, training, IT support, sales and marketing, advertising, customer relationship management); and (c) functional services (including purchasing, finance/accounting, insurance, import/export, legal, inventory management, HR, and supply chain management).  Pursuant to the Shared Services Agreement, any Debtor-provided services are to be reimbursed at cost plus 10 percent, with 3M-provided services to be reimbursed at cost, each in accordance with accepted procedures for invoicing, recharging, or allocating costs by 3M and its affiliates.  As described in further detail below, the Funding Agreement provides that any existing shared services arrangements in place

between 3M and the Debtors immediately prior to the Petition Date are to continue throughout the duration of these chapter 11 cases.  Pursuant to the Funding Agreement, the Debtors will not be required to pay for any shared services during the pendency of these chapter 11 cases.  The Debtors and 3M are also party to a number of ancillary intercompany agreements governing, among other things, treatment of proprietary information, intellectual property, research and development, and marketing and sales.

### 2.  Insurance Policies

34.    3M and the Debtors share insurance and reinsurance policies that provide coverage for claims and defense costs related to the Combat Arms Claims.  The Debtors are insured under many primary, umbrella, and excess liability insurance policies, including commercial general liability policies that cover defense and indemnity costs related to the Combat Arms Claims.  These include several policies pre-dating 3M's acquisition of the Debtors (the "Aearo Legacy Program") that collectively provide approximately $500 million in coverage, not including any supplemental defense coverage.  Additionally, the Debtors have had insurance coverage since the April 1, 2008, acquisition under 3M's product liability and other insurance programs, including dozens of primary, umbrella and excess policies (the "3M Program").

35.    Critically, with respect to the 3M Program, commercial general liability policies covering the 2018-2019 policy period—which include 46 separate policies comprising 18 layers of coverage[6]—are shared between the Debtors and 3M.  The policies explicitly provide retroactive coverage for Aearo, back to the April 1, 2008, acquisition, and Aearo is listed as a named insured alongside 3M.  The combined aggregate limit of 3M's 2018-19 commercial general liability

---

[6]     A list of these policies is attached hereto as **Exhibit C**.

policies is more than $1.05 billion—more than double the coverage available under the Aearo Legacy Program.

36.     3M—on behalf of itself and the Debtors—provided notice of the Combat Arms claims to the following insurers: (1) the Debtors' primary and excess insurers for policy periods covering 1997 to 2008; and (2) 3M's tower policy insurers and reinsurers for a policy period covering 2018 to 2019.  In those notice letters, 3M and the Debtors requested coverage, including for litigation costs, for their defense of personal injury allegations and other covered claims relating to the Combat Arms Claims.  Although none of the insurers has acknowledged its coverage obligations, 3M and the Debtors maintain that they are entitled to coverage for the Combat Arms Claims under these policies.

### 3.     Tort Claims and Liability Arrangements

#### a.     Combat Arms

37.     The Debtors and 3M are subject to liabilities related to the sale and use of the Combat Arms, which broadly fall into two categories: (1) claims alleging that the design of the Combat Arms prevented users from obtaining a proper fit and seal when inserting the devices into their ear canals, allowing damaging sounds to enter; and (2) claims alleging that the Debtors failed to warn users and/or the military of the alleged defects and/or risks associated with use of the Combat Arms.  The Combat Arms Claims represent the vast majority of the tort claims asserted against the Debtors.

38.     As set forth in greater detail in the Informational Brief, the Debtors are named defendants in the MDL, which I understand has swelled to over 230,000 personal injury claims as

of the Petition Date.[7]  I further understand that the MDL is the largest in the history of the United States, surpassing most of its predecessor and contemporary MDLs by orders of magnitude. The Combat Arms MDL now has more than twice as many claims as the other 182 pending multi-district litigations in the United States *combined*.  The Debtors believe that the sheer size of the MDL makes it unmanageable in the tort system and that the MDL docket is full of unvetted claims, thereby preventing the Debtors from cultivating reasonable settlements with claimants. For this reason, the Debtors believe that most claimants are no closer to any compensation determination than they were before the MDL was formed.

39.     Further, the Debtors believe that the MDL bellwether trial process similarly failed to provide reliable information regarding the value of the Combat Arms Claims.  Of the twenty-seven plaintiffs whose claims proceeded in the bellwether trials, the claims of eight plaintiffs were dismissed before trial, and six trials resulted in complete defense verdicts.  And those bellwether trials that resulted in plaintiff verdicts provided minimal information about value or resolution given that juries awarded plaintiffs disparate outcomes, with individual verdicts ranging from $1.7 million to as much as $77.5 million.

40.     The Debtors and 3M have expended significant resources in defense of the Combat Arms Claims.  Defense of the Combat Arms Claims has cost approximately $347 million in fees and costs to date.  This year alone, 3M spent approximately $47.77 million in attorneys' fees and costs in the first quarter of 2022, and approximately $74.5 million in the second quarter, which amounts to approximately $4.7 million spent per week.  For the remainder of 2022, 3M projects that it will spend approximately $99.8 million on attorneys' fees and costs ($56.8 million and $43

---

[7]     In addition, approximately 2,000 claims related to the Combat Arms or their commercial equivalents are currently pending in state court in Minnesota.

million in the third and fourth quarters, respectively), which equals approximately $3.8 million per week. These projections assume that the MDL court does not constitute a Wave 4 and that the only additional trial in 2022 will be the August 2022 trial scheduled in the Minnesota state court actions. These projections do not account for the MDL Wave 1 case trial currently scheduled for October 24, 2022.

### b.    Respirators

41.    In addition, the Debtors are currently defending a number of lawsuits alleging workplace exposure to asbestos, silica, coal mine dust, and other occupational dusts resulting from the manufacture and sale of Respirators. The Respirator Claims largely fall into one of four categories: (1) claims alleging that the design of certain respirators precluded an adequate face fit; (2) claims asserting injuries arising from the allegation that respirators were never tested within mines, where certain harmful exposures were alleged to occur; (3) claims alleging that the electrostatic filter would break down in a humid mine or other workplace conditions; and (4) claims alleging that the Debtors failed to provide adequate warning as to the potential risks associated with use of the Respirators.

42.    Responsibility for legal costs as well as for settlements and judgments associated with the Respirator Claims is currently shared in an informal arrangement among the Debtors, Cabot Corporation, American Optical, and a subsidiary of the Warner-Lambert Company and their respective insurers (the "Payor Group"). Liability is allocated among the parties based on the number of years each company sold respiratory products under the "AO Safety" brand and/or owned the Safety Division of American Optical and the alleged years of exposure of the individual plaintiff.

43.    The Debtors' share of the contingent liability is further limited by an agreement entered into between the Debtors and Cabot Corporation on July 11, 1995. This agreement

provides that, so long as the Debtors pay a quarterly fee of $100,000 to Cabot Corporation, Cabot Corporation will retain responsibility and liability for, and indemnify the Debtors against, any product liability claims involving exposure to asbestos, silica, or silica products for respirators sold prior to July 11, 1995. Because of the difficulty in determining how long a particular respirator remains in the stream of commerce after being sold, the Debtors and Cabot Corporation have applied the agreement to claims arising out of the alleged use of respirators involving exposure to asbestos, silica, or silica products prior to January 1, 1997. With these arrangements in place, the Debtors' potential liability is limited to exposures alleged to have arisen from the use of respirators involving exposure to asbestos, silica, or silica products on or after January 1, 1997. To date, the Debtors have elected to pay the quarterly fee.

44.     As of March 31, 2022, the Debtors had accruals of $41 million for product liabilities and defense costs related to current and future asbestos, silica-related, and coal mine dust claims. This accrual represents the Debtors' best estimate of their probable loss and reflects an estimation period for future claims that may be filed against the Debtors approaching the year 2050.

### 4.      Funding Agreement

45.     In the months prior to the commencement of these chapter 11 cases, the Debtors took proactive steps to determine if they could address their Combat Arms and other liabilities through chapter 11. Following the Disinterested Directors' appointment in June 2022, the Debtors, acting at the direction of the Disinterested Directors, began negotiating the terms upon which 3M would agree to fund the Debtors' chapter 11 cases, including the professional fees expected to be incurred and the ultimate funding of a claims trust, while also remaining independent from 3M before and during a chapter 11 case.

46.     Against this backdrop, the Debtors, at the direction of the Disinterested Directors, and 3M determined to enter into a funding agreement pursuant to which 3M would fund the

Debtors' chapter 11 cases.  The Debtors sought to secure funds from 3M to satisfy operating expenses and administrative and professional fees, as well as additional proceeds to fund a claims trust, all in exchange for the Debtors' commitment to indemnify 3M for all liabilities related to the Combat Arms Claims and Respirator Claims.  And, in light of the shared services historically provided by 3M for the benefit of the Debtors, the Debtors also proposed to 3M that 3M commit to continue such services in the ordinary course going forward.

47.     After several rounds of negotiations, during which 3M was represented by White & Case LLP as counsel and the Debtors were represented by McDonald Hopkins LLC as conflicts counsel, the Debtors and 3M agreed to the Funding Agreement attached hereto as **Exhibit B**.  The key terms of the Funding Agreement[8] include the following:

- ***Consideration from 3M to the Debtors***. 3M agrees to provide cash upfront to fund the Debtors' operations and their chapter 11 cases in the amount of $5.0 million, which was funded on July 25, 2022 (the "Initial Payment"). 3M agrees further to fulfill Funding Requests for Permitted Funding Uses, including, among other things, the Debtors' operations, chapter 11 cases, and one or more Trusts for Earplug Liabilities and Respirator Liabilities.  3M will continue, and will cause its Payor Affiliates to continue, to provide the Shared Services to the Debtors.

- ***Consideration from the Debtors to 3M***. The Debtors agree to indemnify 3M and its Payor Affiliates for all Earplug Liabilities and Respirator Liabilities.

- ***Continuation of Existing Shared Services Arrangement***. 3M will continue, and will cause its Payor Affiliates to continue, to provide the Shared Services to the Debtors.  The Debtors will not be required to make payments to 3M on account of the Shared Services during the pendency of the chapter 11 cases.

- ***Funding***. In addition to the Initial Payment, 3M commits $1.24 billion under the terms of the Funding Agreement, which commitment includes:
    - $1.0 billion to fund one or more Trusts; and
    - $240.0 million to administer the chapter 11 cases.

---

[8]     Capitalized terms used in this summary but not otherwise defined in the First Day Declaration shall have the meanings ascribed to them in the Funding Agreement.  To the extent that there is any inconsistency between this summary and the Funding Agreement, the Funding Agreement shall control.

These commitments are not a cap. Through the Funding Agreement, 3M has committed to fund *any* Permitted Funding Use, even if it exceeds the foregoing commitments.

- ***Permitted Funding Uses***. The following obligations are considered Permitted Funding Uses under the Funding Agreement:

  - Operating Costs: Operating costs and costs associated with the administration of the chapter 11 cases;

  - Liability/Defense Costs: (a) outside of the chapter 11 cases, payments made on account of the Earplug Liabilities and Respirator Liabilities; (b) following the commencement of the chapter 11 cases, funding of one or more Trusts; (c) any Liability for any other Causes of Action allowed or deemed allowed under a Plan, other than the Earplug Liabilities or the Respirator Liabilities; and (d) any ancillary/defense costs related to the foregoing;

  - Liability owed to 3M: Any liabilities of the Debtors owed to 3M or any Payor Affiliate;

  - Enforcement Costs: Costs incurred by the Debtors in enforcing the Funding Agreement; and

  - Indemnification Costs: Costs incurred to pay any indemnification or other obligations owing to any managers, directors, or officers of a Debtor.

  The foregoing constitute Permitted Funding Uses only to the extent the Debtors' available cash (including cash expected to be received from the Debtors' assets and insurance recoveries) is projected to be insufficient to satisfy such liabilities in full while maintaining the Minimum Balance.

- ***No Requirement of Repayment***. The Debtors have no requirement to return or repay any Payment made by 3M under the Funding Agreement.

- ***No Case Controls***. In exchange for 3M's funding commitment, 3M received no other consent rights or controls over the chapter 11 cases. There are no milestone controls, express consent rights over any plan of reorganization or assignment of the Funding Agreement to a Trust, or control over funding decisions.

- ***Conditions to Funding***. Conditions to funding include the following: (a) that there is no continuing breach by the Debtors of their covenants under the Funding Agreement in any material respect, including their covenants to (i) only request and use payments for Permitted Funding Uses, (ii) honor their indemnification obligations to 3M and its Payor Affiliates in all material respects,

subject to the automatic stay, and (iii) provide a Budget every two weeks; and (b) that the Debtors' representations and warranties remain true in all material respects.

48.     Critically, the Funding Agreement will enable the Debtors to fund these chapter 11 cases and the claims trust to resolve the significant potential Combat Arms and Respirator Claims faced by the Debtors.  The Funding Agreement provides the Debtors with an ability to advance these chapter 11 cases to claims estimation, plan confirmation, and emergence, and provides a potential source of recovery for any Combat Arms and Respirator claimants determined to be entitled to compensation.

49.     The Debtors believe they have sufficient assets, including cash available under the Funding Agreement, (a) to fund a claims trust that will be governed by procedures that efficiently and fairly review claims and compensate all tort claimants, and (b) otherwise satisfy the requirements necessary to qualify for section 524(g) and/or 105(a) relief.  While 3M has funded the costs of defending the tort litigation to date, there was no guarantee that 3M would continue to fund these costs until 3M agreed to provide further funding pursuant to the Funding Agreement. In the absence of such funding, the Debtors would lack sufficient assets to mount a defense of the tort claims while continuing to operate their business.

### 5.    Decision to Commence These Chapter 11 Cases

50.     The Debtors' decision to commence these chapter 11 cases stems from the lack of an alternative mechanism to efficiently and equitably address their alleged liabilities related to the sale and use of the Combat Arms and Respirators.  After diligently considering the cost, burden, uncertainty, and anticipated duration of continuing with the Debtors' ongoing litigation through the tort system, the Debtors determined that the filing of these chapter 11 cases was prudent and

necessary.  As detailed above, 3M has already expended hundreds of millions of dollars defending the MDL and various litigations related to the Combat Arms and Respirators.

51.    The Debtors' goal in these cases is to negotiate, obtain approval of, and ultimately consummate a plan of reorganization that would, among other things, (a) establish and fund a claims trust to resolve and pay all Combat Arms Claims and Respirator Claims against the Debtors, (b) enable the Debtors' business to continue thriving without the overhang of legacy liabilities, and (c) provide for the issuance of an injunction that will permanently protect the Debtors and 3M from further claims related to Combat Arms and Respirators for which the Debtors and 3M may otherwise have had legal responsibility, pursuant to sections 105(a) and 524(g) of the Bankruptcy Code.  Confirmation of the plan of reorganization will enable the Debtors to focus their energies on further growing their otherwise healthy businesses, to the ultimate benefit of their stakeholders, all while providing an equitable mechanism for addressing their myriad tort liabilities and ensuring a more timely distribution to Combat Arms and Respirator claimants than they would otherwise hope to receive in the tort system.

52.    The Debtors are prepared to commit the necessary resources to reach an agreement with claimants on a fair and equitable plan of reorganization as soon as possible.  The Debtors also plan to file a motion in the near term to schedule an estimation trial to determine the estimated amount of the Debtors' Combat Arms and Respirator liabilities, so they can utilize a key tool of sections 524(g) and 105(a) of Bankruptcy Code in the event the parties are unable to reach a settlement.  The Debtors look forward to engaging in good-faith negotiations to reach a consensual resolution of these chapter 11 cases with representatives for tort claimants as soon as they are appointed and willing to begin discussions.

**PART II**
**EVIDENTIARY SUPPORT FOR THE FIRST DAY MOTIONS**

53.    Along with this Declaration, the Debtors have filed the First Day Motions, seeking

orders granting various forms of relief intended to facilitate the efficient administration of these

chapter 11 cases.  The following motions comprise the First Day Motions:

- *Debtors' First Day Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "<u>Joint Administration Motion</u>");

- *Debtors' First Day Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* (the "<u>Case Management Motion</u>");

- *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Maintain Existing Business Forms and Books and Records, and (C) Perform Postpetition Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Claims Among the Debtors, and (III) Granting Related Relief* (the "<u>Cash Management Motion</u>");

- *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Specified Trade Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief* (the "<u>Trade Claimants Motion</u>");

- *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Compensation, and Benefit Obligations and (B) Continue Employee Compensation and Benefits Programs, and (II) Granting Related Relief* (the "<u>Wages Motion</u>");

- *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Continue to Pay Certain Brokerage Fees, and (C) Renew, Supplement, Modify, or Purchase Insurance and Reinsurance Coverage, (II) Approving Continuation of their Surety Bond Program, and (III) Granting Related Relief* (the "<u>Insurance Motion</u>");

- *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Approving the Debtors' Proposed Procedures for Resolving Additional*

*Assurance Requests, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (IV) Granting Related Relief* (the "<u>Utilities Motion</u>");

- *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* (the "<u>Taxes Motion</u>");

- *Debtors' Application for Entry of an Order Authorizing Employment of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* (the "<u>Kroll Retention Application</u>");

- *Debtors' Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (II) Granting Related Relief* (the "<u>Schedules Extension Motion</u>"); and

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File One List of the Top Law Firms Representing the Largest Numbers of Tort Plaintiffs Asserting Claims Against the Debtors, (II) Authorizing the Debtors to File One Consolidated Creditor Matrix, (III) Authorizing the Listing of Addresses of Counsel for Tort Claimants in the Creditor Matrix in Lieu of Claimants' Addresses, (IV) Authorizing the Debtors to Redact Personally Identifiable Information, (V) Approving Certain Notice Procedures for Tort Claimants, (VI) Approving the Form and Manner of Notice of the Commencement of These Chapter 11 Cases, and (VII) Granting Related Relief* (the "<u>Creditor Matrix Motion</u>").

54.     I am familiar with the content and substance of the First Day Motions.  To the best of my knowledge, information, and belief, the factual statements contained in each of the First Day Motions are true and accurate.  Each such factual statement is incorporated herein by reference. I believe that the relief requested in the First Day Motions is in the best interests of the Debtors' estates and all parties interests and will allow the Debtors to operate with minimal disruption and maximum value preservation during the pendency of these chapter 11 cases.  Failure to grant the relief requested in the First Day Motions may result in immediate and irreparable harm to the Debtors and their estates.  Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Court should grant the relief requested in each of the First Day Motions.

A description of the relief requested in and the facts supporting each of the First Day Motions is set forth in **Exhibit A** attached hereto and incorporated herein by reference.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 26, 2022

Name: John R. Castellano
Title: Chief Restructuring Officer
*Aearo Technologies LLC*

Exhibit C

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: *All Cases* | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## *Ex PARTE* MOTION AND INCOPORATED MEMORANDUM TO ISSUE A TEMPORAY RESTRAINING ORDER TO ENJOIN 3M[1] FROM TAKING ANY ACTION OUTSIDE THE MDL TO ENJOIN PARTIES FROM PURSUING CAEV2 LITIGATION AGAINST 3M

Now into court, comes Plaintiff, Richard Valle, through undersigned counsel, who respectfully asks this Court to issue a Temporary Restraining Order ("TRO") for seven (7) days to enjoin 3M from taking any action outside of this MDL to enjoin other parties from pursuing their CAEV2 claims against 3M. The All Writs Act endows the Court with this authority, and the Court is free to take action regarding 3M because the automatic stay only applies to the Aearo entities. The balance of equities and consideration of judicial resources clearly favor this Court—and not the Bankruptcy Court—to decide the limits of the automatic stay as to this litigation. For these reasons, and as fully detailed below, Plaintiff respectfullys ask for a TRO to

---

[1] 3M refers to 3M Company.

1

enjoin 3M, or any party acting on their behalf, from seeking relief to enjoin parties from pursuing their claims arising out of the CAEv2.

## I.  Legal Standard

The standard to obtain a TRO is identical to that of obtaining a preliminary injunction. *Windsor v. United States*, 379 F. App'x 912, 916-17 (11th Cir. 2010). "To obtain a preliminary injunction, the moving party must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the movant outweighs the damage to the opposing party; and (4) granting the injunction would not be adverse to the public interest." *Martin v. Kemp*, 341 F. Supp 3d 1326, 1332 (N.D. Ga. 2018).

## II.  The Automatic Stay only Applies to the Debtor.

It is black-letter law that only a debtor in bankruptcy receives the protection of the Bankruptcy Code's automatic stay provision. *See* 11 U.S.C.A. § 362; *In re Stuart*, 594 B.R. 834, 840 (Bankr. N.D. Ga. 2018) ("[T]he automatic stay of 11 U.S.C. § 362(a) protects only the debtor, property of the debtor, and property of the estate. It does not protect non-debtor parties or their property.") (quoting *In re Advanced Ribbons and Office Products, Inc.*, 125 B.R. 259, 263 (9th Cir. BAP 1991)); *see also In re Teknek, LLC*, 563 F.3d 639, 641–50 (7th Cir. 2009) (declining to extend automatic stay to non-debtor, related co-defendants). Where both the

2

debtor and a non-debtor are separately liable for tortious conduct, there is no basis to extend a stay of litigation to the non-debtor. *Id.* **In simple terms, if the non-debtor wishes to receive the benefits of bankruptcy protection, it must also incur its consequences.**

"Defendant 3M Company is not a debtor in the bankruptcy cases; therefore, the automatic statutory stay does not apply to it by operation of law." MDL Dkt. 3329 at 1. Notably, 3M is the subject of multiple jury verdicts for its *own* conduct related to the CAEv2 earplug. That its co-defendant, Aero, has filed for bankruptcy is immaterial. Unless and until 3M files for bankruptcy, Plaintiffs must remain free to continue to pursue their claims in district court, as they have since the inception of this highly complex MDL.

### III. This Court has the authority to interpret the extent of the automatic stay and whether it applies to these proceedings.

This Court has independent authority to interpret the extent and applicability of a Section 362 automatic stay. *Matter of Mahurkar Double Lumen Hemodialysis Catheter Pat. Litig.,* 140 B.R. 969, 973 (N.D. Ill. 1992) ("[I]t is settled that both the bankruptcy court and the court in which the other litigation exists may construe the automatic stay.") (Easterbrook, J.); *In re Baldwin–United Corporation Litigation,* 765 F.2d 343, 347 (2d Cir.1985)) ("Whether the stay applies to litigation otherwise within the jurisdiction of a district court or court of appeals is an issue of law within the competence of both the court within which the litigation is pending."); *Chicago*

*Title Ins. Co. v. Lerner*, 435 B.R. 732, 735 (S.D. Fla. 2010) ("Federal district courts have jurisdiction concurrent with the originating bankruptcy court to determine the applicability of the bankruptcy court's automatic stay."); *Picco v. Global Marine Drilling Co.,* 900 F.2d 846, 850 (5th Cir.1990). This concurrent authority recognizes that a court overseeing multidistrict litigation "may have the perspective needed to manage litigation that involves other parties" and "may be in the best position to decide" the scope of § 362's applicability to the multidistrict action. *Matter of Mahurkar Double Luman Hemodialysis Catheter Pat. Litig.*, 140 B.R. at 973. Included in that authority is the authority to determine whether the requisite "unusual circumstances" exist to warrant extending a stay to non-debtors. *See, e.g.*, *Gray v. Hirsch*, 230 B.R. 239 (S.D.N.Y. 1999); *Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*, 945 F. Supp. 603 (S.D.N.Y. 1996); *Chicago Title*, 435 B.R. 432. Such "unusual circumstances" do not exist where, as here, the debtor and non-debtor are "independently liable" in tort actions. *Variable Parameter*, 945 F. Supp. at 608 (citing *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)). But, crucially, this Court retains the power to make that determination.

**IV.** **This Court should decide the extent of the automatic stay because it has unparalleled knowledge of the litigation and is currently moving thousands of cases through litigation – all of which will be ground to a halt if 3M has its way.**

This Court and the litigants have spent tens of thousands of hours and hundreds of millions of dollars addressing common legal and factual issues

associated with hundreds of thousands of Plaintiffs' claims. Concerns with judicial economy and avoiding duplicative jurisdiction are always important. *See, e.g.*, *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (noting that "[a]s between federal district courts… though no precise rule has evolved, the general principle is to avoid duplicative litigation") *and Weatherly v. Alabama State Univ.*, 728 F.3d 1263, 1270 (11th Cir. 2013) (finding no reversible error where district court, "[f]aced with the potential of duplicative suits and duplicative discovery… found judicial economy militated in favor of keeping the Appellees' claims together in order to avoid wasting resources"). Such concerns are especially acute with MDLs, which exist for the very purpose of avoiding wasted resources and conflicting judgments in high stakes, complex cases like the case at bar.[2] *See, e.g.*, *In re: Schnuck Markets, Inc., Customer Data Sec. Breach Litig.*, 978 F. Supp. 2d 1379, 1381 (U.S. Jud. Pan. Mult. Lit. 2013) (discussing *In re: Gerber Probiotic Prod. Mktg. & Sales Pracs. Litig.*, 899 F.Supp.2d 1378, 1379 n. 2 (U.S. Jud. Pan. Mult. Lit. 2012), where a judge "opined that the action 'should not proceed independently from [the consolidated action], as judicial economy counsels against unnecessary duplication"). It is because of these considerations that MDLs are often

---

[2] Notably, 3M supported consolidation of claims arising out of the CAEv2. *See* Dkt. 98. It is only now, that 3M has lost 13 of 19 bellwether trials with significant jury verdicts that it claims the MDL should be stayed so that a bankruptcy court, with *no* experience with the facts of this case, should resolve the outstanding 233,000 claims. Such a proposition is ludicrous and not grounded in the law.

referred to as akin to *in rem* proceedings. *See, e.g.*, *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 337 (2d Cir. 1985) *("*[T]he jurisdiction of a multidistrict court is 'analogous to that of a court in an *in rem* action . . . where it is intolerable to have conflicting orders from different courts.'") (citing 17 C. Wright & A. Miller & E. Cooper, Federal Practice & Procedure § 4225 at 105 n.8 (Supp. 1985)); *In re Vioxx Prod. Liab. Litig.*, 869 F. Supp. 2d 719, 726 (E.D. La. 2012) ("[C]omplex litigation cases are sufficiently similar to *in rem* proceedings . . . The theory behind the *in rem* analogy is that when complex litigation has reached the point of sufficient advancement, and there has been substantial investment of time and resources, in essence, a *res* is created.") (Fallon, J.).

At this moment alone, the Court has before it post-trial motions to set aside or undo a jury verdict against 3M. Other final judgments against 3M are on appeal, where 3M has challenged this Court's pre-trial decisions. And scores of other plaintiffs with claims against 3M are subject to wave orders to permit their claims to proceed, relying on the extensive MDL litigation history and countless pre-trial orders. Indeed, fifteen hundred cases have or are currently engaged in Wave discovery. *Daubert* and dispositive motions for approximately three hundred seventy-five Wave 1 cases will be ripe on August 9, 2022, and one Wave 1 case is already set for trial in this district. *See* MDL Dkt. 3329.

**V.    Through the All Writs Act, this Court has the authority to enjoin 3M from attempting to argue the stay applies to this case outside of this Court.**

This Court has the authority to stop 3M from attempting to duplicate this litigation and litigate the same issues elsewhere. It would make a mockery of these extensive proceedings for 3M, as an independent defendant that is not in bankruptcy, to seek potentially conflicting rulings associated with the CAEv2 earplugs in another tribunal. Both to protect the Court's MDL jurisdiction to address all pretrial proceedings, as well as its jurisdiction over individual cases that have proceeded through a jury verdict, this Court has ample authority to prevent 3M from presenting substantially similar legal or factual arguments elsewhere. *See Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1295 n.15 (11th Cir. 2002) ("The court's power to protect its jurisdiction includes the power to enjoin a dissatisfied party bent on re-litigating claims that were (or could have been) previously litigated before the court from filing in both judicial and non-judicial forums, as long as the injunction does not completely foreclose a litigant from any access to the courts, which this one does not."); *New York Life Ins. Co. v. Deshotel*, 142 F.3d 873, 879 (5th Cir. 1998) (affirming a federal district court's power under the All Writs Act to enjoin a party from relitigating the same or similar issues in another federal court); *Liles v. Del Campo*, 350 F.3d 742, 746 (8th Cir. 2003) (holding that the All Writs Act provides that federal courts may issue injunctions related to proceedings in other federal

courts "when necessary for adjudication or settlement of a case."); *Stott v. Capital Fin. Services, Inc.*, 277 F.R.D. 316, 337–38 (N.D. Tex. 2011) (noting that in cases involving a "limited fund," a "court's enjoining of competing procedures is generally necessary to ensure that the 'limited fund' is not depleted").

Accordingly, this Court should temporarily enjoin for the next 7 days, 3M and any party acting on 3M's behalf, from filing any motion, action, proceeding, brief, or other judicial filing that seeks to enjoin parties from pursuing CAEv2 related claims against 3M in this MDL or in district courts where MDL cases have been remanded. *See In re Managed Care Litig.*, 236 F. Supp. 2d 1336 (S.D. Fla. 2002) (where an MDL court exercises its authority under the All Writs Act to prevent settlement in another federal court).

Dated:  July 27, 2022

*/s/ Ashley C. Keller*

Ashley C. Keller (Bar #1029118)
ack@kellerpostman.com
Nicole C. Berg (Pro Hac Vice)
ncb@kellerpostman.com
Ashley Barriere (Pro Hac Vice)
ashleybarriere@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois  60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

***Counsel for Plaintiff Richard Valle***

## CERTIFICATE OF COMPLIANCE
## WITH LOCAL RULES 7.1(F) AND 56.1(E)

I hereby certify that this motion complies with the word limit of Local Rules

7.1(F) and 56.1(E) and contains 1823 words.

*/s/ Ashley C. Keller*
Ashley C. Keller

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2022, I caused a copy of the foregoing to be

filed through the Court's CM/ECF system, which will serve all counsel of record.

<u>*/s/ Ashley C. Keller*</u>
Ashley C. Keller

Exhibit D

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
|---|---|
| This Document Relates to: All Cases | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## ORDER

Plaintiff Richard Valle's *Ex Parte* Motion for a Temporary Restraining Order ("TRO"), ECF No. 3332 is pending.  3M Company filed a response in opposition, ECF No. 3337.  Plaintiff's motion requests a TRO "for seven days to enjoin 3M from taking any action outside of this MDL to enjoin other parties from pursuing their CAEv2 claims against 3M." ECF No. 3332 at 1.

A district court may grant a TRO or preliminary injunction only when there is (1) a substantial likelihood of success on the merits; (2) the plaintiff will suffer irreparable injury absent an injunction; (3) the threatened injury to the plaintiff outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest. *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1307 (11th Cir. 2010). A restraining order is "an extraordinary and drastic remedy" and may be granted only where the moving party has "clearly established" that each of these four requirements is satisfied. *Siegel v.*

*LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal marks omitted). Given that there is presently no automatic stay in place as to 3M Company and the bankruptcy court's decision on whether the automatic stay will apply to 3M Company will not be made until August 18 or later, as well as the fact that the parties have stipulated to continuing Wave 3 discovery deadlines within the MDL, the Court finds that Plaintiff has failed to show irreparable harm absent a seven-day TRO. Accordingly, Plaintiff's *Ex Parte* Motion for a TRO, ECF No. 3332, is **DENIED**.

**DONE AND ORDERED** this 28th day of July 2022.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

Exhibit E

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: *All Cases* | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT 3M COMPANY

Pursuant to the All Writs Act, 28 U.S.C. § 1651(a), and Local Rule 7.1(L), Plaintiff, Richard Valle, respectfully asks this Court to enjoin 3M Company and any party acting on 3M's behalf, from filing any motion, action, proceeding, brief, or other judicial filing that seeks to enjoin parties from pursuing CAEv2 related claims against 3M in this MDL or in district courts where MDL cases have been remanded, or from supporting and/or advocating in favor of any other party seeking to enjoin any parties from pursuing CAEv2 related claims against 3M in this MDL or in district courts where MDL cases have been remanded.[1]  Given the imminent harm, Plaintiff respectfully asks for an expedited briefing schedule such that any opposition be due within 7 days and a hearing to follow within 2 days.

---

[1] This motion is solely directed at 3M Company, who is not a debtor in the bankruptcy, *In re Aearo Technologies LLC, et al.*, 22-02890 (Bankr. S.D. Ind.), and is not subject to the automatic stay. MDL Dkt. 3329

This motion is based on the accompanying memorandum of law, declaration, and exhibits in support of Plaintiff's motion for a preliminary injunction.

Dated:  August 3, 2022

*/s/ Ashley C. Keller*

Ashley C. Keller (Bar #1029118)
ack@kellerpostman.com
Nicole C. Berg (Pro Hac Vice)
ncb@kellerpostman.com
Ashley Barriere (Pro Hac Vice)
ashley.barriere@kellerpostman.com
Frank G. Dylewski (Pro Hac Vice forthcoming)
frank.dylewski@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois  60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

***Counsel for Plaintiff Richard Valle***

## **REQUEST FOR EMERGENCY TREATMENT**

Pursuant to Local Rule 7.1(L), and given the imminent harm as more fully described in the accompanying memorandum, Plaintiff requests a ruling more promptly than would occur in the ordinary course of business because.

## **REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 7.1(K), Plaintiff requests oral argument on this Emergency Motion and estimate that one hour shall be required for such argument.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: *All Cases* | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## MEMORANDUM IN SUPPORT OF RICHARD VALLE'S EMERGENCY MOTION ON BEHLAF OF ALL PLAINTIFFS FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT 3M COMPANY

## **INTRODUCTION**

3M is attempting to halt this MDL in its tracks by invoking an argument that may seem familiar at first blush: once a debtor has filed for bankruptcy, all related litigation in other tribunals must come to a halt, so that the bankruptcy court can efficiently resolve all claims affecting the insolvent entity in a single proceeding. But 3M's litigation strategy is anything but ordinary and in fact seeks to misappropriate the bankruptcy process in a cynical attempt to give a *non-debtor* a second bite at issues that have already been litigated and resolved. That attempt is wasteful, not efficient, and does not further any legitimate interest of the debtors (the Aearo entities), let alone a legitimate interest of an independently liable non-debtor (3M). Fortunately, 3M's superficial appeals to bankruptcy conventional wisdom are not actually supported by bankruptcy law. And this Court has well-established authority to put a halt to 3M's tactical gamesmanship.

The Constitution vests "judicial power" in federal courts that wield jurisdiction over specified "cases" and "controversies." U.S. Const. Article III, § 2, Cl. 2. And Congress vested this Court with exclusive statutory jurisdiction to oversee pretrial proceedings over diverse "civil actions" related to the CAEv2 earplugs manufactured and sold by Defendants. 28 U.S.C. § 1407; MDL Dkt 1.

Since April 3, 2019, this Court has tirelessly wielded its jurisdiction to issue myriad rulings that effect hundreds of thousands of Plaintiffs, including movant

Richard Valle.   The Court has ruled—which is to say, exercised its jurisdiction—on 24 *Daubert* motions, 263 motions in *limine*, 42 motions for summary judgment, all deposition designations in preparation for 16 bellwether trials, and 6 post-trial motions.  It has itself presided over six bellwether trials, including two with final judgments that are on appeal to the *only* intermediate appellate court with jurisdiction to review the decisions of this tribunal, the United States Court of Appeals for the Eleventh Circuit.

Now, some three years into this MDL, this Court's jurisdiction is under collateral attack.  Unsatisfied with scores of this Court's careful rulings, and unwilling to press their claims of error to the Eleventh Circuit, Defendants seek refuge in an Article I tribunal, the United States Bankruptcy Court for the Southern District of Indiana (the "Bankruptcy Court").  Defendants Aearo Technologies LLC and certain of its affiliates (the "Aearo Debtors") have filed a petition for Chapter 11 bankruptcy.  *See* MDL Dkt.  3328.  None of the Defendants, including 3M— a *non-debtor*—even attempt to mask their brazen intentions in the Bankruptcy Court.  They claim this Court has presided over an *unfair* MDL and issued *erroneous* decisions that overstate Plaintiffs' right to relief.  So they ask the Bankruptcy Court to institute a claims process to value Plaintiffs' claims "on a scientific basis based on a fair and complete evidentiary record."  Ex. A, Informational Brief of Aearo Technologies, LLC at 12, 43-50, 56-57 (hereafter "Ex. A, Infor. Br.").  Defendants

invite the Bankruptcy Court to reapply the "Federal Rules of Evidence, including Rules 702 and 703" and issue *Daubert* decisions that *directly conflict* with this Court's rulings.   *Id.* at 56.   And to "resolve summary judgment" motions in their favor based on defenses this Court has already *rejected* time and again.   *Id.*

This Court need not sit idly by while its Article III and statutory jurisdiction are impugned.   Our Republic's very first Congress enacted the All Writs Act in 1789. That provision of federal law empowers this Court to issue "all writs necessary or appropriate in aid of [its] jurisdiction."   28 U.S.C. § 1651.   As ancient and modern precedent confirms, that broad power was tailor made for this situation, where a defendant—dissatisfied with judgments it disagrees with—seeks not to exercise its appellate rights but instead to relitigate matters anew in another tribunal.   It is no slight to the competence of the Bankruptcy Court to conclude that 3M is not free to revisit and undermine this Court's adjudicatory authority.

Mr. Valle recognizes that this Court previously denied his hurried motion for an *ex parte* temporary restraining order on the ground that he failed to show irreparable harm.   MDL Dkt 3343.   This more complete motion shows that attacks on a Court's properly vested jurisdiction undermine the integrity of the judicial process.   Under binding precedent, that is irreparable harm as a matter of law.   And 3M's threat to imminently abrogate this Court's jurisdiction irreparably harms Mr. Valle even under traditional principles of equity.   3M supports a motion that will be

heard in the Bankruptcy Court on August 15 to stay Mr. Valle and every other Plaintiff from pursuing CAEv2 related cases against 3M in this or any other federal court.  If that motion is granted, it will assure that this Court cannot protect its jurisdiction going forward.  In our adversarial system, this Court cannot rule on disputed matters if parties are forbidden from filing briefs and making arguments.

Robbing this Court of its constitutional and statutory jurisdiction will work an especially cruel hardship on Mr. Valle and similarly situated Plaintiffs.  Mr. Valle is a Wave 1 Plaintiff whose case is almost ready for trial.  He has been deposed; undergone a Defense Medical Examination; retained an expert who submitted a Rule 26 report and sat for a deposition; filed dispositive and *Daubert* motions against the Defendants; and is now opposing Defendants' dispositive and *Daubert* motions. Halting his case against *non-debtor* 3M so that he can start the entire process anew in a different tribunal imposes costs for which the law lacks an adequate remedy. The gross inefficiency of 3M's attempted jurisdiction strip is especially problematic in the context of this bankruptcy proceeding, because Mr. Valle is *entitled by law* to an Article III court's adjudication of his claims.

Section 157(b)(5) of the Bankruptcy Code provides unequivocally that personal injury claims "shall be tried in the district court in which the bankruptcy court is pending, or in the district court in which the claim arose."  11 U.S.C. § 157(b)(5).  And of course, once a CAEv2 personal injury case is in district court,

it is a near certainty that it will be tagged and transferred by the JPML *back to this Court* for all pretrial proceedings. *See* MDL Dkt. 1. An Article III Court always has the power under the All Writs Act to prevent another tribunal from second guessing its jurisdiction. But wielding that statutory authority should be all but automatic when 3M seeks years of wrangling, delay, and expense *relitigating* in Bankruptcy Court matters this Court has already decided, only for the Bankruptcy Court to then yield—as required by black-letter bankruptcy law—to an Article III tribunal, roundtripping Mr. Valle's matter right back to where it currently sits.

For these reasons, Mr. Valle now moves for a preliminary injunction preventing 3M from (i) relitigating matters in Bankruptcy Court that this Court has already adjudicated and (ii) supporting an injunction against any Plaintiffs from litigating CAEv2 matters against 3M in this Court or following a remand for trial. To be clear, Mr. Valle is not asking the Court to enjoin any debtors in bankruptcy, as such entities are shielded by operation of the automatic stay. But 3M is not a debtor in bankruptcy, has no ability to sidestep this Court's authority,[1] and should be enjoined from making a mockery of Congress's unambiguous decision to vest this MDL Court with jurisdiction to issue judgments that 3M prefers to defy.

---

[1] 3M may continue to argue that the automatic stay applies to it, but that specious argument has been rejected by both this Court and the Bankruptcy Court. *See* Ex. C, Tr. July 27, 2022 Bankr. Hrg. at 103:8-105:22 ("Well I guess you may teach me because I disagree with you, but I don't know if you're going to have an apt student here. The stay doesn't automatically apply to random people.").

## BACKGROUND

Parties who disagree with Court orders but respect the rule of law have two options: file a motion for reconsideration or file a notice of appeal.

For three-and-a-half years, this Court has successfully steered this MDL, through a global pandemic no less, to complete sixteen bellwether trials, prepare over a thousand cases for remand, and transfer tens of thousands of cases to the active docket. Despite this, on July 26, 2022, the Aearo Debtors filed a Chapter 11 bankruptcy case in an attempt to abolish the Court's rulings in this case. 3M ignores the history of this case and portrays this litigation as "the failure of the largest MDL in U.S. history." Ex. A Infor. Br. at 1. A constant refrain from 3M is the "colossal docket" where "standard MDL early vetting tools . . . were curtailed or abandoned," *id.* at 3, 29-33, and exempted "from basic filing requirements." *Id.* at 33. 3M also seeks to blame the Plaintiffs' attorneys for an "extensive marketing campaign" to reach the claimants in this MDL. *See id.* at 25-29.

All of this revisionist history—blaming this Court and Plaintiffs' attorneys— is a legally irrelevant mirage.[2] The overwhelming majority of the management and

---

[2] The Aearo Debtors seek to sabotage the MDL by falsely accusing the Court of improper conduct. *See e.g.* Ex. A, Infor. Br. at 43 ("The frenetic bellwether cadence, coupled with the cascading effects of substantial evidentiary errors and false narratives, tainted the trials from the start."); *id.* at 7 ("[S]ome of the most basic tools of MDL practice, including medical records releases and production, along with filing requirements, were eliminated or suspended early on, reducing any chance of success an MDL might otherwise offer."). Ex. C, Tr. July 26, 2022 Bankr. Hrg. at

progression issues of which Defendants complain are of their own making.  In the first year of this MDL, 3M negotiated and signed a tolling agreement—the supposed death knell of the MDL—relieving the Plaintiffs of the requirement to file their cases on the active docket in exchange for detailed case information contained on the Census Form, certain documents within their possession, and the obligation to request official records from the government.  *See, e.g.*, Ex. B, Tolling Agmt. Between Plaintiff's Counsel and Defendants (signed by Mark Nomellini, Kirkland & Ellis "[f]or Defendants," August 26, 2019).  In other words, 3M not only agreed to suspend the "gatekeeping mechanism" it now claims is improperly lacking, it was a willing participant.  Unsurprisingly, the Aearo Debtors and 3M have not relayed their freely chosen litigation decisions to the Bankruptcy Court.[3]  Ex. A, Infor. Br at

---

110:1-7 ("And I'm also informed that there are communications between where apparently Judge Rodgers is listening into this and we're now, you know, getting messages about it is that she apparently has said that she might be prepared to do. And they're not coming through any formal line of communication and so I'm very concerned about that.  I think everybody should be concerned about that."); *id.* at 42:20-43:2 ("We have one case before one MDL judge, and they're saying, oh, let's tag-along the bankruptcy so that judge has it too, *when the heart of our problem comes out of her court*.  And it's regardless of whether she did what right or she did wrong.  It's we're you know, it's in the fact is indifferent to it.  The fact is we've got a docket that's broken and a case that's broken.") (emphasis added).

[3] This Court, however, has intimate familiarity with the history of this litigation and the actions of the parties.  Defendants have therefore found no success with trying to cast blame on others in this Court.  *See, e.g.*, MDL Dkt. 2953 at 1 (explaining that the creation of the administrative docket was "in small part for the benefit of Defendants [ ] who were clamoring for data about individual claimants at the time").

33.  Furthermore, as detailed in a prior plaintiffs' filing, the requirement to produce records was suspended and replaced with a tiered approach due to difficulties associated with obtaining records from the government.  *See* MDL Dkt. 3255. Defendants were aware of these difficulties and were, in fact, part of the negotiations between the parties, the Court, and the government.  *Id.*[4]

3M no longer likes the decisions it freely made.  And it can barely mask its utter disdain for this Court's rulings and prior juries' verdicts.  So it has embraced a new strategy: Ask the Bankruptcy Court to *disregard* the Court's Orders in search of a second bite at the apple and  different outcomes.  For instance, five pages of the Informational Brief filed on the *first day* of the Aearo Debtors' bankruptcy disputes the Court's rulings on the admissibility of the Air Force Letter, the Michaels testing, and the applicability of the Government Contractor Defense.  Ex. A, Infor. Br at 45-50.  The Court has issued multiple substantive rulings on the evidentiary issues,[5] and those rulings, as well as the Government Contractor Defense, are currently on appeal

---

[4] Although 3M complains about the lack of medical records, the difficulties with obtaining medical records from the government will not somehow resolve upon transfer to the Bankruptcy Court.  Moreover, as this Court knows, "[t]he Department of Defense has recently put a process in place for a contractor to obtain and produce DOEHRS data for individual plaintiffs, which will fulfill the informational needs with respect to non-Wave plaintiffs at this stage of the litigation."  MDL Dkt. 3344.
[5] *See, e.g.*, Air Force Letter: *Estes*, 7:20-cv-137, Dkt. 205 at 4; *Baker*, 7:20-cv-39, Dkt. 129-1; 209 at 4; Michaels testing: *Baker*, Dkt. 118; MDL Dkt. 2244; *see also Baker*, Dkt. 187.

at the Eleventh Circuit.  *See 3M Co., et al. v. Estes, et al.*, Nos. 21-13131, 21-13133, 21-13135; *3M Co., et al. v. Baker*, No. 21-12517.

3M does not hide its disrespect for this Court's rulings.  *See, e.g.*, Ex. A, Infor. Br. at 43 ("[T]he MDL court gutted defenses and barred key evidence in the 16 bellwether cases (some with multiple plaintiffs), which were tried in an unprecedentedly compressed time span—an average of one trial per month.").  It invites the Bankruptcy Court to "resolve the claims" "on a scientific basis *based on a fair and complete evidentiary record*."  Ex. A, Infor. Br at 57 (emphasis added).  The Debtors' counsel reiterated the point to the Bankruptcy Court: "We would propose, ultimately as part of an estimation process, that the estimation be based on scientifically calculated allocations and determinations of liability."  Ex. B, 7/26/22 Bankr. Tr. at 23:4-7.  The barely veiled subtext of 3M's assault on this Court's jurisdiction is that the MDL has defied basic science, conducted an unfair process, and predicated its judgments on an incomplete record.

The affront to this Article III Court's judicial power is as brazen as it is lawless.  *Even if* this Court had misapplied the law, a litigant is not free to undermine the integrity of the judicial process by running to a new tribunal and seeking a do over.  And of course, 3M's gross mischaracterization of this deftly managed MDL is nothing but tendentious advocacy over disputed issues that juries and this Court correctly resolved against the company.  For instance, the Informational Brief baldly

represents that "[m]ost plaintiffs have no proof that they ever used the Combat Arms," largely premised on a section of the DD 2215 Reference Audiogram titled "Personal Hearing Protection – Type Used." *Id.* at 37 ("These forms therefore provide a reliable record of a soldier's hearing protection over time."). The expert and fact testimony elicited over the past two years, however, makes clear that the DD 2215 is anything but reliable, and in no way accurately proves whether a servicemember used the CAEv2. *See, e.g.* Ex. C, 4/13/21 *Estes, Hacker, Keeer* Trial Tr. at 47:9-51:18) (Packer) (testifying as to the various ways the DD 2215 could have been filled out and stating "I think there would be probably rare occurrences where somebody might have actually placed Combat Arms in the comment box on that box"); Ex. E, 9/23/21 *Adkins* Trial Tr. at 278:5 (Ohama) (testifying that the "accuracy could be questioned" as to the form DD 2215s).

The Informational Brief then goes on to completely misrepresent the complicated, nuanced science that has been heavily litigated in this case to baldly proclaim "Most Plaintiffs have no Hearing Loss," based solely on the World Health Organization (WHO) hearing loss criteria. Ex. A, Infor. Br at 39-41. But WHO provides just one standard for hearing loss, a standard that does not account for shifts and is not followed by many other hearing-related organizations, including American Speech Language Hearing ("ASHA") and the American Academy of Audiology. Whether a particular plaintiff suffers from hearing loss is an issue that

has been the subject of expert debate, a debate resolved by juries, consistent with the Seventh Amendment. *See, e.g.* Ex. F, 11/3/21 Camarillorazo Trial Tr. at 710:14-711:711 (Spankovich) (testifying that slight hearing loss is sustained at 15 to 25 dB as defined by the ASHA and the American Academy of Otolaryngology Head and Neck Surgery). Notably, 3M's summary of applicable hearing loss measurements also flouts the Court's Order on Hidden Hearing Loss. *See* MDL Dkt. 1933. This Court, having ruled on so many *Daubert* motions, presided over six bellwether trials, and participated in two "Science Days,"[6] has a thorough understanding of both the complexity of the science in this case and the flippant manner in which the Informational Brief ignores it.

3M's motives are not in dispute. It wants to wipe out the scientific and evidentiary rulings that the Court and the parties have tirelessly litigated; it wants to sidestep this Court's summary judgment decisions on 3M's meritless defenses; and it wants to undo multiple jury verdicts and final judgments against it. It seeks to achieve these aims not through an appeal (which 3M will not win), but through what is tantamount to a complete do over in a different court that 3M simply hopes will see things differently from this tribunal. To state the obvious, if 3M had prevailed on its various arguments before this Court, or if it thought it had strong odds of

---

[6] Which resulted in, *e.g.*, an Order from the Court dictating, according to reliable scientific authority, which medications experts could present as "ototoxic" in their causation opinions. MDL Dkt. 1330.

identifying reversible error by this Court on appeal, it would not be smearing the work of this Court and attempting to relitigate the same issues in another forum. 3M's position is simply that, if the Court and juries do not rule in its favor, the process is illegitimate. This Court should not countenance such a flagrant disregard for its constitutional and statutory authority. To protect its jurisdiction, this Court should grant Mr. Valle's motion.

## LAW AND ANALYSIS

### I.     Preliminary Injunction Standard

The standard for an injunction under the All Writs Act is less demanding than that of a traditional preliminary injunction under Rule 65. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004). "Whereas traditional injunctions are predicated upon some cause of action, an All Writs Act injunction is predicated upon some other matter upon which a district court has jurisdiction. Thus, while a party must 'state a claim' to obtain a 'traditional' injunction, there is no such requirement to obtain an All Writs Act injunction—it must simply point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by someone else's action or behavior. The requirements for a traditional injunction do not apply to injunctions under the All Writs Act because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns." *Id.* "Proceedings in other courts that involve the

same facts as already issued judgments and orders, or that could result in the issuance of an inconsistent judgment, threaten the jurisdiction of the district court enough to warrant an injunction." *Id.* at 1104. *See also In re NTE Connecticut, LLC,* 26 F.4th 980, 987 (D.C. Cir. 2022) (Federal courts have "inherent power under the All Writs Act" to preserve their "prospective jurisdiction."). And even if Mr. Valle needed to satisfy the traditional injunction standard, his motion should be granted.

## II. Mr. Valle is certain to succeed on the merits because 3M cannot deny that it seeks to undermine this Court's jurisdiction.

"The All Writs Act, 28 U.S.C. § 1651(a), confers 'extraordinary powers' upon federal courts." *In re Managed Care Litig.*, 236 F. Supp. 2d 1336, 1339 (S.D. Fla. 2002). The Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. "Th[e] [Supreme] Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Tel. Co.*, 434 U.S. 159, 172, (1977). "This statute has served since its inclusion [ ] in the original Judiciary Act as a legislatively approved source of procedural instruments designed to achieve 'the rational ends of law.'" *Harris v. Nelson*, 394 U.S. 286, 299 (1969). As the Eleventh Circuit explained, "[t]he court's power to protect its jurisdiction

14

includes the power to enjoin a dissatisfied party bent on re-litigating claims that were (or could have been) previously litigated before the court from filing in both judicial and non-judicial forums, as long as the injunction does not completely foreclose a litigant from any access to the courts." *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1295 n.15 (11th Cir. 2002); *see New York Life Ins. Co. v. Deshotel*, 142 F.3d 873, 879 (5th Cir. 1998).

That power was created for precisely this situation.  3M cannot and does not dispute that it plans to argue in Bankruptcy Court that this Court's myriad orders, decisions, and final judgments should be reconsidered and overruled.  Though dissatisfied litigants usually try 3M's gambit by attempting to relitigate adverse federal-court decisions in state court, the All Writs Act provides ample authority to enjoin the maneuver when tried in another federal tribunal. *See, e.g.*, *New York Life Ins. Co.*, 142 F.3d at 879. In *In re Managed Care Litigation*, for instance, the MDL court relied on the All Writs Act to enjoin an MDL defendant from proceeding with pursuing a settlement in another federal jurisdiction.  236 F. Supp 2d 1336, 1343 (S.D. Fla. 2002).  In response to the defendant's argument that the court should assume that all federal judges will follow the law, the court explained "the JPML vested in this Court the authority to streamline pretrial proceedings in these actions, while concomitantly directing the appropriate resolution of all claims," and that "[i]n order to follow the JPML's mandate, an injunction preventing [defendant] from

proceeding with the settlement is necessary from the standpoint of the proper administration of justice." *Id.*; *see In re Am. Honda Motor Co., Inc.*, *Dealerships Relations Litig.*, 315 F.3d 417, 441 (4th Cir. 2003) (injunction pursuant to All Writs Act "was necessary to vindicate the district court's exclusive jurisdiction to resolve interpretive questions under the MDL Settlement Agreement"); *Liles v. Del Campo*, 350 F.3d 742, 746 (8th Cir. 2003) (holding that the All Writs Act provides that federal courts may issue injunctions related to proceedings in other federal courts).

The need to draw upon the All Writs Act is particularly acute for an MDL court, such as this one, where the litigation has significantly progressed.  Congress established MDLs through 28 U.S.C. § 1407 to avoid wasted resources and conflicting judgments in high stakes, complex cases, so it is especially critical for MDL courts to exercise their authority and quash competing, duplicative litigation. *See, e.g.*, *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 337 (2d Cir. 1985) ( *"*[T]he jurisdiction of a multidistrict court is 'analogous to that of a court in an *in rem* action . . . where it is intolerable to have conflicting orders from different courts.'") (citing 17 C. Wright & A. Miller & E. Cooper, Fed. Practice & Procedure § 4225 at 105 n.8 (Supp. 1985)).  As the *Vioxx* MDL court explained, a justification for an MDL court to enjoin another proceeding "is that complex litigation cases are sufficiently similar to *in rem* proceedings so as to permit injunctions on cases actually *in personam* in nature."  *In re Vioxx Prod.*

*Liab. Litig.,* 869 F. Supp. 2d 719, 726 (E.D. La. 2012) (Fallon, J).  The court went

on to state "[t]he theory behind the *in rem* analogy is that when complex litigation

has reached the point of sufficient advancement, and there has been substantial

investment of time and resources, in essence, a res is created."  *Id.*

This MDL has certainly "reached the point of sufficient advancement" with a

"substantial investment of time and resources."  *In re Vioxx Prod. Liab. Litig.,* 869

F. Supp. 2d at 726.  It would make a mockery of these extensive proceedings for

3M, as an independent, non-debtor defendant that is not a debtor in a bankruptcy

case, to seek conflicting rulings associated with the CAEv2 in Bankruptcy Court.

But that attack on this Court's jurisdiction is certain absent injunctive relief.

The Bankruptcy Code does not create any exemption that shelters non-debtors

from the All Writs Act or requires this Court to yield its authority to prevent attacks

on its jurisdiction by non-debtors.  If anything, this Court's need to protect its own

jurisdiction is more pronounced in this context, because it implicates separation-of-

powers concerns.  When a litigant attempts an end-run around a federal court's

jurisdiction by attempting to relitigate in another Article III tribunal of equal dignity,

it undermines the integrity of the judicial process.  But the Bankruptcy Court is an

Article I tribunal; it cannot constitutionally wield the "judicial power of the United

States."  U.S. Const. Art. III, Sec. 1; *Stern v. Marshall,* 564 U.S. 462, 484 (2011).

Permitting a litigant to abrogate this Court's jurisdiction in favor of a tribunal in a

different branch of government would undermine this Court's crucial "role in implementing the separation of powers," which the framers designed into our constitutional system to safeguard the peoples' cherished liberties. *Id.* at 483.

It is blackletter law that that this Court may issue an injunction to stop collateral attacks on its jurisdiction in parallel *federal court* proceedings. It follows *a fortiori* that 3M may not seek to sidestep this Court's jurisdiction in favor of an Article I tribunal. 3M can point to no authority that eliminates this Court's powers under the All Writs Act when the collateral attack comes from a non-debtor in a bankruptcy court.

## III.  Plaintiff, along with all of the MDL plaintiffs, faces irreparable harm if the Court does not enjoin 3M.

Even if Mr. Valle needed to show traditional irreparable harm to obtain an All Writs Act injunction, he easily meets that standard. 3M seeks to undermine this Court's jurisdiction, second guessing existing rulings and *enjoining* Mr. Valle from participating in his own case in this Court. It is irreparable harm to require litigants to *relitigate* issues that have already been decided by a court of competent jurisdiction. It only exacerbates that harm to prevent the litigant from participating in his own Article III case or controversy. That is precisely why "in aid of jurisdiction" injunctions under the All Writs Act routinely issue in situations such as this. Stated conversely, if the need to relitigate issues were *not* irreparable harm,

18

then an All Writs Act injunction could effectively never be justified.  *Klay*, 376 F.3d at 1100.

Mr. Valle's status as a personal injury tort victim only makes this case stronger than the typical one—in which a dissatisfied litigant flees to another tribunal.  That is because the dissatisfied litigant here, 3M, is attempting to whisk Mr. Valle and every other Plaintiff away to a court *that lacks statutory authority* to adjudicate his case.  Section 157(b)(5) requires the district court to "order that personal injury tort or wrongful death claims shall be tried in the district in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending."  *See generally In re Roman Cath. Church for Archdiocese of New Orleans*, 2021 WL 3772062, at *2 (E.D. La. Aug. 25, 2021).[7]   3M would relegate Plaintiff to the Bankruptcy Court for years.  But to what end?  Plaintiff will not consent to a bankruptcy court adjudication of his claim*, cf. Marshall,* 564 U.S. at 478-79, and thus will be *entitled* by statute to an Article III adjudication.  And is there any doubt what will transpire when his case at long last returns to federal court?  It will, alongside countless other cases, be tagged and transferred by the JPML back to this

---

[7] Plaintiff recognizes that Section 157(b)(5) is procedural and not jurisdictional.  *See Stern v. Marshall*, 564 U.S. 462, 478-79 (2011).   For avoidance of doubt, Plaintiff confirms he will <u>not</u> consent to the Bankruptcy Court's jurisdiction for final adjudication of his claims.

Court for pre-trial adjudication.   Attempts to undermine this Court's jurisdiction should never be countenanced.   But that is doubly so when the effort offers only an expensive detour on the path to justice that inevitably runs back to this Court.

The looming hearing on August 15 illustrates the definiteness of Plaintiff's injury; it is not a hypothetical scenario.   A preliminary injunction is thus necessary to prevent 3M from arguing in favor of staying proceedings against it in this Court. Without this equitable relief, Plaintiff will likely irrevocably lose the ability to invoke the Court's Orders and will be forced to start his case afresh, right when it is ready to be remanded for trial.

## IV.   Balance of Hardships

Any threatened injury to Plaintiff clearly outweighs the harm to 3M, who would merely be required to continue with litigation in this forum.   3M can produce *no authority* that requiring a non-debtor to litigate in a forum, which 3M consented to, is a hardship by any measure.   To be sure, 3M believes it could benefit from avoiding a forum where it has been losing and relitigating legal and factual issues already decided by this Court.   But the inability to obtain a do-over is not cognizable irreparable harm.   By contrast, Plaintiff will lose the ability to draw on the extensive scientific and evidentiary rulings developed in the MDL.   As detailed *supra* Section III, Plaintiff will likely be forced to go to the Bankruptcy Court only to end up where he started, thus enduring significant delay with his case.

And to the extent 3M wants to argue the stay applies to it, this Court is best equipped to decide the parameters of the automatic stay. The Court has unparalleled knowledge of the parties, the issues, the science, and the law—more so than the parties themselves. 3M has no plausible justification as to why the Bankruptcy Court—and not this Court—should rule on the scope of the stay.

## V.  The preliminary injunction would serve the public interest.

The preliminary injunction would also serve the public interest. Instituting the stay would prevent 3M from improperly gaming the system to erase the litigation and the Court's work over the past several years. On the other hand, allowing 3M, a non-debtor, to proceed with its charade of invoking the automatic stay would create devastating precedent for future torts actions.[8] The Court should not allow 3M to simply wipe away the litigated record in these cases to the detriment of innocent claimants, like Plaintiff, because 3M is displeased with the results. Allowing such action to stand will signal to future tortfeasors that they can simply escape the civil

---

[8] 3M has justified its contemptible bankruptcy ploy by dismissing the tort system and large MDLs. As the Aearo Debtors (and 3M's lawyers in this action, Kirkland & Ellis) explained, "Lawyers, scholars, and judges have long raised questions about the utility of large MDLs to resolve mass tort claims, as aggregations of untested claims have become a magnet for frivolous lawsuits that otherwise may never have filed and inevitably result in the compensation of claims with little or no merit. The Combat Arms MDL exemplifies these problems." Exhibit A, Infor. Br. at 11-12. 3M actually supported consolidation of claims arising out of the CAEv2. *See* JPML Dkt. 98. It is only now that 3M has lost 13 of 19 bellwether trials with significant jury verdicts that it claims the MDL should be stayed so that another forum, with *no* experience with the facts of this case, should resolve the outstanding 233,000 claims.

justice system by having a related entity file bankruptcy—and not even the specific defendant itself—and extend the stay to the defendant without imposition of any bankruptcy obligations. That is a dangerous precedent to set, and one this Court should not sanction.

### VI. No evidentiary hearing is required here, but an expedited hearing for oral argument is necessary.

Finally, while courts sometimes order expedited discovery and an evidentiary hearing prior to entry of a preliminary injunction, neither is necessary when there are no issues of material fact in controversy that the court must resolve prior to ruling on a motion for preliminary injunction. *McDonalds Corp. v. Robertson*, 147 F.3d 1301, 1302 (11th Cir. 1998) ("Because no issues of material fact were in controversy when the district court ruled on the motion for preliminary injunction, we find that the district court acted well within its discretion and did not err in declining to hold an evidentiary hearing."); *Poarch Band of Creek Indians v. Hidreth*, 656 Fed.Appx. 934, 942 (11th Cir. 2016) (affirming preliminary injunction: "Thus, no material facts necessary to the legal determination on which the district court based its decision were in dispute, and no evidentiary hearing was required.").

Here, there are no relevant issues of material fact in dispute: this motion is based on the evidentiary record consisting of the Court's prior labor and rulings in this MDL, and the actions Debtors (and 3M) are taking in a separate court to try to frustrate the instant proceedings. None of these relevant facts require further

supplementation through discovery, nor does the Court need to hear witness testimony in an evidentiary hearing to preserve the record on which Plaintiff's requested preliminary injunction would be based. Any request by 3M to delay resolution of this motion through expedited discovery and/or an evidentiary hearing should therefore be denied.

## **CONCLUSION**

For these reasons, and as detailed herein, Plaintiff respectfully asks this Court to enjoin 3M and any party acting on 3M's behalf, from filing any motion, action, proceeding, brief, or other judicial filing that seeks to enjoin parties from pursuing CAEv2-related claims against 3M in this MDL or in district courts where MDL cases have been remanded. Given the imminent harm, Plaintiff respectfully asks for an expedited briefing schedule such that any opposition be due within 7 days and a hearing to follow within 2 days.

Dated:  August 3, 2022            */s/ Ashley C. Keller*

Ashley C. Keller (Bar #1029118)
ack@kellerpostman.com
Nicole C. Berg (Pro Hac Vice)
ncb@kellerpostman.com
Ashley Barriere (Pro Hac Vice)
ashley.barriere@kellerpostman.com
Frank G. Dylewski (Pro Hac Vice forthcoming)
frank.dylewski@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois  60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

***Counsel for Plaintiff Richard Valle***

## CERTIFICATE OF COMPLIANCE
## WITH LOCAL RULES 7.1(F) AND 56.1(E)

I hereby certify that this motion complies with the word limit of Local Rules

7.1(F) and 56.1(E) and contains 5,819 words.

*/s/ Ashley C. Keller*
Ashley C. Keller

## <u>CERTIFICATE OF COMPLIANCE</u><br><u>WITH LOCAL RULES 7.1(B) AND 7.1(B), (C)</u>

Pursuant to Local Rule 7.1(B), counsel for Plaintiff and 3M company conferred on August 3, 2022, regarding the foregoing motion but were unable to resolve the issues with 3M Company.

<em>/s/ Ashley C. Keller</em><br>Ashley C. Keller

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 3, 2022, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Ashley C. Keller*
Ashley C. Keller

Exhibit F

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to All Cases | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

### <u>ORDER</u>

Plaintiff Richard Valle has filed an Emergency Motion for Preliminary Injunction Against 3M Company. *See* ECF No. 3358. Given the urgency of the above motion, Defendant 3M Company is directed to file its response, if any, by August 9, 2022 at 5 p.m. Central. Plaintiff's reply, if any, is due by August 10, 2022 at 5 p.m. Central. Oral argument on the matter will be held on August 11, 2022 at 10 a.m. Central at the United States District Court, One North Palafox Street, Courtroom 5, Pensacola, Florida. Each side must advise the Court of who will argue on its behalf by August 10, 2022 at 5 p.m. Central. Counsel who will present argument must appear in person.

**SO ORDERED**, on this 3rd day of August, 2022.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

Exhibit G

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG   )   Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,  )
                             )   Pensacola, Florida
                             )   August 11, 2022
                             )   10:05 a.m.
                             )
                             )
_____)


**ORAL ARGUMENT**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE

(Pages 1-76)


**A P P E A R A N C E S**

**FOR THE PLAINTIFFS:**   Keller Lenkner, LLC
                      By:  **ASHLEY KELLER**
                         *ack@kellerlenkner.com*
                      150 N. Riverside Plaza, Suite 4270
                      Chicago, Illinois  60606


                      Quinn Emanuel Urquhart
                      By: **ADAM B. WOLFSON**
                        *adamwolfson@quinnemanuel.com*
                      865 South Figuero St., 10th Floor
                      Los Angeles, California  90017

<u>**A P P E A R A N C E S**</u>

**FOR THE PLAINTIFFS:**
                    Aylstock, Witkin, Kreis & Overholtz
                    by:  **BRYAN F. AYLSTOCK**
                        *baylstock@awkolaw.com*

                        **JENNIFER HOEKSTRA**
                        *jhoekstra@awkolaw.com*
                    17 E Main Street, Suite 200
                    Pensacola, Florida  32502

                    Clark Love & Hutson, GP
                    by:  **SHELLEY HUTSON**
                        *bgreif@triallawfirm.com*
                    440 Louisiana Street, Suite 1600
                    Houston, Texas  77002

**FOR THE DEFENDANTS:**  Moore, Hill & Westmoreland, PA
                    By:  **CHARLES F. BEALL, JR.**
                        *cbeall@mhw-law.com*
                    350 W Cedar Street, Suite 100
                    Pensacola, Florida  32502

                    White & Case
                    By:  **JESSICA C. LAURIA**
                        *Jessica.lauria@whitecase.com*
                    1221 Avenue of the Americas
                    New York, New York  10020-1095

10:08:34   1   post-trial motions have been resolved, and two are final

10:08:37   2   judgments that are on appeal to the United States Court of

10:08:40   3   Appeals for the Eleventh Circuit.

10:08:41   4          It is unquestioned that you have jurisdiction -- I

10:08:46   5   think -- over this MDL.  And this is not an MDL in an ascent

10:08:54   6   phase; it's not just getting out of the starting block.  You

10:08:54   7   have presided over an MDL that has resulted in 16 jury verdicts

10:08:57   8   in three-and-a-half years with 19 final judgments for veterans.

10:09:03   9   It is a remarkable achievement.

10:09:05   10          **THE COURT:**  I think it's actually 19 separate

10:09:08   11   verdicts.

10:09:09   12          **MR. KELLER:**   19 separate verdicts with 16 jury trials,

10:09:13   13   correct, Your Honor.

10:09:14   14          Because you have jurisdiction, it should also be

10:09:16   15   undisputed that you have the statutory authority to protect it.

10:09:20   16   This goes back to the dawn of our republic.  The very first

10:09:24   17   Congress in 1789 passed the very first judiciary act that

10:09:29   18   included and codified the All Writs Act that gives you the

10:09:34   19   power to use equity in aid of your jurisdiction where that

10:09:37   20   comports with the usages and principles of law.

10:09:40   21          Why does this power exist to act in aid of your

10:09:43   22   jurisdiction?  The heartland case is where a litigant is

10:09:48   23   hell-bent on relitigating issues that Your Honor has already

10:09:52   24   adjudicated in another tribunal.

10:09:55   25          **THE COURT:**  Has 3M -- I believe they said they weren't

| | | |
|---|---|---|
| 10:09:59 | 1 | intending to re-litigate -- |
| 10:10:02 | 2 | **MR. KELLER:**  They do say that. |
| 10:10:05 | 3 | **THE COURT:**  I don't know if the distinction is going |
| 10:10:07 | 4 | to be between judgments or issues, I'm not sure but -- |
| 10:10:09 | 5 | **MR. KELLER:**  It covers both, Your Honor, under the All |
| 10:10:13 | 6 | Writs Act, because you have authority to protect jurisdiction |
| 10:10:14 | 7 | that you've already exercised that is culminated in a final |
| 10:10:16 | 8 | judgment.  And under Eleventh Circuit precedent such as *Clay*, |
| 10:10:19 | 9 | it's very clear that you also have jurisdiction to protect your |
| 10:10:24 | 10 | jurisdiction for go-forward proceedings such as Mr. Valle's. |
| 10:10:28 | 11 | On the very day that 3M submitted its opposition |
| 10:10:31 | 12 | brief, Mr. Valle submitted his opposition brief to their Motion |
| 10:10:36 | 13 | for Summary Judgment against his case.  So you clearly have |
| 10:10:38 | 14 | continuing jurisdiction. |
| 10:10:39 | 15 | And this notion that 3M isn't going to collaterally |
| 10:10:42 | 16 | attack Your Honor's orders doesn't withstand scrutiny, which is |
| 10:10:47 | 17 | the second principle that supports the relief that Mr. Valle is |
| 10:10:52 | 18 | seeking. |
| 10:10:52 | 19 | Let's define what it is to collaterally attack Your |
| 10:10:56 | 20 | Honor's jurisdiction.  And I actually think, since we're |
| 10:11:00 | 21 | talking about 1789 and the first judiciary act, a useful test |
| 10:11:00 | 22 | can come from the most famous case construing the first |
| 10:11:07 | 23 | judiciary act, *Marbury vs. Madison*.  We all know it from law |
| 10:11:12 | 24 | school for establishing judicial review, it's emphatically the |
| 10:11:13 | 25 | province and duty of the judiciary to say what the law is. |

7

10:11:15  1    There's a more mundane section of the opinion that we

10:11:18  2  all probably forget that defines and delineates the distinction

10:11:22  3  between original jurisdiction and appellate jurisdiction.  And

10:11:26  4  Chief Justice Marshall says for the unanimous court original

10:11:30  5  jurisdiction is where a court has the power to decide an issue

10:11:33  6  for the first time, appellate jurisdiction is where an

10:11:36  7  appellate court gets to issue corrections and revisions to

10:11:40  8  those decisions.  It's basically claims of error.

10:11:43  9    If someone is trying to litigate and seek corrections

10:11:48  10  and revisions to this Court's decisions and judgments not in an

10:11:53  11  appellate court, that's a pretty good test to establish that

10:11:56  12  they are attempting to collaterally attack your jurisdiction.

10:12:01  13  And I don't think that it withstands scrutiny that your

10:12:05  14  jurisdiction is not being impugned in the bankruptcy court.

10:12:09  15    Look at the revisions and corrections that are the

10:12:12  16  entire focus of that proceeding.  You, Your Honor, have

10:12:17  17  presided over the most broken MDL in history.  You are to blame

10:12:22  18  for screwing up the case management orders that would normally

10:12:26  19  be obtained in an MDL.  You have conducted a distorted

10:12:31  20  litigation process that isn't working.  You have denied summary

10:12:34  21  judgment for 3M and granted it for plaintiffs on the government

10:12:41  22  contractor defense that has tainted the jury pools and inflamed

10:12:44  23  their passions resulting in verdicts that are not

10:12:47  24  representative.  You have robbed 3M of a fair and complete

10:12:50  25  evidentiary record.

| | | |
|---|---|---|
| 10:12:51 | 1 | The list goes on and on. These are direct quotations |
| 10:12:55 | 2 | or snippets from the bankruptcy court first day hearing or the |
| 10:12:59 | 3 | informational brief. This entire MDL is being put on trial in |
| 10:13:03 | 4 | the bankruptcy court. It beggars belief that the purpose of |
| 10:13:09 | 5 | that proceeding is not to second guess the judgments and |
| 10:13:13 | 6 | decisions and orders that 3M doesn't like. |
| 10:13:14 | 7 | And it's not far to seek why they're doing that. They |
| 10:13:17 | 8 | want to compress the claim values. They want a new court to |
| 10:13:22 | 9 | say everything Judge Rodgers did in the MDL was mistaken, was |
| 10:13:26 | 10 | erroneous, that led to this false impression that juries |
| 10:13:29 | 11 | actually think 3M is liable when a true scientific and factual |
| 10:13:34 | 12 | record would demonstrate that they're not, and the veterans |
| 10:13:37 | 13 | claims should be settled for a song. |
| 10:13:39 | 14 | That is a classic -- |
| 10:13:42 | 15 | **THE COURT:** What would that look like? |
| 10:13:44 | 16 | **MR. KELLER:** What would that look like? |
| 10:13:46 | 17 | **THE COURT:** This quote/unquote, "true scientific |
| 10:13:48 | 18 | process"? |
| 10:13:49 | 19 | **MR. KELLER:** Respectfully, Your Honor, you're going to |
| 10:13:52 | 20 | have to ask my able adversaries because I think this MDL has |
| 10:13:56 | 21 | comported itself admirably, and the record here speaks for |
| 10:13:57 | 22 | itself, and the jury verdicts are proper. And I'm excited to |
| 10:13:59 | 23 | defend Your Honor's judgments in the United States Court of |
| 10:14:02 | 24 | Appeals for the Eleventh Circuit, where appellate decisions |
| 10:14:06 | 25 | should be issued and where attempts to seek corrections and |

10:29:07    1    the All Writs injunction on the basis that there was adequate

10:29:10    2    remedies under applicable law for wrongful arbitration.

10:29:15    3         Similarly -- and you just asked Mr. Keller about this

10:29:19    4    -- there's more than adequate remedy under the Bankruptcy Code

10:29:22    5    11 U.S.C. 1112(b) for Mr. Keller and any other party to go

10:29:29    6    before the bankruptcy court and ask for that to be dismissed.

10:29:32    7    There's very clear statutory authority for a remedy that

10:29:37    8    Mr. Keller seeks.

10:29:38    9         And it's my view, Your Honor, that, because that's how

10:29:42    10   *Clay* came out and because that's how the Eleventh Circuit came

10:29:46    11   out in subsequent decisions -- and I'm talking about *Rowe v.*

10:29:50    12   *Wells Fargo* -- where they essentially said, if you have a

10:29:54    13   statutory remedy, it is not appropriate to use the All Writs

10:29:57    14   Act.

10:29:57    15        Because he knew of that law and there isn't a civil

10:30:00    16   case for wrongful bankruptcy that he could have brought before

10:30:03    17   Your Honor, what he did was he constructed an injunction

10:30:06    18   request that looks narrowly tailored that 3M should be enjoined

10:30:13    19   from seeking an injunction from this Court.

10:30:17    20        3M is not doing that.  He's already said the Aearo

10:30:20    21   debtor -- his motion doesn't apply to the Aearo debtor.  And as

10:30:24    22   Your Honor recognized in your questioning of him, Aearo is the

10:30:27    23   movant, Aearo filed the complaint, Aearo is presenting

10:30:31    24   evidence, Aearo is going to be in front of Judge Graham for

10:30:34    25   three days next week presenting evidence and legal argument

| | |
|---|---|
| 10:30:38 | 1 |
| 10:30:41 | 2 |
| 10:30:43 | 3 |
| 10:30:54 | 4 |
| 10:31:00 | 5 |
| 10:31:09 | 6 |
| 10:31:12 | 7 |
| 10:31:14 | 8 |
| 10:31:16 | 9 |
| 10:31:16 | 10 |
| 10:31:18 | 11 |
| 10:31:19 | 12 |
| 10:31:20 | 13 |
| 10:31:22 | 14 |
| 10:31:25 | 15 |
| 10:31:28 | 16 |
| 10:31:30 | 17 |
| 10:31:32 | 18 |
| 10:31:37 | 19 |
| 10:31:40 | 20 |
| 10:31:41 | 21 |
| 10:31:43 | 22 |
| 10:31:45 | 23 |
| 10:31:51 | 24 |
| 10:31:53 | 25 |

with respect to the 362 and 105 issue.

**THE COURT:**  Do you have a case that you can refer me to where the bankruptcy court was used in this fashion by a defendant, as 3M is -- and just I think without any hesitation or question just blatantly expressing that it's using the bankruptcy court as a way to escape what it doesn't like about this Court?

**MS. LAURIA:**  So I wouldn't characterize it that way, Your Honor.

**THE COURT:**  Then you and I have a different view of the facts.

**MS. LAURIA:**  I understand that, I understand that.  I wouldn't characterize it that way.

Aearo, as a defendant, has 230,000 claims asserted against it, and its independent directors together with its board elected to file for bankruptcy.

**THE COURT:**  And Aearo may well have the right to do that.  It has and it may get the relief it's seeking.  But that's not my question.  I asked if you had a case --

**MS. LAURIA:**  Sure.

**THE COURT:**  -- on similar facts.

**MS. LAURIA:**  I do, Your Honor.  So, as I think we cited in our papers, the *LTL* decision out of the district court for the District of New Jersey --

**THE COURT:**  Let me add a little bit to my question,

| | |
|---|---|
| 10:31:55 | 1 |
| 10:32:05 | 2 |
| 10:32:08 | 3 |
| 10:32:13 | 4 |
| 10:32:18 | 5 |
| 10:32:21 | 6 |
| 10:32:26 | 7 |
| 10:32:30 | 8 |
| 10:32:31 | 9 |
| 10:32:33 | 10 |
| 10:32:36 | 11 |
| 10:32:38 | 12 |
| 10:32:40 | 13 |
| 10:32:44 | 14 |
| 10:32:47 | 15 |
| 10:32:47 | 16 |
| 10:32:49 | 17 |
| 10:32:52 | 18 |
| 10:32:55 | 19 |
| 10:32:59 | 20 |
| 10:33:00 | 21 |
| 10:33:04 | 22 |
| 10:33:09 | 23 |
| 10:33:17 | 24 |
| 10:33:21 | 25 |

then.  I thought you might go to talc and J&J.  I'll add to my question a case with the same motive by the corporate -- the solvent corporate defendant as well as the subsidiary, where the vehicle that was used to get into bankruptcy court and to seek the protection of the bankruptcy court as a financially distressed debtor -- in that case the LT Management, in this case Aearo -- where that vehicle was created on the eve of bankruptcy.

MS. LAURIA:  And by "vehicle" I assume you're referring to the funding agreement?

THE COURT:  The indemnity and funding agreement.

MS. LAURIA:  Understood, Your Honor.  Again, in both the *LTL* cases, there are also four cases pending in the North Carolina Courts funding agreements were entered into prior to the bankruptcy case.

THE COURT:  I'm not talking about the funding agreement.  I'm talking about the indemnity -- I still haven't figured out if you all have a separate indemnity agreement or if just a clause in the funding agreement.  That was a question I was going to have for you.

In *LTL Management* it's very different.  That indemnification agreement existed all the way back to 1979 with the baby products division in the old J&J, and it had been in existence for three decades, Judge Kaplan referenced that in his decision.  That's very different than what we have here.

10:33:24    1      **MS. LAURIA:**  So, Your Honor, what I would say about

10:33:25    2   that is -- so we're conflating the issues related to the motion

10:33:25    3   to dismiss and the bankruptcy court's jurisdiction with

10:33:29    4   respect --

10:33:29    5      **THE COURT:**  I need you to answer my questions.  I'm

10:33:34    6   not conflating anything.

10:33:34    7      **MS. LAURIA:**  To my knowledge, Your Honor, there's not

10:33:36    8   a prefunding agreement/indemnity agreement between 3M Company

10:33:40    9   and Aearo.

10:33:42   10      **THE COURT:**  Right.  It exists only because it was

10:33:44   11   created for purposes of the bankruptcy filing?

10:33:48   12      **MS. LAURIA:**  That's my understanding, Your Honor.

10:33:49   13      **THE COURT:**  So let me -- since you are the bankruptcy

10:33:52   14   lawyer, I want to just make sure you understand -- I mean, you

10:33:55   15   all -- 3M has been working on this for months and months and

10:33:59   16   months, and it's intricate and complex, and so I've only had a

10:34:05   17   short period of time, and I just want to make sure whether I

10:34:11   18   understand what the parties did correctly as far as the

10:34:14   19   documentation.  And I'm referring primarily to the funding and

10:34:18   20   indemnity agreement.  And please correct me where I'm wrong.

10:34:25   21      So my understanding is, before the funding indemnity

10:34:31   22   agreement -- I think it was entered into on the 25th of July or

10:34:35   23   somewhere right around there -- Aearo had no separate liability

10:34:38   24   for the claims in this MDL.  Because if it did, I don't know

10:34:42   25   why there would be a reason for the indemnity agreement.  And

10:34:44  1    I'm going to ask Mr. Beall some of these same questions as far

10:34:47  2    as the liabilities.

10:34:48  3            Aearo was also not in any financial distress.

10:34:53  4            Have I misstepped yet?

10:34:55  5            **MS. LAURIA:**  So can we take it -- with respect to your

10:34:58  6    first question, my understanding is that Aearo was joint and

10:35:01  7    severally liable with respect to 3M -- or with respect to the

10:35:05  8    Combat Arms claims.

10:35:06  9            **THE COURT:**  Okay.  And then why did you need the

10:35:09  10   indemnity agreement then?

10:35:10  11           **MS. LAURIA:**  So, I think as Your Honor knows, I'm sure

10:35:12  12   better than I do because you've sat through many of these

10:35:15  13   trials, after 3M purchased Aearo, the liabilities resided at

10:35:22  14   the Aearo level.  Those assets were ultimately back up at the

10:35:27  15   3M Company level.  It's my understanding that 80 percent of the

10:35:31  16   claims relate to the Aearo time period and 20 percent of the

10:35:34  17   claims relate to the 3M time period.

10:35:38  18           **THE COURT:**  Were there liabilities ever carried on

10:35:41  19   Aearo's balance sheets or just on 3M's?

10:35:44  20           **MS. LAURIA:**  I don't know the answer to that question,

10:35:46  21   Your Honor.

10:35:46  22           **THE COURT:**  And if in fact Aearo did have liability

10:35:52  23   for the claims in the MDL -- and we'll talk about the

10:35:56  24   bellwethers -- wouldn't 3M have had a duty to its shareholders

10:36:05  25   to assert that?

Exhibit H

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to: All Cases | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## <u>ORDER</u>

This matter is before the Court on 3M Company's Emergency Motion for a Stay Pending Appeal, ECF No. 3395, which Plaintiff Richard Valle opposes. ECF No. 3401. The motion seeks to stay the enforcement of the Court's recently entered All Writs Act injunction. ECF No. 3395. On careful consideration, the Court will grant the motion to stay as to a portion of the injunction but deny the motion to the extent it requests a stay of the injunction in its entirety.

Federal Rule of Civil Procedure 62(d) provides that "[w]hile an appeal is pending from an interlocutory order or final judgment that grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms . . . that secure the opposing party's rights." The rule simply "codifies the inherent power of courts to make whatever order is deemed necessary to preserve the status quo" pending appeal. 11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2904 (3d ed. 2022) (citing *Pettway v. Am. Cast Iron Pipe Co.*, 411 F.2d 998 (5th

Cir. 1969)). However, courts cannot use this inherent power to substantially alter the original injunction while an appeal is pending because doing so would divest the appeals court's jurisdiction over the issue. *See Coastal Corp. v. Tex. E. Corp.*, 869 F.2d 817, 819–20 (5th Cir. 1989) (collecting cases) ("[W]e are persuaded that the powers of the district court over an injunction pending appeal should be limited to maintaining the status quo" and should not "divest the court of appeals from jurisdiction . . . .").

On August 16th, 2022, the Court issued an All Writs Act injunction preventing 3M from "attempting to relitigate the same or related issues precluded by the principles of res judicata and collateral estoppel" and from "supporting, directly or indirectly, financially or otherwise, any collateral attack on this Court's orders by any other parties in any other forum, including Aearo." *In re 3M Combat Arms Prods. Liab. Litig.*, Case No. 3:19md2885, ECF No. 3389 at 8 (N.D. Fla. Aug. 16, 2022). Understanding that the automatic bankruptcy stay was, and still is, in place as to Aearo, the Court's intent was not to impact Aearo or interfere with its ability to act in bankruptcy court; the sole purpose of the injunction was to prohibit *3M Company* from collaterally attacking the Court's orders in another jurisdiction. Notwithstanding, it appears that one part of the Court's injunction; i.e. prohibiting 3M Company from "supporting, directly, or indirectly, financially or otherwise, a collateral attack on this Court's orders by any other parties in any other forum,

including Aearo" may in fact interfere with Aearo's ability to act in the bankruptcy court in light of the funding agreement between 3M and Aearo. *See* ECF No. 3395 at 9–10. Accordingly, the Court will grant 3M's request for a limited stay as to this specific provision.

This does not resolve 3M's motion, however, because 3M seeks a stay of the injunction in its entirety pending appeal. *See* ECF No. 3395.

An injunction is not stayed pending appeal "[u]nless the court orders otherwise." Fed. R. Civ. P. 62(c). Thus, granting a stay is within the discretion of the district court. 11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2904 (3d ed. 2022) (explaining that "[a]n application under Rule 62(c) . . . necessarily goes to the discretion of the court"). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009) (citing *Clinton v. Jones*, 520 U.S. 681, 708 (1997)). In particular, the moving party must show that (1) there is a substantial likelihood of success on the merits, (2) the party "will be irreparably injured absent the stay," (3) the stay will not "substantially injure the other parties interested in the proceeding," and (4) the stay promotes the "public interest." *See id.* at 434 (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

3M argues that it "faces imminent and irreparable harm" absent a stay because the Court's entire injunction "essentially bar[s] 3M from participating" as an

interested party in Aearo's bankruptcy proceedings. *See* ECF No. 3395 at 7, 9–10. 3M's broad assertion fails to reference a single action 3M or Aearo is prohibited from taking based on the Court's injunction. 3M offers no explanation of how 3M (a nondebtor) is prohibited by the injunction from "participating" in the bankruptcy proceedings, and there is certainly no showing of imminent harm, especially given the Court's decision to stay the only provision of the injunction that arguably impacts the bankruptcy proceeding. *See* ECF No. 3395 at 7.

Furthermore, it is nonsensical to argue—as 3M has—that a stay of the Court's injunction promotes the public interest when the Court issued the injunction for the very purpose of promoting the public interest. *See* ECF No. 3395 at 12. Clearly, the Court's injunction promotes the public interest by preserving the finality of the Court's orders and judgments in the MDL, conserving scarce judicial resources that have been exhaustively extended during the prior three and half years of litigation in the MDL. *See, e.g., B&B Hardware, Inc. v. Hargis Industries, Inc.*, 575 U.S. 138, 148 (2015) ("The idea [of issue preclusion] is straightforward: Once a court has decided an issue, it is forever settled . . . between the parties, thereby protecting against the expense and vexation attending multiple lawsuits, conserving judicial resources, and fostering reliance on judicial action by minimizing the possibility of inconsistent verdicts.") (internal alterations and citations omitted). Granting 3M the stay it requests would completely undermine the basis of the injunction in the first

Case 3:19-md-02885-MCR-GRJ   Document 3407   Filed 08/25/22   Page 5 of 5
USCA11 Case: 22-12796   Document: 3   Date Filed: 08/29/2022   Page: 140 of 149

Page 5 of 5

instance and give 3M carte blanche to do the very thing the injunction is designed to prevent while the case is on appeal.[1]

Accordingly, 3M's motion, ECF No. 3395, is **GRANTED IN PART** and **DENIED IN PART**.[2]

**DONE AND ORDERED** this 25th day of August 2022.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[1] This is quite different from granting a stay of the imposition of sanctions in connection with the violation of an injunction or court order, which is routinely done pending appeal.

[2] 3M's motion could have been denied without prejudice on an independent procedural basis, namely 3M's failure to comply with the mandatory counsel certification requirement in the Local Rules for Northern District of Florida, *see* N.D. Fla. Loc. R. 7.1(B)-(C). 3M offered no explanation for its failure to comply with this requirement when filing its motion. Failure to comply with these rules may result in a dismissal of the motion without prejudice to refile the motion once the party complies with the local rule. *See* N.D. Fla. Loc. R. 41.1 ("If a party fails to comply with an applicable rule . . ., the Court may strike a pleading, dismiss a claim, enter a default on a claim," or "take other appropriate action."). While 3M's failure to abide by the Local Rules would constitute a basis for denying relief, the Court finds it more appropriate under the circumstances to address the motion on the merits.

Exhibit I

| From: | Husnick, Chad J. |
|---|---|
| To: | Ashley Keller |
| Cc: | Wallice, Anne G.; Michael L. Tuchin; Thomas E. Patterson; Robert J. Pfister; Sasha M. Gurvitz; Nir Maoz; dcaruso@rubin-levin.net; mtheisen@rubin-levin.net; mcyganowski@otterbourg.com; asilverstein@otterbourg.com; jfeeney@otterbourg.com; bbarriere@fishmanhaygood.com; tmanthey@fishmanhaygood.com; cnobles@fishmanhaygood.com; jburge@fishmanhaygood.com; Nicole Berg; Ashley Barriere; Frank Dylewski; Amanda Hunt; Patty Tomasco; Adam Wolfson; *ericwinston@quinnemanuel.com; patrickking@quinnemanuel.com; joannacaytas@quinnemanuel.com; matthosen@quinnemanuel.com; KBarrett@baileyglasser.com; mburrus@baileyglasser.com; kcharonko@baileyglasser.com; BGlasser@baileyglasser.com; tmatthews@baileyglasser.com; dselby@baileyglasser.com; ali@sllawfirm.com; Rick@paulllp.com; Geier, Emily; Winters, Spencer A.; Hunter, Derek J. |
| Subject: | Re: Aearo - Proposed Agreed Entry |
| Date: | Friday, August 19, 2022 12:17:57 PM |

Some people who received this message don't often get email from chusnick@kirkland.com. Learn why this is important

Ashley--

I am disappointed in your response: it is hard to see how your clients could argue that 3M violated the MDL court's order when the Aearo debtors are simply carrying out the bankruptcy court's command to submit findings/conclusions based on the bankruptcy court record at the PI hearing.

Nevertheless, the parties appear to have reached an impasse and the Aearo debtors will act accordingly.

Chad J. Husnick, P.C.
--------------------------------------------
KIRKLAND & ELLIS LLP
300 North LaSalle, Chicago, IL 60654
T +1 312 862 2009  M +1 630 291 1947
F +1 312 862 2200
--------------------------------------------
chad.husnick@kirkland.com

> On Aug 19, 2022, at 11:27 AM, Ashley Keller <ack@kellerpostman.com> wrote:

> I'd like to be done, but I'm not agreeing to that.  I may not understand $5 words like détente, but I thought the word meant a period of mutual stand down, not a waiver of any rights.  I'm not going to pre commit myself to the position that your client 3M will not be in contempt of a binding court order for the content of a filing you make putatively on behalf of your other clients the debtors that I haven't seen yet.  3M is duty bound during this detente to obey court orders.  If I think it has flouted that duty, I will bite my tongue until the stand down period ends.  And not one second longer.

> Ashley Keller

Partner

## Keller | Postman

150 N. Riverside Plaza, Suite 4100 | Chicago, IL, 60606
312.741.5222 | Email | Bio | Website

---

**From:** "Husnick, Chad J." <chusnick@kirkland.com>
**Date:** Friday, August 19, 2022 at 11:58 AM
**To:** Ashley Keller <ack@kellerpostman.com>, "Wallice, Anne G."
<anne.wallice@kirkland.com>, "Michael L. Tuchin" <mtuchin@ktbslaw.com>,
"Thomas E. Patterson" <tpatterson@ktbslaw.com>, "Robert J. Pfister"
<RPfister@KTBSLAW.com>, "Sasha M. Gurvitz" <SGurvitz@KTBSLAW.com>, Nir
Maoz <NMaoz@KTBSLAW.com>, "dcaruso@rubin-levin.net" <dcaruso@rubin-
levin.net>, "mtheisen@rubin-levin.net" <mtheisen@rubin-levin.net>,
"mcyganowski@otterbourg.com" <mcyganowski@otterbourg.com>,
"asilverstein@otterbourg.com" <asilverstein@otterbourg.com>,
"jfeeney@otterbourg.com" <jfeeney@otterbourg.com>,
"bbarriere@fishmanhaygood.com" <bbarriere@fishmanhaygood.com>,
"tmanthey@fishmanhaygood.com" <tmanthey@fishmanhaygood.com>,
"cnobles@fishmanhaygood.com" <cnobles@fishmanhaygood.com>,
"jburge@fishmanhaygood.com" <jburge@fishmanhaygood.com>, Nicole Berg
<ncb@kellerpostman.com>, Ashley Barriere
<ashley.barriere@kellerpostman.com>, Frank Dylewski
<frank.dylewski@kellerpostman.com>, Amanda Hunt
<amanda.hunt@kellerpostman.com>, Patty Tomasco
<pattytomasco@quinnemanuel.com>, Adam Wolfson
<adamwolfson@quinnemanuel.com>, "*ericwinston@quinnemanuel.com"
<ericwinston@quinnemanuel.com>, "patrickking@quinnemanuel.com"
<patrickking@quinnemanuel.com>, "joannacaytas@quinnemanuel.com"
<joannacaytas@quinnemanuel.com>, "matthosen@quinnemanuel.com"
<matthosen@quinnemanuel.com>, "kbarrett@baileyglasser.com"
<kbarrett@baileyglasser.com>, "mburrus@baileyglasser.com"
<mburrus@baileyglasser.com>, "kcharonko@baileyglasser.com"
<kcharonko@baileyglasser.com>, "bglasser@baileyglasser.com"
<bglasser@baileyglasser.com>, "tmatthews@baileyglasser.com"
<tmatthews@baileyglasser.com>, "dselby@baileyglasser.com"
<dselby@baileyglasser.com>, "ali@sllawfirm.com" <ali@sllawfirm.com>,
"Rick@PaulLLP.com" <Rick@PaulLLP.com>
**Cc:** "Geier, Emily" <emily.geier@kirkland.com>, "Winters, Spencer A."
<spencer.winters@kirkland.com>, "Hunter, Derek I."
<derek.hunter@kirkland.com>
**Subject:** RE: Aearo - Proposed Agreed Entry

Ashley--

3M informed me that it agrees with this, provided that plaintiffs will not take the position, whether during the 7-day period or after, that the findings of fact and conclusions of law the Aearo debtors will be filing in bankruptcy court on August 22, 2022 violate the All Writs Act order.

Hopefully we are done here.

Thanks,

**Chad J. Husnick, P.C.**
----------------------------------------
**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 2009  **M** +1 630 291 1947
----------------------------------------
chad.husnick@kirkland.com

**From:** Ashley Keller <ack@kellerpostman.com>
**Sent:** Friday, August 19, 2022 5:37 AM
**To:** Wallice, Anne G. <anne.wallice@kirkland.com>; Michael L. Tuchin <mtuchin@ktbslaw.com>; Thomas E. Patterson <tpatterson@ktbslaw.com>; Robert J. Pfister <RPfister@KTBSLAW.com>; Sasha M. Gurvitz <SGurvitz@KTBSLAW.com>; Nir Maoz <NMaoz@KTBSLAW.com>; dcaruso@rubin-levin.net; mtheisen@rubin-levin.net; mcyganowski@otterbourg.com; asilverstein@otterbourg.com; jfeeney@otterbourg.com; bbarriere@fishmanhaygood.com; tmanthey@fishmanhaygood.com; cnobles@fishmanhaygood.com; jburge@fishmanhaygood.com; Nicole Berg <ncb@kellerpostman.com>; Ashley Barriere <ashley.barriere@kellerpostman.com>; Frank Dylewski <frank.dylewski@kellerpostman.com>; Amanda Hunt <amanda.hunt@kellerpostman.com>; Patty Tomasco <pattytomasco@quinnemanuel.com>; Adam Wolfson <adamwolfson@quinnemanuel.com>; *ericwinston@quinnemanuel.com <ericwinston@quinnemanuel.com>; patrickking@quinnemanuel.com; joannacaytas@quinnemanuel.com; matthosen@quinnemanuel.com; kbarrett@baileyglasser.com; mburrus@baileyglasser.com; kcharonko@baileyglasser.com; bglasser@baileyglasser.com; tmatthews@baileyglasser.com; dselby@baileyglasser.com; ali@sllawfirm.com; Rick@PaulLLP.com
**Cc:** Husnick, Chad J. <chusnick@kirkland.com>; Geier, Emily <emily.geier@kirkland.com>; Winters, Spencer A. <spencer.winters@kirkland.com>; Hunter, Derek I. <derek.hunter@kirkland.com>
**Subject:** Re: Aearo - Proposed Agreed Entry

Sorry to be technical about the "during that period" part of your first sentence, but to be clear: during our detente, KP agrees it won't argue anything about the All Writs Act

order, and 3M agrees it won't appeal that order.  Once our détente ends, 3M is free to appeal the order if it wishes, and KP is free if it wishes to inform Judge Rodgers that it believes 3M violated the order, even if the violation is based on conduct that occurred during the détente.  In other words, if KP believes 3M violated the order "during that period," KP can eventually point out the violation.  It just can't point out the violation "during that period."

With that, KP agrees to this.

**Ashley Keller**
Partner

Keller | Postman

150 N. Riverside Plaza, Suite 4100 | Chicago, IL, 60606
312.741.5222 | Email | Bio | Website

**From:** "Wallice, Anne G." <anne.wallice@kirkland.com>
**Date:** Thursday, August 18, 2022 at 9:44 PM
**To:** Ashley Keller <ack@kellerpostman.com>, "Michael L. Tuchin" <mtuchin@ktbslaw.com>, "Thomas E. Patterson" <tpatterson@ktbslaw.com>, "Robert J. Pfister" <RPfister@KTBSLAW.com>, "Sasha M. Gurvitz" <SGurvitz@KTBSLAW.com>, Nir Maoz <NMaoz@KTBSLAW.com>, "dcaruso@rubin-levin.net" <dcaruso@rubin-levin.net>, "mtheisen@rubin-levin.net" <mtheisen@rubin-levin.net>, "mcyganowski@otterbourg.com" <mcyganowski@otterbourg.com>, "asilverstein@otterbourg.com" <asilverstein@otterbourg.com>, "jfeeney@otterbourg.com" <jfeeney@otterbourg.com>, "bbarriere@fishmanhaygood.com" <bbarriere@fishmanhaygood.com>, "tmanthey@fishmanhaygood.com" <tmanthey@fishmanhaygood.com>, "cnobles@fishmanhaygood.com" <cnobles@fishmanhaygood.com>, "jburge@fishmanhaygood.com" <jburge@fishmanhaygood.com>, Nicole Berg <ncb@kellerpostman.com>, Ashley Barriere <ashley.barriere@kellerpostman.com>, Frank Dylewski <frank.dylewski@kellerpostman.com>, Amanda Hunt <amanda.hunt@kellerpostman.com>, Patty Tomasco <pattytomasco@quinnemanuel.com>, Adam Wolfson <adamwolfson@quinnemanuel.com>, "*ericwinston@quinnemanuel.com" <ericwinston@quinnemanuel.com>, "patrickking@quinnemanuel.com" <patrickking@quinnemanuel.com>, "joannacaytas@quinnemanuel.com" <joannacaytas@quinnemanuel.com>, "matthosen@quinnemanuel.com" <matthosen@quinnemanuel.com>, "kbarrett@baileyglasser.com" <kbarrett@baileyglasser.com>, "mburrus@baileyglasser.com" <mburrus@baileyglasser.com>, "kcharonko@baileyglasser.com"

<kcharonko@baileyglasser.com>, "bglasser@baileyglasser.com"
<bglasser@baileyglasser.com>, "tmatthews@baileyglasser.com"
<tmatthews@baileyglasser.com>, "dselby@baileyglasser.com"
<dselby@baileyglasser.com>, "ali@sllawfirm.com" <ali@sllawfirm.com>,
"Rick@PaulLLP.com" <Rick@PaulLLP.com>
**Cc:** "Husnick, Chad J." <chusnick@kirkland.com>, "Geier, Emily"
<emily.geier@kirkland.com>, "Winters, Spencer A."
<spencer.winters@kirkland.com>, "Hunter, Derek I."
<derek.hunter@kirkland.com>
**Subject:** RE: Aearo - Proposed Agreed Entry

> Some people who received this message don't often get email from anne.wallice@kirkland.com.
> Learn why this is important

Ashley,

3M has confirmed that it is also in agreement with respect to filing an appeal of the All
Writs Act order during the continuance, subject to plaintiffs' agreement not to seek to
enforce it or otherwise argue that 3M violated it during that period.  The debtors have
already adjourned the stay motion to the September omnibus hearing.

Thanks,

Anne G. Wallice

--------------------------------------------
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue, New York, NY 10022
**T** +1 212 390 4511
**M** +1 347 751 3579
**F** +1 212 446 4900
--------------------------------------------
anne.wallice@kirkland.com

---

**From:** Ashley Keller <ack@kellerpostman.com>
**Sent:** Thursday, August 18, 2022 6:00 PM
**To:** Wallice, Anne G. <anne.wallice@kirkland.com>; Michael L. Tuchin
<mtuchin@ktbslaw.com>; Thomas E. Patterson <tpatterson@ktbslaw.com>; Robert J.
Pfister <RPfister@KTBSLAW.com>; Sasha M. Gurvitz <SGurvitz@KTBSLAW.com>; Nir
Maoz <NMaoz@KTBSLAW.com>; dcaruso@rubin-levin.net; mtheisen@rubin-levin.net;
mcyganowski@otterbourg.com; asilverstein@otterbourg.com;
jfeeney@otterbourg.com; bbarriere@fishmanhaygood.com;
tmanthey@fishmanhaygood.com; cnobles@fishmanhaygood.com;
jburge@fishmanhaygood.com; Nicole Berg <ncb@kellerpostman.com>; Ashley Barriere
<ashley.barriere@kellerpostman.com>; Frank Dylewski
<frank.dylewski@kellerpostman.com>; Amanda Hunt
<amanda.hunt@kellerpostman.com>; Patty Tomasco
<pattytomasco@quinnemanuel.com>; Adam Wolfson

<adamwolfson@quinnemanuel.com>; *ericwinston@quinnemanuel.com
<ericwinston@quinnemanuel.com>; patrickking@quinnemanuel.com;
joannacaytas@quinnemanuel.com; matthosen@quinnemanuel.com;
kbarrett@baileyglasser.com; mburrus@baileyglasser.com;
kcharonko@baileyglasser.com; bglasser@baileyglasser.com;
tmatthews@baileyglasser.com; dselby@baileyglasser.com; ali@sllawfirm.com;
Rick@PaulLLP.com
**Cc:** Husnick, Chad J. <chusnick@kirkland.com>; Geier, Emily
<emily.geier@kirkland.com>; Winters, Spencer A. <spencer.winters@kirkland.com>;
Hunter, Derek I. <derek.hunter@kirkland.com>
**Subject:** Re: Aearo - Proposed Agreed Entry


And 3M/Debtors are of course agreeing not to appeal the All Writs Act order during
this continuance, correct?


**Ashley Keller**
Partner

**Keller | Postman**

150 N. Riverside Plaza, Suite 4100 | Chicago, IL, 60606
312.741.5222 | Email | Bio | Website

---

**From:** "Wallice, Anne G." <anne.wallice@kirkland.com>
**Date:** Thursday, August 18, 2022 at 5:53 PM
**To:** "Michael L. Tuchin" <mtuchin@ktbslaw.com>, "Thomas E. Patterson"
<tpatterson@ktbslaw.com>, "Robert J. Pfister" <RPfister@KTBSLAW.com>, "Sasha
M. Gurvitz" <SGurvitz@KTBSLAW.com>, Nir Maoz <NMaoz@KTBSLAW.com>,
"dcaruso@rubin-levin.net" <dcaruso@rubin-levin.net>, "mtheisen@rubin-
levin.net" <mtheisen@rubin-levin.net>, "mcyganowski@otterbourg.com"
<mcyganowski@otterbourg.com>, "asilverstein@otterbourg.com"
<asilverstein@otterbourg.com>, "jfeeney@otterbourg.com"
<jfeeney@otterbourg.com>, "bbarriere@fishmanhaygood.com"
<bbarriere@fishmanhaygood.com>, "tmanthey@fishmanhaygood.com"
<tmanthey@fishmanhaygood.com>, "cnobles@fishmanhaygood.com"
<cnobles@fishmanhaygood.com>, "jburge@fishmanhaygood.com"
<jburge@fishmanhaygood.com>, Ashley Keller <ack@kellerpostman.com>, Nicole
Berg <ncb@kellerpostman.com>, Ashley Barriere
<ashley.barriere@kellerpostman.com>, Frank Dylewski
<frank.dylewski@kellerpostman.com>, Amanda Hunt
<amanda.hunt@kellerpostman.com>, Patty Tomasco
<pattytomasco@quinnemanuel.com>, Adam Wolfson
<adamwolfson@quinnemanuel.com>, "*ericwinston@quinnemanuel.com"
<ericwinston@quinnemanuel.com>, "patrickking@quinnemanuel.com"
<patrickking@quinnemanuel.com>, "joannacaytas@quinnemanuel.com"

<joannacaytas@quinnemanuel.com>, "matthosen@quinnemanuel.com"
<matthosen@quinnemanuel.com>, "kbarrett@baileyglasser.com"
<kbarrett@baileyglasser.com>, "mburrus@baileyglasser.com"
<mburrus@baileyglasser.com>, "kcharonko@baileyglasser.com"
<kcharonko@baileyglasser.com>, "bglasser@baileyglasser.com"
<bglasser@baileyglasser.com>, "tmatthews@baileyglasser.com"
<tmatthews@baileyglasser.com>, "dselby@baileyglasser.com"
<dselby@baileyglasser.com>, "ali@sllawfirm.com" <ali@sllawfirm.com>,
"Rick@PaulLLP.com" <Rick@PaulLLP.com>
**Cc:** "Husnick, Chad J." <chusnick@kirkland.com>, "Geier, Emily"
<emily.geier@kirkland.com>, "Winters, Spencer A."
<spencer.winters@kirkland.com>, "Hunter, Derek I."
<derek.hunter@kirkland.com>
**Subject:** Aearo - Proposed Agreed Entry

All,

Attached, please find the proposed agreed entry documenting the 7-day continuance.
Please let us know of any comments regarding the attached.

We also want to confirm that the agreed entry covers the MDL court's order under the
All Writs Act and that plaintiffs agree not to seek to enforce that order or otherwise
argue that 3M was in violation of that order during the course of the 7-day period.

Best,

**Anne G. Wallice**
------------------------------------------
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue, New York, NY 10022
**T** +1 212 390 4511
**M** +1 347 751 3579
**F** +1 212 446 4900
------------------------------------------
anne.wallice@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland
& Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited and may be unlawful. If you have received this
communication in error, please notify us immediately by return email or by email to
postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.


The information contained in this communication is confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland
& Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited and may be unlawful. If you have received this

communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.