Record No. 22-12796-A

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

3M COMPANY,

*Defendant-Appellant*

v.

RICHARD VALLE,

*Plaintiff-Appellee*

On Appeal from the United States District Court
for the Northern District of Florida

MDL No. 19-02885

## PLAINTIFF-APPELLEE RICHARD VALLE'S
## SUPPLEMENTAL APPENDIX VOL. I OF I

Noah Heinz
KELLER POSTMAN LLC
1100 Vermont Ave.
NW Fl. 12
Washington, DC 20005

Ashley Keller
 *Counsel of Record*
KELLER POSTMAN LLC
2800 Ponce De Leon Blvd., Suite 1100
Coral Gables, FL 33134
ack@kellerpostman.com
(312) 741-5222

November 9, 2022

*Counsel for Plaintiff-Appellee Valle*

## INDEX TO PLAINTIFF-APPELLEE'S
## SUPPLEMENTAL APPENDIX

**Description**                                                           **Docket/Tab #**

3M's Memorandum in Opposition to Plaintiff Valle's Emergency
Motion for Preliminary Injunction (August 9, 2022) ........................... MDL.Dkt.3370

3M Press Release (July 26, 2022) ........................................................ MDL.Dkt.3378-4

3M Earnings Call Transcript (July 26, 2022) ..................................... MDL.Dkt.3378-5

Bankruptcy Court Oral Argument Transcript (July 27, 2022) .............. Adv.Pro.Tr.07.27.22

District Court Stay Order (October 10, 2022) ..................................... MDL.Dkt.3568

U.S. Trustee's Objection to Debtors' Application for Order
Authorizing Employment of Kirkland & Ellis (October 20, 2022) ...... Bankr.Dkt.695

# MDL.Dkt.3370

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG LITIGATION
LIABILITY LITIGATION

This Document Relates to:
   *All Cases*

CASE NO.: 3:19-MD-2885-MCR-GRJ


Judge M. Casey Rodgers
Magistrate Judge Gary Jones

**DEFENDANT 3M'S MEMORANDUM IN OPPOSITION TO PLAINTIFF
VALLE'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION...................................................................................1

BACKGROUND ....................................................................................5

ARGUMENT AND AUTHORITIES ....................................................8

    I.    THERE HAS BEEN NO CHANGE IN CIRCUMSTANCES SINCE THIS COURT DENIED PLAINTIFF'S TRO MOTION. ...................................................................................................8

    II.    THE ALL WRITS ACT IS NOT AN APPROPRIATE BASIS TO COLLATERALLY ATTACK THE BANKRUPTCY COURT'S JURISDICTION AND DENY 3M ITS CONSTITUTIONAL RIGHT TO DUE PROCESS. ....................10

    III.    PLAINTIFF MISCHARACTERIZES THE EFFECT OF THE DEBTORS' BANKRUPTCY PROCEEDINGS ON COMBAT ARMS CLAIMS. ................................................................23

CONCLUSION...................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*A.H. Robins Co. v. Piccinin (In re A.H. Robins Co.)*,
  788 F.2d 994 (4th Cir.1986) ...................................................................14, 26, 28

*BioConvergence LLC v. Attariwala*,
  No. 19-cv-01745 (SEB) (TAB), 2020 WL 1915269 (S.D. Ind. 2020)..............19

*Chao v. Hosp. Staffing Servs., Inc.*,
  270 F.3d 374 (6th Cir. 2002) ...........................................................................16

*Chicago Title Ins. Co. v. Lerner*,
  435 B.R. 732 (S.D. Fla. 2010) .........................................................................18

*GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*,
  788 F.3d 1318 (11th Cir. 2015) .......................................................................22

*Gilchrist v. Gen. Elec. Cap. Corp.*,
  262 F.3d 295 (4th Cir. 2001) ...............................................................16, 20, 21

*Gruntz v. Cty. of L.A. (In re Gruntz)*,
  202 F.3d 1074 (9th Cir. 2000) .........................................................................19

*Ho v. City of Boynton Beach*,
  No. 21-81023-cv (JDM), 2022 U.S. Dist. LEXIS 53240 (S.D. Fla. Mar. 23,
  2022) .................................................................................................................22

*Home Ins. Co. v. Cooper & Cooper Ltd.*,
  889 F.2d 746 (7th Cir. 1989) ...........................................................................14

*In re Airadigm Commc'ns, Inc.*,
  519 F.3d 640 (7th Cir. 2008) ...........................................................................29

*In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*,
  770 F.2d 328 (2d Cir. 1985) .........................................................17, 18, 19, 22

*In re Caesars Ent'mt Op. Co.*,
  808 F.3d 1186 (7th Cir. 2015) .........................................................................15

*In re LTL Mgmt., LLC*,
   637 B.R. 396 (Bankr. D.N.J. 2022) ...................................................25

*In re Managed Care Litig.*,
   236 F. Supp. 2d 1336 (S.D. Fla. 2002) .............................................21

*In re Mid-City Parking, Inc.*,
   332 B.R. 798 (Bankr. N.D. Ill. 2005) ...............................................19

*In re NTE Conn., LLC*,
   26 F.4th 980 (D.C. Cir. 2022)...........................................................21

*In re Purdue Pharma L.P.*,
   619 B.R. 38 (S.D.N.Y. 2020) ...........................................................15

*In re Rodriguez*,
   *633 F*. App'x 524, 526 (11th Cir. 2015)..........................................12

*In re Stinnett*,
   465 F.3d 309 (7th Cir. 2006) ............................................................14

*In re Vioxx Prods. Liab. Litig.*,
   869 F. Supp. 2d 719 (E.D. La. 2012)................................................21

*In re W.R. Grace & Co.*,
   386 B.R. 17 (Bankr. D. Del. 2008) ..............................................14, 15

*In re W.R. Grace & Co.*,
   No. 01-01139 (JKF), 2004 WL 954772, at *4 (Bankr. D. Del. Apr. 29, 2004). 29

*In re WMR Enters., Inc.*,
   163 B.R. 884 (N.D. Fla. 1994) .........................................................14

*Klay v. United Healthgroup, Inc.*,
   376 F.3d 1092 (11th Cir. 2004) ...................................................15, 21

*Meadows v. Commissioner*,
   405 F.3d 949 (11th Cir. 2005) ..........................................................18

*Melvin v. Blitz U.S.A., Inc.*,
   No. 8:11-cv-2542-T-24 (TGW) (SCB), 2012 WL 415444 (M.D. Fla. Feb. 9,
   2012) ...............................................................................................18

*Miller v. Brooks (In re Am. Honda Motor Co.)*,
    315 F.3d 417 (4th Cir. 2003) ...............................................................21

*N.Y. Life Ins. Co. v. Deshotel*,
    142 F.3d 873 (5th Cir. 1998) ...............................................................21

*Penn. Bureau of Corr. v. U.S. Marshals Serv.*,
    474 U.S. 34 (1985).................................................................................15

*Riccard v. Prudential Ins. Co. of Am.*,
    307 F.3d 1277 (11th Cir. 2002) ...........................................................21

*Rohe v. Wells Fargo Bank, N.A.*,
    988 F.3d 1256 (11th Cir. 2021) ......................................................16, 19

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    511 B.R. 375 (Bankr. S.D.N.Y. 2014)...............................................19

*Tenn. Student Assistance Corp. v. Hood*,
    541 U.S. 440 (2004)...............................................................................16

*United States v. New York Tel. Co.*,
    434 U.S. 159 (1977)...............................................................................22

## DOCKETED CASES

*In re TK Holdings Inc.*,
    No. 17-11375 (BLS) (Bankr. D. Del. February 21, 2018) [Docket No. 2120]..27

*In re USA Gymnastics*,
    No. 18-09108 (Bankr. S.D. Ind. Apr. 17, 2019) [Docket No. 1776]..................29

## FEDERAL STATUTES

11 U.S.C. § 1109(b) ........................................................................12, 30

28 U.S.C. § 157(a) ...........................................................................3, 10

28 U.S.C. § 157(b)(5)...................................................................passim

28 U.S.C. § 157(d) ................................................................................11

28 U.S.C. § 1334(e) ...........................................................3, 10, 16, 21, 27

v

All Writs Act. 28 U.S.C. § 1651 .........................................................................passim

Bankruptcy Code Chapter 11 ...........................................................................passim

Bankruptcy Code § 105(a) ...........................................................3, 15, 19, 22, 29

Bankruptcy Code § 362...............................................................3, 4, 15, 23, 24, 30

Bankruptcy Code § 541................................................................................................14

Bankruptcy Code § 1109 ........................................................................................12, 30

## FEDERAL RULES

Federal Rule of Civil Procedure 65 ..............................................................20

Federal Rules of Bankruptcy Procedure Rule 9033 ...............................27

## **INTRODUCTION**

Plaintiff's renewed request for a preliminary injunction under the All Writs Act against 3M in this multi-district litigation is based on a misapprehension of the law and the foundational underpinnings of the Bankruptcy Code.  Plaintiff treads entirely new ground by requesting that this Court preempt the Bankruptcy Court's imminent hearing on the Debtors' adversary complaint—just six days from now—regarding the application of the automatic stay to 3M and the issuance of a preliminary injunction barring litigation of Combat Arms Claims against 3M.  If granted, the request would also deprive 3M of its ability to participate in the Debtors' bankruptcy cases, including as to matters that directly affect 3M.  Courts have held that an All Writs Act injunction is a drastic remedy that must be used sparingly, consistent with constitutional guarantees of due process of law and access to courts.  As to 3M, an order granting Plaintiff's motion would infringe upon its constitutional right to due process and its right to participate in the bankruptcy as a party in interest.

In addition to the matters currently pending before the Bankruptcy Court, Plaintiff's motion, if granted, could be construed to prohibit 3M from participating in the negotiation of a trust for the benefit of holders of Combat Arms Claims, which 3M is obligated to fund under the Funding Agreement.  It could also inhibit 3M's ability to appear before the Bankruptcy Court, make filings and arguments with respect to contested matters, provide sworn testimony, participate in any bankruptcy-

1

supervised mediation of Combat Arms Claims and vote to accept or reject a plan of reorganization, as applicable.  To be clear, as Plaintiff concedes, the bankruptcy cases will continue without regard to the disposition of Plaintiff's motion.  3M, however, will be irreparably harmed by any injunction imposed by this Court that purports to restrain 3M in violation of its constitutional due process rights.  Any such restraint would contravene the wishes of representatives of a majority of plaintiffs in this MDL, who have demanded 3M's participation in the bankruptcy cases.  Plaintiff's motion should be denied for the reasons set forth herein.

*First*, on July 28, 2022, this Court denied Plaintiff's request for the same relief sought in the instant motion.  Plaintiff's motion merely renews his request on an emergency basis, based on the same purported legal authority, the All Writs Act.  No circumstances have changed in the short time that elapsed between this Court's denial of Plaintiff's previous motion and the filing of Plaintiff's renewed motion for a preliminary injunction against 3M.  Indeed, 3M has not made any filings (other than its notice of appearance) or argued in the Bankruptcy Court other than to clarify one item related to the Debtors' first-day cash management motion.[1]  Nor has Plaintiff presented any new evidence to this Court.  As Plaintiff concedes, this

---

[1]    In contrast, certain plaintiffs have served extensive document discovery on 3M in connection with the Debtors' adversary complaint.  3M has fully cooperated with such discovery on an expedited basis.  These plaintiffs also took the rule 30(b)(6) deposition of a 3M corporate representative on August 9, 2022.

motion is merely a less "hurried" and "more complete" version of the motion that the Court denied.

*Second*, Plaintiff's attempt to invoke the All Writs Act to abrogate the authority of the Bankruptcy Court to hear and rule on the Debtors' (not 3M's) adversary complaint is fatally flawed. The residual authority afforded to federal courts under the All Writs Act cannot be used to supplant the clear statutory authority under the Bankruptcy Code, which empowers courts exercising bankruptcy jurisdiction[2] under section 362(a) to apply the automatic stay to preserve the property of a debtor's estate and under 105(a) to issue a preliminary injunction to support the debtor's reorganization efforts. It is also well established that federal district courts, including courts presiding over multi-district litigation, should defer to bankruptcy courts on matters pertaining to a debtor's automatic stay.[3]

---

[2]    Importantly, the matters raised by Plaintiff's motion do not inherently create a conflict between Article I and Article III courts, as plaintiff suggests. 28 U.S.C. § 1334(e) grants exclusive jurisdiction to *federal district courts* over all property of a debtor in bankruptcy. Under 28 U.S.C. § 157(a), each district court may provide that cases under the Bankruptcy Code and proceedings arising thereunder, therein or related thereto, shall be referred to the bankruptcy judges for such district. The Bankruptcy Court presiding over the Debtors' chapter 11 cases has jurisdiction under section 1334 and the *Standing Order of Reference from the United States District Court for the Southern District of Indiana*, dated July 11, 1984.

[3]    If Combat Arms Claims were permitted to be severed and proceed only against 3M, the result would be an ongoing violation of the Debtors' automatic stay under section 362(a)(3) of the Bankruptcy Code, which stays any act to exercise control over property of the estate. Any defense costs incurred by 3M or verdicts against 3M would be paid by the Debtors first from their own assets, including

There is currently a complaint pending before the Bankruptcy Court—the court with appropriate jurisdiction to decide these matters—to determine the application of the automatic stay and enjoin Combat Arms Claims as to 3M. Moreover, the Debtors (not 3M) have filed a motion in their bankruptcy cases to enforce the automatic stay against Plaintiff's counsel in response to counsel's filing of a notice of potential tag-along action with the Judicial Panel on Multidistrict Litigation seeking to transfer the entirety of the chapter 11 cases to this Court.[4]  In sum, the Bankruptcy Court is the appropriate forum to decide the scope of the automatic stay and whether any supplemental injunction should be issued in furtherance of the Debtors' bankruptcy cases.

*Third*, Plaintiff mischaracterizes the effect of the Debtors' bankruptcy proceedings on his Combat Arms Claim.  Rather than setting a devastating precedent, as Plaintiff argues, the Debtors—like many other companies before them—are pursuing an avenue to obtain finality with respect to Combat Arms Claims through settlement negotiations or claims estimation in bankruptcy. Moreover, contrary to Plaintiff's contention, this Court's determinations with

_____

proceeds of shared insurance.  Any such losses by 3M would also implicate the Debtors' obligations to indemnify 3M.

[4]     *Declaration of Laura E. Baccash in Support of Defendant 3M's Memorandum in Opposition to Plaintiff Valle's Emergency Motion for Preliminary Injunction* (the "**Baccash Declaration**"), Ex. 1 (Bankr. Docket No. 173).

4

respect to Combat Arms Claims will continue to carry the same force of law during the Debtors' bankruptcy.  Plaintiff also erroneously construes the intent of 28 U.S.C. § 157(b)(5)  and the ultimate effect that such statute will have on the vast majority of holders of Combat Arms Claims.

## BACKGROUND

Plaintiffs asserting claims that have been consolidated for pre-trial proceedings in this MDL (the "**MDL Plaintiffs**"), including movant, Plaintiff Richard Valle ("**Plaintiff**"), assert claims against Aearo Technologies LLC and certain of its affiliates (collectively, the "**Debtors**") and non-debtor 3M Company ("**3M**") in more than 230,000 pending civil actions in state and federal court related to the Combat Arms Earplug, Version 2 ("**CAEv2**") and a civilian version of the CAEv2 sold commercially to non-military consumers (collectively, the "**Combat Arms Claims**").

On July 25, 2022, 3M and the Debtors entered into that certain Funding and Indemnification Agreement (the "**Funding Agreement**").[5]  Under the Funding Agreement, 3M has agreed, subject to the Debtors' first depleting their own assets (including insurance assets), to fund the Debtors' restructuring expenses and

---

[5]    At the July 27, 2022 hearing before this Court, counsel to 3M inadvertently provided the incorrect date on which the Funding Agreement was entered into among the Debtors and 3M as Saturday, July 23, 2022.  July 27, 2022 Hr'g Tr. at 12:2–5.  The Funding Agreement was entered into on Monday, July 25, 2022.

liabilities for Combat Arms Claims, including any contribution to a trust for holders of compensable Combat Arms Claims.  In exchange, the Debtors have agreed to indemnify 3M for losses related to Combat Arms Claims.

On July 26, 2022, the Debtors (not 3M) filed chapter 11 bankruptcy cases in the United States Bankruptcy Court for the Southern District of Indiana (the "**Bankruptcy Court**").  On the same date, the Debtors (not 3M) filed a complaint (the "**Complaint**") and supporting motion and memorandum of law, requesting an extension of the automatic stay and a preliminary injunction barring the prosecution of Combat Arms Claims against 3M and its non-debtor affiliates, thereby commencing an adversary proceeding (the "**Adversary Proceeding**").[6]  As stated in the Complaint, the Debtors commenced the Adversary Proceeding to preserve assets of their bankruptcy estates in furtherance of the efficient and equitable resolution of Combat Arms Claims against the Debtors through a plan of reorganization.

On July 27, 2022, Plaintiff filed the *Ex Parte Motion and Incorporated Memorandum to Issue a Temporary Restraining Order to Enjoin 3M from Taking*

---

[6]    Baccash Decl., Exs. 2, 3, *3M Occupational Safety LLC et al. v. Those Parties Listed on Appendix A to the Complaint and John and Jane Does 1-1000 (In re Aearo Techs. LLC)*, Adv. Pro. No. 22-50059 (Bankr. S.D. Ind. July 26, 2022) (Bankr. Adv. Pro. Docket Nos. 1, 2).

*Any Action Outside the MDL to Enjoin Parties from Pursuing CAEv2 Litigation Against 3M* [MDL Docket No. 3332] ("**Plaintiff's TRO Motion**").[7]

On the same date, the Bankruptcy Court held a "first day" hearing. Thereafter, the Debtors and certain parties in the Adversary Proceeding agreed and stipulated to the provisions set forth in the *Amended Agreed Entry Resolving Debtors' Request for a Temporary Restraining Order*,[8] which the Bankruptcy Court approved on August 5, 2022 (the "**Agreed Order**").[9] The Agreed Order provides for an agreement among the parties (not including Plaintiff) to request from this Court that (1) all depositions scheduled between July 27, 2022 and August 17, 2022 in Wave cases be continued, (2) any discovery deadlines in the MDL Wave cases that have not already expired be continued three weeks, and (3) 3M and the MDL plaintiffs shall comply with the current MDL deadlines for briefing on Wave 1 summary judgment and *Daubert* response or venue disputes. The Bankruptcy Court set for hearing on August 15, 2022 the Debtors' (not 3M's) request for an extension of the automatic stay and a preliminary injunction.

On July 28, 2022, this Court denied Plaintiff's TRO Motion.[10]

---

[7]    The Plaintiff TRO Motion was filed at 9:28 a.m. Central Time, just minutes before the Bankruptcy Court began the Debtors' first day hearing.

[8]    Baccash Decl., Ex. 4 (Bankr. Docket No. 62).

[9]    Baccash Decl., Ex. 5 (Bankr. Docket No. 78.)
[10]    MDL Docket No. 3343.

On August 3, 2022, Plaintiff filed the *Plaintiff's Emergency Motion for Preliminary Injunction Against Defendant 3M Company* and memorandum in support thereof [MDL Docket No. 3358] ("**Plaintiff's PI Motion**").

On August 4, 2022, this Court entered an order setting a briefing schedule on Plaintiff's PI Motion and scheduling oral argument for August 11, 2022.[11]

## ARGUMENT AND AUTHORITIES

### I.    THERE HAS BEEN NO CHANGE IN CIRCUMSTANCES SINCE THIS COURT DENIED PLAINTIFF'S TRO MOTION.

Plaintiff's TRO Motion (which this Court denied) requested that this Court enjoin under the All Writs Act, 28 U.S.C. § 1651(a), "3M and any party acting on 3M's behalf, from filing any motion, action, proceeding, brief, or other judicial filing that seeks to enjoin parties from pursuing CAEv2 related claims against 3M in this MDL or in the district courts where MDL cases have been remanded."[12]  Plaintiff's PI Motion renews his request for the same relief—verbatim—on an emergency basis, again under the All Writs Act.[13]  The only difference between the relief requested in Plaintiff's TRO Motion and Plaintiff's PI Motion is that the latter also requests 3M be enjoined "from supporting and/or advocating in favor of any other

---

[11]    MDL Docket No. 3359.

[12]    Plaintiff's TRO Motion at 1–2, 8.

[13]    Plaintiff's PI Motion at 1, 23.

party seeking to enjoin any parties from pursuing CAEv2 related claims against 3M." As Plaintiff concedes, Plaintiff's PI Motion is merely a less "hurried" and "more complete" version of Plaintiff's TRO Motion.[14]

In its order denying Plaintiff's TRO Motion, this Court concluded that Plaintiff had failed to demonstrate irreparable harm because (1) the Bankruptcy Court had not yet ruled on whether the automatic stay applies to 3M, and (2) the parties stipulated to continuing Wave 3 discovery deadlines.[15] No circumstances have changed in the six days between denial of Plaintiff's TRO Motion and the filing of Plaintiff's PI Motion. Indeed, 3M has not made any filings other than its notice of appearance or argued in the Bankruptcy Court other than to clarify one item for the Bankruptcy Court related to the Debtors' first day cash management motion. Certain MDL Plaintiffs, on the other hand (not including Plaintiff), have served extensive document requests on 3M in connection with the Complaint, to which 3M responded on an expedited basis. These MDL Plaintiffs have also taken the rule 30(b)(6) deposition of a 3M corporate representative. Plaintiff has failed to present any new evidence to this Court in support of the instant motion. For those reasons, and as addressed below, there can be no threat of irreparable injury to Plaintiff in the absence of a preliminary injunction. Moreover, as explained below, the Debtors'

---

[14]    Plaintiff's PI Motion at 4.

[15]    MDL Docket No. 3343 at 2.

chapter 11 cases do not threaten the integrity of this MDL, and the All Writs Act does not afford this Court the authority to grant the requested relief.

## II. THE ALL WRITS ACT IS NOT AN APPROPRIATE BASIS TO COLLATERALLY ATTACK THE BANKRUPTCY COURT'S JURISDICTION AND DENY 3M ITS CONSTITUTIONAL RIGHT TO DUE PROCESS.

Plaintiff's PI Motion is an improper collateral attack on the Bankruptcy Court's jurisdiction over the Debtors and their estates, which is derived from the exclusive jurisdiction of the United States District Court for the Southern District of Indiana under 28 U.S.C. § 1334(e).  In accordance with 28 U.S.C. § 157(a) and the *Standing Order of Reference from the United States District Court for the Southern District of Indiana*, dated July 11, 1984, all bankruptcy cases filed in the Southern District of Indiana have been referred by the District Court to the United States Bankruptcy Court for the Southern District of Indiana.  If Plaintiff disagrees with the Bankruptcy Court's authority and wishes the District Court for the Southern District of Indiana to determine a dispute related to the Debtors or their reorganization, Plaintiff's recourse is to file a motion for withdrawal of the District Court's reference to the Bankruptcy Court under 28 U.S.C. § 157(d).[16]

Instead, Plaintiff's PI Motion seeks to divest the Bankruptcy Court from exercising the jurisdiction that has been conferred upon it by the District Court to

---

[16]   A district court may, but is not required to, withdraw a case referred to the bankruptcy court, upon timely motion of a party, for cause shown.  28 U.S.C. §

hear and determine the Complaint, on which a hearing is scheduled in a mere six days, and to determine matters related to the bankruptcy that directly impact 3M's rights and obligations. Plaintiff asks this Court to invoke the All Writs Act to abrogate the Bankruptcy Court's jurisdiction by enjoining 3M and "any party acting on 3M's behalf" (the meaning of which is unclear) from taking any action to enjoin parties from pursuing Combat Arms Claims against 3M.[17]

This relief would preclude 3M from participating in the adjudication of the Complaint in contravention of its constitutional right to due process. *See Sec. & Exch. Comm'n v. Torchia*, 922 F.3d 1307, 1316 (11th Cir. 2019) ("Due process, in its most basic form, still requires notice and an opportunity to be heard."). Plaintiff's motion, if granted, could also be construed to prohibit 3M from negotiating with the Debtors, plaintiffs, insurers and other stakeholders with respect to the funding of a

---

157(d). Discretionary withdrawal requires truly exceptional and compelling circumstances. *United States v. Kaplan*, 146 B.R. 500, 505 (D. Mass. 1992).

[17]    Although it is unclear whether Plaintiff is arguing for a preliminary injunction under any standard other than the All Writs Act, the relevant factors weigh against granting the requested relief, as addressed throughout this opposition. Additionally, the balance of equities weighs in favor of 3M, as it would be prejudiced by the entry of Plaintiff's requested preliminary injunction while there would no prejudice to Plaintiff if Plaintiff's PI Motion were denied because the bankruptcy proceeding will continue without regard to the disposition of Plaintiff's PI Motion. The public interest weighs against granting the requested relief because of the strong public interest in promoting the reorganization of the Debtors and an equitable resolution for creditors.

trust for the benefit of holders of Combat Arms Claims, which 3M is obligated to fund under the Funding Agreement.  Plaintiff's requested relief could also inhibit 3M's right under section 1109(b) of the Bankruptcy Code to appear as a "party in interest" that "may raise and be heard on any issue in a bankruptcy case." *In re Rodriguez, 633 F*. App'x 524, 526 (11th Cir. 2015).  To receive adequate process in the Bankruptcy Court, 3M must be able to make filings and arguments with respect to contested matters therein, including implementation of a channelling injunction under a plan of reorganization for the Debtors, provide sworn testimony with respect to such matters, participate in any Bankruptcy Court-supervised mediation of Combat Arms Claims and related issues and vote to accept or reject a plan of reorganization for the Debtors, as applicable.  *See SEC v. Terry*, 833 F. App'x 229, 233 (11th Cir. 2020) (recognizing a party's due process rights to "present and argue their facts," "rebut the characterizations [of its conduct]," and "present affirmative defenses.").  Taken to the extreme, given its request to enjoin 3M from "supporting . . . any other party seeking to enjoin" Combat Arms Claims, an order granting Plaintiff's PI Motion could produce the absurd result of barring 3M from performing its obligations under the Funding Agreement or the Shared Services Agreement.[18]

---

[18]    The "Support Services Agreement" refers to that certain Support Services Agreement dated as of April 1, 2008, by and among 3M and certain of the Debtors.

As Plaintiff concedes in his motion, the bankruptcy cases and the Complaint will proceed without regard to the disposition of Plaintiff's motion before this Court. Accordingly, it is unclear how Plaintiff could demonstrate irreparable harm given that the Debtors will not be restrained from prosecuting the Complaint. Moreover, Plaintiff's concession provides no comfort to 3M, as the entry of an order granting the requested injunction will irreparably harm 3M by purporting to deprive 3M of its constitutional right to due process. Further, as noted above, representatives of a majority of MDL Plaintiffs have demanded 3M's participation in the Debtors' bankruptcy cases, and there is no indication that any MDL Plaintiff other than Plaintiff joins in his request for an injunction.[19]

Plaintiff's PI Motion could be construed to collaterally attack the application of the automatic stay by inviting this Court to invoke the All Writs Act to potentially prevent the Bankruptcy Court from deciding the matters that are the subject of the Complaint without the full participation of relevant parties, including 3M in its capacity as a non-debtor creditor, party in interest, parent of the Debtors and co-defendant with the Debtors in this MDL. Moreover, to the extent Plaintiff's PI

_____

[19]  The only other context in which we are aware that Combat Arms Claims could be enjoined against 3M is under the terms of a confirmed chapter 11 plan for the Debtors. Under section 1121 of the Bankruptcy Code, the Debtors have the exclusive right to file and solicit votes on a plan for up to 18 months. 3M could not file a plan now even if it so desired. There is therefore no imminent threat of irreparable harm by 3M and 3M disputes any notion that any plan would result in irreparable harm for the reasons set forth below.

13

Motion purports to limit the breadth of the Debtors' (not 3M's) automatic stay or their ability to prosecute the Complaint or any other matter in the Bankruptcy Court (which the Debtors argue includes enjoining Combat Arms Claims against 3M and its non-debtor affiliates), the Plaintiff PI Motion violates the automatic stay.[20] Regardless, as described below, the All Writs Act should not be wielded in a manner that would supersede the Bankruptcy Court's ability to interpret and apply the provisions of the Bankruptcy Code to matters that relate to the Debtors' estates or a party in interest's right to participate in the bankruptcy cases.

"The [All Writs] Act does not create any substantive federal jurisdiction. Instead, it is a codification of the federal courts' traditional, inherent power to protect the jurisdiction they already have, derived from some other source." *Klay v. United Healthgroup, Inc*., 376 F.3d 1092, 1099 (11th Cir. 2004) (citations omitted). The Act "is a residual source of authority to issue writs that are not otherwise covered by

---

[20]    Section 362(a)(3) of the Bankruptcy Code precludes all entities from taking "any act to obtain possession of property of the estate . . . or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Proceeds of an insurance policy are property of a chapter 11 debtor's estate under section 541(a)(1) of the Bankruptcy Code. 11 U.S.C. § 541(a)(1); *see In re WMR Enters., Inc.*, 163 B.R. 884, 886 (Bankr. N.D. Fla. 1994); *In re Stinnett*, 465 F.3d 309, 312-13 (7th Cir. 2006); *Home Ins. Co. v. Cooper & Cooper Ltd.*, 889 F.2d 746, 748 (7th Cir. 1989). Moreover, the automatic stay applies to litigation that implicates a debtor's obligation to indemnify a non-debtor. *See A.H. Robins Co. v. Piccinin (In re A.H. Robins Co.)*, 788 F.2d 994, 999-1001 (4th Cir.1986); *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, No. 01-01139, Adv. Proc. No. 01-771, 2004 Bankr. LEXIS 579, at *12 (Bankr. D. Del. Apr. 29, 2004).

statute. Where a statute specifically addresses the particular issue at hand, it is that

authority, and not the All Writs Act, that is controlling." *Penn. Bureau of Corr. v.*

*U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985).

Here, the relief requested in the Complaint is predicated on statutes that

specifically address the particular issues at hand—sections 105(a) and 362(a) of the

Bankruptcy Code.[21] For that reason, it is those specific statutes in the Bankruptcy

Code, rather than the All Writs Act, that must control under these circumstances.

*See Penn. Bureau of Corr.*, 474 U.S. at 43. It would turn the All Writs Act on its

head to effectively strip the Bankruptcy Court of its jurisdiction to determine the

matters that are the subject of the Complaint, which directly affect the administration

of the bankruptcy estate. The Bankruptcy Code provides a clear statutory scheme

that is intended to preserve the property of a debtor's estate, which supersedes any

residual authority afforded to federal courts by the All Writs Act. Indeed, as noted

---

[21]     Section 105(a) of the Bankruptcy Code authorizes a bankruptcy court to "issue
any order, process, or judgment that is necessary or appropriate to carry out the
provisions" of the Bankruptcy Code. The Complaint, in addition to requesting a
determination of the application of the automatic stay under section 362(a) of the
Bankruptcy Code to 3M, requests that the Bankruptcy Court issue a preliminary
injunction under section 105(a) enjoining all persons or entities from commencing
or continuing Combat Arms Claims against 3M. Such relief is granted in chapter 11
cases to the extent the bankruptcy court determines it is necessary to safeguard the
debtor's prospects for a successful reorganization and would serve the public
interest. *See In re Caesars Ent'mt Op. Co.*, 808 F.3d 1186, 1188–89 (7th Cir. 2015);
*In re Purdue Pharma L.P.*, 619 B.R. 38, 45-46 (S.D.N.Y. 2020); *In re W.R. Grace
& Co.*, 386 B.R. 17, 36 (Bankr. D. Del. 2008).

above, the Bankruptcy Court has the *exclusive* jurisdiction, conferred upon it by the

District Court under 28 U.S.C. § 1334(e) "of all of the property, wherever located,

of the debtor as of the commencement of [the chapter 11] case, and of property of

the estate."[22]  *See Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004).

Accordingly, the Bankruptcy Court, applying specific statutes in the Bankruptcy

---

[22]     Perhaps recognizing that his request for a preliminary injunction pertains to
the Debtors' estate property, Plaintiff describes this Court's authority as "analogous
to that of a court in an *in rem* action."[22]  Critically, however, the Bankruptcy Court
presiding over the Debtors' chapter 11 cases is *actually* exercising *in rem* jurisdiction
over the Debtors' estates and their property.  Courts have explicitly recognized the
bankruptcy court's actual *in rem* authority to enjoin proceedings that would affect a
debtor's bankruptcy estate.  *See Rohe v. Wells Fargo Bank, N.A.*, 988 F.3d 1256,
1266 (11th Cir. 2021) ("[W]here a court is exercising jurisdiction over particular
property, as in an *in rem* proceeding or with regard to a bankruptcy estate, the court
generally has the power to protect its jurisdiction over that property by enjoining
proceedings in other courts regarding the property . . . because control over the *res*
is fundamental to the court's ability to render judgment in the case." (internal
quotation omitted)).  Indeed, the *in rem* jurisdiction of a bankruptcy court generally
takes precedence over the jurisdiction of other federal and state courts.  *See*, *e.g.*,
*Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 383–87 (6th Cir. 2002) (explaining
extent of bankruptcy court's exclusive jurisdiction over property); *Gilchrist v. Gen.
Elec. Cap. Corp.*, 262 F.3d 295, 303–04 (4th Cir. 2001) (holding that a bankruptcy
court had jurisdiction over property rather than court in which a receivership
proceeding was filed).

Code, has the paramount authority to make the rulings requested in the Complaint without the jurisdictional encroachment that the Plaintiff's PI Motion advocates.

Contrary to Plaintiff's unsupported suggestion that this Court is "best equipped to decide the parameters of the automatic stay,"[23] it is well established that federal district courts, including courts presiding over multi-district litigation, should defer to bankruptcy courts on matters pertaining to a debtor's automatic stay.[24]  The Second Circuit's decision in *In re Baldwin-United Corp. Litigation* is instructive.  In that case, the Second Circuit acknowledged that a district court's "duty to assure orderly pretrial proceedings in the multi-district litigation assigned to it is important" but held that "to whatever extent a conflict may arise between the authority of the Bankruptcy Court to administer [a] complex reorganization and the authority of the District Court to administer consolidated pretrial proceedings, the equities favor maintenance of the unfettered authority of the Bankruptcy Court."  765 F.2d 343, 348 (2d Cir. 1985).  The Second Circuit reasoned that the bankruptcy court must be allowed to use its "vital authority" to "'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions' of the Bankruptcy Code," and

---

[23]    Plaintiff's PI Motion at 21.

[24]    Indeed, on August 1, 2022, the Debtors filed a motion in their bankruptcy cases to enforce the automatic stay against Plaintiff's counsel in response to the filing of a notice of potential tag-along action with the Judicial Panel on Multidistrict Litigation seeking to transfer the entirety of the chapter 11 cases to this Court.  *See* Baccash Decl., Ex. 1 (Bankr. Docket No. 173).

a district court should not interfere with such authority by seeking to interpret the scope of the stay or issuing related injunctions. *Id.*

Cases recognizing the paramount authority of a bankruptcy court in the context of the automatic stay are legion, including in the Eleventh Circuit. *See, e.g.*, *Meadows v. Commissioner*, 405 F.3d 949, 959 (11th Cir. 2005) (finding that tax court did not abuse its discretion by deferring complex issues to bankruptcy court because the bankruptcy court is more knowledgeable about the scope of the automatic stay); *Chicago Title Ins. Co. v. Lerner*, 435 B.R. 732, 737 (S.D. Fla. 2010) (deferring to bankruptcy court's determination of whether litigation against non-debtors was subject to automatic stay based on *In re Baldwin-United Corp.*); *Melvin v. Blitz U.S.A., Inc.*, No. 8:11-cv-2542-T-24 (TGW) (SCB), 2012 WL 415444, at *2 (M.D. Fla. Feb. 9, 2012) ("[T]he Court finds that the issue of whether the claims . . . should be stayed due to their effect on [the] bankruptcy and reorganization would be best handled by the bankruptcy court, because the bankruptcy court is in the best position to analyze the issue.").[25]

The Eleventh Circuit has similarly deferred to the Bankruptcy Court's jurisdiction in the context of the automatic stay and declined invitations to enjoin

---

[25]    There are also countless examples of similar decisions outside of the Eleventh Circuit. *See, e.g.*, *Gruntz v. Cty. of L.A. (In re Gruntz)*, 202 F.3d 1074, 1082 (9th Cir. 2000) ("The automatic stay is an injunction issuing from the authority of the bankruptcy court, and bankruptcy court orders are not subject to collateral attack in other courts."); *BioConvergence LLC v. Attariwala*, Case No. 19-cv-01745 (SEB)

litigation under the All Writs Act in light of a pending bankruptcy.  In *Rohe v. Wells Fargo Bank, N.A.*, the debtor filed an All Writs Act petition in federal district court requesting that the court void certain state court orders on the grounds that they violated the automatic stay.  988 F.3d at 1262.  The district court denied the petition.  The Eleventh Circuit affirmed, holding that the bankruptcy court was the proper court to enforce the automatic stay, because the *bankruptcy court* "can exercise authority provided by both the All Writs Act, and 11 U.S.C. § 105(a)." *Id.* (citations omitted) ("Because the bankruptcy case falls within the purview of the bankruptcy court, which is well-equipped to protect the proceeding's integrity, the bankruptcy case is not a proceeding on which non-appellate use of the All Writs Act by the District Court could be predicated.").

It is also not appropriate to use the All Writs Act to attempt to exempt Combat Arms Claims pending in this MDL from the application of the Debtors' (not 3M's) automatic stay or to deprive the Bankruptcy Court of its exclusive jurisdiction over

---

(TAB), 2020 WL 1915269, at *3 (S.D. Ind. 2020) ("[T]he bankruptcy court does possess the final word: If the non-bankruptcy court issues a finding as to the application of the stay that the bankruptcy court deems erroneous, the bankruptcy court's resolution of this issue is determinative"); *In re Mid-City Parking, Inc.*, 332 B.R. 798, 804 (Bankr. N.D. Ill. 2005) ("The bankruptcy court from which the automatic stay originated nonetheless has the final say [on the scope of that stay]."); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 511 B.R. 375, 388 (Bankr. S.D.N.Y. 2014) (concluding, based on *In re Baldwin-United Corp.*, that it was appropriate for the bankruptcy court to decide the scope of the automatic stay).

property of the Debtors' estates simply because the MDL was the first-filed case.
The Court of Appeals for the Fourth Circuit examined this question in *Gilchrist v.
Gen. Elec. Cap. Corp.* 262 F.3d 295 (4th Cir. 2001). In *Gilchrist*, the United States
District Court for the District of South Carolina, which was presiding over a
previously filed receivership of a debtor's assets, issued a temporary restraining
order to protect its jurisdiction under the All Writs Act, specifically enjoining
creditors from "undertaking any action in furtherance of [an] involuntary petition
filed against [the debtor] in the Southern District of Georgia." *Id*. at 298. On appeal,
the Court of Appeals recognized that "the district court has within its equity power
the authority to protect its jurisdiction over a receivership estate through the All
Writs Act, 28 U.S.C. § 1651, and through its injunctive powers, consistent with
Federal Rule of Civil Procedure 65." *Id*. at 302. Nevertheless, the Court of Appeals
reversed the District Court's All Writs Act injunction, determining that "Congress
intended that the bankruptcy process be favored in circumstances such as these"
because "[s]ection 1334(e) of title 28 is unequivocal in its grant of exclusive
jurisdiction to the bankruptcy court . . . ." *Id*. Here, the injunction requested by
Plaintiff is indistinguishable from the All Writs Act injunction that was rejected by
the Fourth Circuit in *Gilchrist* and should be denied for the same reasons.

Plaintiff cites no case where a District Court—in this Circuit or elsewhere—
granted injunctive or other relief under the All Writs Act to bar a party in interest

20

from appearing before a Bankruptcy Court regarding matters pertaining to the

automatic stay or the issuance of a preliminary injunction.  Indeed, none of Plaintiff's

cited cases addresses the use of the All Writs Act to enjoin a litigant before a

bankruptcy court.[26]  Indeed, an All Writs Act injunction is a "drastic remedy" that

must be used "sparingly," "consistent with constitutional guarantees of due process

of law and access to the courts."  *Comer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812,

817 (4th Cir. 2004).  The Supreme Court has explained that the constitutional

---

[26]     *See Riccard v. Prudential Ins. Co. of Am.*, 307 F.3d 1277, 1295 n.15 (11th Cir.
2002) (affirming district court's use of the All Writs Act to enjoin a serial litigant
"bent on re-litigating claims" in state court and administrative agencies); *Klay v.
United Healthgroup, Inc.*, 376 F.3d 1092 (11th Cir. 2004) (overturning district
court's improper use of the All Writs Act to prevent defendants from proceeding
with arbitration of claims); *N.Y. Life Ins. Co. v. Deshotel*, 142 F.3d 873, 879 (5th
Cir. 1998) (affirming district court's use of the All Writs Act to enjoin a litigant
from relitigating in another district court); *Miller v. Brooks (In re Am. Honda Motor Co.)*,
315 F.3d 417, 438 (4th Cir. 2003) (affirming an MDL court's use of the All Writs
Act to enjoin a party from enforcing a portion of an arbitration award); *In re
Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d
328, 333–34 (2d Cir. 1985) (affirming MDL court's use of the All Writs Act to
enjoin states from litigating state claims against settling MDL defendants); *In re
Vioxx Prods. Liab. Litig.*, 869 F. Supp. 2d 719, 723-24 (E.D. La. 2012) (using All
Writs Act to enjoin state court plaintiffs from offering evidence in separate
proceedings that implicated damages for claims settled in the MDL); *In re NTE
Conn., LLC*, 26 F.4th 980, 987 (D.C. Cir. 2022) (granting district court's use of the
All Writs Act against the Federal Energy Regulatory Commission where the
Circuit's "prospective jurisdiction was certain"); *In re Managed Care Litig.*, 236 F.
Supp. 2d 1336 (S.D. Fla. 2002) (finding that an MDL judge could overrule a
prospective settlement with a sub-class of plaintiffs in a separate district court
proceeding); *United States v. New York Tel. Co.*, 434 U.S. 159 (1977) (finding that
a district court may direct a telephone company to provide facilities and technical
assistance under that All Writs Act).

21

protection afforded by access to the courts is "the right conservative of all other rights, and lies at the foundation of orderly government." *Chambers v. Baltimore & Ohio R.R. Co.*, 207 U.S. 142, 148 (1907).

Because the All Writs Act is inapposite by virtue of the clear and supervening statutory authority of the Bankruptcy Court to determine the scope of the automatic stay and grant a preliminary injunction under sections 362(a) and 105(a) of the Bankruptcy Code, respectively, Plaintiff fails to set forth any cognizable claim or cause of action that could support an injunction, much less a likelihood of success on the merits of any such claim. *See GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318 (11th Cir. 2015) (affirming lower court's denial of request for preliminary injunction finding a failure to show likelihood of success on the merits); *Ho v. City of Boynton Beach*, Case No. 21-81023-cv (JDM), 2022 U.S. Dist. LEXIS 53240, at *15 (S.D. Fla. Mar. 23, 2022) (denying plaintiff's renewed request for preliminary injunction where no cognizable claim was discernable, "let alone one on which they are likely to succeed on the merits.").[27]

---

[27]    It is also critical to note that if this Court grants Plaintiff's PI Motion (which it should not), and Combat Arms Claims are permitted to proceed against 3M, any defense costs or bellwether trial verdicts would be paid *by the Debtors* first from their own assets. In particular, any continuation of Combat Arms Claims against 3M would deplete the proceeds of insurance policies shared among the Debtors and 3M. *See* Baccash Decl., Ex. 2. It would also implicate the Debtors' obligation to indemnify 3M for losses related to Combat Arms Claims. *Id.* Moreover, the Funding Agreement contains a waterfall provision that requires the Debtors to use

## III.  PLAINTIFF MISCHARACTERIZES THE EFFECT OF THE DEBTORS' BANKRUPTCY PROCEEDINGS ON COMBAT ARMS CLAIMS.

Plaintiff's PI Motion is premised on purported irreparable injuries that Plaintiff argues he will sustain if Combat Arms Claims are enjoined against 3M pursuant to the Complaint filed by the Debtors (not 3M) in the Adversary Proceeding.  In particular, Plaintiff argues, among other things, as follows:

- The Debtors are seeking to relitigate in Bankruptcy Court matters this Court has already decided.[28]

- Plaintiff is "*entitled by law* to an Article III court's adjudication of his claims" under 28 U.S.C. § 157(b)(5), and the "roundtripping" of Plaintiff's case back to the relevant district court following the culmination of the bankruptcy is nothing more than an "expensive detour."[29]

_____

their own assets—including insurance recoveries—to satisfy their liabilities before they are entitled to request funding from 3M.  Funding Agreement § 1, Definition of "Permitted Funding Use."  As a result, the entry of an order granting Plaintiff's PI Motion would ensure that Combat Arms Claims continue to be prosecuted against 3M in an ongoing violation of the Debtors' automatic stay under section 362(a)(3), without any court needing to consider whether section 362(a)(1) of the automatic stay extends to 3M.

[28] Plaintiff's PI Motion at 6.

[29] *Id.* at 5-6, 20.

- 3M would be "gaming the system" by benefitting from the Debtors' restructuring.[30]

For the reasons that follow, Plaintiff's concerns mischaracterize how mass tort claims are addressed in bankruptcy and the process that is commonly implemented in chapter 11 to provide equitable compensation to holders of compensable claims. Moreover, Plaintiff ignores that any relief the Debtors request in their chapter 11 cases is subject to applicable legal standards and that Plaintiff will be afforded due process—in the Bankruptcy Court—with respect to any and all such proposed relief.

The Debtors commenced their chapter 11 cases to implement an equitable and expeditious process to resolve Combat Arms Claims by consolidating such claims for uniform treatment and negotiating and soliciting creditor votes on a global resolution implemented through a plan of reorganization that provides finality. Rather than creating a "devastating precedent,"[31] the Debtors—like many other companies before them—are pursuing an avenue to obtain complete finality with respect to Combat Arms Claims following a successful settlement negotiation or estimation. *See In re LTL Mgmt., LLC*, 637 B.R. 396, 411 (Bankr. D.N.J. 2022) ("Addressing mass torts through a legislative scheme enacted by Congress within the bankruptcy system . . . provides a judicially accepted means of aggregating and

---

[30] *Id.* at 21.

[31] *See id.* at 21.

24

resolving mass tort claims.").  In addition to the benefits that the bankruptcy system affords to the Debtors, the process also affords holders of Combat Arms Claims the opportunity to avoid potentially disparate outcomes in the tort system and unequal compensation.

The premise that 3M will "relitigate" legal and factual issues that have already been decided by this Court is incorrect.  The commencement of a bankruptcy case does not afford 3M, the Debtors or any other party an opportunity for a "do-over,"[32] in the form of an exception to principles of *res judicata* or otherwise.  Neither this Court's nor any other court's prior determinations with respect to Combat Arms Claims will fail to continue to carry the same force of law during the Debtors' bankruptcy.

Plaintiff's PI Motion is a transparent attempt to accomplish precisely what the Bankruptcy Code is intended to forestall—a race by plaintiffs who happen to be closest to trial to liquidate their claims before other similarly situated creditors can do the same.  Plaintiff's desire to effectively sever his claims against 3M from those against the Debtors and proceed against 3M alone does not constitute a legal basis to grant the relief requested in Plaintiff's PI Motion.

---

[32] *See id.* at 20.

To make his argument, Plaintiff also mischaracterizes Congress's intent in enacting 28 U.S.C. § 157(b)(5) and the effect such statute will have on the vast majority of holders of Combat Arms Claims.  Section 157(b)(5) provides that

> [t]he district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

Plaintiff's arguments are baseless for several reasons.  First, section 157(b)(5) aims to "centralize the administration of the [bankruptcy] estate and to eliminate the 'multiplicity of forums for the adjudication of parts of a bankruptcy case.'"  *A.H. Robins Co.*, 788 F.2d at 1011 (quoting House Agreement to the Conf. Report on H.R. 5174, 130 Cong. Rec. 20206, at 20228 (1984), as reprinted in 1984 U.S.C.C.A.N. 576, 579 (statement of Rep. Kastenmeier, Member, H. Comm. on the Judiciary)).  Second, as the Sixth Circuit stated in *Dow Corning*, which involved claims against the bankrupt manufacturer of silicone gel breast implants and various non-debtor defendants,

> Section 157(b)(5) should be read to allow a district court to fix venue for cases pending against nondebtor defendants which are "related to" a debtor's bankruptcy proceedings pursuant to Section 1334(b).  This approach will further the prompt, fair, and complete resolution of all claims "related to" bankruptcy proceedings, and harmonize Section 1334(b)'s broad jurisdictional grant with the oft-stated goal of centralizing the administration of a bankruptcy estate.

26

86 F.3d 482, 497 (6th Cir. 1996) (internal footnote omitted).  Third, because

distribution procedures under a mass tort plan of reorganization are typically the

subject of hard-fought negotiations with representatives of a majority of plaintiffs

and overwhelmingly approved by individual plaintiffs, the number of claimants

who elect under distribution procedures to pursue their claims in the tort system

will likely be few in number.  Fourth, Plaintiff fails to acknowledge rule 9033 of

the Federal Rules of Bankruptcy Procedure, which enables a debtor to obtain district

court approval of a plan of reorganization that provides for binding treatment of one

or more classes of personal injury claims.  This rule offers a solution to the

constitutional inability of an Article I court to liquidate a personal injury claim for

purposes of distribution.[33]

Plaintiff also improperly attributes the Debtors' bankruptcy filing and

restructuring strategy to non-debtor 3M, making no distinction between the legal

entities.  Despite the manner in which Plaintiff strategically interchanges the Debtors

---

[33]    *See, e.g.*, *In re TK Holdings Inc.*, 17-11375 (BLS) (Bankr. D. Del. February 21, 2018) [Docket No. 2120] (confirming a plan involving personal injury claims but referring the channeling injunction to the district court for affirmation); *In re Mallinckrodt plc*, 20-12522 (JTD) (Bankr. D. Del. March 2, 2022) [Docket No. 6660] (confirming a plan involving personal injury claims subject to affirmation by the district court).  In each of these cases and many others, the debtor was able to confirm and consummate a plan of reorganization consistent with section 157(b)(5), without the wasteful "roundtripping" regarding which Plaintiff expresses apparent concern.

and 3M throughout the Plaintiff PI Motion in an effort to erroneously imply that 3M
is orchestrating the Debtors' actions, 3M itself did not file for bankruptcy protection.
3M did not file the Adversary Proceeding or request the injunction that is the subject
of the Complaint.  The Debtors are managed by their boards of directors, including
two disinterested directors to whom the boards have delegated authority to decide
any matter in which there is a conflict of interest between the Debtors and 3M.  As
noted above, 3M and the Debtors are parties to the Funding Agreement, which was
negotiated at arm's length.

Neither 3M's agreement to fund the Debtors' restructuring of Combat Arms
Claims under the terms of the Funding Agreement nor the Debtors' request in the
Complaint to enjoin litigation against 3M related to Combat Arms Claims is "tactical
gamesmanship" or an effort to "gam[e] the system."[34]  As noted above, there is an
extensive and uniform body of case law recognizing that the automatic stay enjoins
the prosecution of cases against a non-debtor where such claims are the exact same
claims, such that the debtor is the real party defendant.  *See A.H. Robins Co., Inc.*,
788 F.2d at 1002–03.  Additionally, litigation against a non-debtor that implicates
shared insurance or a debtor's indemnification obligations violates the debtor's
automatic stay.  *See id.* 1001–02; *In re W.R. Grace & Co.*, No. 01-01139 (JKF), 2004

---

[34]     *See* Plaintiff's PI Motion at 2, 21.

28

WL 954772, at *4 (Bankr. D. Del. Apr. 29, 2004).  Moreover, there are clear standards that must be satisfied for a bankruptcy court to approve a plan of reorganization that contains third-party releases in favor of a non-debtor.  *See In re Airadigm Commc'ns, Inc.,* 519 F.3d 640, 657 (7th Cir. 2008).  Far from a "contemptible bankruptcy ploy," [35] the Debtors have availed themselves of the protections afforded by chapter 11 of the Bankruptcy Code, including the protections available under section 105(a) and afforded by section 362(a) thereof, which guard against threats to their reorganization.  Any relief that the Debtors request in their chapter 11 cases, from the imposition of a preliminary injunction to confirmation of a plan that compensates holders of Combat Arms Claims, is subject to applicable legal standards and will afford plaintiffs due process.[36]

The appropriate forum for the grievances expressed in Plaintiff's PI Motion is the Bankruptcy Court.  The Bankruptcy Court has set a deadline to object or otherwise respond to the relief requested in the Complaint of August 11, 2022.

---

[35]    *See id.* at 21 n.8.

[36]    Any liability of 3M relating to Combat Arms Claims may be resolved and channelled to a trust under the Debtors' ultimate plan of reorganization only if the Bankruptcy Court approve third-party releases in favor of 3M.  *See In re Airadigm Commc'ns*, 519 F.3d at 657 (finding that "Congress affirmatively gave the bankruptcy court the power to release third parties from a creditor's claims"); *In re USA Gymnastics*, No. 18-09108 (Bankr. S.D. Ind. Apr. 17, 2019) [Docket No. 1776] (confirming a plan where the releases and injunctions were "narrow" and "essential to the reorganization").

Under section 1109 of the Bankruptcy Code, any party in interest, including Plaintiff, in his capacity as a creditor, "may raise and may appear and be heard on any issue" in a chapter 11 case.  11 U.S.C. § 1109(b).  Plaintiff cannot demonstrate irreparable harm where he has the right to participate in the Debtors' bankruptcy proceeding.  By prosecuting what is, in effect, an objection to the Complaint under the guise of a preliminary injunction motion against 3M in this Court, Plaintiff is attempting to circumvent the collective nature of the bankruptcy process and elevate his own interests above those of the class of plaintiffs as a whole.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Plaintiff's PI Motion.

30

Dated:  August 9, 2022                     Respectfully submitted,

                                           s/ *Jessica C. Lauria*
                                           Jessica C. Lauria (admitted *pro hac vice*)
                                           White & Case LLP
                                           1221 Avenue of the Americas
                                           New York, New York 10020
                                           Telephone:  (212) 819-8200
                                           Email:  jessica.lauria@whitecase.com

                                           *Counsel for Defendant 3M Company in*
                                           *Connection with the Restructuring of the*
                                           *Debtors*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

Pursuant to Local Rule 7.1(F), counsel for Defendant 3M certifies that this memorandum contains 7,920 words.

Dated:  August 9, 2022

s/ *Jessica C. Lauria*
Jessica C. Lauria (admitted *pro hac vice*)
White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

*Counsel for Defendant 3M Company in Connection with the Restructuring of the Debtors*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY this 9th day of August 2022, a true and correct copy of

the foregoing was electronically filed via the Court's CM/ECF system, which will

automatically serve notice of this filing via e-mail to all registered counsel of record.

s/ *Jessica C. Lauria*
Jessica C. Lauria (admitted *pro hac vice*)
White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

*Counsel for Defendant 3M Company in*
*Connection with the Restructuring of the*
*Debtors*

# MDL.Dkt.3378-4

3M News Center

# 3M Subsidiary Aearo Technologies Takes Action to Efficiently and Equitably Resolve Litigation Related to Combat Arms Earplugs

Aearo Technologies and related entities have voluntarily initiated chapter 11 proceedings
3M has committed $1 billion to fund a trust to resolve all claims determined to be entitled to compensation

ST. PAUL, Minn., July 26, 2022 /PRNewswire/ -- 3M (NYSE: MMM) today announced it is taking action to resolve litigation related to Combat Arms Earplugs Version 2 ("Combat Arms Earplugs"). Aearo Technologies and related entities ("Aearo Technologies"), all of which are wholly-owned 3M subsidiaries, have voluntarily initiated chapter 11 proceedings seeking court supervision to help establish a trust – funded by 3M – to efficiently and equitably resolve all claims determined to be entitled to compensation.

3M and Aearo Technologies believe the Combat Arms Earplugs were effective and safe when used properly, but nevertheless face increasing litigation, including approximately 115,000 filed claims and an additional 120,000 claims on an administrative docket as of June 30, 2022. The well-established chapter 11 process is intended to achieve an efficient and equitable resolution, reduce uncertainty, and increase clarity for all stakeholders, while reducing the cost and time that could otherwise be required to litigate thousands of cases. 3M and its other businesses have not filed for chapter 11 and will continue to operate as usual. Aearo Technologies will also continue to operate in the ordinary course.

"We have great respect for the brave men and women who protect us, and remain committed to the military as an active partner and valued customer going forward," said 3M chairman and chief executive officer Mike Roman. "We determined that taking this decisive action now will allow 3M and Aearo Technologies to address these claims in a way that is more efficient and equitable than the current litigation."

The company believes that, absent the actions taken today, the claims could take years, if not decades, to litigate on a case-by-case basis. With this change in strategy, this process is intended to resolve claims related to Combat Arms Earplugs in a manner that is more efficient and equitable to all parties.

## Announcement Details

Aearo Technologies was acquired by 3M in 2008 and has since operated as a wholly-owned subsidiary of 3M.
3M has entered into a funding agreement with Aearo Technologies to establish a trust to resolve all claims determined to be entitled to compensation, and to support Aearo Technologies as it continues to operate during the chapter 11 process.
The claims largely relate to the previous generation Combat Arms Earplugs manufactured by Aearo Technologies, as well as discontinued Aearo Technologies mask and respirator products utilized to reduce workplace exposure to asbestos, silica, coal mine dust or occupational dusts.
Aearo Technologies has indemnified 3M for obligations related to the claims.
3M has committed $1 billion to fund the trust, based on the analysis of an experienced estimator of claims in chapter 11.
3M has also committed an additional $240 million to fund projected related case expenses.
3M will provide additional funding if required under the terms of the agreement.

As a result, 3M recorded a total pre-tax charge of $1.2 billion, or $1.66 per share, and reflected it as an adjustment in arriving at its results, adjusted for special items.

## Additional Information

In conjunction with the chapter 11 process, Aearo Technologies will file customary first day motions with the bankruptcy court seeking authority to continue operating in the normal course of business, without interruption

or disruption to its customers, vendors, and employees.

The Aearo Technologies chapter 11 cases were filed in the U.S. Bankruptcy Court for the Southern District of Indiana. Additional information is available on resolvingearpluglitigation.com and www.3mearplugsfacts.com. Court filings and information about the chapter 11 cases are available on a separate website administered by Aearo Technologies' claims agent, Kroll; information is also available by calling (855) 639-3375 (Toll-Free US/Canada) or +1 (347) 897-3818 (International); or by emailing aearotechnologiesinfo@ra.kroll.com.

**Advisors**

Kirkland & Ellis LLP is serving as legal counsel and AlixPartners LLP is serving as restructuring advisor to Aearo Technologies. PJT Partners is serving as financial advisor and White & Case LLP is serving as legal counsel to 3M.

**Planned Spin-Off of Health Care Business**

In a separate press release issued today, 3M announced its intent to spin off its Health Care business, resulting in two world-class public companies well positioned to pursue their respective growth plans.

To access the press release, please visit our press release page here.

**Q2 2022 Earnings Results and Conference Call**

In a separate press release issued today, 3M announced its second-quarter 2022 results and updated its outlook for the full-year 2022. Please see the company's second-quarter earnings press release for more details.

3M will conduct an investor teleconference at 9 a.m. EDT (8 a.m. CDT) today. Investors can access this conference via the following:

Live webcast at http://investors.3M.com.
Live telephone:

Call 800-762-2596 within the U.S. or +1 212-231-2916 outside the U.S. Please join the call at least 10 minutes before the start time.
Webcast replay:

Go to 3M's Investor Relations website at http://investors.3M.com and click on "Quarterly Earnings."
Telephone replay:

Call 800-633-8284 within the U.S. or +1 402-977-9140 outside the U.S. (for both U.S. and outside the U.S., the access code is 21999290). The telephone replay will be available until 11:30 a.m. EDT (10:30 a.m. CDT) on August 1, 2022.

**Forward-Looking Statements**

This news release contains forward-looking information about 3M's financial results and estimates and business prospects that involve substantial risks and uncertainties. You can identify these statements by the use of words such as "anticipate," "estimate," "expect," "aim," "project," "intend," "plan," "believe," "will," "should," "could," "target," "forecast" and other words and terms of similar meaning in connection with any discussion of future operating or financial performance or business plans or prospects. Among the factors that could cause actual results to differ materially are the following: (1) worldwide economic, political, regulatory, capital markets and other external conditions and other factors beyond the Company's control, including natural and other disasters or climate change affecting the operations of the Company or its customers and suppliers; (2) risks related to public health crises such as the global pandemic associated with the coronavirus (COVID-19); (3)

foreign currency exchange rates and fluctuations in those rates; (4) liabilities related to certain fluorochemicals, including lawsuits concerning various PFAS-related products and chemistries, and claims and governmental regulatory proceedings and inquiries related to PFAS in a variety of jurisdictions; (5) legal proceedings, including significant developments that could occur in the legal and regulatory proceedings described in the Company's Annual Report on Form 10-K for the year ended Dec. 31, 2021, as updated by the Company's Current Report on Form 8-K dated April 26, 2022, and any subsequent quarterly reports on Form 10-Q (the "Reports"); (6) competitive conditions and customer preferences; (7) the timing and market acceptance of new product offerings; (8) the availability and cost of purchased components, compounds, raw materials and energy (including oil and natural gas and their derivatives) due to shortages, increased demand or supply interruptions (including those caused by natural and other disasters and other events); (9) unanticipated problems or delays with the phased implementation of a global enterprise resource planning (ERP) system, or security breaches and other disruptions to the Company's information technology infrastructure; (10) the impact of acquisitions, strategic alliances, divestitures, and other unusual events resulting from portfolio management actions and other evolving business strategies, and possible organizational restructuring; (11) operational execution, including scenarios where the Company generates fewer productivity improvements than estimated; (12) financial market risks that may affect the Company's funding obligations under defined benefit pension and postretirement plans; (13) the Company's credit ratings and its cost of capital; (14) tax-related external conditions, including changes in tax rates, laws or regulations; (15) matters relating to the proposed spin-off of the Company's Health Care business, including whether the transaction will be completed, or if completed, will be on the expected terms; the risk that the expected benefits will not be realized; the risk that the costs or dis-synergies will exceed the anticipated amounts; the ability to satisfy the various closing conditions; potential business disruption; the diversion of management time; the impact of the transaction (or its pendency) on the Company's ability to retain talent; potential impacts on the Company's relationships with its customers, suppliers, employees, regulators and other counterparties; the ability to realize the desired tax treatment (including whether an Internal Revenue Service private letter ruling will be sought or obtained); the risk that any consents or approvals required will not be obtained; risks associated with financings that may be undertaken and indebtedness that may be incurred in connection with the transaction; and (16) matters relating to the voluntary chapter 11 proceedings of the Company's subsidiary Aearo Technologies and certain of its affiliates (the "Aearo Entities"), including legal risks related to the chapter 11 proceedings; potential impacts to the Company's reputation and its relationships with customers, suppliers, employees, regulators and other counterparties and community members; potential impacts to the Company's liquidity or results of operations, including risks related to the amount that will be necessary to fully and finally resolve all of the Company's obligations to make payments to resolve such claims under the terms of its funding and indemnification agreement with the Aearo Entities; and the Aearo Entities' ability to navigate the chapter 11 proceedings to obtain approval and consummation of a plan of reorganization. Changes in such assumptions or factors could produce significantly different results. A further description of these factors is located in the Reports under "Cautionary Note Concerning Factors That May Affect Future Results" and "Risk Factors" in Part I, Items 1 and 1A (Annual Report) and in Part I, Item 2 and Part II, Item 1A (Quarterly Reports). The Company assumes no obligation to update any forward-looking statements discussed herein as a result of new information or future events or developments.

**Investor Contact:**

Bruce Jermeland

(651) 733-1807

Diane Farrow

(612) 202-2449

https://news.3m.com/2022-07-26-3M-Subsidiary-Aearo-Technologies-Takes-Action-to-Efficiently-and-Equitably-Resolve-Litigation-Related-to-Combat-Arms-Earplugs

# MDL.Dkt.3378-5



Q2 2022 Earnings Call Transcript
Michael Roman, Monish Patolawala, and Kevin Rhodes
July 26, 2022

Slide 1, Cover page
Bruce Jermeland, Senior Vice President, Investor Relations

Thank you and good morning, everyone and welcome to our second-quarter earnings conference call.

With me today are Mike Roman, 3M's chairman and chief executive officer, Monish Patolawala, our chief financial and transformation officer, and Kevin Rhodes our chief legal affairs officer. Please note that Mike's and Monish's formal comments this morning will be longer than past quarters given the announcements that we made this morning. Therefore, when we get to Q&A, please keep it to one question and one follow-up so that we can try and get to everyone as efficiently as possible.

Also note that today's earnings release and slide presentation accompanying this call are posted on the home page of our investor relations website at 3M.com.

Please turn to slide two.

Slide 2, Forward looking statement
Bruce Jermeland

Please take a moment to read the forward-looking statement. During today's conference call, we will be making certain predictive statements that reflect our current views about 3M's future performance and financial results. These statements are based on certain assumptions and expectations of future events that are subject to risks and uncertainties. Item 1A of our most recent Form 10-K and 8-K lists some of the most important risk factors that could cause actual results to differ from our predictions.

Please note, throughout today's presentation we will be making references to certain non-GAAP financial measures. Reconciliations of the non-GAAP measures can be found in the appendix to these slides and in the attachments to today's press release.

With that, please turn to slide three and I will now hand the call off to Mike.

Mike.

Slide 3, 3M is taking significant actions to benefit stakeholders
Mike Roman, Chairman and Chief Executive Officer

Thank you, Bruce. Good morning, everyone, and thank you for joining us.

Today is an exciting and important day for 3M. We are positioning our company for future success by creating more opportunity while reducing uncertainty.

We plan to spin off our Health Care Business, which will result in two world-class public companies that are global leaders with significant growth opportunities in their respective markets. We intend to execute a tax-free spin-off, creating a global diversified health care technology leader. New 3M will remain a leading global material science innovator, serving customers across a range of diverse and attractive end markets. Each company will be well capitalized, more agile and focused, and well positioned for long-term success.

Yes, Steve, there's certainly -- there are process steps that we will go through as we file today for the Aearo Technologies. And so there are – we have to work through each of those steps. So there's always decisions that are made along the way. So I think that's part of gaining certainty as we go, and we'll keep everybody updated. I don't -- Kevin, do you want to make any comments specifically?

Kevin Rhodes

Yes. Certainly, while most Chapter 11 proceedings are contested, Stephen, we've -- we're prepared to move forward, and we believe the applicable law supports our position as we move forward into this process. And the goal, again, is to remove uncertainty to set up a more efficient and equitable process for establishing a fund to compensate claimants who are entitled to compensation as opposed to the process of continuing to litigate on a claim-by-claim basis.

Charles Stephen Tusa - JPMorgan Chase & Co, Research Division - MD

Got it. Helpful. And then just one quick follow-up on how you're kind of preparing for a potential pullback in demand, more broadly. When you look at what happened in COVID, all you guys took a lot of temporary cost out, able to defend the margins pretty nicely. What are kind of the contingencies this time around? Did the things -- are things going to be a little bit different? Or should we look at COVID as kind of like the same playbook if we do see a significant macro pullback in the next couple of quarters?

Mike Roman

Yes, Steve. I think, as you've seen, we manage into recessions and through any kind of slowdowns with a broad-based approach. And we'll do what's needed given the economic conditions. As I said, we're watching how each of the market demand areas are developing, how the overall macro is developing, what's going on, on the global economic outlook. And we'll take actions as required, and it will be in what we do in our factories and how we manage our commercial businesses and how we operate the company. So we'll keep you updated as we get a better view.

Nigel Edward Coe - Wolfe Research, LLC - MD & Senior Research Analyst

Just wanted to go back to the bankruptcy filing. So when you put Aearo into Chapter 11, do you move EBITDA in that business? How does that work?

Monish Patolawala

Yes, Nigel. Depending on how the bankruptcy proceeding goes, the plan will be to deconsolidate that entity. But the overall revenue and earnings are immaterial in the grand scheme of things.

Nigel Edward Coe - Wolfe Research, LLC - MD & Senior Research Analyst

Okay. Okay. We'll move off-line there. And then is the -- I mean there is controversy around the structure and those appeals and the congressional bickering about it. But how contingent is the Health Care separation on a successful filing for Aearo? I mean is one contingent on the other? So can you still go ahead and separate Health Care even if the filing for Aearo is unresolved?

Mike Roman

15

Yes. Nigel. We did announce both actions today. They're really the result of separate kind of strategies and decisions. The Health Care spin was based on, as you know, we actively manage our portfolio. We look at, broadly, where to invest in our portfolio, where acquisitions make sense and how do we get the most value out of it. And that's what was behind the decision to ultimately spin the Health Care.

We've invested in strategies to create a stronger Health Care company. It's well positioned to succeed and have a great future as a stand-alone company. And that really drove that decision. The decision to really take the steps related to Combat Arms litigation came out of really, first and foremost, the result of the bellwether trial. They were highly variable. We believe it would take years to litigate those claims.

And so given a choice between a costly litigation process and a better, fair, more efficient resolution, that's what drove the decision to step into the new actions that we're taking. So they were -- they happened to be announced in the same day, but they're really based on separate strategies, and both really helping to set us up for, I think, well positioned for, as we said at the top, greater opportunity with the spin and more certainty with the actions we're taking related to Combat Arms.

Nigel Edward Coe - Wolfe Research, LLC - MD & Senior Research Analyst

And then if I can just follow up. We get a lot of questions from investors around, obviously, the $1 billion is what you put in initially. But obviously, the plaintiffs will be at a much, much higher level. So assuming the structure is approved. How does that gap get bridged between the $1 billion you're putting in and obviously, the plaintiffs that are at a much, much higher level? How does that get resolved?

Mike Roman

Well, based on what we're doing, there will be a separate process. There will be a different process. Kevin can talk about how that proceeds, but there will be -- in the court that takes responsibility for these proceedings, they will oversee a process there that -- we believe that, as I said, we're committed to a fund that was based on, we think, appropriate analysis from an expert outside firm. But Kevin can talk about the steps of that process and how that resolves.

Kevin Rhodes

Yes. As part of the Chapter 11 proceeding, there will be a claims estimation process where the court oversees that process. And we believe that the $1 billion that we have committed based on the external analysis is sufficient to fund a trust for those claimants who are entitled to compensation.

The proceedings will be the subject of expert reports overseen by the court. The claimants will be represented as well, and we believe this is a number that is required, the funding agreement. If necessary, 3M is prepared to provide additional funding to resolve this matter at the end of the process.

Joseph Alfred Ritchie - Goldman Sachs Group, Inc., Research Division - VP & Lead Multi-Industry Analyst

Congrats on both announcements. My question is for Kevin, actually, because this is all fairly new to us. I'm just curious. Like is there some kind of likelihood that the plaintiffs will come back and want their lawsuits to be heard outside of bankruptcy court?

Kevin Rhodes

So once the Chapter 11 filing is made, there's an automatic stay as to the debtor entity, which, in this case, is Aearo Technologies. We are also asking for that automatic stay to be extended to 3M. We are funding, according to the

# Adv.Pro.Tr.07.27.22

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| IN RE: | . | Case No.  22-02890-JJG |
| | . | (Jointly Administered) |
| AEARO TECHNOLOGIES LLC, | . | |
| ET AL., | . | 116 U.S.  Courthouse |
| | . | 46 E.  Ohio Street, Room 116 |
| Debtors. | . | Indianapolis, IN  46204 |
| . . . . . . . . . . . . | . | |
| AEARO TECHNOLOGIES LLC, | . | |
| ET AL., | . | |
| | . | |
| Plaintiffs, | . | |
| V. | . | Adversary No. 22-50059 |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A, | . | |
| | . | |
| Defendants. | . | |
| | . | Wednesday, July 27, 2022 |
| . . . . . . . . . . . . | . | 9:30 a.m. |

TRANSCRIPT OF MISCELLANEOUS MOTIONS BY PLAINTIFFS/DEBTORS
BEFORE THE HONORABLE JEFFREY J. GRAHAM
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:        Kirkland & Ellis LLP
                        BY:  CHAD HUSNICK, ESQ.
                             DAVID M. BERNICK, ESQ.
                             SPENCER WINTERS, ESQ.
                        300 North LaSalle Street
                        Chicago, IL  60654

Audio Operator:         Heather Heiser-Davis

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311   Fax No.  (609) 587-3599**

2

APPEARANCES CONTINUED:

For the Debtors:            Kirkland & Ellis LLP
                            BY:  EMILY GEIER, ESQ.
                            601 Lexington Avenue
                            New York, NY  10022

                            Kirkland & Ellis
                            BY:  JARED MAHER, ESQ.
                                 MARK McKANE, ESQ.
                            555 California Street, 27th Floor
                            San Francisco, CA  94104

                            Kirkland & Ellis
                            BY:  DAVID HOROWITZ, ESQ.
                            333 South Flower Street, Suite 3700
                            Los Angeles, CA  90071

For Creditors:              Valenti Hanley & Robinson PLLC
                            BY:  MARK A. ROBINSON, ESQ.
                            One Riverfront Plaza
                            401 W. Main Street, Suite 1950
                            Louisville, KY  40202

For 3M Company:             Faegre Drinker Biddle & Reath LLP
                            BY:  JAY JAFFE, ESQ.
                            600 East 96th Street, Suite 600
                            Indianapolis, IN  46240

                            White & Case LLP
                            BY:  MATTHEW E. LINDER, ESQ.
                                 MICHAEL ANDOLINA, ESQ.
                            111 S. Wacker Drive, Suite 5100
                            Chicago, IL  60606

For Aylstock, Witkin,       Klee, Tuchin, Bogdanoff & Stern, LLP
Kreis & Overholtz, PLLC:    BY:  SASHA M. GURVITZ, ESQ.
                            1801 Century Park East, 26th Floor
                            Los Angeles, CA  90067

For Seeger Weiss LLP:       Rubin & Levin, P.C.
                            BY:  DEBORAH CARUSO, ESQ.
                                 MEREDITH R. THEISEN, ESQ.
                            135 N. Pennsylvania St., Suite 1400
                            Indianapolis, IN  46204

**WWW.JJCOURT.COM**

3

APPEARANCES CONTINUED:

For Seeger Weiss LLP:       Seeger Weiss LLP
                           BY:  CHRISTOPHER SEEGER, ESQ.
                                DAVID BUCHANAN, ESQ.
                           55 Challenger Road
                           Ridgefield Park, NJ   07660

                           Otterbourg P.C.
                           BY:  MELANIE CYGANOWSKI, ESQ.
                                ADAM SILVERSTEIN, ESQ.
                           230 Park Avenue
                           New York, NY  10169-0075

For the U.S. Trustee:      U.S. Department of Justice
                           BY:  HARRISON E. STRAUSS, ESQ.
                                NANCY GARGULA, ESQ.
                                RONALD J. MOORE, ESQ.
                                DAMARIS ROISCH-SCHWARTZ, ESQ.
                                LAURA A. DUVALL, ESQ.
                           46 E. Ohio St., Road 520
                           Indianapolis, IN  46204

For various claimants:     Jacobson Hile Kight
                           By:  ANDREW KIGHT, ESQ.
                           108 E. 9th Street
                           Indianapolis, IN 46202

                           Weitz & Luxenberg
                           By:  LISA BUSCH, ESQ.
                           700 Broadway
                           New York, NY 10003

For various Claimants:     BY:  MARK WENZEL, ESQ.

For Richard Valle:         Keller Postman
                           BY:  ASHLEY KELLER, ESQ.
                           150 N. Riverside Plaza
                           Chicago, IL  60606

4

 1          THE COURT:  It's so nice to have so many willing
 2   jurors today.
 3                      (Laughter)
 4          THE COURT:  All right.  Well, as I wait for my
 5   computer to boot up, welcome to Indianapolis.  I'd like to
 6   welcome you all here.  I'd also like to thank Chief Judge Tanya
 7   Pratt for the use of her courtroom.  It's greatly appreciated.
 8   And also bankruptcy Judge Robyn Moberly for allowing us
 9   overflow if needed.  So I normally don't have digs quite this
10   fancy, which you'll see if you go down the hall.  So that might
11   be in your future someday because I don't think she'll let me
12   use her courtroom on a full-time basis.
13          All right.  Is everyone ready to begin?
14          MR. HUSNICK:  We are, Your Honor.
15          THE COURT:  Okay.  Well, let me go ahead and call and
16   I'll call things as they appear on our Court docketing system
17   with the understanding that someone may request that we take
18   things in a slightly different order.
19          All right.  We have Adversary Number 22-50059, Aearo
20   Technologies LLC, et al. vs. Those Parties Listed on
21   Appendix A, i.e., the Tort Claimants.  There's a hearing on the
22   debtors' ex parte motion for request for a temporary
23   restraining order with an objection and a response thereto.
24   And with regard to the Chapter 11 cases, 22-2890, Aearo
25   Technologies LLC, et al., we have several first day motions,

5

1    and forgive me if some of them have rather lengthy titles.

2    It's an expedited hearing of the debtors' motion for

3    entry of an order authorizing the debtors to file one list on

4    the top firms representing the largest number of tort

5    plaintiffs, authorizing the debtors to use one consolidated

6    creditor matrix, authorizing the listing of creditors addresses

7    for counsel rather than the individuals, authorizing the

8    debtors to redact personally identifiable information, proving

9    certain notice procedures with respect to the tort claimants,

10    and approving the form and manner of notice of the commencement

11    of these cases with the U.S. Trustee's objection thereto.

12    Next is an expedited hearing on the debtors' motion

13    to retain a noticing, balancing, and claims agent under our

14    Local Rule 1007-2.

15    Next is an expedited hearing on the debtors' motion

16    to extend time to file schedules; hearing on the debtors'

17    motion for case management order; hearing on debtors' first day

18    motion for interim and final orders authorizing the debtors to

19    pay pre-petition wages, compensation, benefits, continuing

20    employee compensation and benefits programs, and related relief

21    with an objection thereto by the U.S. Trustee; hearing on the

22    debtors' first day motion to pay pre-petition trust fund taxes;

23    hearing on the debtors' first day motion for entry of final

24    orders regarding payment of insurance premiums, continuing

25    brokerage fees, renew supplemental or modify insurance or

6

insurance coverage, and improving continuation of their surety

bond program and related relief.

Next is a hearing on the debtors' first day motion to

provide adequate assurance for utilities; hearing on debtors'

first day motion for interim of final orders on debtor's

pre-petition claims for specified trade claimants, granting

administrative expense priority to all undisputed obligations

on account of outstanding orders, and granting related relief

thereto with the U.S. Trustee's objection; and a hearing on the

debtors' amended first day motion for approval of a cash

management system and the Trustee's objection thereto.

All right.  May I have appearances by those

officially participating in this hearing?  And if you're not at

the podium, please speak as loud as you can.

MR. HUSNICK:  Good morning, Your Honor.  Chad Husnick

with Kirkland and Ellis appearing on behalf of the debtors.

THE COURT:  Thank you.

MR. BERNICK:  Good morning, Your Honor.  David

Bernick, Kirkland and Ellis (indiscernible).

THE COURT:  Thank you.

MS. GEIER:  Good morning, Your Honor.  Emily Geier,

Kirkland and Ellis, appearing on behalf of the debtors.

THE COURT:  Thank you.

MR. WINTERS:  Good morning, Your Honor.  Spencer

Winters, Kirkland and Ellis, on behalf of the debtors.

7

1          THE COURT:  Thank you.

2          MR. MAHER:  Good morning, Your Honor.  Jared Maher,

3  Kirkland and Ellis, on behalf of debtors.

4          THE COURT:  Thank you.

5          MR. McKANE:  Good morning, Your Honor.  Mark McKane,

6  Kirkland and Ellis.

7          THE COURT:  Thank you.

8          MR. HOROWITZ:  Good morning, Your Honor.  David

9  Horowitz, Kirkland and Ellis, on behalf of the debtors.

10          THE COURT:  Thank you.

11          MR. ROBINSON:  Good morning, Your Honor.  Mark

12  Robinson for the creditors.

13          THE COURT:  Thank you.

14          MR. JAFFE:  Good morning, Your Honor.  Jay Jaffe,

15  Faegre Drinker Biddle and Reath, for 3M Company, and I'd like

16  to introduce to the Court Mr. Matthew Linder from White Case,

17  Michael Andolina, also from White Case.

18          THE COURT:  Thank you.  Welcome.

19          MS. GURVITZ:  Good morning, Your Honor.  Sasha

20  Gurvitz from the Klee Tuchin firm, KTBS Law LLP, on behalf of

21  Aylstock Witkin.

22          THE COURT:  Thank you.

23          MS. CARUSO:  Good morning, Your Honor.  Debbie Caruso

24  and Meredith Theisen on behalf of Seeger Weiss LLP whose

25  attorneys include Christopher Seeger who is co-lead plaintiffs'

8

1 counsel and member of the plaintiffs' executive committee in
2 the MDL action.

3          And with me today is David Buchanan who is co-chair
4 of the plaintiff's steering committee in the MDL and both of us
5 will be participating at some level throughout the hearings.

6          And also on Zoom, we have Melanie Cyganowski and Adam
7 Silverstein who are also counsel for Seeger Weiss.

8          Thank you, Your Honor.

9          THE COURT:  Thank you.  And welcome.

10          MR. STRAUSS:  Good morning, Your Honor.  Harrison
11 Strauss for the United States Trustee.  With me, I also have
12 the United States Trustee Nancy Gargula, Assistant United
13 States Trustee Ron Moore, and trial attorneys Damaris Rosich-
14 Schwartz and Laura DuVall.

15          I will be taking the lead in this, but some of my
16 other colleagues have helped with the motion so they may chime
17 in when I flounder.

18          THE COURT:  I don't have that option, so you're lucky
19 to have that.

20          Thank you.

21          MR. KIGHT:  Judge, Andy Kight, Jacobson Hile Kight,
22 on behalf of a number of claimants represented by the law firm
23 Weitz and Luxenberg PC, and Ms. Lisa Busch is attending by Zoom
24 and will be filing a pro hac motion shortly.

25          THE COURT:  Thank you.

1          MR. WENZEL:  Your Honor, Mark Wenzel, appearing on

2  behalf of the Sean Tracy law firm, also representing a number

3  of plaintiffs in the MDL litigation.

4          THE COURT:  Anyone else?  We have a microphone so I

5  can mostly hear you.

6                         (No audible response)

7          THE COURT:  No?

8                         (No audible response)

9          THE COURT:  All right.

10         I will ask, because we don't have fancy district

11 court recording even though we get the courtroom, to please

12 state your name when you're speaking just so that the audio

13 recording accurately reflects that.  Also, I'm horrible with

14 names, which is a good reason why I'm a judge because I

15 couldn't get business because I never remembered anyone's name.

16 So that will also help me try to address you correctly as we go

17 forward.

18         With that, I'll turn it over to the debtors and you

19 can lead us off.

20         MR. HUSNICK:  Thank you, Your Honor.  Good morning.

21 Chad Husnick from Kirkland and Ellis, proposed counsel to the

22 debtors.

23         Your Honor, you heard from each of my colleagues so I

24 won't go through who's here with me from my firm.  But before I

25 jump into what I think will be a relatively brief introduction

10

1   to the case, I did want to introduce you to the two company

2   representatives who are here with us today.

3          First, Mr. John Castellano of AlixPartners, sitting

4   in the front row.  Mr. Castellano is the managing director of

5   AlixPartners and is serving as the debtors' Chief Restructuring

6   Officer.  He is also the debtor's first day declarant in

7   support of the first day motions.

8          The second individual I'd like to introduce you to is

9   Mr. Jeff Stein.  Mr. Stein is serving as one of the debtors two

10  disinterested directors and he is the declarant on the debtors'

11  request for a temporary restraining order in connection with

12  the adversary proceeding.

13         Your Honor, a couple of housekeeping items.  First,

14  we filed an affidavit of service of Kroll Administration, the

15  debtors' proposed notice and claims agent, at Docket Number 70.

16  That affidavit of service is from Mr. Ben Steele.  Kroll served

17  notice of the first day hearing and the first day agenda on the

18  United States Trustee, the top counsel list, 3M's counsel, the

19  attorney for the Southern District -- or the U.S. Attorney for

20  the Southern District of Indiana, the IRS, the Attorneys

21  General for all 50 states, the Department of Veteran Affairs,

22  the Department of Defense, the SEC, and all of the Rule 2002

23  notice parties.

24         We served that via email where we had email notice

25  and via overnight mail in the absence of email addresses.  We

11

 1  also served the notice of the agenda and the relevant motions

 2  on the cash management banks, the taxing authorities, insurance

 3  brokers, and carriers and utilities.  We did that again via

 4  email where we had the email addresses and overnight delivery

 5  in the absence of that.

 6          Your Honor, unless you have any further questions

 7  about service, we can take that up in individual motions as

 8  well.

 9          THE COURT:  Okay.  I do not.

10          MR. HUSNICK:  Thank you.

11          The first item on the agenda, Your Honor, was the

12  joint administration motion, and so, Your Honor has already

13  entered that and so we'll skip over that.

14          We filed a revised agenda at 849, the Docket

15  Number 84.  In that revised agenda, Your Honor, I'd proposed to

16  go through, as I said, a short introduction to the case and

17  then turn immediately to the adversary proceeding and the

18  requested temporary restraining order.

19          The reason for the reordering, Your Honor, is there's

20  a number of things that have been going on, not the least of

21  which, last night, one of the plaintiffs' law firms, Keller

22  Postman, filed what we believe to be a violation of the

23  automatic stay by filing a request to transfer or tag-along

24  under the JPL rules, the entire bankruptcy case.  And we think

25  that needs to be put to an end sooner than later and so we were

12

1    hopeful to take the TRO up before we get to the first day

2    relief.

3            Your Honor, unless you have any other questions about

4    the agenda, and we can deal with that at the right time, I

5    would propose to do the introduction if I may publish a

6    presentation to the Court.

7            THE COURT:  That's fine.  And then, I will ask

8    though, when we get to the proposed order, whether there's any

9    objection to tackling the TRO first.  Given the amount of

10   people here and the interest, I think that's why we're mostly

11   here so that makes sense.  But I will give people an

12   opportunity to see if there's a difference of opinion on that.

13           You may proceed.

14           MR. HUSNICK:  Thank you, Your Honor.

15           Mr. Bank (phonetic).

16           I'm not seeing it.  There we go.

17           Let me start, Your Honor.  A couple of things.  Just

18   a brief overview of this case.  This case is not a couple of

19   things.  It's not about the debtors' attempt or 3M's attempt to

20   avoid liability to veterans for valid claims compensable in the

21   tort system.  This is not a Texas Two Step or a divisive merger

22   that you've heard so much about in connection with the J&J

23   cases.  And while I personally have no issue with those types

24   of transactions, that's not what we have here.  This is an

25   organic structure as you'll hear about in a moment.

13

1          Your Honor, this is not a liquidation.  This is a
2   reorganization of an operating business.  And this is not about
3   funded debt or and operational restructuring.  We're here to
4   address the mass tort issues that this company faces both in
5   connection with Combat Arms Earplugs as well as the mask
6   respirator liabilities.

7          This case is, as I said, a reorganization of an
8   existing operating company that has approximately $126 million
9   in annual revenue.  This operating company is facing
10  significant, indeed the largest MDL in United States history,
11  billions of dollars of asserted claims.  One plaintiff even
12  asserted that it's in the trillions.  It's more than 230,000
13  individual claimants.

14         We're seeking to use the Chapter 11 tools where the
15  debtors believe the MDL has fallen short.  It's not that the
16  MDL did something wrong necessarily, it's that the process has
17  failed the debtors, and frankly, we believe failed the
18  plaintiffs.  Right now, we sit with 99.5 percent of the claims
19  remaining unvetted and unresolved on the MDL docket.  That's
20  after having spent three years in the MDL process and nearly
21  $350 million in legal fees.  What we're here to do, Your Honor,
22  is an equitable and expeditious process to provide a 100
23  percent recovery to veteran, service members, and all creditors
24  for valid claims against these debtors.

25         Your Honor, a very brief overview of the business.

14

1  I'm sure you've had an opportunity to read the volumes of paper

2  that we filed on Your Honor's docket, and we thank you for

3  that.  But very briefly, the debtor's business, we basically

4  manufacture film, foam, and other materials that are used to

5  reduce noise, vibration, shock, and heat in a variety of

6  products.  We sell those products to original equipment

7  manufacturers, aerospace companies, commercial truck

8  manufacturers, the medical industry, electronics industry, and

9  power generation companies.

10         We have approximately, as I said, $126 million of

11 annual revenue.  Roughly, two thirds of that revenue is for

12 sales to third parties and roughly one third of that $126

13 million of revenue is for sales to 3M.  3M then uses the

14 debtors' products in turn in creating its own products and

15 marketing to other third parties.

16         The debtors' products, as you can see, show up in a

17 number of different industries and forms.  They're used in

18 airplane frames to control noise.  They're used in MRI

19 machines.  If you've had an MRI and you hear the bang, bang,

20 bang, going over your head, it's the debtors' material that's

21 in those machines to help try and negate the vibration effect

22 and the sound.  They're used in cell phones to try and mute the

23 vibration noises.  They're used in generators to try and

24 control the heat produced by electricity generators.

25 Ultimately, as shown by this truck in this photo, the debtors'

15

1 products can show up in various forms across even a single

2 completed product like a truck.

3         The debtor is located and headquartered right here in

4 Indianapolis.  We have approximately 172 of our total 330

5 employees are working out of the Indianapolis headquarters and

6 the plant that's located in Indianapolis.

7         The debtors' remaining employees are generally in

8 Newark -- I believe that's how it's pronounced -- Newark,

9 Delaware.  And there are others that are working remotely.  We

10 do have several facilities internationally.  These are in our

11 non-debtor affiliates, but they're wholly owned by the debtor

12 entities, and that includes manufacturing facilities in

13 Ensenada, Mexico; San Luis Potosí, Mexico; Mississauga, Canada;

14 and Shenzhen, China.

15         Your Honor, just a moment on the organizational

16 chart.  3M acquired the Aearo debtors in 2008 and you read

17 quite a bit about that in the first day declaration.  There's

18 two key points though about that acquisition.  Number one,

19 Aearo continues to and always has maintained a standalone

20 business from that of 3M.  It has its own board of directors

21 and it has its own operations.  Granted, it does share services

22 from 3M as is typical in a large corporate enterprise, and

23 we'll talk more about that at the relevant periods of time and

24 in the first day motions.

25         But the second part I want to emphasize here about

16

1  this corporate structure is this is not something that was

2  created overnight or something that was created last night

3  through a Texas Two Step or a divisive merger.  This is an

4  organic capital structure that existed well before the

5  Chapter 11 filings.

6          The debtors' board is organized as follows.  There

7  are two members who are 3M employees.  That's Mr. Dan Renninger

8  and Mr. Eric Forbes.  There's one employee of Aearo.  He is the

9  president of Aearo, and that is Matthew Blaisdell.  And then,

10  the two remaining directors are disinterested directors who

11  have no connection to 3M or prior connections to the debtors

12  here, and that's Mr. Jeff Stein and Mr. Roger Meltzer, each of

13  whom have experienced serving as disinterested directors in

14  these types of roles.

15          They have been delegated authority over all conflicts

16  matters where there's a conflict between 3M on one hand and the

17  debtor entities on the other hand.  To the extent that there

18  needs to be a determination as to what constitutes a conflict

19  as a matter of corporate governance, Mr. Stein and Mr. Meltzer

20  also have that power under the delegation of authority.

21          Finally, and not least, Mr. Castellano, as I said is

22  the debtors' CRO.

23          Your Honor, I don't need to spend any more time on

24  the professionals because you heard from each of them.  Let me

25  just get right into the events leading to the Chapter 11.  I

17

1  don't want to be completely duplicative of the things that we

2  said in our first day papers, but I do want to call out a

3  couple of things.

4          As Your Honor is aware from the papers, we have two

5  pieces of separate tort litigation.  The Combat Arms, of

6  course, is the largest of those pieces of litigation.  We have

7  a much, much smaller piece of litigation related to mask

8  respirators, but we felt we needed to call it out because there

9  will definitely be interest from the plaintiffs and the

10 plaintiffs' bar in these cases.

11         Let me address the Combat Arms briefly.  Your Honor,

12 in the late 1990s, the U.S. military was trying to solve a

13 problem.  They were trying to create a solution that allowed to

14 block out high level noises like gunfire and explosions, but

15 allow pass-through of lower level sounds like speech.

16         I can't get this thing to move again, Mac.

17         There we go.

18         That problem, Your Honor, created a conundrum for the

19 military and service members.  This was the better deaf than

20 dead conundrum.  They didn't want to wear the earplugs because

21 if you blocked out all sound, you were at risk of not hearing

22 enemy combatants in the field of battle.  To meet this need,

23 the debtors, in close collaboration with the U.S. military and

24 expert scientists at the French-German Institute de Saint-

25 Louis, designed and developed the Combat Arms Earplug

18

1   Version 2.  The military ultimately approved these Combat Arms
2   Earplugs for purchase.  This was around 1999.  And in the early
3   2000s, Combat Arms began being purchased by the United States
4   military for distribution to servicemen and women.

5          These Combat Arms Earplugs were extensively tested,
6   and you can read about that in the papers and I'm sure the
7   plaintiffs will have their own side of the story on that front.
8   But suffice to say, there's significant records around the
9   testing of their Combat Arms Earplugs.  They, from our
10  perspective, worked as they were intended to work.  They
11  entered service, as I said in 1999, and they were largely
12  viewed as a solution to the better deaf than dead conundrum.

13         What happened in terms of sales is, in the early
14  2000s, they began being sold and they were sold until the
15  product was discontinued in 2015.  Eighty percent of all of
16  those sales occurred before 2008.  I highlight that because
17  once again, that's the date, April 1, 2008, when 3M purchased
18  the Aearo entities, the stock in the Aearo entities.  So 80
19  percent of the sales of the $31.5 million of sales of these
20  products over their lifetime were done prior to that
21  acquisition.

22         The MDL, which is largely based on the single memo
23  discovered in 2015, the plaintiffs' bar seized on that
24  opportunity.  The memo, discussed at detail in the
25  informational brief, talked about what was perceived to be a

19

1  known defect.  We don't have to get into that.  Suffice to say,
2  the MDL was commenced in 2019.  And after the commencement of
3  the MDL, the plaintiffs' lawyers orchestrated a massive
4  advertising onslaught.

5          Between 2019 and May '22, they spent over $25 million
6  on television advertising alone.  Radio spots, direct emails,
7  targeted social emails.  I got one relatively recently on
8  Facebook and I've never spent a day in the military.  On top of
9  promising service members that they would be entitled to a
10 substantial or significant financial compensation, some of
11 these were misleading indicating that the debtors had already
12 agreed to a settlement, or frankly, just inaccurate.

13         Stepping back, Your Honor, though, just talking about
14 MDLs, generally.  The problem with the MDL system when there's
15 a significant amount of mass tort claims like this is not an
16 unknown problem.  It's pretty well settled.  The MDL
17 Subcommittee noted that a significant number of claimants,
18 often at the settlement stage, turn out to have unsupportable
19 claims.  Likewise, the author of this article is actually Judge
20 Rodgers overseeing the MDL process noted in her article that a
21 reported 20 to 50 percent of MDL cases often involve claims
22 with, I'm sorry, plaintiffs with unsupportable claims.

23         What we notice here in our case is we have the Combat
24 Arms MDL has now turned out to be twice as large as the
25 remaining 182 currently pending MDLs combined.  It is massive.

20

1   It is the largest MDL in U.S. history by orders of magnitude.

2   There remain 110,000 claimants on the administrative dockets

3   that haven't yet been required to pay a filing fee, serve

4   defendants with a complaint, file attorney appearances, or

5   provide evidence as to the support for their claim.

6           The bottom line here is, Your Honor, there's been

7   very minimal vetting outside of the Bellwether Trials.  And

8   just spending a moment on the Bellwether Trials, I'm not going

9   to go through each one.  But you see them as they pop up here.

10  But you see this curious phenomenon as we get closer to the

11  end, and these are in temporal order across the bottom.  And

12  what I'm flagging here is this.  As we move through the

13  Bellwether Trials and the early results are heard, the jury

14  verdicts start to escalate massively.  Is it a creature of the

15  MDL system?  Who knows?  Is it a creature of additional

16  advertising that happens after the first couple of trials?

17          But it is quite interesting that the jury verdicts in

18  Pensacola alone increased from March 2021 to 350,000 to

19  April 2021, a judgment of 50 million.  That's 150 million, or

20  I'm sorry, 150 times greater.  The bottom line is these jury

21  verdict -- or these Bellwether Trials provided very little

22  guidance to the debtors or the plaintiffs on a constructive

23  negotiation.  It left us with 13 plaintiffs' verdicts, six

24  defense verdicts, and eight dismissals.  All of the 13

25  plaintiff verdicts are either stuck in post-trial motions --

21

1    some, I think, one for eight months -- or on appeal.

2          Your Honor, we've started the waive process where we

3    move chunks of 500 off the docket and start the discovery

4    process.  But it's in the very, very early stages.  And what

5    we're discovering there is of the approximately 1500 plaintiffs

6    that have been moved out in the waive process that have been

7    ordered to engage in discovery, hundreds of those have been

8    unable or unwilling to engage in discovery.  So it further

9    supports our position that these claims simply have not been

10   vetted.

11         Where do we sit today?  We're no closer to

12   resolution, Judge, today, three years into the MDL, than we

13   were at the beginning, and we spent 350 million in legal fees

14   to get here.  This quagmire, Your Honor, has led to massive

15   market confusion regarding the size of these liabilities.  The

16   plaintiffs, as I said earlier, one plaintiff's lawyer said it's

17   over a trillion dollars.  Analysts have published reports that

18   say it's between 1.8 billion and 1.55 trillion.  None of these

19   is more than a guess.  It certainly can't be right.

20         Your Honor, the other piece of litigation, I'm going

21   to move off Combat Arms and shift gears for a moment, but I

22   promise it won't be nearly as long -- is on the respirators.

23   The debtors' mask respirator litigation, we have accrued

24   approximately $41 million under our -- it's an accounting

25   accrual in our public statements.  That's what we report.  We

22

1    believe that number to be accurate.  That covers approximately
2    2059 pending cases where the Aearo debtors are defendants, are
3    named defendants in the litigation.  There are some additional
4    cases where the debtors have indirect indemnification
5    obligations of parties.
6            Importantly, the TRO that Your Honor is considering
7    today does not relate to the asbestos docket.  It's dealing
8    with the Combat Arms docket today.
9            Where are we?  We're trying to get a fair and
10   efficient resolution using the Chapter 11 tools.  We're trying
11   to address each of the issues that I pointed out as I moved
12   through the materials, the lack of vetting of the 230,000
13   claims that are actively on the docket, or that are sitting on
14   the docket, whether on the administrative docket or the active
15   docket, but they're on unvetted.  We would propose that a
16   Chapter 11 process will have verified disclosures established
17   through a well-known bar date process required under the
18   Bankruptcy Rules.  It will require plaintiffs and claimants to
19   verify the nature and extent of their injuries so that they can
20   be properly evaluated.
21           Through the MDL, we've been unable to resolve
22   anything more than a small fraction of the cases and it's all
23   been through a piecemeal process.  We would propose, Your
24   Honor, a consolidated resolution, one where we're dealing with
25   the plaintiffs *in toto*  instead of having one-off trials.

23

1          Your Honor, we want to ensure fair compensation to

2    all of the plaintiffs, as opposed to the inconsistent jury

3    awards that you saw a couple of slides ago.  It cannot be that

4    150 times greater jury verdict is appropriate.  We would

5    propose, ultimately as part of an estimation process, that the

6    estimation be based on scientifically calculated allocations

7    and determinations of liability.  Ultimately, this is a

8    settlement negotiation, Your Honor.  That's what we intend to

9    do is negotiate with the plaintiffs in an attempt to try and

10   get to settlement using the tools that the bankruptcy process

11   provides.

12         We believe that the Chapter 11 process will provide

13   finality.  Because it has to be negotiated through a global

14   settlement with at least 75 percent of the plaintiffs, at least

15   in the respirator stage, that will engender a great deal of

16   consensus and hopefully avoid what could be years or even a

17   decade or more of litigation.  And that's not to mention the

18   imposition on the federal district courts.  Judge Rogers, I

19   believe, noted that, as she starts to remand the over 230 cases

20   now that the Bellwethers are complete, that could result in an

21   imposition on the 94 federal districts to the tune of 2,500

22   cases per district, which we certainly believe needs to be

23   taken into account when we're addressing the public interest

24   component of the TRO standard.

25         Your Honor, the debtors have done their homework in

24

1  terms of determining what we believe the estimated liability

2  is.  The preliminary analysis by Dr. Charles Mullin at Bates

3  White, who is an experienced estimator of claims in the

4  Chapter 11 cases, who has testified in many, many large cases,

5  including Takata, the Purdue bankruptcy case, W.R. Grace.

6          Your Honor, Mr. Mullin's preliminary analysis

7  assesses that the total value of claims involving functional

8  hearing loss in the Combat Arms MDL is less than $1 billion.

9  We will present that analysis and his final report at the

10 appropriate time to both the Court and, of course, to the

11 plaintiffs.

12         Your Honor, the last piece I want to summarize is the

13 funding agreement.  I will not spend much time here.  Suffice

14 to say, 3M is committed to funding the resolution of this case.

15 Their lawyers are here.  They will say the same thing.  In

16 support of that commitment, they funded up front $5 million of

17 upfront cash and agreed to fund $1.24 billion into a trust and

18 to fund the operations of the debtors through the Chapter 11

19 cases.  The debtors are cash users during these cases.

20         Critically, really critically, these funds are

21 uncapped.  It is not meant to serve as a cap but is simply what

22 the debtors are committed -- or what 3M is committing up front.

23 3M is committed to provide additional funding to the extent

24 necessary to bring resolution to the cases.  3M has also agreed

25 to provide shared services that have historically been provided

25

1  to the debtor so that the debtors did not have to go out and
2  create their own shared service back office.  These services
3  are being provided for the benefit of the debtors under the
4  funding agreement.  In exchange, Your Honor, the debtors agreed
5  to indemnify 3M for the mask respirator liabilities that
6  originated at Aearo and for the Combat Arms liabilities, again,
7  that originated at Aearo back in 1999.

8        Your Honor, there's a visual aid here just to show
9  how the funding agreement works.  I'm going to let my
10  colleague, Ms. Geier, walk through that at the right time.  But
11  suffice to say, you can see that 3M pays for certain goods
12  directly to third-party vendors, also provides funding down so
13  that the debtors can pay for certain of those goods.  But we'll
14  get into that in more detail.

15        So let me end where we began.  This case is a
16  reorganization of an existing operating company located here in
17  Indiana.  That operating company has faced millions and
18  millions of dollars of litigation costs related to the largest
19  MDL in U.S. history in addition to the mask respirator
20  liability.  We're simply seeking to utilize the Chapter 11
21  tools where the MDL fell short to address these issues.  We
22  believe this is the quintessential case, an example to use the
23  tools available in 11 to address mass torts.

24        Ultimately, we're trying to facilitate an equitable
25  and expeditious recovery, a hundred percent recovery, to the

26

1 veteran, service members, and other creditors for all of their

2 valid claims.

3          Your Honor, with that, unless you have any specific

4 questions, we would be ready to turn to the first day agenda.

5          THE COURT:  All right.  I don't yet, since it's just

6 an introduction.  So that being said, we can proceed.  And I

7 guess the first question is, you indicated you wanted to

8 proceed with the TRO first, correct?

9          MR. HUSNICK:  That's correct, Your Honor.

10          THE COURT:  All right.  Does anyone have an objection

11 to proceeding in that manner?

12                    (No audible response)

13          THE COURT:  All right.  Seeing none, let's tackle the

14 TRO first then.

15          MR. HUSNICK:  Thank you, Your Honor.  I'm going to

16 turn the podium to my partner, Mr. David Bernick.

17          THE COURT:  All right.

18          MR. BERNICK:  Good morning, Your Honor.  I'm David

19 Bernick.

20          Just to be clear, we had planned and I don't know if

21 this was clear in the dialogue that took place between the

22 parties, to address both the TRO and the stay at the same time.

23 But we'll go anyway that Your Honor prefers if there's no

24 objection.

25          THE COURT:  Any objection to that?

27

1                    (No audible response)

2          THE COURT:  All right.  You may proceed.

3          MR. BERNICK:  Your Honor, I'd like to, if we could

4    just show the first slide.

5          We, I think, are getting the most recent deck ready.

6          There we go.

7          If we could go to Slide 2, please.

8          These are essentially the topics I would address here

9    this morning.  And I want to begin with the problem and to a

10   certain extent, this will be a little bit repetitive of what

11   Mr. Husnick has just covered.  But I want to spend a little bit

12   more time on it because the plaintiffs I see, or the state

13   defendants as I see, take the position that there really isn't

14   irreparable harm at this point.  Everything is kind of, okay.

15         And so I want to revisit that a little bit, because

16   from our point of view, this is an extremely urgent case even

17   witnessed the events that have taken place in the last 24

18   hours.  So I spent time on the problem.  And then I want to

19   talk a little bit about the history and evolution of mass tort

20   Chapter 11 cases.

21         Your Honor sits in history here, and the history is a

22   very, very long history.  It goes back actually to the 1980s of

23   Chapter 11s based upon mass tort.  And the reason I bring that

24   up, and we'll talk about some of the specific cases, is that

25   this is a very mature and sophisticated area of law.  There's

28

1  an enormous amount of jurisprudence that stands in service of

2  Your Honor resolving these matters and addressing these

3  matters, and we would urge the Court to be, you know, a little

4  bit of an Historian here and focus on how the law has evolved

5  because it's really quite a remarkable story and it's very

6  instructive in this case.

7          I then want to talk about the basic phases of mass

8  tort Chapter 11 case, because this first phase that we're in

9  now is one of the most critical.  There's the greatest

10 fragility at this point in time and that's why the motions and

11 the requests for stay, or the confirmation of the stay, that

12 we're here today to address is so critical.  If it's not done

13 right at the outset, that essentially affects everything and I

14 want to spend a few moments talking about that.

15         And then we have the debtors' request for a TRO.

16 That should also be the stay and the TRO, and we'll walk

17 through the standards that pertain to that and how they're met.

18 And then I do want to talk a little bit about the next steps

19 that we have that I think are a logical thing to cover here

20 because, again, it underscores the importance of the relief

21 that we're asking for here.

22         If we could go to Slide 2.  Actually, it's 3.

23         The problem to be solved.  So -- and Mr. Husnick did

24 show a chart that was similar to this.  But we show it here

25 because the problem that we're here to resolve is a problem

29

1  that goes back, you know, intimately in a detail to the Aearo

2  Company.  We are here asking for a stay to apply to 3M, but the

3  notion that this is anything but a case where the liability

4  really arises from a product, a product made by Aearo, conduct

5  that Aearo engaged in over the years, that's exactly what this

6  case is about.

7          And this chart illustrates this because it shows that

8  the sales of the product, the product is what's giving rise to

9  the litigation, those sales follow the trend that is indicated

10 here.  Most of those sales took place even before 3M made its

11 acquisition in 2008.  Roughly, 80 percent of the claims had

12 occurred prior to that point in time.

13         But there's more.  If we could go to the next slide.

14         The historical conduct associated with the

15 development and original sale of the product is all Aearo

16 conduct.  And it's that conduct that animates really the

17 entirety of their liability case.  There is some after-the-fact

18 conduct that's picked up.  But, again, recognizing that it's

19 the sale of the product that is the origination of the

20 liability, it is what gives rise to the injury, and the conduct

21 associated with that sale is the conduct that's at issue here.

22 That conduct, when it comes to development, you know, really

23 every feature of the product was all Aearo conduct.  And all

24 that we've done here is to indicate through the diamonds that

25 you see here some of the very important aspects of the

30

1  liability case.

2          I flagged the Flange memo -- we made reference to it

3  in our briefs -- because the Flange memo also plays a role down

4  the road here in being one of the original reasons why the

5  litigation all of the sudden began to increase really long

6  after almost all of the product was sold.

7          If we go to the next slide.

8          There it is.  The Flange memo is first used in the

9  deposition in 2015.  But by that time, the product is almost

10 off the market and you've got all of this historical conduct

11 that goes way back.  But this becomes what is now the seed that

12 drives the growth that takes place thereafter.

13         If we could look at Slide 6.

14         This slide indicates the growth of the litigation in

15 terms of claims -- lawsuits that are picked up.  It turns out

16 that the red arrow indicates you see the very precipitous rise

17 in August of 2020.  That's only because the data that was being

18 gathered didn't pick up cases that were simply in the

19 administrative docket.  And once that glitch was fixed, you can

20 see that there had been between November of 2019 and August

21 2020 when you see that arrow rise, there already had been a

22 substantial rise in the cases that were brought but they were

23 brought and put in the administrative docket.

24         As of the time of the MDL, there were 700 cases.  So

25 you can see what is by any stretch of the imagination, you

31

1  know, a stunning exponential growth.  I literally -- I'm not

2  sure that there's ever been such a rapid growth in case filings

3  ever.  I mean, I know that we have asbestos.  Asbestos, of

4  course, boomed but the cases rose.  I think probably in the

5  aggregate on what's probably a slower basis exponentially.  But

6  in any event, it's a phenomenally rapid rise here.

7           If we go to Slide 6, excuse me, 7.

8           We've now overlaid some of the factors that do relate

9  to what's driving the litigation growth.  So you see here, and

10  it's covered in our briefs, that in November of 2019, the basic

11  records requirements were suspended and then the administrative

12  docket was created.  And that actually does kind of match up

13  pretty well with the red line that we've drawn because that

14  really is what ultimately accounts for all the blue bars that

15  you see here, is the enormous growth of a docket that is kind

16  of a bespoke docket, but it's a docket that's bespoke in a way

17  that departs from standard practices and rules that have been

18  followed in the MDLs for years and years and years in mass

19  torts.

20           We then overlay the verdicts that have taken place

21  and these have taken place and I'm sure, as Mr. Husnick

22  indicates, that they also helped to drive the filings and we

23  simply put them down here.  And during this period of time, and

24  this is a very key feature in the litigation, some of the key

25  depositions that were very helpful and very important in

32

1  flagging and in revealing what actually happened in the very
2  early periods of the development of the product, those key
3  depositions were delayed.  And so a decision was made to go
4  forward with all these Bellwether Trials on a highly compressed
5  schedule and without the benefit of very important deposition
6  testimony, a fact which was remarked on by some of the district
7  judges who were asked to take on this trial caseload of trials
8  that were in this very compressed schedule.

9          And, again, this is really a remarkable condensed,
10  you know, it's just an amazing number of trials to do,
11  particularly Bellwether Trials.  I mean, if you have a mature
12  mass tort and you've done the Bellwethers, then the judges
13  start to, and you know, I know that I've been through this
14  process, Mr. Seeger, who is a very distinguished lawyer who has
15  been on the other side of mass tort cases from me, we know that
16  that the Bellwether cases are, you know, kind of bespoke.
17  They're designed to be informative.  It's very important to get
18  them right and to have enough time between them to be able
19  to -- for the parties to really kind of regroup and figure out
20  if they're doing the right thing in trying these cases.

21          And then you get to the court like Judge Kennelly in
22  the testosterone cases.  He says, well, I'm now going to have
23  multi-track trials and I'm going to get other judges involved.
24  There was no such opportunity here.  All of these things were
25  essentially on a compressed schedule and they're all

33

 1  Bellwethers.  This is the time when you're supposed to be
 2  really giving the parties an opportunity and spacing the trials
 3  so they can be handled.  And there really hasn't been such a
 4  period of time as that in this case.  And that, again, is a
 5  departure.

 6          Now, I can be corrected that there may be other cases
 7  very recently that are similar to this, even in the Bellwether
 8  process, but if that's so, it is really not the purpose of
 9  Bellwethers to be simply, particularly when you have key
10  evidence that's not available, to have such a truncated
11  schedule and include multiple district judges who don't have
12  the same degree of familiarity as the MDL judge.

13          If we go to Slide 8.

14          Again, kind of coming back to something that
15  Mr. Husnick covered, but when you kind of look at a little bit
16  and study it a little bit more, it becomes, you know, very,
17  very helpful.  You know, Your Honor's going to -- we're going
18  to go through an estimation process.  And the estimation
19  process oftentimes is driven by a settlement history.  We don't
20  have a settlement history here.  There are other sources of
21  data, but inevitably, people are going to come back and say,
22  well, what about the cases that were tried?

23          And the cases that were tried are not necessarily the
24  best data for an estimation precisely because there aren't that
25  many of them.  For an estimation, you need more robust data so

34

1    that you can do a statistical extrapolation that's
2    representative of the claimant pool.  Nonetheless, if we just
3    take these, what comes out of it?  What do you see?  And the
4    answer is, there really isn't a pattern, except that the
5    punitive damages are growing.

6            If you take a look at the compensatory damages, you
7    know, they kind of grow some.  You get one that's way off in
8    March.  I think that that's a case where punitive damages were
9    not available and the jury came in with a very substantial
10   compensatory award.  Again, there are people who know that case
11   better than I do, but that's my understanding.

12           The other thing is that you get all the defense
13   verdicts.  So you say, well, what's the pattern?  If you're to
14   try to extrapolate this and say, is there a consistent pattern
15   of liability?  Is there a consistent pattern even of liability?
16   You'd say, well, you know, you're probably some were cases that
17   were verdicts in favor of the plaintiffs.  But then, again,
18   these are Bellwethers.  They're designed to be, you know, is
19   there really consistent liability or not?

20           You don't get anything like that.  And that's very
21   important here that the record so far does not show that these
22   are clear liability cases.  It says these are cases even before
23   a jury that are a mixed bag.  How do you estimate on the basis
24   of a mixed bag, even on the issue of liability?  And so the
25   liability is very much an issue in the estimation process, as

1  well as damages.

2          I do think if we go to slide 8, and Mr. Husnick
3  talked about some of the factors and said that there are many
4  factors that probably drive the verdicts.  And, indeed, that
5  many of those factors are local factors to Pensacola.  But one
6  thing that's a clear common denominator that you can't help but
7  link to these punitive damage awards and that is the
8  unbelievable, over the top efforts to inflame the jury.  You
9  take a look at these quotes.  I've never been in a trial where
10  these kinds of things take place with the regularity that
11  they've taken place here.  And I've tried a lot of cases.

12          So you just can't help but say, what's accounting for
13  the spike?  And it may be local, but the actual stimulus for
14  the verdict is in fact the anger factor, the desire to penalize
15  3M, and there's no question but that the trial record here
16  reflects a concerted effort to inflame the jury.

17          If we go to Slide 9.

18          And I'll just skip through very quickly.  But you
19  know, who's in the, excuse me, 235,000?  You've heard about
20  this.  I mean, this is ultimately, and I want to get to the
21  bottom line point about all this.  You know, the plaintiffs, or
22  the stay defendants talk about the fact that, well, where's the
23  irreparable harm?  And the irreparable harm in this case is an
24  out-of-control docket that cannot be managed.  That's the
25  irreparable harm.  And there's no --

36

1          THE COURT:  Hasn't that been there since the

2   inception of the MDL?

3          MR. BERNICK:  Well, in this case, you could say, if

4   you went back to 700 cases, 2,500 cases, that it doesn't apply.

5   I mean it's not unusual to have cases that'll have 5,000,

6   10,000, 15,000, 20,000 cases.  That's not unusual.

7          THE COURT:  Right.  But we've been at -- well, we --

8   you have been at this high number for quite some time, correct?

9          MR. BERNICK:  Well, if we go back, it's been about I

10  guess probably 2020, 2021.  If we go back -- I mean, it's right

11  here.  So if we take the thing, it's been over a hundred

12  thousand since August of 2020.  That's correct.

13         And so the experiment that's been run is whether the

14  docket can be managed.  And that is the experiment that has

15  been run over this period of time.  Is it a manageable docket?

16         So if you had Bellwethers that were being conduct --

17  first of all, if you had a docket that had the proper screening

18  procedures for fees and basic record requirements, that's

19  really the counterfactual.  The counterfactual is, what if the

20  management of this case had been different and you had all the

21  measures that have been taken typically in MDLs -- that's the

22  counterfactual -- would this docket have been unmanageable?

23  And the answer is, we don't know, but there's pretty good

24  reason to believe that it wouldn't have been because this

25  docket was created by the case management decisions that the

37

1  district court made.

2        It didn't have to happen.  If we had filing fees and

3  we had basic record requirements, if we waited until the

4  discovery was done, if we had controls on the kinds of things

5  that get set, all we know, and that's really -- I'll take the

6  next slide to answer Your Honors question.

7        Let's go to Slide 10, this one right here.  No, go

8  back to 10.

9        Even today, there are over a hundred thousand that

10  have never had a filing fee.  And with respect to the ones that

11  have now been put on the administrative docket or have now been

12  required to pay a fee or been ordered to pay a fee or have been

13  now required to provide or been asked to provide information,

14  it's already had an impact.  So we know that these things

15  count.

16        We know, if we go back to that slide, Slide 9,

17  Slide 8, Slide 7.

18        We know that these things were not being done.  We

19  know that the docket grew to an unprecedented level and that's

20  what we know.  The counterfactual that says, well, what if

21  things had been done differently?

22        THE COURT:  Well, and I understand that --

23        MR. BERNICK:  Yeah.

24        THE COURT:  -- but I guess the point I'm trying to

25  make is, and the opposition makes it, but so this has been

38

1    brewing for a while.  And I understand that there's issues that
2    the debtors have had with how the MDL has been run.  But as I
3    look at it, you're before me on a stay and a TRO.

4              MR. BERNICK:  Right.

5              THE COURT:  Why now?

6              MR. BERNICK:  Because it is irreparable and it's
7    continuing.  I mean, we're now at a situation where what Your
8    Honor is saying is, well, should we have acted earlier?  Yeah,
9    with hindsight, we should have filed earlier.  I don't think
10   that there's too much question about if we knew what was
11   happening, we should have filed.  I mean, Chapter 11 in my
12   experience, and we'll go through some of the cases.  I've been
13   involved in many, many mass tort Chapter 11s and I've tried the
14   cases in the underlying MDLs.

15             Everybody waits before filing Chapter 11.  Nobody
16   sits there and says, gee, we're going to file for Chapter 11
17   now because we see the handwriting on the wall.  So maybe we
18   should have filed in October, in August of 2020.  We would take
19   that point with the benefit of hindsight, we should have.  But
20   we didn't.  What we decided to do is to go through the MDL
21   process.  And what we found in the process of doing that is how
22   unbelievably broken it is.

23             I don't think that there's a single MDL in history
24   that is as broken as this one is.  Witness the numbers, witness
25   the steps that have been taken, witness the verdicts.  Not one.

39

1   And I also don't think, I would submit to Your Honor, the fact
2   that it's been broken for a while doesn't obviate the need for
3   protection now.  I mean, we need protection now because it's an
4   unsustainable broken process that's producing terrible verdicts
5   and costing tens and hundreds of millions of dollars.  That's
6   why you file a Chapter 11 case.

7          There's nothing that says you file a Chapter 11 case
8   because you can see the handwriting on the wall and it's going
9   to happen.  I'm not really familiar with that phenomenon.
10  Maybe it's happened.  But I'm not -- it didn't happen in
11  Manville.  It didn't happen in Grace.  It didn't happen in the
12  Breast Implants.  I mean, I could go on, Combustion
13  Engineering.  They were all filed after there was clear
14  insolvency by the debtor in light of the press of business.
15  I'd be interested at how many anticipatory mass tort Chapter 11
16  cases have been filed.

17         You go through the process, you see if it can work,
18  you see if you win your trials, you see if you change the tide.
19  None of those things worked here because, again, the way it was
20  set up.  You say, well, I'm blaming the district judge.  Well,
21  I am blaming the district judge in the sense that there was a
22  departure from the case management standards that are used in
23  other cases.  I'm not blaming her for the fact that, gee, she
24  tried a lot of things because of the volume.  I mean, it
25  doesn't really make a difference whether you blame her or not.

40

1   The fact of the matter is that it turns out that with this
2   volume, it was not sustainable following the usual rules of
3   litigation.  That's irreparable harm.  And it doesn't stop.

4          If you have an irreparable harm, an injunction case,
5   it is ongoing.  I mean, there's always the need to step in.
6   And so the fact that you could have done it earlier, I don't
7   understand.  That doesn't really weigh.  How is that -- the
8   delay means that you're not entitled to the equity?  I don't
9   think that there's -- I understand the question, but I don't
10  think that there's an argument there.  And there's a concession
11  of irreparable harm.

12         If you take a look at, go through the additional
13  slides, 7, 8, 9, excuse me, 10, 11, 12.  Right.

14         So 2017, it's been recognized by Congress that -- and
15  I'll tell you, Your Honor, there have been countless meetings
16  sponsored by different organizations to bring judges and
17  practitioners together to talk about MDLs.  What Congress --
18  the House of Representative report says here is well
19  recognized.  Everybody knows that there are too many claims
20  that are being filed in the MDLs and it happened here.  And
21  that's the next slide.  It's a class of statement.

22         This last statement by the MDL judge in the article
23  that she wrote in 2021, "the sheer volume of unsupportable
24  claims in some MDLs can grossly distort the true merit and the
25  size of the litigation."  That is the essence, that is the

41

1  definition of irreparable harm, not only to the litigants but

2  to the courts.

3        This is a case -- I can't think of a case that's more

4  compelling in terms of the acceleration in the docket and then

5  the impact on following a rule-based process.  I can't think of

6  a single precedent for it.  And I think that the irreparable

7  harm is continuing.  It may have been there before.  But it's

8  certainly here now.  It needs to stop now.

9        And just take a look at what's happened in the last

10 couple of days.  We're facing show cause orders out of the MDL.

11 We're now facing the prospect the court wants to take a look at

12 whether the parties have conducted themselves appropriately in

13 the mediation.  That's at least the essence of it.

14       And so now we're going to have the MDL during the

15 course of this case which is now pending, still activated to

16 look at us and take action with respect to us.  In fact, I

17 think we should extend our request for a TRO to include the

18 individual attorneys because I think it's going to happen.  I

19 think you're going to see orders from this Court that start to

20 go after the attorneys.  And then, it's almost, you know, it's

21 remarkable.

22       So there's now a tag-along action, a tag-along

23 request that's been filed to the JPMDL asking for this case,

24 this entire case, to be transferred to the MDL.  I mean, there

25 was consideration of doing that in the early '90s because there

42

1 was an MDL for all asbestos claims in federal court before a

2 Judge Weiner, in 1991. And he kind of looked at it, and well,

3 you know, maybe we should go ahead and do this. And they took

4 two years to kind of look at it and decide what to do, and they

5 said, we're not going to do this.

6        And we're not going to do it because the bankruptcy

7 case is not just a civil case in the MDL. There's a district

8 court there, right. That is a common feature. But the

9 underlying bankruptcy case and the underlying bankruptcy

10 jurisdiction is only one place and it's a place of the debtors

11 choosing within the rules of the Bankruptcy Code.

12        And so the idea that we're going to have an MDL judge

13 who is -- they're now asking that she -- well, let's just give

14 that whole case back to her and she'll figure out what to do

15 with it. I mean, that is the imminent harm and it's happening

16 every day. It's a distortion to the process. It was rejected

17 by the JPMDL, and they're doing it under far less compelling

18 circumstances. That was all of asbestos. My God, there were

19 cases all over the country.

20        We have one case before one MDL judge, and they're

21 saying, oh, let's tag-along the bankruptcy so that judge has it

22 too, when the heart of our problem comes out of her court. And

23 it's regardless of whether she did what right or she did wrong.

24 It's we're, you know, it's in the fact is indifferent to it.

25 The fact is we've got a docket that's broken and a case that's

43

1  broken and that invokes the, I think the obligation of the
2  bankruptcy courts to provide us the relief that we're seeking.

3        I hope that answers Your Honor's question.  I'm sorry
4  to go on for -- and it's also, I got a note, Judge Rodgers, the
5  MDL, is about to remand thousands of cases back to all the
6  other -- wherever it is that they came from.  So the out-of-
7  control docket now becomes an out-of- control remand docket.  I
8  mean, they're kind of saying, well, you know, we're kind of
9  seeing that it's like Mark Twain and, you know --

10        THE COURT:  But when you say "about to," it's not
11  now, correct?

12        MR. BERNICK:  Somebody else can talk about the
13  specific timing of that.  I believe that that is the --

14        THE COURT:  Let me ask this.  Is it within the next
15  14 days?

16        MR. BERNICK:  I don't know whether that's in the -- I
17  suspect not.  But maybe somebody else can answer.  I don't know
18  the answer to the question.  Somebody else I'm sure will be
19  able to answer.

20        What I can tell you right now, there are 343
21  depositions scheduled between now and September 15.  Sixty-two
22  of depositions next week.  Expert reports are due for 372
23  plaintiffs on August 15th.  That's a little bit past 14 days.
24  Six hundred and nineteen Daubert or summary judgment
25  oppositions are due on August 9th.  That is the intensity of

44

 1  this litigation.  And, again, so I mean, you know, I can say,

 2  Your Honor, that, you know, when you talked about the balance

 3  of harms associated with the next 14 days, all of the harms are

 4  one way.  Absolutely all of the harms are one way.  That's why

 5  we're here now.  And that's why we're asking for a TRO.

 6          And you could have, again -- well, I'm repeating

 7  myself so I'll just proceed unless Your Honor has further --

 8          THE COURT:  No, go ahead.

 9          MR. BERNICK:  Okay.  Thank you.

10          Let's go to Slide 14.

11          Courts have consistently recognized that the measures

12  are the essential first step is just to be a Chapter 11 case,

13  incontestable.  <u>A.H. Robins</u>, I think was handled by Judge

14  Mehridge in the district court, a very esteemed mass tort

15  judge.  I think he was on the JPMDL at the time.  "It seems

16  incontestable that, if suits are permitted to continue

17  discovery allowed, any effort at reorganization of the debtor

18  will be frustrated, if not permanently thwarted."

19          I mean, this is why we're at the beginning, Slide 15.

20  And I'll move along here, Your Honor.  I know that I've been

21  going for a while.

22          This is how the process works.  I mean, the whole

23  idea is to centralize and consolidate.  And once you have all

24  the claims in one place, and only then can you actually do an

25  estimation.  You have the pool of claimants and you can go

45

1  ahead.  And then, with a plan formulation and confirmation, you

2  also know that, you know, what the scope of the channeling

3  injunction should be.  So you can't do any of this if you don't

4  have control.  And right now, there is no control and as

5  indicated, it's about (indiscernible).  Of course, there are

6  parallel negotiations.

7          Slide 16.

8          Now, the reason I put this out here is that this is

9  an old issue.  In every single one of these cases, the issues

10  that we're talking about here were addressed.  I happen to know

11  about many of them because I was in <u>Dow Corning</u>, <u>Babcock</u>,

12  <u>Grace</u>, <u>Combustion Engineering</u>, and I was not in <u>Purdue</u>.  I was

13  involved in the litigation before then.  And in each and every

14  case, we had this kind of proceeding.

15          In many of the cases, it wasn't even contested that

16  you would have a stay for claims against the debtor and the

17  debtors' parent, or people who are other non-debtors, but that

18  certainly has been addressed on multiple occasions by multiple

19  courts of appeal.  I also take a look at this, and again, I

20  could be wrong.  You know, there have been over a hundred mass

21  tort bankruptcies if you count all the asbestos bankruptcies.

22  And maybe there's one.

23          But I'm not aware of a case where -- they say if you

24  always -- now you know that everyone's going to check this

25  forever.  But a case does not come to mind where you have a

46

1    wholly owned subsidiary where you have a parent and there is
2    not a stay or comparable relief.  In <u>Dow Corning</u>, it was 157.
3    A stay or comparable relief that protects both the debtor and
4    the parent with respect to the liability that the product made
5    by the debtor that is at issue.

6          So, for example, in <u>Quigley</u>, there was a stay
7    injunction, whichever it was, but it did not apply to asbestos
8    products that the parent, Pfizer, had made and put out there.
9    But it did apply to the parent with respect to the product that
10   was made by the subsidiary, by Quigley.

11         But, you know, <u>Dow Corning</u>, the parent, <u>A.H. Robins</u>,
12   it was officers.  <u>W.R. Grace</u>, it didn't have a parent.  <u>Babcock</u>
13   <u>and Wilcox</u>, the parent was McDermott.  <u>Combustion Engineering</u>,
14   that was a case where I was counsel.  And that's a case where
15   ABB of Europe was the parent and the sole source of real
16   financing.  And we actually put together a prepack to get into
17   11.  It took about 35, 40 days.  But the parent was in itself
18   an extremist in terms of its creditors because of the threat of
19   the spill-over to liability.  But I don't think there was even
20   an issue that the stay should apply to the parent.

21         <u>Quigley</u>, I've talked about.  <u>Takata Holdings</u>, I think
22   got the benefit of the stay.  In <u>Purdue</u>, the Sackler families
23   got the benefit of the stay.

24         So I'm not sure that there's a case out there where
25   ultimately there wasn't injunctive or stay relief that covered

47

1  the parent, which is exactly what we're talking about here.
2  And in this case, again, the underlying liability originated
3  with -- okay, well, I can't read and talk to the Court at the
4  same time.
5          So if you'd give me a little note, I might be able to
6  do better.
7          Okay.  Sixteen.  Seventeen.
8          This is the stay.  It's just here.  But Your Honor
9  has read it.
10         Eighteen.  Legal standards.
11         Of course, you know all of this and I'm going to go
12 through them fairly quickly.
13         Nineteen.  362(a)(1).
14         These are, I think the most instructive cases where
15 effectively the action is an action directed at the debtor.  At
16 the same time, it's directed at the parent and that is exactly
17 what we have here.  We have an inextricable core of liability
18 conduct and the same product.
19         And I'll note that in about 2010, this is way past
20 the peak of sales, the Combat Arms product was declining in the
21 market.  You'll remember that it was way down.  And so, at that
22 point, I believe that some of the operations, if not all of the
23 operations, relating to this legacy product -- That's what it
24 was, was a legacy product. -- got upstream to a 3M entity.
25 That's what happened.

48

1          So at that point in time, you know, essentially the
2    company took that legacy and put it to itself through the
3    operations.  Now, of course, again, it doesn't change that the
4    liability conduct took place on, you know, overwhelmingly.  You
5    know, they have a couple claims that are based on later
6    theories but the origination of the product and the basic
7    liability, it was all there.  But, you know, the company said,
8    well, it's a legacy product.  We're going to take this to
9    ourselves.

10          And so the case for the stay then becomes even more
11   compelling.  It's already there based upon the actions being
12   driven, derivative essentially, are driven by the underlying
13   liability conduct to Aearo.  But then, it actually becomes part
14   of the operations of that sub.  And (indiscernible), you've got
15   indemnity even where indemnity is disputed.  We had that in
16   W.R. Grace.  Actions brought against the non-debtor where the
17   non-debtor is a contribution claim, that's Seventh Circuit.

18          And, you know, the list really goes on and on.  We
19   could cite many more cases that come out exactly the same way
20   under 362(a)(1).

21          If we go to Slide 20.

22          This is ironic.  The plaintiffs and their -- the stay
23   defendants in their opposition -- and I'll deal with all
24   theirs, at some point before I sit down -- themselves say gee,
25   it's such a shocking surprise that now we're taking the

49

1  position that Aearo is separate.  And the answer is it's not a

2  question of whether Aearo is separate.  We're not taking the

3  position that Aearo is separate.  To the contrary, we're taking

4  the position that the corporate entity was separate but the

5  liability of the corporate entity has been asserted as our

6  liability.  That's the whole thing that's going on here.  The

7  plaintiffs themselves take the position that there's no

8  difference -- the fact that we filed as one entity of two

9  that's alleged to be liable is not exactly shocking.  It's not

10 a new development.  They have been saying forever that, well,

11 and they've been telling juries, you know, the entity -- 3M,

12 Aearo, they're the same thing.

13          And we have got some of the quotes here.  They have

14 referred to both as 3M, tell the juries they're one in the

15 same, just note Aearo is 3M, so the idea of their objection

16 here though, there's some shocking new development.  We filed

17 an entity with the origination of the liability and the

18 origination of the products are the source of the liability.

19 The liability is being asserted in the courts for both Aearo

20 and 3M, and the liability is essentially the same.  Again,

21 there are a couple post fact acts, but the basic liability is

22 the same.  So, that objection actually is belied by the way

23 that they pursued the underlying litigation.

24          Slide 21 stays actions, (a)(3), property of the

25 estate.  Of course Your Honor is familiar with this, a person

50

1 who is covered by the insurance, and here the debtors and 3M

2 share 46 insurance policies. I mean, this is, you know, pretty

3 much a lock. I mean, I haven't seen -- again, I haven't seen a

4 case where the fact of there being shared insurance policies

5 doesn't qualify under 362(a)(3). And those are all -- those

6 are all stays to both (a)(1) and (a)(3) that are triggered by

7 operation of statute. They should be in place now.

8          22, here I think we'll get back to the question that

9 Your Honor has asked, and now we get to TRO and 105, and the

10 test. And it's kind of an interesting history. It goes back

11 and expands 20 years. And you can see how it's evolved

12 somewhat. And this is important because of the Court's

13 decision in 2019 in the Bush's case. So, the language in

14 Xonics, and this was pre-Celotex, the Supreme Court case, says

15 related to -- it was related to jurisdiction over proceedings

16 or actions that affect the estate as a race, so its effects. A

17 few years later the Supreme Court comes around in Celotex and

18 does kind of a canvass of all the circuits, and basically says

19 nine circuits use a test that says does it conceivably have an

20 effect on the estate? Which is obviously a very broad concept,

21 but it notes that the Seventh Circuit is a little bit --

22 slightly different. And of course as a result of Xonics, and

23 then the subsequent decision in Home Insurance, it is slightly

24 different. And then you can see that the language of Xonics

25 carry forward to FedPak and -- to FedPak, and Fisher, all of a

51

1  sudden it changes a little bit, it may effect.  The same thing

2  in Teknek.  And then Judge Easterbrook takes up the Bush case,

3  and he uses this as an opportunity, because his real point

4  about the analysis of related to is that it's made ex ante,

5  it's made at the beginning of the bankruptcy.  It doesn't

6  depend on the actual effect at the time the bankruptcy is

7  concluded.  It is ex ante.  It is at the beginning.

8       And so he then says it now changes, and the paragraph

9  that we have to take a look at is this -- is a paragraph that

10  -- where he uses the word potential effect.  So what he's

11  saying is if you do the ex ante analysis, right, you're looking

12  at possibilities.  You're not waiting until the end of the case

13  to see does it actually have an impact at the end of the case.

14  You're looking at the beginning of the case to see is this

15  something, the proceeding with respect to which the stay is --

16  or the injunction is requested, is this something that may

17  have, potentially has, based upon what may happen in the future

18  not being known?  It is -- it is designed to be prophylactic.

19  It's broader at the beginning.

20       And, importantly, the beginning is also the point of

21  the greatest fragility because if things aren't done right, not

22  only does the debtor have a big problem, but if things aren't

23  done right the bankruptcy has got a big problem because

24  something that might be enjoined or stayed at the very

25  beginning could have a very big impact later on.  You don't

52

1  wait for it to happen, you act.

2            And so, the analysis at the beginning of the case is

3  one that's purposely broad.  It's not just effects.  It's does

4  it have the potential to affect?  If we take a look at Slide

5  23, and this is -- let's go back to 22, this is a very, very --

6  again, it's the maturity of the jurisprudence.  And Judge

7  Easterbrook is kind of acknowledging, he points out, well, gee,

8  <u>Celotex</u> we said we are kind of a little different.  He kind of

9  says, well, you know, maybe we'll be kind of a little bit more

10 of the same now.

11           So, this is a very deliberate decision, and it bears

12 directly on Your Honor's determination here.  So let's go to

13 Slide 23.  This now is the greatest point of fragility for this

14 Chapter 11, for this Chapter 11, because right now we haven't

15 really -- we haven't really started, and we're faced with this

16 massive litigation that's eating us up and still is evolving,

17 you know, literally every hour, at least every day, with other

18 things that are being done to potentially derail this process.

19 We can't ignore that.  And the potential impact is on the

20 estate.  Again, for related to you don't have to have the --

21 you know, the direct action against the debtor.  Under

22 362(a)(1) you don't have to have actually impact on property

23 because it's the process.  It's the process of Chapter 11 that

24 needs to be protected, and the process of Chapter 11 is

25 unquestionably impaired.  If at the time we're going through

53

1   the initial stages of this case 3M, which is -- which we'll
2   talk about, it's critical to this process.  It's providing
3   funding for this process, support for this process.  3M is out
4   dealing with a proceeding which is taking up all of its effort,
5   and for that matter we're going to need people from -- we're
6   going to need the resources of Aearo people, and people working
7   on this case in order to deal with what is threatened and will
8   take place in the MDL.

9          So, this is all about protecting the process that we
10  have filed.  We are here.  Aearo is not going anywhere.  3M is
11  not going anywhere.  We want to begin this case.  We don't want
12  to begin the case in a way that doesn't recognize the fact that
13  what's happening out there is occupying huge amounts of money
14  and really every smidgen of the time that's available from
15  people who are actually critical to this case, as well.

16         24, basis for the TRO under 105, you know, you know
17  these from the briefs, closely related indemnity.  I'm going
18  to talk about the indemnity in a minute.  The non-debtor is
19  essential shared insurance.  I mean, it's really a pretty
20  compelling list of elements.

21         Slide 25, here they are.  Shared insurance.  Now, I
22  want to get to another point that the plaintiffs raise about
23  the shared insurance.  It's oh, well, you didn't tell us.  You
24  didn't tell the Court that oh, well, gee, it's in here but it's
25  kind of buried.  None of the insurers has yet to acknowledge

54

1    its coverage obligations.  That's a good fact.  It means that
2    the value of the policies is out there and it's intact.  And
3    one thing that the history of this litigation -- mass tort
4    litigation shows is that once a debtor that's an insured is in
5    Chapter 11, the money comes out of those carriers.  I mean,
6    they fight it, but it happens in every single case.  The
7    carriers are the last to come to the table, and the only thing
8    that brings them to the table is they can't keep the time value
9    of money because the whole litigation issue, liability issue is
10   compressed into the Chapter 11 through the estimation process.
11   Now, sometimes it continues on, but Chapter 11 is what the
12   insurance companies hate, because they know that it puts
13   pressure on their coverage defenses.
14           Slide 26, 3M's contribution under the funding
15   agreement, and it covers -- it's soup to nuts.  It's the
16   administration of the estate.  It is contributing money at the
17   outset to begin to fund, and then its funding obligations are
18   uncapped.  I mean, literally the entire liquidity of the
19   Chapter 11 case is based upon essentially insurance and --
20   which again is a shared insurance, so they will be able to get
21   the shared insurance.  They -- in fact, I think under the terms
22   of the funding agreement they get the -- the debtor gets paid
23   when it has exhausted its available resources, including the
24   insurance.  So, they will be able to get the shared insurance.
25   That then brings me to Slide -- let me talk about -- yeah,

55

1    we'll get to it, Slide 27, commit to the indemnity.  Now, they
2    will say, oh, well, you entered into the indemnity days before
3    -- days before the Chapter 11 was filed, and the answer to that
4    is, yes, that's true.  Now, their -- we are looking into it, I
5    can't really speak to it definitively, but I believe that there
6    were some existing obligations even before the indemnity.  But
7    yes, the indemnity is the flip side of the contribution.  What
8    we're saying is if we're going to be here, we're going to be
9    here.  We're not going to be off someplace else.  The -- and
10   that's really what the indemnity says.  This is the
11   consideration, the only consideration for our bringing all the
12   liquidity to the table.  So, yes, it was done immediately
13   beforehand because the company wanted to make these
14   commitments.  But to have them be made in the context of the
15   company getting the access to and protection of the Chapter 11
16   case.

17           If we go back to the Seventh Circuit's test of what
18   is -- what might happen, what is the potential effect on the
19   estate, you know, to the extent that we're not able to
20   participate fully and get protection fully, it obviously puts
21   enormous pressure on, you know, our ability -- on our funding
22   agreement.  And so the idea is that's exactly -- why would you
23   take all of the liquidity that is committed in the funding
24   agreement and say, oh, we'll see what happens.  That liquidity
25   is central to the entire case.  Why would you put that

56

1  liquidity through the funding agreement and potential jeopardy
2  by saying, hey, by the way, 3M, you're going to -- it's not
3  going to -- this case isn't going to do anything for you.
4  You're not part of the case.  We'll continue to soak you for
5  all that same money outside of the case.  That's -- it's -- you
6  know, 3M is a big company, but what company wants to go forward
7  and both fund the entire liability of Aearo with an un -- it's
8  like we're standing there with an uncapped funding obligation
9  so that they can push all of the liability of Aearo for all of
10 the products sold to us to pay without any cap.  And we're also
11 going to be sitting there on the litigation doing the same
12 thing.  They'll get the same -- they will be able to use the
13 same liabilities in exposure to get money from us outside the
14 litigation.  I don't -- it's kind of difficult to contemplate.
15 I don't know, but it's difficult to contemplate that that's
16 going to be something that is -- you know, is going to be
17 tenable.
18       Let's go to 23, 24.  I'm almost done here.  I'm
19 sorry.  105 -- 25, that's the insurance.  26, that's the
20 indemnity.  28, next steps.  So, you know, what I think that --
21 this is all pretty straighforward, and we had a little slide
22 that kind of talked about it, but we want to get going.  We
23 want to use the 230,000 claims here, and to use them to begin
24 the estimation process it will be a very extensive data set
25 that we can use then to conduct the estimation process, and we

57

1  think that we will be able to save some time.

2          I want to close by just touching on some of the

3  objections so that I cover them now.  Maybe I won't have to

4  respond.  So I have talked about Aearo is back as an allegedly

5  separate entity.  They have never been -- from a liability

6  point of view they have never been treated.  Rather than

7  pursuing appellate relief for the perceived injuries we did

8  pursue appellate relief.  The problem was that the entry of the

9  final orders on post-trial motions were very prolonged

10  schedule.  And that's actually a not unknown device that some

11  of the MDL judges use to maintain the pressure to reach

12  resolution outside of Chapter 11 is to delay the appeals.  And

13  that is what happened here.

14          They say, well, there's an absence of the irreparable

15  harm if it's not granted.  Well, the judge has actually given

16  the definition of irreparable harm, which is a distorted -- a

17  distorted litigation process that's not working.  There's

18  nothing imminent or potentially cataclysmic in the immediate

19  horizon, and I have to say, and maybe this is not appropriate,

20  just kind of get this picture that, well, we're kind of like,

21  you know, Mark Twain picture, rivers rolling by and everything

22  is calm.  It's the opposite.  We're sitting here up against a

23  wall every day.

24          Okay.  The plaintiffs just filed an ex parte motion

25  for a TRO with the MDL court to enjoin 3M or any party acting

58

1  on 3M's behalf from acting to enjoin parties from pursuing 3M

2  for combat arms claims.  So what this says is that we're filing

3  a TRO here.  They are going to -- the folks over here are going

4  to the MDL court to create competing TROs, and any party acting

5  on 3M's behalf.  So it means all my colleagues here are picked

6  up by this TRO, that the MDL has now issued, if this -- I'm

7  sure that this is accurate.  And that -- I mean, so -- okay.

8  I'm going to move the declaration.  I'll remember to do that.

9        So, that's where we are.  And I am not -- again, I am

10  not familiar, I've never -- I have never heard that happen.

11  And yet they are saying, oh, no rush, no TRO, so that they can

12  continue what they're doing in the MDL.  And forgive me for the

13  tone, but it really is -- they say, oh, well, we haven't had

14  discovery regarding the debtor's apparent claim that they alone

15  are now responsible.  Well, they have had tons of discovery,

16  and they will get more discovery on that issue if they want it

17  in the context of this case.  We all know that there is

18  disclosure in bankruptcy that's very robust and extensive, and

19  so what they are really doing is to say, well, we would have

20  preferred to have that outside of bankruptcy, and so that's a

21  reason for not giving us relief.

22        I already addressed the question of, well, the

23  insurers haven't acknowledged coverage obligations.  That's

24  true.  That's good.  The assets there, and they will give it

25  eventually.  That is the carriers.

59

1        I'd like to move into evidence the first day

2  declaration of Jay Castellano, and the first day declaration of

3  Mr. Stein.  I know that Your Honor already has those in the

4  filings, but we would move them into evidence.  And anything

5  else I need to move in?

6                    (Counsel confer)

7        MR. BERNICK:  So, we're -- the Court has told us to

8  respond by noon central today for the TRO motion, as I've just

9  mentioned.  So we definitely want the TRO to include

10 representatives -- the same -- representatives of both the

11 debtor and 3M, because right now they are seeking to get the

12 district court to engage with us.

13                    (Counsel confer)

14        MR. BERNICK:  So, DX-4, 5, 6, 7, 8 is the funding

15 agreement, and then the policies we would also move them in.

16 And I am done, Your Honor.  I am sorry if I have gone on too

17 long.

18        THE COURT:  No.  That's fine.  Now, I'm going to ask

19 a very non-East Coast, and possibly Texas question, what am I

20 to do by admitting these declarations into evidence?

21        MR. BERNICK:  Well, they are just --

22        THE COURT:  What weight do they have?

23        MR. BERNICK:  Well, first of all, I am a Chicago boy,

24 so I am not that far off.

25        THE COURT:  I always wondered, because all the East

60

1  Coast, it's like we want a declaration.

2        MR. BERNICK:  Yeah.  Well, I --

3        THE COURT:  It's not subject to cross examination.

4        MR. BERNICK:  Yeah, yeah, yeah.

5        THE COURT:  Most of them are here.

6        MR. BERNICK:  Right.

7        THE COURT:  What am I doing with these other than to

8  put into evidence the dissertation that they have said, which

9  is basically the intro that Mr. Husnick said?

10        MR. BERNICK:  Yeah.  So, you're right.  And I had --

11 I started in Chicago for most of my practice, and then I went

12 to New York, and I -- there are a lot of things that don't make

13 sense about New York practice from my point of view, but as I

14 said --

15        THE COURT:  I said East Coast.  I didn't just pick on

16 New York.

17        MR. BERNICK:  Well, that's true.  But I tell you,

18 it's worse than the East Coast, so -- worse in New York than it

19 is anywhere else, just because it's been around for longer.

20 So, what I would say is pretty simple, which is the

21 declarations are being proffered, and if there's no objection

22 --

23        THE COURT:  Well, proffered is very different than a

24 declaration just going in.

25        MR. BERNICK:  No.  I'm -- I don't want to  --

61

1          THE COURT:  Oh.  You're going to move?  Okay.

2          MR. BERNICK:  I am moving it in.

3          THE COURT:  Okay.

4          MR. BERNICK:  And then we have the witnesses here --

5              (Unrelated conversation on Zoom)

6          MR. BERNICK:  That's somebody who is on Zoom, I

7  think.

8              (Unrelated conversation on Zoom)

9          THE COURT:  Who is on Zoom right now?  And may I ask

10 is this -- hello?  Please mute them.

11         MR. BERNICK:  Yeah.

12         THE COURT:  And for those of you paying attention and

13 following the rules, that's fine if you want to talk and ask

14 questions, but if you're just talking amongst yourselves on

15 Zoom and not listening to me to tell you to be quiet, it's not

16 a good move.  So, you'll be muted as a punishment.  And to the

17 extent you try to talk you may want to flag someone that

18 they're being muted.  So, go ahead.  I'm sorry.

19         MR. BERNICK:  Yeah.  So, I think the effect of it

20 would be that it's proffered.  If there is an objection we can

21 have the witness take the stand and essentially say, yeah, I

22 testify under oath that this is true and accurate, and then it

23 will be open to cross examination.

24         THE COURT:  Right.

25         MR. BERNICK:  I know that Your Honor is familiar with

62

1    that practice.  So, the idea is not to presume that it's

2    independently admissible.  It's just something they proffer.

3             THE COURT:  So, let me, I guess -- so you would like

4    to proffer the testimony of Mr. Castellano and Mr. Stein?

5             MR. BERNICK:  That's -- and also the -- that's

6    correct.  And then we're also proffering the two -- the four

7    exhibits, DX --

8             THE COURT:  How do you proffer an exhibit?

9             MR. BERNICK:  Move it into evidence.

10            THE COURT:  And it will be into evidence?

11            MR. BERNICK:  For purposes of this proceeding.

12            THE COURT:  That there's insurance policies?

13            MR. BERNICK:  There are insurance policies and the

14   funding agreement.  Again, there are lots of cases where you

15   say, well, you know, the record doesn't -- the Court is --

16            THE COURT:  Oh, I -- and you don't know me that well,

17   but the one thing I am very worried about is protecting the

18   record.

19            MR. BERNICK:  Right.

20            THE COURT:  Mainly because if I am going to get

21   overruled, much less remanded, which is the worst of all things

22   there is, I want it to be on things that I've actually

23   considered, not on something that an enterprising district

24   court or circuit court law clerk found.  So, I guess let me

25   start with the initial.  Is there an objection to the proffered

63

1  testimony of Mr. Castellano and Mr. Stein?

2          MS. CARUSO:  Your Honor, Debbie Caruso.  And, yeah --

3          THE COURT:  Would you mind either using the podium or

4  using the --

5          MS. CARUSO:  I'd be happy to.

6          THE COURT:  I can hear you, but --

7          MS. CARUSO:  I know.  Most people can.  And I was

8  raised in Chicago and grew up there, and my family is there,

9  and I still think this is -- there's some problems with this

10 process.  Okay?  We don't have videos.  We don't have exhibits.

11 We had half of a day.  They obviously have had months to -- I

12 mean, look at this presentation.  This didn't happen with an

13 emergency filing.  So, we are at an extreme disadvantage to

14 cross examine anybody today, anybody.  And we would like to

15 present argument to the Court on why the TRO is not appropriate

16 today, and we're prepared to do that now, so I would like o

17 maybe postpone the offer, and if it's not going to be postponed

18 we would like we would like to reserve our right to cross

19 examine these witnesses and to review all these exhibits.

20 They're offering these exhibits into evidence.  You've seen

21 what's in these exhibits.  Do they have supporting

22 documentation for the exhibits?  They are summaries of what?  A

23 lot of stuff.  And it's just -- from a due process standpoint

24 it puts us in a horrible position, completely, and an unfair

25 position.

64

1          So, what we would like to do is proceed with our

2   argument on why the TRO should not be entered today, why this

3   should go forward in an orderly fashion with discovery, the

4   opportunity to take depositions, and the opportunity to do

5   document discovery, and that's what we would like to do, Your

6   Honor.

7          THE COURT:  All right.  Let me ask Mr. Bernick this

8   question.  Is that the close of your legal argument, opening?

9          MR. BERNICK:  It is the close -- it is the close of

10  our legal argument, period, and it -- subject of course to

11  whatever it is that they --

12         THE COURT:  Right.

13         MR. BERNICK:  -- have to say.  And with the proffer

14  -- with the proffer, the motion to admit these documents we

15  don't have any further evidence --

16         THE COURT:  So, that would be the -- the proffers are

17  your evidentiary portion?

18         MR. BERNICK:  That's correct.

19         THE COURT:  All right.  Well, let's table that for a

20  moment.  I would like to at least hear legal argument before we

21  move to evidence.  That's how I normally do things.  And we'll

22  go from there.

23         UNIDENTIFIED ATTORNEY:  Okay.

24         MS. GURVITZ:  Thank you, Your Honor.  Sasha Gurvitz

25  of the Klee Tuchin firm, KTBL Law, LLP, appearing on behalf of

65

1   the Aylstock Witkin or AWKO firm.  In the courtroom with me
2   today is Jennifer Hoekstra of AWKO, and my partner, Rob
3   Pfister, who is admitted in Indiana, and also my partner,
4   Michael Tuchin, both of KTBS Law, are joining me remotely by
5   this Zoom.  My pro hac vice is pending at Docket Number 48, and
6   our notice of appearance is at Docket Number 43.

7           Your Honor, AWKO represents approximately 45,000 tort
8   victims in the 3M MDL proceeding in the Northern District of
9   Florida.  And AWKO serves as the lead counsel for the
10  plaintiff's steering committee in the MDL.  We are here today
11  in opposition for the request for a TRO, and we filed a brief
12  opposition to that end which appears on the docket in adversary
13  proceeding at Docket Number 16.

14          As I said, Your Honor, AWKO represents approximately
15  45,000 tort victims with claims against the debtors and 3M.
16  These are veterans and service members who put their lives at
17  risk in service to their country, and who suffered injuries
18  that they attribute to the use of defective combat ear plugs
19  manufactured, sold and distributed by the debtors and 3M.

20          Since 2019 and thereafter their claims have been
21  pending in the MDL, which is a centralized forum explicitly
22  designed by Congress to facilitate the resolution of mass
23  claims such as these.  The claims have been working their way
24  through the MDL process, with some cases having proceeded to
25  trial, resulting in substantial jury verdicts.

66

1          After participating in the MDL process for more than
2    three years the debtors and 3M apparently became dissatisfied
3    with the results obtained in that form, and so the debtors have
4    sought to opt out of the MDL process, a process specifically
5    designed for litigating these types of claims in favor of the
6    bankruptcy forum.  Counsel for the debtors acknowledged in his
7    opening remarks that ultimately this bankruptcy case is a
8    settlement negotiation.  Otherwise stated, this is a legal
9    tactic employed strategically to get a leg up on the plaintiffs
10   by derailing the MDL.

11         Not only have the debtors shopped a new forum, the
12   debtors have also seized on another alarming trend in
13   bankruptcy, seeking to avail their solvent, non-debtor parent,
14   3M, of all the benefits of bankruptcy without subjecting that
15   non-debtor to the burdens of bankruptcy.  In these
16   circumstances and on essentially no notice the debtors should
17   not be permitted the extraordinary relief of a TRO in favor of
18   this solvent, non-debtor entity.

19         The fact is there is no emergency here.  The debtors
20   have been planning this bankruptcy for at least the last couple
21   of months.  They had time to plan, to prepare visual aids, to
22   strategize.  They filed in the forum of their choosing at the
23   time that suited their interests, not because of any imminent
24   operational shortfall or looming threat coming in the next few
25   days or weeks.

67

1       No one is disputing that the automatic stay protects
2   the debtors, but 3M is not a debtor.  It is not entitled to the
3   protection of a stay, and it is not entitled to a TRO on this
4   record.  It is not a debtor.  It is solvent.  It is potentially
5   independently liable on these claims.  First and most
6   significantly, there has been no showing of irreparable harm if
7   the TRO is not granted.  The upcoming litigation deadlines in
8   the MDL cited by the debtors in support of the requested relief
9   reflect that the earliest deadline is an August 9th deadline
10  for responses to certain written discovery requests.  No trials
11  are scheduled to commence in the next couple weeks.  No
12  judgments are coming down the pike that will threaten the
13  debtors' ability to reorganize.

14      All that will happen if the TRO is denied is that
15  non-debtor 3M will continue to participate in ongoing
16  depositions and discovery in the MDL.  The debtors claim that
17  ongoing discovery obligations imposed on 3M will distract from
18  their efforts to reorganize their business, but the debtors are
19  protected by the automatic stay.

20      THE COURT:  Are the debtors protected from having to
21  undergo discovery with regard to 3M?

22      MS. GURVITZ:  The debtors are protected from having
23  to undergo discovery directed at the debtors.

24      THE COURT:  Well, but most of these cases are with
25  joint defendants, correct?

68

1          MS. GURVITZ:  Correct.

2          THE COURT:  And in theory you could attempt to

3  proceed not against the debtor, but against 3M.  And there's

4  discovery coming.  Are those discovery deponents and are those

5  experts, are they debtor experts?  Are they 3M experts?  Are

6  they debtor employees?  Are they 3M employees?

7          MS. GURVITZ:  I think that's a matter that probably

8  merits further fleshing out, and further briefing to --

9          THE COURT:  But we don't quite know yet?

10         MS. GURVITZ:  Exactly.

11         THE COURT:  So, there could be harm?

12         MS. GURVITZ:  There are allegations in the record

13 that support the position that 3M has independent liability

14 here as opposed to derivative liability here.  So there is a

15 basis for proceeding in -- with discovery with respect to

16 independent liability of 3M, and at this stage in the

17 proceedings there isn't a record that supports cutting off

18 those rights.

19         THE COURT:  No.  I'm just asking --

20         MS. GURVITZ:  Yes.

21         THE COURT:  If nothing happens today, if all we had

22 was a petition, what would happen in the depositions?  Would

23 you proceed?

24         MS. GURVITZ:  I think the depositions --

25         THE COURT:  And when I say you, I mean is it likely

69

1  that the tort plaintiffs would proceed?

2          MS. GURVITZ:  I think the depositions could proceed

3  as to 3M.

4          THE COURT:  But we're not sure if it involves debtor

5  employees versus 3M employees, correct?

6          MS. GURVITZ:  I think to the extent it involves 3M

7  employees, 3M experts --

8          THE COURT:  Okay.

9          MS. GURVITZ:  -- it could proceed, and it should.

10         THE COURT:  But that's a fine line, isn't it?

11         MS. GURVITZ:  Not necessarily.  I mean, in the -- the

12 debtors haven't developed that fulsome of a record to this

13 point, and we haven't --

14         THE COURT:  We don't really have a record yet.

15         MS. GURVITZ:  Right.  And we haven't developed any

16 record.  We haven't had the opportunity to develop any record,

17 but like the debtors, for example, say sort of obliquely in

18 their first day declaration that in 2010 the debtors' business

19 was upstreamed to 3M, that suggests that perhaps from and after

20 2010 or from 2010 until 2015 this was really all about 3M.

21         THE COURT:  Possibly.  But in the pending litigation

22 there's multiple defendants, generally speaking, at least for

23 the purposes of today, the debtors and 3M.

24         MS. GURVITZ:  Yes.  I believe as far as we know the

25 witnesses are 3M.

70

1          THE COURT:  Understood.  Understood.

2          MS. GURVITZ:  Yes.

3          THE COURT:  But what's in front of us today, that's

4  where we sit.

5          MS. GURVITZ:  Yes.

6          THE COURT:  Okay.  Go ahead.

7          MS. GURVITZ:  Thank you, Your Honor.  So, 3M has been

8  participating in the MDL since 2019, and as a solvent entity it

9  is more than capable of continuing to do so, and so it should.

10 As we were just discussing this is not a situation in which we

11 believe this is a case about derivative liability where

12 plaintiffs are trying to get indirectly what they cannot get

13 directly by going after directors and officers, for example,

14 for the debtors' misconduct.  This is a situation in which 3M

15 itself is potentially independently liable.  Failure to grant

16 the TRO will also not upend the funding agreement which the

17 debtors cite as essential to their reorganization efforts.

18 There is no indication in the funding agreement or otherwise

19 that 3M's payment commitment is in any manner conditioned on

20 the debtors obtaining or even seeking a TRO protecting 3M.

21 Irrespective of whether the Court grants the TRO today, 3M's

22 obligation under the funding agreement will remain exactly the

23 same.  Nor will it deplete the debtors' pool of potential

24 funding as the commitments from 3M are uncapped.  Nor will 3M's

25 participation in the discovery that is ongoing in the MDL

71

1   diminish the debtors' estates or irreparably harm the debtors.

2         The debtors make much of shared insurance coverage,
3   but there is no evidence of any imminent risk to shared
4   insurance.  The insurers have not accepted coverage to this
5   point, so any harm is hypothetical, as counsel essentially
6   acknowledged in his remarks.  And in any event, even if shared
7   insurance was at risk, which there is no evidence is the case,
8   the Court need not and should not enjoin litigation against 3M
9   to protect the estate asset.  Rather, the Court could simply
10  enjoin 3M from drawing against shared insurance, thereby
11  preserving the asset for the benefit of the estate consistent
12  with the debtors' fiduciary duties.

13        The final argument that the debtors make relates to
14  their indemnity obligations in favor of 3M under the funding
15  agreement, but this argument is simply too cute by half.  The
16  debtors cannot be permitted to manufacture indemnity
17  obligations on the eve of bankruptcy and then cite those same
18  obligations as the basis for granting extraordinary relief on
19  essentially no notice and essentially no record to a solvent
20  non-debtor.

21        On the flip side, if the TRO is granted, the tort
22  victims will suffer irreparable harm.  The MDL is a centralized
23  procedure for handling over 200,000 claims.  The schedules for
24  discovery and pretrial issues and other matters that are
25  established in the MDL are complex and carefully calibrated,

72

1   and are relied upon by thousands of attorneys and hundreds of

2   thousands of victims in scheduling many sequenced and

3   interdependent deadlines.  Taking these matters off calendar

4   will have far-reaching, disruptive consequences for these

5   parties and will interfere with the process established by the

6   MDL judge.

7          Mr. Bernick's discussion of irreparable harm takes

8   the long view.  But as the Court noted that's not what's at

9   issue today.  This is not the preliminary injunction hearing.

10  This is a TRO.  It's about imminent harm in the next few weeks.

11  The absence of irreparable harm alone is reason to deny the

12  TRO.

13         THE COURT:  Let me ask -- let me ask this.  Have the

14  plaintiffs considered just extending the deadlines so as to

15  allow the Court to have a hearing on the preliminary

16  injunction?

17         MS. GURVITZ:  Extending the deadlines in the --

18         THE COURT:  Right.  Because right now what is at

19  issue are these 62 depositions are due -- are happening next

20  week, 372 expert reports due on August 15th, and then Daubert's

21  01:47:31) reports due next week of a number of which I don't

22  know, because I didn't write it down.  Have we considered, or

23  has there been any discussion, I understand it's short notice,

24  but let me ask this.  If those were continued by agreement of

25  the parties, doesn't that obviate the need for a TRO and set up

73

1    a preliminary injunction hearing?  Because at that point you

2    can argue, Your Honor, there's no irreparable harm right now

3    because everything has been continued.

4              MS. GURVITZ:  But wouldn't that just be conceding the

5    relief requested in the TRO?

6              THE COURT:   But I am asking -- because you are

7    saying your people are going to be harmed by it if we stop

8    those deadlines.  They are saying they are going to be harmed

9    if they continue.  That's the crux right now of the next two

10   weeks or so.  So, I am asking, has that been considered?

11             MS. GURVITZ:  So, my understanding from our client is

12   that the discovery that's coming up in the next couple of weeks

13   in the MDL is case-specific discovery as opposed to discovery

14   necessarily directed at the debtors or at 3M.  So it's not

15   something that --

16             THE COURT:  Almost everything is case-specific right

17   now, right, because we're getting ready for the remand of

18   waves?

19             MS. GURVITZ:  But I don't believe it's as to 3M

20   witnesses or the debtors' witnesses in particular.

21             THE COURT:  Well, we're going to have to get to that.

22             MS. GURVITZ:  Right.

23             THE COURT:  And, obviously, that's going to be a key

24   decision.  But my question is has it been discussed?  Because

25   isn't your argument greatly strengthened if you say, Judge, all

74

1  they're saying is all these things are happening, we are

2  willing to move those so we can have a preliminary injunction

3  hearing that's briefed, that will have exciting exhibits, that

4  will have things in front of me, isn't that what you're arguing

5  that should happen?

6          MS. GURVITZ:  I think in part -- I -- I think in part

7  the issue is that moving things in the MDL has consequences.

8          THE COURT:  And I understand that.  But that's the

9  big issue.  Your concern is we don't want a TRO that's going to

10 have irreparable harm on all these things, and I'm just asking,

11 what have we asked about this?  Can we move these things two

12 weeks?  Is that going to irreparably harm the trial schedules

13 of those matters?  You may not have had an opportunity --

14         UNIDENTIFIED SPEAKER:  This hasn't the time, Your

15 Honor.

16         THE COURT:  Okay.

17         UNIDENTIFIED SPEAKER:  Yeah, we had --

18         THE COURT:  But that's a question -- that's a

19 question because, you know, we're reaching the noon hour,

20 that's a question I have to ask you all, because doesn't that

21 strengthen your position if you're willing to move everything

22 to look back and say what irreparable harm between now and a

23 preliminary injunction hearing.  That really strengthens your

24 argument, saying there shouldn't be a TRO.

25         MS. GURVITZ:  I understand, Your Honor, but I think

1  that kind of takes us to the bigger point of the debtors have
2  had time to plan and strategize to get --

3          THE COURT:  And I understand.  And it is -- and I
4  understand I am approaching this from a lifetime bankruptcy
5  perspective.  To me it's normal, because that's what happens.
6  To most everyone in the outside world it's like how can this
7  happen?  How can you be allowed to prepare and to do this and
8  spring this upon everyone?  Every -- but that's a common
9  creditor argument.  Obviously, to file a bankruptcy you have to
10 do due diligence to see if you can do it, and these things, and
11 they're well lawyered, they know what -- I mean, I understand
12 that they threw you into a strange forum in the middle of
13 nowhere.  I mean, there's not even an ocean nearby.  I mean,
14 what have they done to you?  So, I understand that.  But -- so
15 yes, they've had time to plan.  That's unquestionable.  But
16 that's the case in every bankruptcy, and I would be out of
17 business if I said you couldn't plan before a bankruptcy.

18         MS. GURVITZ:  Right.  And I appreciate that
19 perspective as someone who frequently represents debtors.
20 Certainly debtors, you know, they don't file, in most cases, or
21 at least in many cases they don't truly file on a whim on an
22 emergency on one day.  They plan for it and they pick the day.
23 But they don't always ask for emergency injunctive relief at
24 the first day without an opportunity for the other side to
25 present meaningful arguments to engage in basic discovery to

76

1  brief the issues.  So, I think that's what's different here.

2          THE COURT:  Okay.

3          MS. GURVITZ:  So -- and that really actually takes me

4  to sort of my closing point, which is that there's just no

5  basis for short circuiting the process for injured veterans and

6  service members to get notice of the extraordinary relief being

7  sought as to non-debtor 3M, to have an opportunity to take

8  basic discovery, to brief their positions, and to be

9  meaningfully heard by this Court, and to do so on a prompt but

10  fair timetable approved by this Court.

11          These veterans and service members do not deserve to

12  be jammed up on one or two days' notice with a stay that will

13  permanently derail the MDL process.

14          At the end of the day, today in opposing the TRO the

15  victims are seeking to preserve the status quo.  The debtors

16  and 3M are seeking to disrupt the status quo on no notice, on

17  no record, and with no meaningful opportunity for discovery or

18  briefing that would greatly, I believe, aid the Court and the

19  parties.

20          So, that's the issue.  Can they get this

21  extraordinary relief before Your Honor gets to hear both sides

22  of the story on a developed record?  We believe that they

23  cannot, and that they have not met their burden to do so.

24          THE COURT:  All right.  So, is it the argument, then,

25  at least now, that, A, there's not irreparable harm?  Okay.  I

77

1  didn't get a chance to ask counsel this, but I will ask you,
2  and then I will ask him, Ms. -- it's sad I have to use all my
3  paper to figure out people's names, what is the estimated cost
4  of what's going to happen in the next two weeks from the
5  plaintiff's perspective?  Do you have an idea of the number of
6  hours or costs or expenses which may be expended?
7              MS. GURVITZ:  In --
8              THE COURT:  Assuming that --
9              MS. GURVITZ:  -- the handling --
10             THE COURT:  -- there's no -- that there's no TRO in
11 place, what do you think you would -- what would it cost the
12 plaintiffs time-wise and hourly-wise, or expenses?  I
13 understand you're probably on contingency, but I am assuming
14 you are still keeping track of hours, how much are you going to
15 expend on the items that were listed of things on the horizon
16 within the next two weeks?
17             MS. GURVITZ:  The MDL?
18             THE COURT:  Yes.
19             MS. GURVITZ:  That's not something I am prepared to
20 opine on.
21             THE COURT:  Okay.  But can you guesstimate?  Is it
22 100,000?  Is it 50,000?  Is it a million?
23             MS. HOEKSTRA:  So, Your Honor, Jennifer Hoekstra.
24             THE COURT:  Come on down.  You're on the Price is
25 Right.

78

1                          (Laughter)

2          MS. HOEKSTRA:  Not a venue I'm comfortable normally

3    speaking in, Your Honor.  Apologies for that.  From plaintiff's

4    perspective there are 50 depositions, probably somewhere

5    between 15 and 20 defense medical exams that are currently

6    scheduled.  Each of those involves a plaintiff taking the day

7    off of work, a plaintiff rescheduling if necessary, possibly

8    using multiple vacation days.  There's a lot of factors that go

9    into the estimation.  It's not just attorney hours from our

10   perspective.

11         We have now -- we're in the third wave of the remands

12   in terms of the depositions that are ongoing.  We have gone

13   through this process twice.  Scheduling the depositions is a

14   herculean effort.  There are hundreds of us who have to get

15   together and coordinate schedules to get them done within a

16   certain time frame.  Moving 40 of them will probably result in,

17   you know, twice the effort of hours that go into the actual

18   deposition in terms of resetting everything.  That is the

19   concern that is being raised.

20         In terms of attorney hours, man hours, probably

21   100,000, 150,000 hours total between the depositions, the

22   different individuals, and the follow up that goes along with

23   it.  Within the 14 days, as well, is the response to the

24   dispositive motions from the wave one, which is due August 9th.

25   There were almost 400 motions filed last Thursday.  The

79

1   responses to all of those motions are due for wave one on the
2   ninth of August.  Shifting that shifts the calendar, and that
3   is the concern about any sort of stay.
4         THE COURT:  Okay.  So, would it be fair to categorize
5   what you said as there's a lot that's going to go on and it's
6   taken a lot of effort to get there?
7         MS. HOEKSTRA:  Correct.
8         THE COURT:  All right.
9         MS. HOEKSTRA:  And it's not new.  These orders have
10  been in place since November, February and May in terms of what
11  all the deadlines are.
12        THE COURT:  All right.  Thank you.
13        MS. GURVITZ:  Thank you.  So, I think unless Your
14  Honor has further questions, to close I would just like to
15  emphasize the point that the debtors have been focused in their
16  presentation, I would say primarily on argument and not on
17  evidence, and that the concerns animating the TRO were
18  generally concerns relating to burdens on non-debtor 3M, and
19  burdens that are inherent in the MDL process.  And we heard a
20  lot about the ineffectiveness of the MDL process and the way
21  it's gone off course, and that's not what the TRO determination
22  is about.
23        The TRO determination is about whether in the next
24  few days there will be irreparable harm to the debtors if the
25  TRO is not granted, and there is simply not evidence on that

80

1  point, and given the allegations or position that 3M is

2  independently liable on these claims, a position we believe

3  they have not contested in the underlying litigation, it

4  doesn't seem like there could be a showing in that regard,

5  given the stage of the litigation and the nature of the claims,

6  and the fact that we're not dealing here with derivative

7  liability, we are not dealing with claims against officers and

8  directors who are busy running the bankruptcy case.  That's not

9  the type of situation.  This is not a case like <u>A.H. Robbins</u>,

10 where the plaintiffs are trying to get indirectly at the

11 debtors' liability.

12        3M is a solvent non-debtor proper target of

13 litigation.  If 3M wanted protection of the automatic stay it

14 should have filed for bankruptcy.  It chose not to.  It has to

15 live with those consequences.

16        THE COURT:  Okay.

17        MS. GURVITZ:  Thank you, Your Honor.

18        THE COURT:  All right.  I'll hold back.  Ms. Caruso?

19        MS. CARUSO:  Yes.  Your Honor, Seeger Weiss filed a

20 joinder to the objection, and briefly, we will not rehash what

21 has been discussed here.  I understand we are getting towards

22 the noon hour.  But we would like to present argument by

23 Melania Cyganowski.  However, we have to unmute her because she

24 is muted.

25        THE COURT:  Oh.

81

1              MS. CARUSO:  She is on Zoom.

2              THE COURT:  Was she one of -- oh.  Sorry.

3              MS. CARUSO:  Yes, yes, yes.  And also, David

4  Buchanan, who I think will be very helpful to hear from because

5  David is with Seeger Weiss, and he has been living this MDL

6  case.  And that would be the conclusion of our arguments on

7  this issue.

8              THE COURT:  Let me ask briefly a very important

9  question, because I have read all the studies about what

10  happens just before lunchtime, usually in criminal cases, what

11  would you anticipate the approximate -- assuming we unmute her,

12  what would be the approximate time frame in which you think the

13  testimony would be?  Are we talking a half an hour?

14             MS. CARUSO:  Oh.  This isn't testimony.  This is

15  argument.

16             THE COURT:  I'm sorry.  Legal argument.

17             MS. CARUSO:  Not more than 30 minutes, and probably

18  not 30 minutes.

19             THE COURT:  Okay.  That's fine.

20             MS. CARUSO:  Thank you.

21             THE COURT:  All right, ma'am.  You may proceed.

22             MS. CYGANOWSKI:  Thank you, Your Honor.  For the

23  record, Melanie Cyganowski of Otterbourg P.C., counsel to

24  Seeger Weiss, as Ms. Caruso noted, one of the lead counsel in

25  the MDL, and also counsel independently to thousands of

82

1   plaintiff entities.

2        If I might, Your Honor, let me begin by answering the

3 questions you raised at the conclusion of counsel's argument,

4 namely administrative scheduling in connection with the MDL.

5 And I think frankly this also goes to the heart of the TRO

6 that's being requested.  This morning, prior to the hearing

7 before you there was a hearing in the MDL court before Judge

8 Rodgers, and she frankly chastised debtors' counsel and counsel

9 for the 3M/Aearo parties for not coming before her at any time

10 prior to unilaterally canceling the depositions.

11        These are regular scheduling issues.  The MDL Court

12 is regularly available for conferences to deal with these

13 issues.  It makes no sense, and in fact is turning federal

14 jurisprudence on its head that we're running to bankruptcy

15 courts when we're dealing with scheduling issues in an MDL, or

16 otherwise complaining of an administrative schedule that as an

17 aside both Aearo and 3M voluntarily agreed to as the admin

18 schedule was being put together and agreed to by the -- and

19 implemented by the Court.

20        So to specifically answer your questions, I don't

21 think we here today at the podium can agree to waive or stop

22 these depositions.  I would, however, encourage all parties to

23 seek a conference before Judge Rodgers, and I'm sure all of

24 this can be dealt with before her, who knows her calendar best.

25 I myself am a former U.S. Bankruptcy Judge.  I sat in the

83

1   Eastern District of New York for 14 years.  It's now been 14
2   years since I sat on the bench.  But I well remember the
3   scheduling difficulties and all the other balances of hardships
4   and equities that a court needs to do.

5           Frankly, this is not the job of a bankruptcy court to
6   be overseeing how an MDL calendar is scheduled, nor is it one
7   for this Court to be dealing with issues of which debtors'
8   counsel now complains.  I mean, if they were so upset with the
9   MDL there are other remedies that Congress has put in place.
10  There could be mandamuses to the Court of Appeals.  There could
11  be appeals to the Court of Appeals.  There could be seeking
12  reconsideration of the administrative process that's ongoing in
13  the MDL court.  The bankruptcy system was not designed, as this
14  Court well knows, to handle issues of this sort.

15          But coming back to the central issues that are here,
16  and to go over the points without repeating unnecessarily what
17  counsel has said, and what our papers says, simply put there's
18  no exigency here for a TRO.  There's no melting ice cube.
19  There's no melting acid.  There's no large judgment about to
20  enter.  There's nothing other than at best these depositions.

21          To put a finer point on it, until today not one
22  employee who testified in connection with the MDL depositions
23  was an Aearo employee.  They were all 3M employees.  Until a
24  few days ago when this artificial, my words, indemnification
25  agreement was imposed upon the debtor there was no identity of

84

1 interest, and the 3M defendant in the MDL voluntarily said that

2 they were the sole party responsible for the judgments and the

3 sole party that was participating in these trials.

4        With you in court is Mr. Buchanan, who can go through

5 this with more specificity.  He has been living through these

6 cases.  But it's important for the Court to know that Aearo

7 employees are not at the central core of the discovery that's

8 taking place before the MDL.

9        We believe for the reasons that have also been noted

10 that more time should happen.  We were counsel to another MDL

11 in the <u>LTL/J&J</u> case.  We were in North Carolina when Judge

12 Whitley heard from those parties that the TRO had to proceed.

13 He placed it on a slower calendar.  It took three weeks before

14 we had an orderly TRO hearing.  Ultimately the TRO was granted

15 in favor in order to -- in Judge Whitley's terms he did not

16 want to send a case on fire to New Jersey when he transferred

17 it.  But the point is that for those three weeks the world

18 didn't come to an end.  Johnson & Johnson didn't stop doing

19 what Johnson & Johnson did.  There was an orderly process for

20 discovery to take place, and we had an orderly evidentiary

21 hearing that gave the Court a record for him to proceed.

22        With respect to the overall case and where we stand,

23 from our point of view, from the plaintiffs' point of view we

24 are greatly concerned that this case is following the Texas

25 two-step.  Some can call that a dance.  Here it's a slightly

85

1  different rhythm.  Here there's no divisive merger here but the

2  same artificial construct where you have a solvent parent and

3  joint tortfeasor here at 3M seeking the protection of the

4  Bankruptcy Court without taking on any of the burdens.

5        We all agree, as counsel pointed out, and there's

6  absolutely no dispute that the automatic stay arises with

7  respect to debtors immediately upon the filing, but there is

8  now this new mantra.  We heard this in LTL/J&J most recently,

9  that all non-debtor affiliates get the benefit of the automatic

10 stay merely because there's this pre-petition indemnification

11 agreement which artificially constructs the argument that

12 there's an identity of interest.  There will come a time when

13 we will explore that.  We believe we will be able to point out

14 to the Court that it's not an arm's length agreement.  This was

15 the pivotal question that Judge Rodgers asked today.  Was it in

16 fact an arm's length agreement, or was it simply a subterfuge

17 to defraud the plaintiffs?  Today is not the day to answer that

18 question, but it will be before you at some point.

19       We have heard the overall refrain before.  MDLs don't

20 work.  All claims flow from ambulance chasing plaintiff's bar.

21 The company has done no wrong.  There's no liability, that they

22 want an equitable and expeditious way to proceed.  History,

23 however, does not bear that out.  In the Texas two-step cases

24 they are still going on.  There is no confirmed plan.  There is

25 no settlements in sight.  It's, simply put, a way to deprive

86

1  plaintiffs of their right to a jury.

2           When we've looked at their points, and I have to say
3  I -- I have never, ever as a litigant heard an attack as
4  vicious as I heard debtors' counsel do today with respect to
5  Judge Rodgers and the MDL.  I have not been a part of that MDL,
6  but I find it unimaginable that Judge Rodgers did not do a
7  proper job throughout the case, and moreover, that she did so
8  most times, if not all times, with the consent of the parties
9  who are today complaining before you.

10          The defendant companies, the debtor companies, so
11  that we don't get confused as to who is on which side, have
12  lost trials consistently over the past few years.  They have
13  lost them before different judges, before different juries, in
14  different jurisdictions.  It's truly an artificial argument to
15  blame everything today, and the reason for the TRO, and the
16  reason for the reach for this Court to give this overarching
17  blanket stay over all of these non-debtor parties merely
18  because they are in an MDL, is this the precedent that we are
19  now going to be setting in bankruptcy courts that any
20  defendants in any MDL would simply do what Aearo has done in
21  this court today?  My hope is that this court will find, as we
22  believe, that there is no basis in that argument.

23          I also find it astonishing, and frankly am having
24  difficulty processing what I believe is an absurd inconsistency
25  about on one hand complaining that the MDL does not

87

1  appropriately and properly process all these thousands or

2  hundreds of tort cases, whatever they may be, but yet

3  complaining that the process by which discovery and bellwethers

4  are taking place is too rushed.

5          The bottom line is that a so-called out of control

6  docket, I wrote the words when counsel said it, he specifically

7  said the irreparable harm today is an out of control docket.

8  How is that possibly sufficient to satisfy the standards?

9          For all these reasons, Judge, and those in our

10  papers, and I leave it for others to also argue, I believe that

11  first there's no basis whatsoever for the TRO on this record to

12  be granted.  I believe on this record whether or not you admit

13  the declaration, which I believe you should not admit, that's

14  not what we do on the East Coast, as they say.  We wait until

15  the witness has been cross examined.  At the end of the cross

16  examination counsel then offers the declaration into the record

17  in evidence.  It is not offered at the beginning without any

18  foundation, assuming that there is an evidentiary basis

19  sufficient.  But I believe that even if that declaration were

20  placed into the record, based on that alone and what's before

21  the Court there is no basis for this Court to find irreparable

22  harm is taking place, especially when balanced against the

23  undue prejudice which is being placed upon the plaintiffs in

24  the MDL.

25          In the event that the Court is not prepared to make

88

1  that ruling, we minimally request that the evidentiary hearing

2  on the TRO be deferred for a few days.  There's no reason why

3  we cannot depose the gentleman on the first day declaration.

4  There is no reason why we can't look behind the so-called

5  indemnification agreements to see, you know, whether or not

6  they were indeed at arm's length.  And nothing will jeopardize

7  that.

8          And I would also urge that this -- that the parties

9  contact and meet with Judge Rodgers so that they can deal with

10  the scheduling issues so that the two courts can appropriately

11  coordinate the respective matters pending before it.  Thank

12  you.

13          THE COURT:  All right.

14          MR. WINSTON:  Your Honor, this is Eric Winston on

15  Zoom.  May I be heard?

16          THE COURT:  There's one in the courtroom that's

17  already been stated as coming, then you can be heard, sir.

18          MR. WINSTON:  Thank you, Your Honor.

19          THE COURT:  All right.

20          MR. BUCHANAN:  I think it's still morning, Your

21  Honor.  Dave Buchanan --

22          THE COURT:  Still morning here.

23          MR. BUCHANAN:  Dave Buchanan of Seeger Weiss.  I am

24  co-chair of the plaintiff's steering committee and the MDL.  My

25  partner, Chris Seeger, is co-lead counsel in the MDL.  We

89

1    represent thousands of clients individually, and obviously have

2    responsibility in the MDL on behalf of the 235,000 cases or

3    claims that are currently in that court.  I was struck, as my

4    co-counsel was, by the statements that were just made by

5    defense counsel as to the way this litigation has been managed,

6    as if it's been managed singularly by the Court without the

7    input and consent of both sides.

8            The administrative docket process that comes under

9    criticism in this courtroom by Mr. Bernick was a process that,

10    in fact, defendants endorsed.  It followed a practice that

11    defendants endorsed where they agreed to toll all claims, toll

12    all claims did not need to be filed.  And by, I think, the fall

13    of 2019, there were 180,000 claims that defendants were aware

14    of that had been tolled.

15            It wasn't until, and then there was an administrative

16    docket that was created thereafter to facilitate the obtaining

17    of records because of certain conditions required to get

18    records from the military, but it wasn't until April of this

19    year, a date that coincides seemingly with the defendants'

20    statement as to when they first started to consider an

21    alternative way of resolving their liability, that the

22    defendants raised any complaint or concern about the

23    administrative docket and the fact that complaints had not been

24    brought into the system formally.

25            Since that time, more than half of the cases on the

90

1    administrative docket have indeed been transitioned, half of
2    the cases that have been brought over, a process that the
3    defendants have agreed to, a process that they sought, now a
4    process they complain about.  And so what is it really that
5    underlies and that gives rise to this broken system that the
6    defendants complain about?

7            The results of the system they joined in supporting,
8    a Bellwether system, a Bellwether process that began with a
9    random sample of cases, random, from those cases then on the
10   docket.  That sample was then reviewed by the plaintiffs and by
11   the defendants and the plaintiffs had picks and the defendants
12   has picks and the Court had picks, random picks by the Court.
13   And through that process, I think there were -- we saw it on
14   one of the slides, but in terms of estimation and that's why I
15   raise it because in this court Mr. Bernick is proposing a
16   different way of valuing cases than the parties had agreed to
17   value cases, a Bellwether process.

18           Twenty-seven Bellwethers were selected randomly.
19   From that, plaintiffs prevailed in 13 of the 19 that went to
20   trial and 18 were dismissed --

21           UNIDENTIFIED ATTORNEY:  Eight.

22           MR. BUCHANAN:  -- eight were dismissed, excuse me.
23   So what we have really are the arguments that you saw in
24   slides, arguments that defense counsel here proffered to juries
25   19 times.  Seventy percent of the time they lost.  Seventy

91

1 percent of the time the arguments about liability, the

2 arguments about how damaged somebody was, the arguments about

3 whether somebody had the plug or not, everything that litters,

4 if you will, the informational brief followed by debtors'

5 counsel, all the issues about this plug and how great it was or

6 how much the military liked it or didn't like it.

7        All those arguments have been vetted by very good

8 estimators, 19 juries and fairly consistently or at least 70

9 percent of the time the juries have rejected those arguments,

10 over and over and over again to the tune of very significant

11 verdicts.  Why do verdicts get better?  Well, what ends up

12 happening over time is their witnesses say things, their

13 witnesses admit things when they're in a courtroom and when

14 they're not in a deposition.

15        They make admissions that they can't then run from in

16 subsequent trials and that's what we had in these cases.

17 Liability that, yes, included a flange memo, that, yes, also

18 included the company's chief courtroom representative, Mr.

19 Berger, who said over and over and over again in the later

20 trials, not in the early trials, that this was the most

21 variable earplug the company had ever made, the most variable

22 earplug, an earplug that works sometimes and not others.  Of

23 course, those are statements of one witness, then a 3M

24 consultant at that point in time who became a 3M employee after

25 3M acquired the company.

92

1         The statement that all of this relates to Aearo
2    employees also struck me because we were told three years ago
3    when we were trying to figure out how to do discovery in this
4    case that Aearo had no employees.  After 2010, all employees
5    had been absorbed into 3M.  3M had the employees.  They've
6    worked from 3M since the time of the transition in 2009, 2010.
7    Certainly an issue we'd like to explore as we now see the
8    company saying it's got hundreds of employees.

9         Well, certainly, in the course of the litigation when
10   those employees were deposed, those people who still worked
11   there, they were 3M employees.  As the litigation progressed,
12   they had one counsel, one counsel for debtors and 3M at these
13   depositions.  And there's no dispute that 3M sold this product
14   on its own until 2015.

15        3M made its own determinations that this product was
16   flawed.  They made their own determinations that this product
17   was not safe for use in the very settings they promoted it for.
18   3M made their own affirmative statements about this product,
19   their own misrepresentations about this product.  They have
20   their own independent liability for this product.

21        Perhaps that's why at no point did 3M ever try to
22   distinguish itself and say it had no liability in any claim in
23   the MDL, a statement that I think was acknowledged before Judge
24   Rodgers this morning.  At no point did they seek such a
25   finding.  They come here now and try and draw a different

93

characterization of their role, that merely it was all the acts of a sub. There is independent liability of 3M for their acts, the acts of a non-debtor.

Well, highlight that beyond what happened after 3M took the company over with its own liability, an issue that gave rise in the discovery of some of the findings and facts about this case arose out of a litigation involving just 3M and a competitor of 3M, <u>Moldex v. 3M</u>. That gave rise to an investigation by the U.S. Government against 3M, an investigation by the Criminal Investigation Command of the Department of the Army in conjunction with the Department of Justice against 3M. And you know who settled it? 3M settled it. 3M resolved those claims, not Aearo, not Aearo.

And when the time was taken, when the time came when these issues arose in 2015 and 2016, it was 3M that determined that the product couldn't be sold in the manner that it -- with the claims they had made, with the claims of safety that they had made. That was 3M. And it was 3M who also chose to keep it a secret and never tell anybody that was still using it. It was 3M that never recalled this product. 3M has independent liability from Aearo. That's why it was never contested before juries.

So, where are we today? We have tens of thousands of veterans who've used the product. Yes, made, marketed and sold by 3M, certainly after the acquisition of Aearo. Independent

94

1  liability with regard to 3M's actions and inactions.  U.S.
2  Government didn't know, soldiers didn't know, and 3M knew it
3  all and said nothing.

4        So, 3M was happy with this administrative docket.
5  They were happy with the process that, frankly, they touted in
6  their securities filings for years.  There's only 10 or 15,000
7  cases on the docket.  They were happy with that number and it
8  was perceived the litigation that was of scale, 10 or 15,000
9  cases.

10        Over time, analysts started to figure out that there
11  was a bigger case.  At that point, 3M had to deal with its
12  administrative docket and the fact that the estimator, the 19
13  juries who had seen this case 13 out of 19 times said your
14  case, your defense is no good.  The case and the defense that
15  you were presented with and they'd like different estimators,
16  non-Seventh Amendment jury estimators to evaluate, that defense
17  has been rejected over and over again.

18        Respectfully, Your Honor, I'll defer to my counsel,
19  my bankruptcy counsel with regard to whether or not the
20  showings have been made on the TRO, but certainly we welcome
21  the opportunity to take on the merits of this.  Thank you, Your
22  Honor.

23        THE COURT:  All right.  Mr. Winston.

24        MR. WINSTON:  Good morning, Your Honor, or I think
25  it's still morning.  Thank you, very much, for allowing me to

95

1  appear by Zoom.  We're trying to get our pro hac vice

2  applications on file.

3            THE COURT:  Right.

4            MR. WINSTON:  Your Honor, I'm with --

5            THE COURT:  But I am going to preface this, by the

6  way, if you could be brief, that would even be better.  But go

7  ahead.

8            MR. WINSTON:  Less than five minutes, I promise.  I'm

9  with Quinn Emanuel, Your Honor, and we are among the counsel

10  representing some of the veterans and service members that were

11  injured.  We represent, you know, several thousand.  We've

12  actually done three of the Bellwether trials, all of which

13  resulted in plaintiff verdicts.  And my colleague, Adam Wilson,

14  who may be on the Zoom somewhere, is one of the members of the

15  executive committee.

16            I just want to highlight a couple of facts and then

17  suggest one possible solution here.  The facts that I -- have

18  been touched upon, but I just want to make sure Your Honor

19  knows, you asked about discovery that's coming up.  Fact

20  discovery of the debtors and 3M, that's over.  All of the fact

21  discovery that you're hearing about is of the plaintiffs which

22  3M has been taking and then unilaterally counsel.  It's up to

23  them whether they want to take it.  But this is not a question

24  of officers of the debtors or even the debtors' parent being

25  distracted because that's all over.

96

1          The expert depositions and reports, that's still fair
2     game for both sides, but that's overwhelmingly 3M's
3     responsibility and they've been paying for it.  The other fact
4     I just want to mention, this came up in front of Judge Rodgers
5     today which I didn't hear counsel for the debtors mention is
6     that in her questioning of both 3M and the debtors' counsel
7     today about how the MDL has gone, she commented that thousands
8     of cases have been resolved just this year which I think to us
9     suggests that the MDL is working the way it's supposed to work.
10    That process now has been just tremendously disrupted.

11         And then the third fact I just want to bring up, and
12    this goes to why we think we need discovery and can't --
13    there's nothing that can be resolved on today's record is
14    exactly what are the obligations of the debtors vis-a-vis 3M
15    and now this artificial indemnification agreement because, as
16    you've heard, it has been represented in the MDL that 3M is
17    completely responsible for this.  And if that is, in fact, the
18    case, I have no idea what the debtors were doing entering into
19    an indemnity agreement and equally important how it would be
20    bad, much less, you know, have a material adverse effect on the
21    estate for liability to be established that 3M has to pay for.

22         When counsel raised the Queenie case, that was the
23    question was whether the liability of the non-debtors would
24    have a material -- immediate, material adverse effect on the
25    debtors' estates because it would effectively be a judgment

97

1  against the debtor.  Here, it's the opposite.  It's a question
2  of whether it's a judgment against 3M.  And, indeed, the vast
3  majority of the cases that have been discussed, <u>A.H. Robbins</u>,
4  <u>Purdue Pharma</u>, those were the cases where the tort fees are
5  filed for bankruptcy.  The tort fees are here, 3M hasn't and
6  that's the problem.

7         Which brings me to the proposal and I think this goes
8  to a question you posed to one of the other plaintiff's counsel
9  and we just want to address, at least give our suggestion and
10 that's this.  Deadlines might be able to be moved, there's
11 obviously been a lot of disruptions already and it's hard to
12 get people to leave their jobs for the day and get depositions
13 rescheduled.  But I think if we go before the MDL judge and
14 agree to work out a schedule for several weeks to see if we can
15 reset depositions, reset deadlines, if it can be done, and hit
16 pause for just a week or two and allow the parties to actually
17 discuss things, as opposed to what happened where we have less
18 than 24 hours notice of this TRO trying to disrupt everything,
19 that might be the right path here which actually probably would
20 save just a huge amount of money and might obviate the need for
21 a TRO altogether which, I mean, since from our perspective
22 nothing was immediate anyway.  I don't think there's any cost
23 to the plaintiff's side.

24        So, Your Honor, that's it.  I said less than five
25 minutes.  Hopefully I kept my promise.

98

1          THE COURT:  You're close.  All right.  There also is
2    a request from a Ms. Keller.  You, too, have the ability to
3    speak briefly.

4          MR. KELLER:  Hi, Your Honor, this is Ashley Keller.
5    It's actually Mr. Keller, but you are --

6          THE COURT:  Oh, sorry.

7          MR. KELLER:  -- not the first and won't be the last
8    to make that mistake.  And I had not actually intended to speak
9    today, so I didn't file anything.  But at the very beginning,
10   the debtor and debtors' counsel said that my firm, and me in
11   particular since I signed the papers, violated the automatic
12   stay.  So very briefly with your permission, I'd like to speak
13   to that issue.

14         THE COURT:  Well, it did catch my attention.  Go
15   ahead.

16         MR. KELLER:  Yeah.  So, what we filed was a notice
17   for the JPML, the Judicial Panel on Multi district Litigation,
18   saying that this case is related to cases that the JPML has
19   consolidated in Florida.  In no sense is that a violation of
20   the automatic stay and you notably didn't hear debtors' counsel
21   explain how it is.  This is not an action against the debtor or
22   the estate.  This is not an attempt to impact estate property.
23   It's not bringing a claim of any kind.  And so if you look at
24   the statutory text of Section 362, this is none of the things
25   that are contemplated by the automatic stay and it's also not

99

1  the sort of filing that we could have made prior to the

2  commencement of this proceeding.

3        The only purpose of a potential notice of tag-along

4  is to notify the JPML that in our opinion, which we have in

5  good faith, this is the sort of proceeding that has overlapping

6  questions of law and fact that deserves to be sent to where the

7  JPML has already created an MDL.  It's, essentially, a request

8  to transfer.  It wouldn't make the debtor suddenly not be

9  bankrupt.  It wouldn't unfile the bankruptcy.  It would just be

10  sending this proceeding to a different tribunal.

11        Now I understand my friend's argument that in the

12  nineties there were asbestos cases and maybe they'll

13  successfully persuade the Judicial Panel on Multi-district

14  Litigation that that precedent should apply and --

15        THE COURT:  Let me just ask a brief question out of

16  curiosity because there's nothing in front of me, but who

17  determines the right jurisdiction and whether it should be

18  transferred, the transferor or the transferee court?

19        MR. KELLER:  It's actually neither, Your Honor.  It's

20  the Judicial Panel on Multi-district Litigation which is a

21  panel of differently selected Article III judges.

22        THE COURT:  Well, no, I know what the panel is,

23  but --

24        MR. KELLER:  I apologize.  I didn't mean to explain

25  something you already knew.

100

1          THE COURT:  It just raises the question of whether or

2    not then that they can just -- well, it raises a lot of

3    questions, but nothing's in front of me.  But thank you for

4    informing.  Anything else I should know about that particular

5    filing?

6          MR. KELLER:  Well, the only thing I'll conclude with,

7    Your Honor, is I think it's quite likely that the panel is

8    going to set a briefing schedule, not because they think we're

9    right or they think the debtors are right, but because,

10   essentially, when someone tags a case, then they set a briefing

11   schedule.  We, obviously, agree with everything that's already

12   been said by our able colleagues as to why you shouldn't grant

13   an injunction and you'll take the TRO request based on those

14   arguments.

15         But I just want to be clear that it's our position

16   that we should not be enjoined regardless of what you do from

17   responding to the Judicial Panel on Multi-district Litigation

18   where, essentially, the debtor gets to file a response and

19   papers about why the case shouldn't be sent Northern District

20   of Florida, but we have to proceed with our hands tied behind

21   our back and, you know, to comply with your order not say

22   anything.  So, we would just request that if briefing is

23   ordered by the JPML, we get to put in our papers.

24         THE COURT:  Well, that's not an issue for me today.

25   You proceed how you think you are legally entitled to proceed

101

1  and if something comes in front of me, I'll make a legal

2  determination of what happened, but thank you.

3            MR. KELLER:  Very good, Your Honor, thank you.

4            THE COURT:  All right.  So, is there any other legal

5  argument to be made before I would open evidence?

6                    (No audible response)

7            THE COURT:  Do you want to have a chance to -- first,

8  if there's anymore, you can respond briefly, but I do want to

9  at least hear anyone else.

10          MR. BERNICK:  I apologize for getting up from my

11  chair --

12          THE COURT:  Just give me a little bit of time to hear

13  if anyone else has anything.

14          MR. BERNICK:  Oh, I'm sorry.

15          THE COURT:  All right.  Either you've been muted or

16  you're not.  So you have a 10-minute or less legal rebuttal

17  before we'll take a break and then we'll take evidence.

18          MR. BERNICK:  Okay.  I'm sorry for popping up in my

19  chair.  I guess I didn't hear who the last gentleman

20  represented.

21          THE COURT:  His name was Ashley Keller and I didn't

22  catch -- I didn't write down, but somewhat involved in it.

23          MR. BERNICK:  Well, I'm just -- if he's speaking, I'm

24  assuming he's representing some party to this case.  If he's

25  not, then --

102

1          THE COURT:  He said he -- I didn't write it down,
2    but, yes.  I have a feeling your opposition may know and can
3    fill you on that.

4          MR. BERNICK:  Right.  That's what I figured, but I
5    thought I would just ask.  So, a few things and they're not
6    going to be unfortunately in particular order because there are
7    just so many things that were happening, but that's fine.  So,
8    there are a lot of broad statements that have been made that,
9    you know, for example, juries aren't estimators.

10          THE COURT:  I'm not --

11          MR. BERNICK:  Yeah.

12          THE COURT:  Okay.

13          MR. BERNICK:  Okay.

14          THE COURT:  For rebuttal, let's just focus on the one
15    thing I'm really worried about right now is the TRO.

16          MR. BERNICK:  Okay.

17          THE COURT:  That's what I'm really concerned about
18    because that's what's in front of me.

19          MR. BERNICK:  Right.  Well, that was the one thing I
20    did want to make sure is that we're also seeking relief under
21    the stays and the stays are now, whatever they are, they're
22    triggered by the filing of the bankruptcy.

23          THE COURT:  Right, as to all the named debtors,
24    correct.

25          MR. BERNICK:  Yeah.  Well, but under 360(a)(1), it is

103

1   any claim that is made, in effect, against the non-debtor

2   parties.

3          THE COURT:  Right.

4          MR. BERNICK:  Yeah.  And this is not, as you know, an

5   unusual situation.  I mean, it's been said that this is without

6   precedent and it's a Texas Two Step.  It's not a Texas Two

7   Step.  And this exact configuration has been litigated again

8   and again and again.  And I don't want to belabor that with

9   Your Honor, but it's our view that those stays are in place and

10  they cover 3M for the reasons that we've stated.  And I don't

11  think that --

12         THE COURT:  But isn't that what your TRO is for?

13         MR. BERNICK:  No.  The TRO is not that.  The TRO is a

14  broader, is broader relief so that if, in fact, the stays are

15  in place as we believe they are for the reasons that we've

16  indicated, then the effectively the case, the entire litigation

17  is stayed against both the debtor and --

18         THE COURT:  Why do you need a TRO if you think you've

19  got a stay against everybody?

20         MR. BERNICK:  It is a belt and suspenders.  That's

21  what it is.  Again, that one of my charts was you need the TRO

22  as a predicate for using related to jurisdiction and a Section

23  105 injunction.

24         THE COURT:  You mean I have to find a TRO to do

25  something?

104

 1          MR. BERNICK:  Yeah, you have to find a --

 2          THE COURT:  Which would be to say under 105 I'm

 3    extending the stay to 3M.

 4          MR. BERNICK:  If the stays are not applicable.  If

 5    the stay is applicable --

 6          THE COURT:  Okay.

 7          MR. BERNICK:  -- then this is a standard -- I'm

 8    sorry, Your Honor, I don't mean to teach the Court.  I mean,

 9    I'm just --

10          THE COURT:  Well, I guess you may teach me because I

11    disagree with you, but I don't know if you're going to have an

12    apt student here.  The stay doesn't automatically apply to

13    random people.

14          MR. BERNICK:  That's correct.

15          THE COURT:  Unless you're in a 13, you can get a

16    co-debtor stay, right?

17          MR. BERNICK:  Yeah, so that's correct.

18          THE COURT:  So, enlighten me as to why you think 3M's

19    already got a stay in its favor?

20          MR. BERNICK:  Because --

21          THE COURT:  We could have saved two hours.

22          MR. BERNICK:  Well, that's why we stood up and all

23    the slides said stay and.

24          THE COURT:  Well, yes, including the slide you said,

25    oh, by the way, this should say stay too.

105

 1              MR. BERNICK:  Yes, right.  That was one of the
 2   earlier slides.
 3              THE COURT:  You're on an uphill battle here, so --
 4              MR. BERNICK:  Sure.
 5              THE COURT:  -- if you want to sum up.  I mean, you
 6   can make that argument, but --
 7              MR. BERNICK:  Well, the argument is pretty simple
 8   because it's been adopted in, you know, many cases and --
 9              THE COURT:  Well, again, everyone likes to tell me
10   all the -- I don't care about other cases specifically right
11   now.  I want to know this and how the law applies to other
12   things, but I know asbestos has all sorts of great things that
13   have happened to asbestos cases which was mainly your chart.
14   Asbestos is its own special breed that's been --
15              MR. BERNICK:  Right.
16              THE COURT:  -- largely adopted by Congress.
17              MR. BERNICK:  Right.
18              THE COURT:  It hasn't really expanded it pursuant to
19   these other things.  So, it seems to me that now you, maybe I'm
20   wrong, and obviously if you disagree with me you can appeal, if
21   it's interlocutory you maybe can, but that the stay already
22   applies.  But that seems a bold maneuver.  So, but go ahead.
23              MR. BERNICK:  Well, the precedence for that are,
24   again, in that little slide and I'm sorry it wasn't -- for
25   whatever reason I'm sorry it didn't get across.  That's my

106

1  responsibility.  But the stays are -- have been used and the

2  non-bankruptcy cases that we're talking about are <u>Dow Corning</u>,

3  that was breast implants.

4           THE COURT:  Right.

5           MR. BERNICK:  Okay.

6           THE COURT:  But where there's -- where, essentially,

7  a judgment against a non-debtor is a judgment against the

8  debtor?

9           MR. BERNICK:  That's correct.

10          THE COURT:  Which is one of the showings I thought

11 you would have to make for the TRO.  And to get a TRO at a

12 preliminary injunction to extend the stay, those are findings

13 --

14          MR. BERNICK:  No, no, actually the TRO is different

15 because under related to jurisdiction it's any impact on the

16 Chapter 11 process.

17          THE COURT:  All right.

18          MR. BERNICK:  Okay.  So -- but that's pretty

19 important for us.  That's why it's related to.  The stay is our

20 core.  Related to jurisdiction really picks up a broader sweep

21 of penumbra around the core issues.  So --

22          THE COURT:  I don't think you want to use penumbra.

23          MR. BERNICK:  Okay.  That's true.  I don't want to --

24          THE COURT:  That hasn't really worked.

25          MR. BERNICK:  Yeah, that's right.

1          THE COURT:  So, go ahead.

2          MR. BERNICK:  Yeah.  So but and point of fact, you

3   have insurance policies, then you're under (a)(3), right,

4   363(a)(3).  That's property of the estate.  It is -- and there

5   are -- we cite in our brief, there are many cases that on the

6   basis of the (a)(3) provision which stay applies, that is a

7   sufficient basis for the stay to apply all by itself under

8   (a)(3).  You never reach the preliminary injunction Rule 105.

9   So the precedent is clear.  It's Circuit precedent in the Sixth

10  Circuit.

11          I believe, you have to track the cases, I believe

12  it's also in the Third Circuit where the question is- is the

13  case, essentially, against the third party debtor and that

14  qualifies under (a)(1).  (a)(3) is completely independent.

15  Those matters are ripe now because they apply by operation of

16  the filing.  And we have supported that.  That's why we want to

17  put in the insurance policies and the declarations also go to

18  the question of judgment against, that the judgment will run

19  against, it's, essentially, a case against the debtor, one's a

20  case against the third party.  And these are all clear vectors,

21  clear analyses that don't require any kind of stand or 105.  So

22  that -- but it's in our briefs.  I would just ask Your Honor to

23  take a look at it.

24          With respect to the other arguments, I do want to

25  address Your Honor with respect to the questions that you've

108

1  posed on the next three weeks because I know that that's what
2  your focus is.  So over the next three weeks, we know and
3  there's no dispute about it and they're not prepared to at
4  least at this point back down from it, that you have all the
5  depositions.  All those depositions are going to be taken by
6  3M.  So, all the 343 depositions between now and September 15,
7  yes, that's right, they're not depositions of the personnel,
8  but they're depositions that will be taken by 3M.
9          The expert reports are 372 plaintiffs.  They
10  presumably they relate to all the defendants.  And then you've
11  got 619 Dauber or summary judgment oppositions.  Those are
12  Dauber and summary judgment motions against all of the
13  defendants.  The cost to us is about $3.8 million a week.  And
14  the people who are involved include people in this -- and that
15  are involved in this case, as well, because this case requires
16  the knowledge --
17          THE COURT:  What people?
18          MR. BERNICK:  What?
19          THE COURT:  The employees or the attorneys?
20          MR. BERNICK:  The attorneys.  Okay.  Then you get the
21  problem of --
22          THE COURT:  Do you think that the automatic stay
23  protects attorneys?
24          MR. BERNICK:  Well, in this particular case it may be
25  that it should, but the question is resources of the debtor and

109

1    resources of 3M, right.  And so the debtors' --

2          THE COURT:  Well, resources also include legal

3    resources.

4          MR. BERNICK:  Yes.  Well, I would think so.  I mean,

5    we, unfortunately or fortunately, lawyers are essential to the

6    Chapter 11 process.  And so that's why, you know, we're all

7    here and I'm just pointing it out to the Court with complete

8    respect.  Then you get to the question of the -- what's

9    happening in the MDL.  And, yes, I, you know, I have made very

10   strong arguments on behalf of my client about what's happening

11   in the MDL case.  And I think the documentation substantiates

12   what we're saying in this court and in our papers which say

13   exactly the same thing.

14          And what's happened over the last 48 hours actually

15   makes a very troubling and compelling case all by itself that

16   this case, that that case should be stayed insofar as both the

17   debtor and 3M are concerned because effectively what's

18   happening, and I think Your Honor can easily see this, is that

19   the same matters that Your Honor is focused on in connection

20   with our request for a TRO are now being focused on by the MDL

21   judge.  She's asking the same questions of us that are similar

22   questions to the ones that you're asking, there's show cause

23   orders to respond and to discuss these matters, matters before

24   Your Honor in a separate proceeding where our stay and our

25   requests are directed.

110

1          And I'm also informed that there are communications
2  now between where apparently Judge Rodgers is listening into
3  this and we're now, you know, getting messages about what it is
4  that she apparently has said that she might be prepared to do.
5  And they're not coming through any formal line of communication
6  and so I'm very concerned about that.   I think everybody should
7  be concerned about it.

8          So, and then you have the tag-along where counsel on
9  somebody's behalf is saying, well, this is really not
10 inconsistent with the stay.   Well, of course, it's inconsistent
11 with the stay.   It seeks to move this entire case to a
12 different court, back to the MDL court.   How can that not be
13 inconsistent with the stay?   We're now going to get the MDL
14 panel.

15          I mean, this case is going to set records for the
16 activity of -- activity by -- that's being asked of or
17 instigated by judges that are not involved in this case.   It
18 will set records.   The tag-along, well, it was tried for all of
19 asbestos.   That was completely different case and it wasn't
20 accepted.   Now all of a sudden it's being invoked here.   This
21 case is so special we're going to go back and go to the MDL
22 panel.   You get the MDL judge conducting hearings on what's
23 happening in this court.

24          I'm not aware of any situation where that's ever
25 taken place, in my experience, which is not inconsiderable.

111

1  And then you've got -- well, and so what is the control that
2  this Court needs to excerpt, it's control that needs to excerpt
3  now.  Now is precisely the moment of fragility.  And the harms
4  and benefits, it's the harms and benefits, the irreparable
5  damage to this proceeding, to the bankruptcy case.  And this
6  case is being harmed right now by the things that are taking
7  place before the MDL judge.

8         And, you know, I am a Chicago boy.  I still live in
9  Chicago, although I've moved around a lot.  And that's basic
10 common sense.  And it's the same basic common sense I feel
11 strongly about and if I'm going too hard, I apologize to Your
12 Honor, but the same basic common sense says this Court is being
13 invoked now for an unbelievably important process.

14        Your Honor should have freedom from having to worry
15 about what the judge in the MDL is doing and what is happening
16 in that case.  That should not be happening, period.  It should
17 not be taking place and yet it's taking place.  It's
18 extraordinary.  And, if nothing else, that's what the TRO is
19 for.

20        There are all these complaints about the TRO.  Well,
21 we didn't get the -- well, that's what happens in every TRO
22 situation.  Yes, it's short notice.  The trustee, I think,
23 requires 24 hours notice.  We gave 24 hours notice.  No, there
24 wasn't discovery.  Yes, they had to prepare it quickly.  We had
25 to prepare it quickly ourselves, much as they think otherwise

112

1  because of the oppressive business.  And it's standard, that's
2  what TROs are all about and that's why they are short-lived.

3          So, if you take a look at the harms and benefits to
4  this process in the next two weeks, it's kind of phenomenally
5  imbalanced.  We should have peace for the next two weeks so
6  that everybody can focus on this case, not what's happening out
7  in California.  We should be focused here and we're prepared,
8  of course, to engage in the discovery that's necessary for that
9  process.  Say, well, we haven't had discovery.  Nobody has
10  discovery for a TRO.

11          If we had to put on all the evidence today, yeah, we
12  could keep on going and going and going and going.  We haven't
13  done that.  It's a TRO.  So, yes, we want peace for 14 days,
14  peace from the MDL, peace from the JPMDL.  They can control all
15  of this stuff if they want.  But, instead, no, they're saying
16  you got to keep on, you know, slogging away at the discovery
17  and we're certainly not backing off of all the requests that
18  we're making through the other judicial venues, through the MDL
19  and the -- they're not stepping back from all of that.

20          I mean, Your Honor, it is unprecedented and
21  completely contrary to the whole purpose of what's supposed to
22  be happening here and the irreparable harm is to this process
23  every single day and it should not be tolerated.  And I'm
24  sorry, again, to rale along, but that is the artificial
25  construct.  Artificial construct, the idea that a parent, a sub

113

1  of a parent files for Chapter 11 and seeks to be included,

2  that's not a construct.  This is not a Texas Two Step.

3          That goes all the -- I mean, there are countless

4  cases involving parents and I have said show me the case where

5  the parent is still litigating liability that is intertwined

6  with it.  We heard all these arguments about how there's

7  liability that 3M has separately once it acquired the deal.

8  Sure, there may be claims against 3M.  Are they inextricably

9  intertwined with this product developed by Aearo in Aearo's

10  history?  Absolutely.

11          And the intertwining has been recognized as a basis

12  for stays and preliminary injunctions going all the way back to

13  A.H. Robbins, a non-asbestos case in -- excuse me -- in 1986,

14  all the way forward through Dow Corning.  Virtually every one

15  of the parent cases involves the same thing, inextricably

16  intertwined and that is not asbestos law, that is non-asbestos

17  law.

18          So all these arguments that Mr. Buchanan, that he is

19  a very effective advocate, does very well and he laid it out

20  before the Court, they do nothing to address the test which is

21  are they intertwined, do they lead to potential findings and

22  taint the record.  That was recognized in Manville in the --

23          THE COURT:  All right.

24          MR. BERNICK:  So, I'm done.

25          THE COURT:  But I'm going to need evidence on that.

114

1          MR. BERNICK:    Yeah, what -- yup.

2          THE COURT:  Right.

3          MR. BERNICK:  Well, with respect to that, you could

4   actually just read -- no, it's in the cases that we've cited.

5          THE COURT:  No, no, no, no, I need to know the

6   intertwining of the debtors and 3M.

7          MR. BERNICK:  Yes.

8          THE COURT:  I don't know if the cited cases you told

9   me are going to tell me that.

10          MR. BERNICK:  No, no, no.

11          THE COURT:  That's a big deal.

12          MR. BERNICK:  Yes, that's a totally big deal.

13          THE COURT:  Okay.  I'm going to need evidence on

14   irreparable harm.

15          MR. BERNICK:  Yeah.

16          THE COURT:  And you're going to have to -- I mean,

17   these are my concerns right now.

18          MR. BERNICK:  Right.

19          THE COURT:  Okay?

20          MR. BERNICK:  Yeah.

21          THE COURT:  I understand there's bigger issues with

22   regard to preliminary injunction versus TRO.

23          MR. BERNICK:  Right.

24          THE COURT:  As far as the TRO, which is my main focus

25   right now because you can not prevail on a TRO, but prevail on

115

1    a preliminary injunction.

2          MR. BERNICK:  That's right, yes.

3          THE COURT:  So, I need to know what irreparable harm

4    is now.

5          MR. BERNICK:  Yeah.

6          THE COURT:  Okay.  When you reference, this is for

7    later --

8          MR. BERNICK:  Right.

9          THE COURT:  -- okay, when you reference all these bad

10   things are going to happen, I need evidence, okay.  I don't

11   know -- I haven't seen a document stating that the Northern

12   District of Florida is ignoring the Bankruptcy Court and will

13   do whatever it wants.  Haven't seen anything like that, okay.

14   So, I don't know, you keep talking about the last 48 hours

15   things have happened that show it.  Well, I'll need to have

16   some documentary evidence or good testimony on that as to what

17   it is --

18         MR. BERNICK:  Okay.

19         THE COURT:  -- because that's going to be your

20   biggest hurdle with me for a TRO is what's the difference

21   between now and two weeks from today.

22         MR. BERNICK:  Right.

23         THE COURT:  Okay.

24         MR. BERNICK:  Right, it's very difficult.  No, I --

25         THE COURT:  I know you're thinking how can I not have

116

1  convinced him of that, that's silly.

2          MR. BERNICK:  No, no, no.

3          THE COURT:  But there you go.  That's all I'm doing

4  because that's my concern.

5          MR. BERNICK:  I totally --

6          THE COURT:  Because you're telling me it's 3.8

7  million a week, okay.  When we're setting up a trust of a one

8  billion dollars, 3.8 million a week may not rise to the level

9  of irreparable harm even though 99.9 percent of cases that

10 would be in this district, okay.

11         MR. BERNICK:  We're not --

12         THE COURT:  But you're going to have to convince me

13 of that.

14         MR. BERNICK:  I totally get that, Your Honor.

15         THE COURT:  Because it's one thing to say and all the

16 things you want 14 days from now --

17         MR. BERNICK:  Right.

18         THE COURT:  -- versus now.

19         MR. BERNICK:  Yeah, I totally --

20         THE COURT:  Okay.

21         MR. BERNICK:  -- understand that.

22         THE COURT:  That's going to be your burden because

23 that is your burden.

24         MR. BERNICK:  That is our burden.  I still come

25 back --

117

1              THE COURT:  I know, I know.

2              MR. BERNICK:  -- for the stays.

3              THE COURT:  That's fine, but that's where you're

4    going to have the difficulty with me.

5              MR. BERNICK:  Yeah, sure.

6              THE COURT:  Because right now I see it as business as

7    usual with some things looming that could be different.  All

8    your argument's about is an MDL manageable at this size versus

9    not.  Those are things that in a preliminary injunction make

10   sense because now I'm looking at it am I going to do it or not,

11   period --

12             MR. BERNICK:  Right.

13             THE COURT:  -- as opposed to do I have to do it now.

14             MR. BERNICK:  I get that, Your Honor.

15             THE COURT:  Okay.

16             MR. BERNICK:  But that is why we made the stay

17   points, as well, and I would urge Your Honor to consider those

18   and I know you will.

19             THE COURT:  Well, and I'll consider them, but

20   generally speaking when I've seen it done and when I've done

21   it, if we're going to look back at our past experience, I've

22   used it under 105(a).

23             MR. BERNICK:  Right, but that -- I understand that.

24   And although I would suggest, Your Honor, is that (a), I

25   believe it's in our papers.

118

```
 1            THE COURT:  Well, but, again, it's -- if you get one,
 2  you get the other.
 3            MR. BERNICK:  Well --
 4            THE COURT:  Because if you're going to show us it's
 5  inexplicably intertwined, that's good for you --
 6            MR. BERNICK:  Right.
 7            THE COURT:  -- because that's going to bolster your
 8  showing under 105(a), as well.
 9            MR. BERNICK:  Yes, yes, yes, yes.
10            THE COURT:  Okay.  The difficulty, what you're really
11  asking me is if we have common defendants, if one goes into
12  bankruptcy, everything's stayed forever.
13            MR. BERNICK:  No -- not --
14            THE COURT:  I don't -- well, that's kind of what I'm
15  hearing.
16            MR. BERNICK:  Then --
17            THE COURT:  And that's a really broad ruling that I'm
18  pretty sure won't go over well if someone's looking at what
19  precedent does this create.
20            MR. BERNICK:  Yeah.  So, I -- that is, again, I think
21  it's in -- you know, I will say I haven't communicated it,
22  obviously, and I'll take responsibility for that.
23            THE COURT:  Well, I'm not worried about that.  I'm
24  just saying these are the things that are concerning the judge
25  and when we turn to evidence look at it.
```

119

1        MR. BERNICK:  Right.

2        THE COURT:  The other thing you want to consider is,

3   too, is do you want to proceed on the TRO based upon what I've

4   said.  That's a decision you have to make, too, because if you

5   put on testimony today, that's obviously not part of the

6   record.  And I'm just going to tell you now I'm not letting in

7   85 exhibits most likely based on the testimony of a

8   disinterested director and a chief restructuring officer.

9   Going to have to have some pretty good foundation to get it in

10  because even if you stipulate to in evidence, I may not let it

11  in if it doesn't meet the criteria.

12       MR. BERNICK:  Sure.  So, the insurance policies

13  triggered directly, shared insurance triggers --

14       THE COURT:  Again, I know you're going to tell me

15  that --

16       MR. BERNICK:  Yeah.

17       THE COURT:  -- most likely.

18       MR. BERNICK:  Yeah.

19       THE COURT:  But you're saying and here's the

20  insurance policy I want into evidence, you're going to have to

21  lay a foundation for that.

22       MR. BERNICK:  Well, we can -- I think we can do that

23  with --

24       THE COURT:  You probably can.  I'm just telling you

25  this is what you're going to have to do.

1              MR. BERNICK:  Right.

2              THE COURT:  You're not just going to get a ream of

3  evidence in and say, but, Judge, here it is.

4              MR. BERNICK:  Okay.  I get that.

5              THE COURT:  Okay.  I'm a simple, small mind that

6  needs to see it in front of me and in the record because what

7  they're saying is correct.  There's nothing in the record to

8  support a TRO at this point.  But we haven't taken evidence

9  yet, so you have an opportunity to do that.

10             MR. BERNICK:  Right.

11             THE COURT:  But I'm saying that's -- I'm not just

12  going to let it in.  You have to get it in --

13             MR. BERNICK:  Yes.

14             THE COURT:  -- just like an old fashioned hearing.

15             MR. BERNICK:  Okay.

16             THE COURT:  All right.

17             MR. BERNICK:  So, I appreciate the clarity and we'll

18  caucus and --

19             THE COURT:  Okay.

20             MR. BERNICK:  -- figure out what to do.

21             THE COURT:  And to the extent you all can talk and if

22  you think you can move all the dates, that's another thing to

23  look at.  I don't know if you have to get in front of an MDL

24  judge to do that or if you can voluntarily agree.  I don't

25  know.  But when I'm hearing that the depositions are by 3M of

1 other people, generally the deponent taker has some control

2 over when they take it.

3          MR. BERNICK:  Fair enough.

4          UNIDENTIFIED ATTORNEY:  Judge?

5          THE COURT:  Yes.

6          UNIDENTIFIED ATTORNEY:  We are willing to talk and

7 we --

8          THE COURT:  Well, talking is good.

9          UNIDENTIFIED ATTORNEY:  -- actually I think

10 everyone's gotten notice that the magistrate judge in the MDL

11 would agree to extending the depositions.

12          THE COURT:  Again, things I don't know.

13          UNIDENTIFIED ATTORNEY:  No, no.  Yeah, yeah, I --

14          THE COURT:  And it does make me a little nervous,

15 I'll be honest, that I have three, four, five different people

16 weighing in on what's going on.

17          UNIDENTIFIED ATTORNEY:  Right.  But we're willing --

18          THE COURT:  Makes me very -- but that's good.

19          UNIDENTIFIED ATTORNEY:  -- to sit down and talk.

20          THE COURT:  All right.  So, how long do you need to

21 talk and make sure you're not hungry for the afternoon session?

22          UNIDENTIFIED ATTORNEY:  Are we doing the evidence in

23 the afternoon session or is that what we're talking about

24 because I -- you know, we have first day motions and to me --

25          THE COURT:  I know.

1          UNIDENTIFIED ATTORNEY:  -- it would make sense to do

2  that another day.

3          UNIDENTIFIED ATTORNEY:  Your Honor --

4          THE COURT:  Well, but it's a -- it's a TRO.  The

5  difficulty I have and for those of you who can't hear the

6  question is can we just delay the TRO.  Generally speaking, TRO

7  needs to be held right away.  With all due respect to my

8  colleague who delayed it three weeks which probably was

9  strategically brilliant, I'm not so sure I feel comfortable on

10  a TRO waiting three weeks because at that point it's not really

11  a TRO anymore.  But if you want to talk about that and discuss

12  it, I'm willing to listen.

13          UNIDENTIFIED ATTORNEY:  Okay.

14          MR. BERNICK:  So, I think we could probably at least

15  on our side, clock us in about an hour if Your Honor wants a

16  longer --

17          THE COURT:  Well, I was thinking 1:30, but I didn't

18  know.  And I know as an attorney, you never want to tell the

19  judge, oh, that, you know, that time frame is wrong, but I also

20  know eating is important.

21          MR. BERNICK:  Yes, that's true.

22          THE COURT:  So, I don't want someone to pass out in

23  the middle of the hearing because they haven't eaten.  So, I

24  want to make sure you at least can grab a bite to eat which we

25  don't provide.  I'll give you water, but I'm not giving you

123

1 food.  So, does 1:30 work for everybody?

2          MR. BERNICK:  Okay here.

3          THE COURT:  And those on Zoom don't get to weigh in,

4 sorry.  From the Trustee's office?  Most of you are here, so

5 that worries me a little bit.

6          UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

7          THE COURT:  Okay.  From the tort claimant area, does

8 that work?

9          UNIDENTIFIED ATTORNEY:  That's fine, Your Honor,

10 thank you.

11          THE COURT:  All right.  Well, let's adjourn then

12 until 1:30 Eastern Time and thank you and we'll talk then.

13                    * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

124

1                    **C E R T I F I C A T I O N**

2              We, KAREN WATSON, TAMMY DeRISI and KELLI R. PHILBURN,

3    court approved transcribers, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    of the proceedings in the above-entitled matter, and to the

6    best of our ability.

7

8    /s/ Karen Watson

9    KAREN WATSON

10

11   /s/ Tammy DeRisi

12   TAMMY DeRISI

13

14   /s/ Kelli R. Philburn

15   KELLI R. PHILBURN

16   J&J COURT TRANSCRIBERS, INC.        DATE:  July 29, 2022

17

18

19

20

21

22

23

24

25

# MDL.Dkt.3568

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to All Cases | Judge M. Casey Rodgers Magistrate Judge Hope T. Cannon |

**<u>ORDER</u>**

The past few months have been fairly tumultuous, both in the MDL and elsewhere, with CAEv2-related controversies now pending in this Court, in the Eleventh Circuit Court of Appeals, Seventh Circuit Court of Appeals, United States Bankruptcy Court for the Southern District of Indiana, and Minnesota state court. Nonetheless, in that time, thousands of plaintiffs—9,290 in total—have filed new cases against only 3M Company in the MDL.[1]  More than 3,100 plaintiffs have newly transitioned to the MDL docket and paid the requisite filing fee.  And four waves of individual MDL cases (totaling 2,000 plaintiffs) have continued with plaintiff-specific discovery in preparation for remand to their respective transferor courts for trial.[2]  Of course, the current litigation posture follows on the heels of 16 bellwether trials and 19 verdicts that occurred between March 2021 and May 2022,

---

[1] There were 229,484 cases pending in the MDL as of October 25, 2022.

[2] Five hundred cases were initially assigned to each wave.  Currently, there are 374 active cases in Wave 1, 362 active cases in Wave 2, 362 active cases in Wave 3, and 500 active cases in Wave 4.

USCA11 Case: 22-12796    Document: 31    Date Filed: 11/09/2022    Page: 179 of 207
Case 3:19-md-02885-MCR-HTC    Document 3568    Filed 10/27/22    Page 2 of 8

Page 2 of 8

which was preceded by extensive corporate and government discovery on common issues. Needless to say, incalculable time and resources have been and continue to be devoted to these endeavors by the parties, the special masters, and the federal judiciary.

Shortly after 3M's MDL co-defendants filed for bankruptcy in July 2022, 3M adopted a jarringly novel litigation stance—namely, that it "is not liable for the conduct of" its co-defendants (in particular, the Aearo entities) because, among other reasons, it is not a successor-in-interest to the co-defendants' alleged tort liability and it did not directly assume that liability when it acquired the Aearo entities. *See, e.g.*, *George v. 3M Co.*, 7:20cv71963, ECF No. 46 at 9-10. In other words, for the first time in the three-and-a-half year history of the MDL, 3M paradoxically claims that Aearo alone (now strategically steered into bankruptcy) is the bogeyman and 3M itself has neither independent nor successor liability for any alleged CAEv2-related injuries. The Wave 1 plaintiffs have collectively moved for summary judgment on 3M's "full and independent liability for [all] CAEv2-related injuries" based on judicial estoppel, collateral estoppel, waiver, and implied assumption of liability. *See* ECF No. 3506-1. That matter is now fully briefed and ripe for adjudication by the Court. Although the briefing was filed in the context of the Wave 1 cases, it presents liability issues common to all cases in the MDL, the resolution of which will affect how all of those cases may proceed. The Court will rule on the

USCA11 Case: 22-12796    Document: 31    Date Filed: 11/09/2022    Page: 180 of 207
Case 3:19-md-02885-MCR-HTC    Document 3568    Filed 10/27/22    Page 3 of 8

Page 3 of 8

matter promptly.  However, given the broad import and impact of that decision, the Court also intends to *sua sponte* certify its decision for interlocutory appeal.  While this will inject further delay into the litigation, and continued uncertainty about the claims and/or defenses, appellate review of the Court's decision—if desired by either side—needs to occur before thousands of cases are remanded to transferor courts around the country for trial.

To conserve the parties' and judicial resources in the interim, and enable both sides to fully engage in ongoing settlement negotiations, the following changes will be implemented in the MDL:

1.    **Stay of Wave Process**.  The current waves will be stayed as of the below dates, and no new waves will be initiated, until further order of the Court. Any Wave plaintiff who believes successor liability is not at issue in his or her case, such that the stay should be lifted and the case permitted to proceed at this time, may file an appropriate motion.

| No. | Date |
|-----|------|
| Wave 1 | Immediate Stay |
| Wave 2 | October 31, 2022 (close of expert discovery) |
| Wave 3 | November 4, 2022 (close of fact discovery) |
| Wave 4 | November 7, 2022 (deadline for written discovery requests and production of online records) |

USCA11 Case: 22-12796    Document: 31    Date Filed: 11/09/2022    Page: 181 of 207
Case 3:19-md-02885-MCR-HTC    Document 3568    Filed 10/27/22    Page 4 of 8

Page 4 of 8

    **2.**    **Stay of Transition Process.**  The transition process is hereby stayed until further order of the Court.

    **3.**    **Monthly Settlement Conferences.**  Beginning in November 2022, the parties must convene for monthly settlement conferences at the United States District Court, One North Palafox Street, Pensacola, Florida.  Special Master Randi S. Ellis will schedule and conduct the conferences.  The following attorneys must personally attend each conference on behalf of the common plaintiffs:  Bryan Aylstock, Chris Seeger, and Justin Witkin.  On behalf of 3M, Kevin Rhodes, Executive Vice President and Chief Legal Affairs Officer, must attend the conferences as the corporate representative with full settlement authority, subject to Board approval.  Courtney Enloe, Senior Vice President and Deputy General Counsel for 3M, may also attend.  Additionally, 3M must be represented at the conferences by settlement counsel with demonstrated experience resolving mass torts (and in particular, product liability matters) in the multidistrict litigation context.  During the conferences, the parties must meet and confer with each other and Special Master Ellis to discuss settlement, and negotiate in good faith.  The confidentiality parameters adopted for prior mediations will apply to the monthly settlement conferences.  *See* ECF No. 3424.

    The Defense Occupational and Environmental Health Readiness System ("DOEHRS") records that were recently produced by the Department of Defense for

nearly the entire MDL plaintiff population will be an essential component of the settlement discussions. BrownGreer PLC, a neutral third-party, has now analyzed that data and shared its findings with the Court. In the Court's view, it is critically important for both sides to hear BrownGreer's unbiased insights regarding the nature and scope of that audiometric data as it relates to the hearing loss claims in this litigation,[3] and to use those insights to rationally inform their decision-making.[4]

A few additional comments are warranted. Much vitriol has been directed at the undersigned in various forums of late for a range of supposed failings in this MDL. The vilification, while frequently personal and provocative, generally amounts to nothing more than the overzealous and deceptive public posturing that has unfortunately seeped into the adversarial process in recent years, a response to

---

[3] BrownGreer was prepared to present its findings to the parties at the mediation session previously set for October 6, 2022. That mediation was cancelled, however, after the Court was notified that 3M had no intent to reach a global resolution in the MDL. That may or may not still be true—litigants routinely make concessions and/or change their settlement positions for a variety of reasons (and, sometimes, for no apparent reason at all). Either way, BrownGreer's objective findings are significant enough that both sides should have them.

[4] This is not to say that the DOEHRS data alone establishes the cause of any service member's hearing-related injuries. But the data does demonstrate the *fact* of certain injuries based on hearing thresholds measured by conventional pure tone audiometry, the gold standard for determining the type, degree, and configuration of hearing loss. There is no averaging of select frequencies, as with pure-tone averages, which are only "for epidemiological use" (not individual diagnoses) in any event. *See* World Health Organization, *World Report on Hearing* at 38 (2021). And there are no estimations, formulas or assumptions as used in the workers' compensation and disability ratings context. Rather, the DOEHRS data reflects the *actual* hearing loss of individual service members in this litigation.

Case No. 3:19md2885/MCR/GRJ

USCA11 Case: 22-12796    Document: 31    Date Filed: 11/09/2022    Page: 183 of 207
Case 3:19-md-02885-MCR-HTC    Document 3568    Filed 10/27/22    Page 6 of 8

Page 6 of 8

which is beneath the dignity of the Court.  One matter, however—repeated attacks

on the integrity of the bellwether process—cannot stand uncorrected.

The bellwether process for this MDL is beyond legitimate reproach.  From the

beginning, both sides agreed that bellwether proceedings would be important and

necessary to the parties' evaluation of the relative merits of the various claims and

defenses, to understand how juries respond to the evidence, to gain insights to assist

in valuing the larger pool of cases, and to advance the litigation as a whole.  Through

collaboration and consensus, the parties and the Court together designed a selection

process that resulted in a truly representative pool of bellwether cases.  This involved

prevalence analyses performed on a random sample of the inventory by BrownGreer

PLC (again, a neutral third-party) to ascertain the most representative characteristics

of the plaintiffs in terms of branch of service, age, and injury.[5]  From the pool of

representative bellwether candidates, each side selected an equal number of cases

(and alternates), alongside a number of random selections by both the parties and the

Court, to proceed with plaintiff-specific discovery and trial.  Nineteen bellwether

---

[5] At the time, there were 139,693 claimants registered in MDL Centrality in connection with the 3M litigation.  One percent of that population—1,397 claimants—was *randomly selected* for consideration as potential bellwether candidates.  Next, a series of prevalence analyses were conducted on the entire population of claimants with completed census forms, to identify the individual plaintiff characteristics that were most representative of the whole, in terms of branch of service, age, and injury.  The analyses revealed that the most representative claimant was between the ages of 30 and 49, serves or served in the Army, and alleged a combination of tinnitus and hearing loss.  Of the randomly selected 1%, 175 cases met the three criteria.  Those 175 cases comprised the bellwether candidate pool from which all bellwether plaintiffs were selected.

USCA11 Case: 22-12796    Document: 31    Date Filed: 11/09/2022    Page: 184 of 207
Case 3:19-md-02885-MCR-HTC   Document 3568   Filed 10/27/22   Page 7 of 8

Page 7 of 8

cases were tried. The statistics have been recited numerous times before but they bear repeating here. 16 different trials. 19 representative plaintiffs. 19 separate verdicts. 10 different presiding judges from districts throughout the Eleventh Circuit. Jury venires drawn from three dissimilar divisions in the Northern District of Florida. One side or the other may be unhappy with certain results, or with the uncomfortable lessons learned from jury after jury, but several truths are inviolate no matter how loudly one yells or how forcefully one pounds the table—the bellwether selection process was developed fairly and by consensus, the bellwether plaintiffs were representative of the overall composition of this litigation,[6] the bellwether trial process enabled the cases to be heard by a diverse combination of judges and jury pools, and, as a result, the bellwether verdicts provide a fair representation of how juries view the evidence and value the claims. No other MDL litigants in this country have obtained more objectively representative and reliable data points about individual claims, and the broader whole, in this timeframe, than the parties in this litigation. Whether they use that information honestly and responsibly going forward is, of course, up to them. But the fundamental fairness of

---

[6] After the bellwether selections were made, and the MDL inventory had grown to 150,885 plaintiffs with 89,815 census forms on file, BrownGreer performed another prevalence analysis on the new data. That analysis confirmed the characteristics of the most representative plaintiff remained the same as before, and matched the criteria used in the bellwether selection process. On October 27, 2022, at the Court's request, BrownGreer again performed a prevalence analysis on the 220,240 census forms currently completed in MDL Centrality. **The trends as to the most representative characteristics—plaintiffs between the ages of 30 and 49, who serve or served in the Army, and allege a combination of tinnitus and hearing—remain the same today**.

USCA11 Case: 22-12796    Document: 31    Date Filed: 11/09/2022    Page: 185 of 207
Case 3:19-md-02885-MCR-HTC   Document 3568   Filed 10/27/22   Page 8 of 8

Page 8 of 8

the bellwether process by which the information was obtained is unassailable, as is

the recently produced DOEHRS data.

      **DONE AND ORDERED**, on this 27th day of October, 2022.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

# Bankr.Dkt.695

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE:<br><br>AEARO TECHNOLOGIES LLC, *et. al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-02890-JJG-11<br><br>(Jointly Administered) |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' APPLICATION
FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND
EMPLOYMENT OF KIRKLAND & ELLIS LLP AND KIRKLAND & ELLIS
INTERNATIONAL LLP AS ATTORNEYS FOR THE DEBTORS AND DEBTORS
IN POSSESSION EFFECTIVE AS OF JULY 26, 2022 (ECF No. 300)**

Nancy J. Gargula, United States Trustee (the "U.S. Trustee"), by Harrison E. Strauss, Trial Attorney, in furtherance of her duties pursuant to 28 U.S.C. §§ 586(a)(3) and (5), submits this objection ("Objection") to the *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession Effective as of July 26, 2022* (the "Application") (ECF No. 300), and respectfully represents as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the Debtors' First Day Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief, that was filed contemporaneously therewith. The location of the Debtors' service address for the purposes of these chapter 11 cases is: 7911 Zionsville Road, Indianapolis, Indiana 46268.

## PRELIMINARY STATEMENT

Although the debtor in a chapter 11 case is normally afforded great deference in its choice of counsel, that deference is not without limits. Among other things, a debtor's selection of counsel must be consistent with "the important policy of ensuring that all professionals. . . tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities." *In re Crivello*, 134 F.3d 831, 836 (7th Cir. 1998) (quoting *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir.1994)). For this reason, a debtor's application to retain an attorney must be denied if, among other things, that attorney "hold[s] or represent[s] an interest adverse to the estate," or is not "disinterested." 11 U.S.C. § 327(a).

The Debtors' proposed counsel, Kirkland & Ellis LLP and Kirkland & Ellis International LLP (collectively "Kirkland"), concurrently serves as lead litigation counsel to the Debtors' parent, 3M Company ("3M"), in non-bankruptcy tort litigation that involves hundreds of thousands of claims and potentially billions of dollars in liability to veterans and current US servicemembers, among others.

The interests of 3M and the Debtors, however, are not aligned: in addition to being a tort co-defendant of the Debtors, 3M owes the Debtors potentially billions of dollars under a pre-petition funding agreement (and may have substantial claims against the Debtors under the same agreement). 3M is also expected to provide funding for the Debtors' eventual plans of reorganization, in exchange for a third-party release and a permanent non-

2

debtor injunction, which the Debtors have described as one of the "cornerstones" of their reorganization strategy. *See* Informational Brief of Aearo Technologies LLC, ECF No. 12 at 57. In each of these matters, 3M holds interests that are both adverse to the Debtors and factually related to Kirkland's litigation work for 3M.

Simply put, Kirkland does not possess undivided loyalty to the Debtors. Because 3M is the party bound and obligated under a funding agreement and the non-debtor third party that will benefit greatly from eventual releases, Kirkland cannot be retained to represent the Debtors while simultaneously providing counsel to 3M in related matters. For this reason, the Application must be denied.

## <u>JURISDICTION</u>

1.     The United States Bankruptcy Court for the Southern District of Indiana has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and 1334.

2.     Pursuant to 28 U.S.C. § 586(a)(3), the U.S. Trustee is charged with administrative oversight of the bankruptcy system in this District. Such oversight is part of the "U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Systems, Inc. (In re Columbia Gas Systems, Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the "U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest).

3

3.      Pursuant to 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the issues raised in this Objection.

## BACKGROUND AND RELEVANT FACTS

4.      The Debtors filed for relief under chapter 11 of the United States Bankruptcy Code on July 26, 2022 ("Petition Date"). On the Petition Date, the Court entered orders approving joint administration and procedural, but not substantive, consolidation of these cases pursuant to Fed. R. Bankr. P. 1015(b).

5.      A description of the Debtors' business operations and the reasons for commencing these chapter 11 cases are described in the First Day Declaration of John R. Castellano, ECF No. 11 ("First Day Declaration").

6.      The Debtors are wholly owned subsidiaries of non-debtor 3M. In recent years the Debtors and 3M have been co-defendants in the largest multidistrict litigation in United States history in which over 230,000 claims are pending against the Debtors and 3M in the Northern District of Florida (the "MDL"). The claims consolidated in the MDL generally allege hearing injuries arising from the sale of noise-reduction earplugs, known as "Dual-Ended Combat Arms-Version 2" earplugs, which were historically manufactured by the Debtors. In addition, there are state court claims against the Debtors and 3M in Minnesota that allege similar injuries (collectively with the MDL the "CAE Litigation"). First Day Declaration ¶¶ 8 and 38 and footnote 7. In their more recently filed Statements of Financial Affairs the Debtors indicate that there are

4

more than 364,000 claims in total related to the earplugs. Statement of Financial Affairs, ECF No. 389-5 at 1-4,581.

7.      The Debtors are also subject to a smaller number of claims related to alleged personal injuries from workplace exposures to asbestos, silica, coal mine dust, or other occupational dusts in connection with the use of the Debtors' mask and respirator products ("Respirator Litigation"). First Day Declaration ¶ 10.

8.      The Debtors filed these bankruptcy cases with the goal of resolving both the CAE Litigation and the Respirator Litigation. First Day Declaration ¶ 11. According to the Debtors, that strategy is intended to result in plans that will discharge litigation claims not only against the Debtors, but also against non-debtor 3M. *See* First Day Declaration ¶ 51 ("The Debtors' goal in these cases is to negotiate . . . a plan of reorganization that would, among other things . . . provide for the issuance of an injunction that will permanently protect the Debtors <u>and 3M</u> from further claims related to Combat Arms and Respirators") (emphasis added). Informational Brief of Aearo Technologies LLC, ECF No. 12 at 57.

9.      On July 25, 2022, one day before the filing of the Debtors' chapter 11 cases, the Debtors and 3M entered into a funding agreement ("Funding Agreement"). First Day Declaration ¶ 12. In pertinent part, the Funding Agreement obligates 3M to fund both the expenses of the Debtors' chapter 11 cases and a trust to compensate allowed CAE Litigation and Respirator claims—with no monetary cap on 3M's obligations. In return, the Debtors are

obligated to indemnify 3M and its affiliates for all liabilities related to those claims.

10.     On July 26, 2022, Debtors filed a Complaint for Declaratory and Injunctive Relief (i) Confirming that the Automatic Stay Applies to Certain Actions Against a Non-Debtor; (ii) Preliminarily Enjoining Certain Actions Against a Non-Debtor; and (iii) Granting a Temporary Restraining Order Pending an Order on The Preliminary Injunction. Adv. No. 22-50059 ("Adversary Proceeding").

11.     Also on July 26, 2022, Debtors filed a Motion for Declaratory and Injunctive Relief (i) Confirming that the Automatic Stay Applies to Certain Actions Against a Non-Debtor; (ii) Preliminarily Enjoining Certain Actions Against a Non-Debtor; and (iii) Granting a Temporary Restraining Order Pending an Order on the Preliminary Injunction in the Adversary Proceeding. Adv. No. 22-50059, ECF No. 2 ("Preliminary Injunction Motion").

12.     A trial was conducted on the Preliminary Injunction Motion, and the Court denied the motion on August 26, 2022. Adv. No. 22-50059, ECF No. 143 ("Preliminary Injunction Denial Order").

13.     On August 9, 2022, the Debtors filed the Application seeking to authorize the employment of Kirkland as attorneys for the Debtors effective as of the Petition Date.

14.     Kirkland was paid $6,385,697.78 prepetition directly by the Debtors. Application ¶ 14, footnote 7.

15.    Kirkland was paid an additional $7,726,556.88 by 3M on behalf of the Debtors. Application ¶ 14, footnote 7.

16.    The Debtors will pay any post-petition fees and expenses directly to Kirkland as and when they are approved by the Court. Application ¶ 20, footnote 8.

17.    Kirkland contends in the Application that, to the best of its knowledge,  it is a "disinterested person" within the meaning of section 1101(14) of the Bankruptcy Code as required by 11 U.S.C. § 327(a).

18.    In support of the Application, Kirkland submitted the declaration of Chad J. Husnick, the president of Chad J. Husnick, P.C., which is a partner of both Kirkland & Ellis LLP and Kirkland & Ellis International LLP. ECF No. 300-2 (the "Husnick Declaration").

19.    As stated in the Husnick Declaration, Kirkland currently represents, and in the past has represented, non-debtor 3M and several other Non-Debtor Affiliates[2] on a variety of matters including in the CAE Litigation.

20.    The Husnick Declaration states that the firm of White & Case LLP represents 3M in connection with these chapter 11 cases and represented 3M in the negotiation and execution of the Funding Agreement.

21.    The Debtors are also represented by McDonald Hopkins LLC, the Debtors' proposed conflict counsel for these chapter 11 cases, for any conflict matters, including the negotiation of the Funding Agreement.

---

[2] Capitalized terms not expressly defined herein carry the definition given in the Application. Here, the Application defines Non-Debtor Affiliates as 3M together with its non-Debtor affiliates.

22.    In addition, the Husnick Declaration contends that all current and prior Kirkland representations of the Non-Debtor Affiliates have been in matters not adverse to the Debtors.

23.    Lastly, the Husnick Declaration states that during the twelve-month period ending on July 31, 2022, the Non-Debtor Affiliates' payments to Kirkland represented approximately 1.7 percent of Kirkland's total fee receipts for that twelve-month period.

### LAW, ANALYSIS AND ARGUMENT

11 U.S.C. § 327(a) allows the debtor in possession to employ professional persons that "do not hold or represent an interest adverse to the estate" and that are "disinterested persons." One court has described Section 327(a) as "a prophylactic provision designed to insure [sic] that the undivided loyalty and exclusive allegiance required of a fiduciary to an estate in bankruptcy is not compromised or eroded." *See In re Prudent Holding* Corp., 153 B.R. 629, 631 (Bankr. E.D.N.Y. 1993). Further, the stringent requirements and standards for employment of professionals under the Bankruptcy Code and Bankruptcy Rules are designed to ensure the integrity of the bankruptcy process and the public's confidence in the bankruptcy courts. *See In re Lee Way Holding Co.,* 100 B.R. 950, 961 (Bankr. S.D. Ohio 1989).

An applicant under 11 U.S.C. § 327 has the burden of establishing by motion and accompanying affidavit that its chosen professional is qualified. *See In re BH&P, Inc.,* 949 F.2d 1300, 1317 (3d Cir. 1991) ("It is not . . . the obligation of the bankruptcy court to search the record for possible conflicts of

interest. That obligation belongs to the party who seeks employment by the estate").

Section 327(a) requires that the proposed professionals "not hold or represent an interest adverse to the estate, and that [they] are disinterested persons . . . ." 11 U.S.C. § 327(a). Although the Bankruptcy Code does not define "interest adverse," it does define "disinterested person" as one "who is not a creditor . . . or an insider . . . and does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14).

Any professional person that does not meet both the "no adverse interest" and the "disinterested person" tests is disqualified from employment under Section 327(a). *See In re BH&P*, 949 F.2d at 1314 (Section 327(a) "creates a two-part requirement for retention of counsel"). Thus, a professional who holds or represents an adverse interest is *per se* disqualified. *See Michel v. Eagle-Picher Indus. (In re Eagle-Picher Indus.)*, 999 F.2d 969, 972 (6th Cir. 1993) (professional can lack disinterestedness without having an adverse interest).

In this case, there are at least two significant matters that have arisen (or are likely to arise) in the Debtors' chapter 11 cases in which the interests of the Debtors and 3M are adverse and which are factually and legally interconnected with the non-bankruptcy litigation in which Kirkland represents 3M.

9

First, 3M and the Debtors have adverse interests with respect to the
interpretation and enforcement of the Funding Agreement. As noted, that
Funding Agreement provides an unfixed but uncapped payment obligation
running from 3M to the Debtors, where the funds are ultimately to be used to
resolve the tort liabilities of both the Debtors and 3M, in return for which the
Debtors must indemnify 3M and its affiliates for 3M's litigation liabilities. As
the Court noted in its Preliminary Injunction Denial Order, 3M's payment
obligations under this Funding Agreement are not self-executing. Rather, they
arise only after the Debtors have exhausted their own assets and only upon a
valid funding request. *See* Prelim. Inj. Denial Order, ECF No. 143 at 10-11. The
Funding Agreement thus creates a natural tension between the interests of the
Debtors, who are under a fiduciary obligation to maximize the value of their
rights under that Funding Agreement, and 3M's interest in minimizing its own
liability under the Funding Agreement—which it may do by, among other
things, forcing the Debtors to liquidate other assets before approving a funding
request.

This tension is further heightened by the fact that, as the Court
recognized, certain provisions of the Funding Agreement appear to be
ambiguous and may be open to differing interpretations that may be more or
less favorable to 3M or to the Debtors. Among these ambiguities is the question
of whether the Debtors' indemnity obligations to 3M are included within the
expenses that must be funded by 3M—an interpretation that would essentially
make the Debtors' indemnity obligation circular. *Id.* at 10. Although the Court

resolved this ambiguity in favor of the Debtors, the Debtors notably did not raise this argument—despite that the Court's interpretation was one that made the Funding Agreement on the whole much more favorable to the Debtors. *Id.*

Second, under the proposed reorganization strategy announced by the Debtors, the Debtors and 3M will be adverse when negotiating the terms of the Debtors' plans. A cornerstone of the plans will be the creation of a settlement trust that will resolve tort claims against 3M as well as the Debtors. As counsel to the Debtors, Kirkland would have a fiduciary duty to maximize 3M's contribution to that trust—and by implication to maximize 3M's share of the parties' combined tort liability. Yet this presents a conflict with Kirkland's duty, in its capacity as litigation counsel to 3M, to minimize those same liabilities as to 3M.

As numerous courts have concluded under similar circumstances, competing interests of this nature are sufficient to disqualify Kirkland as counsel to the Debtors. *See, e.g., In re The Harris Agency, LLC*, 462 B.R. 514, 519 (E.D. Pa. 2011) (disqualifying debtor's counsel based on representation of affiliated company that was also creditor and co-obligor of the debtor); *In re Gordon Properties, LLC*, 504 B.R. 807, 811-812 (Bankr. E.D. Va. 2013) (holding that "adverse interest" test was violated by counsel's representation of debtor's owners in other litigation, where owners were also creditors and potential plan funders of the debtor).

Furthermore, Kirkland's conflict cannot be cured by "conflicts counsel" to handle matters involving 3M. Although conflicts counsel may be appropriate in

cases where the conflict involves peripheral matters, they cannot cure a conflict regarding a matter that is central to the chapter 11 cases. *See In re Project Orange Assoc., LLC*, 431 B.R. 363, 376 (Bankr. S.D.N.Y. 2010) ("with regards to matters central to the bankruptcy, even the presence of conflicts counsel does not make the retention appropriate"). Thus, in *Project Orange*, the bankruptcy court disqualified debtor's proposed counsel on the grounds that it represented a litigation adversary of the debtors on matters that were unrelated to the bankruptcy, notwithstanding the fact that the parties had entered into a settlement stipulation that was awaiting approval by the court. Here, the conflict is arguably even stronger: Kirkland's work for 3M is not on unrelated matters but pertains to the same tort litigation that precipitated these chapter 11 cases; moreover, the principal matters in which Kirkland's independence would be compromised—the enforcement of the Funding Agreement and the negotiation of 3M's contribution to the plans—are central to the resolution of these cases and have not yet been litigated or settled. Because these bankruptcy cases were admittedly filed for the express purpose of freeing 3M from its tort liability, 3M's interests will be impacted by virtually every matter that arises in these cases, and it does not appear to be feasible to confine Kirkland's services to matters not involving 3M. Accordingly, approval of Kirkland's retention under these circumstances is inappropriate, regardless of the presence of conflicts counsel.

For the foregoing reasons, Kirkland falls squarely within the statutory prohibition against the employment of debtor professionals who "represent an

interest adverse to the estate" under section 327(a) of the Bankruptcy Code, and the Debtors' application to retain Kirkland must therefore be denied.

The U.S. Trustee reserves any and all rights, remedies, and obligations to, *inter alia*, complement, supplement, augment, alter, substitute, or modify this Objection, file a Motion, or seek any other relief deemed appropriate and necessary and to conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent.

WHEREFORE, for the foregoing reasons, the U.S. Trustee respectfully requests that the Court deny the Application at this time and grant such other and further relief that is deemed just and equitable.

Respectfully submitted,

NANCY J. GARGULA,
UNITED STATES TRUSTEE

By: /s/ Harrison E. Strauss
Harrison E. Strauss
Trial Attorney
Office of the United States Trustee
Birch Bayh Federal Bldg. and
United States Courthouse
46 E. Ohio St., Room 520
Indianapolis, IN 46204
Phone: (317) 226-6101
Fax: (317) 226-6356
Harrison.Strauss@usdoj.gov

13

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System.

David Agay dagay@mcdonaldhopkins.com

John Joseph Allman jallman@hbkfirm.com, dadams@hbkfirm.com

Michael Andolina mandolina@whitecase.com, jdisanti@whitecase.com, mco@whitecase.com

Adam Arceneaux adam.arceneaux@icemiller.com, michelle.mosgrove@icemiller.com

Bryan F. Aylstock baylstock@awkolaw.com

Laura Elizabeth Baccash laura.baccash@whitecase.com

Kevin W Barrett kbarrett@baileyglasser.com, jkittinger@baileyglasser.com

Ashley Barriere ashley.barriere@kellerpostman.com

Brent Barriere bbarriere@fishmanhaygood.com, kfritscher@fishmanhaygood.com, dbush@fishmanhaygood.com

Nicole Berg ncb@kellerpostman.com

David Bernick david.bernick@kirkland.com

Karen Hope Beyea-Schroeder kschroeder@junell-law.com

John Bougiamas jbougiamas@otterbourg.com, mcyganowski@otterbourg.com, jfeeney@otterbourg.com, jhilderbrandt@otterbourg.com, asilverstein@otterbourg.com

Bobby Jene Bradford, Jr. bradfordservice@awkolaw.com

Kayla D. Britton kayla.britton@faegredrinker.com, noticeFRindy@faegrebd.com

Harvey Brown, II harvey.brown@lanierlawfirm.com

David R. Buchanan dbuchanan@seegerweiss.com

Jason Walker Burge jburge@fishmanhaygood.com

Maggie B. Burrus mburrus@baileyglasser.com

Lisa Nathanson Busch lbusch@weitzlux.com

Deborah Caruso dcaruso@rubin-levin.net, dwright@rubin-levin.net;cgilly@rubin-levin.net, atty_dcaruso@bluestylus.com

Cathrine M. Castaldi ccastaldi@brownrudnick.com

Joanna Diane Caytas joannacaytas@quinnemanuel.com

Clayton A Clark cclark@triallawfirm.com

Leo T. Crowley leo.crowley@pillsburylaw.com, nydocket@pillsburylaw.com

Melanie Louise Cyganowski mcyganowski@otterbourg.com

Kevin M Davis kdavis@capdale.com, cecilia-guerrero-caplin-6140@ecf.pacerpro.com

Tabitha De Paulo tabitha.depaulo@kirkland.com

Justine Delaney jdelaney@weitzlux.com

Laura A. DuVall Laura.Duvall@usdoj.gov, Catherine.henderson@usdoj.gov

Frank Dylewski frank.dylewski@kellerpostman.com

Derek Wayne Edwards derek.edwards@wallerlaw.com, chris.cronk@wallerlaw.com, bk@wallerlaw.com, nancy.easterling@wallerlaw.com, tapdocketingclerk-nash@wallerlaw.com

Randi Ellis randi@randiellis.com

Phillip Fajgenbaum phillipfajgenbaum@parkerpoe.com

Jennifer S. Feeney jfenney@otterbourg.com, mmaizel@otterbourg.com

Kiah T Ford, IV chipford@parkerpoe.com

Joshua A. Gadharf jgadharf@mcdonaldhopkins.com

Emily Geier emily.geier@kirkland.com

15

Johnny Givens johnny@givens-law.com, jeanreid@givens-law.com

Brian A. Glasser bglasser@baileyglasser.com

Eric Goodman egoodman@brownrudnick.com

Gregory Mark Gordon gmgordon@jonesday.com

Paul M. Green pmgreen@jonesday.com

Sasha M. Gurvitz sgurvitz@ktbslaw.com

Samuel P. Hershey shershey@whitecase.com, jdisanti@whitecase.com,
mco@whitecase.com

Curt Derek Hochbein curt.hochbein@mbcblaw.com,
kelly.paberzs@mbcblaw.com

Jennifer M. Hoekstra jhoekstra@awkolaw.com

Jeffrey A. Hokanson jeff.hokanson@icemiller.com, bgnotices@icemiller.com,
david.young@icemiller.com

David Horowitz dhorowitz@kirkland.com

Matthew Steven Hosen matthosen@quinnemanuel.com

John R. Humphrey jhumphrey@taftlaw.com, aolave@taftlaw.com

Amanda Hunt amanda.hunt@kellerpostman.com

Derek Hunter derek.hunter@kirkland.com

Chad Husnick chusnick@kirkland.com

Shelley Van Natter Hutson shutson@triallawfirm.com

Jay Jaffe jay.jaffe@faegredrinker.com, noticeFRindy@faegrebd.com

Ashley J. Jericho ajericho@mcdonaldhopkins.com

Jeffrey L. Jonas jjonas@brownrudnick.com

Ashley Keller ack@kellerpostman.com

Max Kelly mkelly@seegerweiss.com

Jessica Lauria jessica.lauria@whitecase.com, jdisanti@whitecase.com, mco@whitecase.com

Martha R. Lehman mlehman@smithamundsen.com, marthalehman87@gmail.com, ispells@salawus.com, lengle@salawus.com

Deborah K. Levy dlevy@junell-law.com

Matthew Evan Linder mlinder@whitecase.com, mco@whitecase.com, jdisanti@whitecase.com

Elizabeth Marie Little elizabeth.little@faegredrinker.com, noticeFRindy@faegredrinker.com, anita.sery@faegredrinker.com, docketgeneral@faegredrinker.com, beth.olivere@faegredrinker.com

Kevin C. Maclay kmaclay@capdale.com, cecilia-guerrero-caplin-6140@ecf.pacerpro.com

Michael R. Maizel mmaizel@otterbourg.com

Tristan Manthey tmanthey@fishmanhaygood.com, kfritscher@fishmanhaygood.com, dbush@fishmanhaygood.com

Nir Maoz nmaoz@ktbslaw.com

Harmony A. Mappes harmony.mappes@faegredrinker.com, kristina.tinsley@faegrebd.com

Micah E. Marcus mmarcus@mcdonaldhopkins.com

Michael B. Martin mmartin@martinwaltonlaw.com

D. Todd Mathews tmathews@baileyglasser.com

Kevin Dale McCullough kdm@romclaw.com, emoon@romclaw.com, zlevick@romclaw.com

Mark McKane mark.mckane@kirkland.com

Eric John McKeown eric.mckeown@icemiller.com

Pauline McTernan pmcternan@otterbourg.com

David Molton dmolton@brownrudnick.com, hcohen@brownrudnick.com

Ronald J. Moore Ronald.Moore@usdoj.gov

William Michael Moreland MMoreland@triallawfirm.com

Joseph Scott Nabers snabers@naberslaw.com, kathy@naberslaw.com, mtorres@naberslaw.com

Cherie Nobles cnobles@fishmanhaygood.com, kfritscher@fishmanhaygood.com

Weston Erick Overturf wes@ofattorneys.com, deidre@ofattorneys.com, overturf.westonb115224@notify.bestcase.com

Richard Paul, III Rick@PaulLLP.com, Kendra@PaulLLP.com

Robert J Pfister rpfister@ktbslaw.com

Todd E. Phillips tphillips@capdale.com, cecilia-guerrero-caplin-6140@ecf.pacerpro.com

Mark P. Robinson, Jr. mrobinson@robinsonfirm.com

Michael Richard Rochelle buzz.rochelle@romclaw.com

Brenton Rogers brogers@kirkland.com

Syed Ali Saeed ali@sllawfirm.com, betty@sllawfirm.com

Edward Sassower esassower@kirkland.com

Ashlea Schwarz ashlea@paulllp.com, Michaela@PaulLLP.com

Christopher A. Seeger cseeger@seegerweiss.com

Caleb Seeley cseeley@seegerweiss.com

David L. Selby, II dselby@baileyglasser.com

Raymond C Silverman rsilverman@yourlawyer.com

Adam C. Silverstein asilverstein@otterbourg.com, awilliams@otterbourg.com, JHildebrandt@otterbourg.com

Connor Skelly connor.skelly@icemiller.com

Dania Slim dania.slim@pillsburylaw.com

18

Renee D. Smith rdsmith@kirkland.com

Gregory Starner gstarner@whitecase.com, jdisanti@whitecase.com, mco@whitecase.com

Claire Stephens claire.stephens@kirkland.com

Ariella Thal Simonds asimonds@ktbslaw.com

Meredith R. Theisen mtheisen@rubin-levin.net, atty_mtheisen@bluestylus.com, mralph@rubin-levin.net, cgilly@rubin-levin.net

H. Victor Thomas vic.thomas@lanierlawfirm.com

Shannon Thomas sthomas@romclaw.com

McClain Thompson mcclain.thompson@kirkland.com

Patricia B. Tomasco pattytomasco@quinnemanuel.com, barbarahowell@quinnemanuel.com, joannacaytas@quinnemanuel.com, ericwinston@quinnemanuel.com, matthosen@quinnemanuel.com, adamwolfson@quinnemanuel.com

Andrea Kochert Townsend atownsend@psrb.com, tjohnson@psrb.com

Sean Patrick Tracey stracey@traceylawfirm.com, 3M@traceylawfirm.com

Michael L. Tuchin mtuchin@ktbslaw.com

Anne Gilbert Wallice anne.wallice@kirkland.com

Nick Wasdin nick.wasdin@kirkland.com

Perry Weitz pw@weitzlux.com

Mark R. Wenzel Mwenzel@smithamundsen.com, ispells@smithamundsen.com

Michael S. Winograd mwinograd@brownrudnick.com

Eric Winston ericwinston@quinnemanuel.com

Spencer Winters spencer.winters@kirkland.com

Justin G. Witkin jwitkin@awkolaw.com

Adam Wolfson adamwolfson@quinnemanuel.com

Robert C Yan ryan@otterbourg.com

I further certify that on October 20, 2022, a copy of the foregoing was mailed by first-class U.S. Mail, postage prepaid and properly addressed to the following:

None.

/s/ Harrison E. Strauss
Harrison E. Strauss, Trial Attorney

**CERTIFICATE OF SERVICE**

On November 9, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All participants in this case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

*/s/ Ashley Keller*
Ashley Keller
*Counsel for Plaintiff-Appellee Valle*